IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-00130-JLK

CENTER FOR BIOLOGICAL DIVERSITY, and
WESTERN WATERSHEDS PROJECT,

       Plaintiffs,

v.

U.S. FISH AND WILDLIFE SERVICE; DAN ASHE, in his official capacity as Director of the
U.S. Fish and Wildlife Service; U.S. DEPARTMENT OF THE INTERIOR; SALLY M.R.
JEWELL, in her official capacity as Secretary of the U.S. Department of the Interior, NOAA
FISHERIES; EILEEN SOBECK, in her official capacity as Assistant Administrator for NOAA
Fisheries; U.S. DEPARTMENT OF COMMERCE; PENNY PRITZKER, in her official capacity
as Secretary of Commerce,

       Defendants.

---

## AMENDED PETITION FOR REVIEW OF AGENCY ACTION

---

## I.    INTRODUCTION

1.     By this citizen suit under the Endangered Species Act, 16 U.S.C. §§ 1531-1544

("ESA"), Plaintiffs Center for Biological Diversity and Western Watersheds Project

("Plaintiffs") – environmental conservation organizations that are dedicated to the conservation

and recovery of endangered species including the Gunnison sage-grouse (*Centrocercus minimus*)

– challenge the U.S. Fish and Wildlife Service's ("FWS") November 20, 2014, determination to

list the Gunnison sage-grouse as a "threatened," rather than "endangered," species under the

ESA.  79 Fed. Reg. 69,192 (Nov. 20, 2014) ("Final Rule").

2.     Plaintiffs also challenge the portion of Defendants' 2014 *Final Policy On

Interpretation of the Phrase "Significant Portion of its Range" in the Endangered Species Act's*

*Definitions of "Endangered Species" and "Threatened Species"* whereby Defendants refuse  to consider whether a species such as the Gunnison sage-grouse is "endangered" throughout a "significant portion of its range" ("SPOR") if it is deemed to be "threatened" throughout its entire range.  79 Fed. Reg. 37,578 (July 1, 2014) ("SPOR Policy" or "Policy").

3.      The Gunnison sage-grouse, pictured below, is a beautiful, rare species of sage-grouse which is found nowhere else in the world except in the rapidly-disappearing sage-brush ecosystems of southwest Colorado and southeast Utah.  It has been in decline since the 1950s and is now reduced to about 8.5 percent of its historic range, which once also included portions of Arizona and New Mexico, due to myriad threats including habitat destruction, livestock grazing, energy development, and climate change.



4.      Defendant FWS first designated the Gunnison sage-grouse as a candidate for ESA protection in 2000, drafted a proposed rule to list it as "endangered" in 2005, and published in the *Federal Register* a proposed rule to list the species as "endangered" in January 2013.  78 Fed. Reg. 2486 (Jan. 11, 2013) ("Endangered Proposal").  The Endangered Proposal acknowledged that the best available scientific evidence demonstrates that the species is at risk of extinction

throughout all of its range, and that voluntary conservation measures are inadequate to mitigate myriad threats and prevent extinction.

5.     Yet, although the best available scientific evidence demonstrates that the Gunnison sage-grouse is "in danger of extinction throughout all or a significant portion of its range" and therefore must be listed as an endangered species, FWS abruptly changed course and listed the Gunnison sage-grouse as a threatened species in the Final Rule – a less-protective status under the ESA – based on, *inter alia*, untested, voluntary conservation measures.  The public had no notice or opportunity to comment on FWS's decision to list the species as threatened.  In listing the species as threatened rather than endangered, FWS failed to acknowledge the dire status that the species is in right now, compromising the ability of conservation measures to ensure its survival and long-term recovery.

6.     Having decided the Gunnison sage-grouse is threatened throughout its range, Defendant Secretary of the U.S. Department of Interior also applied the SPOR Policy in a manner contrary to the plain language and patent purpose of the ESA by failing to address at all whether the Gunnison sage-grouse is endangered throughout a "significant portion of its range." Moreover, the agency arbitrarily defined the "foreseeable future" for the species and failed to apply its definition in the Final Rule.

7.     By failing to provide any public notice or opportunity for comment on its change in position that the Gunnison sage-grouse should be listed as a threatened species instead of an endangered species, and by similarly failing to provide any public notice or opportunity for comment on the portion of the SPOR Policy challenged here, Defendants also violated the public participation requirements of the ESA, 16 U.S.C. § 1533(h), and the Administrative Procedure Act, 5 U.S.C. § 553(b)-(c) ("APA").

8.      Thus, Plaintiffs seek judicial relief declaring that Defendants failed to properly classify the Gunnison sage-grouse as "endangered" throughout its range, and also ask that the Court remand the Final Rule to FWS to properly list the Gunnison sage-grouse, leaving the "threatened" listing in effect during the remand.  Plaintiffs also seek vacatur and remand of the aspect of the SPOR Policy challenged here.  Such relief is necessary to afford the Gunnison sage-grouse the full protections of law to which it is entitled and desperately needs.

9.      At a minimum, Plaintiffs seek judicial relief entitling them to an opportunity to submit comments on the complete text of the listing rule and on the aspect of the SPOR Policy challenged here, so that they have an opportunity to participate meaningfully in these rulemaking and policy processes under the ESA and APA.

II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to the citizen suit provisions of the ESA. 16 U.S.C. §§ 1540(g)(1), 1540(g)(2)(C).  The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346, because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA and the APA.  The requested relief is proper under 16 U.S.C. § 1540(g)(1); 28 U.S.C. §§ 2201, 2202, 1361; and 5 U.S.C. §§ 704, 705, 706.

11.     In compliance with 16 U.S.C. § 1540(g)(2)(C), Plaintiffs gave notice to Defendants of Plaintiffs' intent to file suit under the ESA for the violations described in this complaint more than 60 days ago.  The violations complained of in the notices have not been remedied.

12.     Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e).  The Gunnison sage-grouse is located in this district, and FWS's regional office which issued the Listing Determination is located here.

III.    PARTIES

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a non-profit organization that is dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems.  The Center was founded in 1989 and is based in Tucson, Arizona, with offices throughout the country, including Colorado.  The Center has more than 55,000 members, including many who reside in, explore, and enjoy the native species and ecosystems of the Interior Mountain West and Colorado, where the Gunnison sage-grouse is found.  The Center routinely petitions for the listing of imperiled species as endangered or threatened and hence, on behalf of itself and its members, has an enormous organizational interest in the manner in which Defendants process listing petitions and make decisions on whether species should be listed as endangered or threatened.

14.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a non-profit conservation organization that was founded in 1993, with the mission of protecting and restoring western watersheds and wildlife on public lands through education, public policy initiatives, and litigation.  Headquartered in Hailey, Idaho, Western Watersheds Project has over 2,000 members and field offices in Idaho, Montana, Oregon, Utah, Wyoming, Arizona, and California.  WWP has actively advocated for statutory and regulatory protection of sagebrush-obligate species, including the Gunnison sage-grouse, since its formation.

15.     Plaintiffs' members and staff spend time in areas adversely affected by Defendants' violations of the ESA.  Plaintiffs' members and staff intend to continue to use and

5

enjoy, on a frequent and ongoing basis, the habitat adversely affected by FWS's failure to properly list Gunnison sage-grouse as endangered or to properly interpret the ESA in the SPOR Policy. The Plaintiffs' staff and members have ongoing interests in protecting the Gunnison sage-grouse and enjoy viewing, studying, photographing, and deriving other concrete benefits from the species – which they plan to continue doing in the future.

16. Plaintiffs' members and staff routinely review and comment upon proposals to protect species under the ESA, such as the proposal to list the Gunnison sage-grouse, that pertain to listing petitions that they or others have filed to list imperiled species or for those species that are important to areas they seek to conserve or enjoy. By failing to provide the public with the opportunity to review and comment on Defendants' rationales for listing Gunnison sage-grouse as threatened instead of endangered, or on that aspect of the Final SPOR Policy that limits when Defendants will assess whether a species is endangered in a SPOR, Defendants deprived Plaintiffs' members and staff of critical information to which they are legally entitled as well as the opportunity to comment upon Defendants' rationales, if provided, for the changes in their position.

17. Plaintiffs' members and staff rely on Defendants to comply fully with all provisions of the ESA, including the ESA listing requirements, which ensure that species warranting protection as endangered, as demonstrated by the best available scientific data, promptly receive such protected status. By failing to recognize the species' proper legal status and by relying on untested, voluntary conservation measures to protect it from threats where it still survives, FWS's decision to list Gunnison sage-grouse as threatened rather than endangered fails to afford the species and its habitat the full suite of the ESA's protective measures. As a result, the recreational, scientific, educational, aesthetic, and other interests of Plaintiffs have

been, are being, and, unless the relief requested is granted, will continue to be adversely affected and injured by FWS's failure to comply with the ESA. These are actual, concrete injuries that are caused by Defendants' failure to comply with mandatory duties under the ESA and the APA. Plaintiffs have no adequate remedy at law, and the injuries would be redressed by the relief sought.

18.     Plaintiffs are also injured by Defendants' adoption and application of a SPOR Policy that, in pertinent part and without advance public notice or comment, precludes Defendants from considering whether a species is endangered in a SPOR once Defendants have found that the species is threatened throughout its range. This aspect of the SPOR Policy impairs Plaintiffs' and their members' recreational, professional, aesthetic, and other concrete interests in the Gunnison sage-grouse and other species to be considered by Defendants for listing pursuant to the Policy. In addition, Plaintiffs' procedural right to notice and comment under the APA and ESA was violated by Defendants' limitation, in the final SPOR Policy, on when Defendants would consider whether a species is endangered in a SPOR. These injuries would be remedied through vacatur and remand of the SPOR Policy along with the listing decision for the Gunnison sage-grouse.

19.     Defendant U.S. FISH AND WILDLIFE SERVICE is a federal agency within the Department of the Interior that is authorized and required by law to protect and manage the fish, wildlife, and native plant resources of the United States, including enforcing and implementing the ESA. The Secretary of Interior delegated authority to FWS to implement the ESA for the Gunnison sage-grouse, including making decisions; promulgating proposed and final listing decisions; and processing petitions for such actions, as well as for promulgation of the SPOR Policy. 50 C.F.R. § 402.01(b).

20.     Defendant DAN ASHE is the director of the U.S. Fish and Wildlife Service. Director Ashe is sued in his official capacity.

21.     Defendant SALLY M.R. JEWELL is the U.S. Secretary of the Interior, the highest-ranking official within the Department of Interior ("DOI") and, in that capacity, has ultimate responsibility for implementing the ESA with regard to the Gunnison sage-grouse, for promulgating the Final SPOR Policy, and for compliance with all other federal laws applicable to DOI.  Secretary Jewell is sued in her official capacity.

22.     Defendant NOAA FISHERIES is a federal agency within the Department of Commerce that is authorized and required by law to protect and manage fish and other wildlife, including enforcing and implementing the ESA.  The Secretary of Commerce delegated authority to NOAA Fisheries to implement the ESA for species under its jurisdiction, including for promulgation of the SPOR Policy. 50 C.F.R. § 402.01(b).

23.     Defendant EILEEN SOBECK is the Assistant Administrator for NOAA Fisheries. Eileen Sobeck is sued in her official capacity.

24.     Defendant PENNY PRITZKER is the U.S. Secretary of Commerce, the highest-ranking official within the Department of Commerce, and, in that capacity, has ultimate responsibility for implementing the ESA for species within the agency's jurisdiction, as well as for promulgation of the SPOR Policy.  Secretary Pritzker is sued in her official capacity.

IV.    THE RELEVANT STATUTORY AND REGULATORY SCHEME

       A.    The Endangered Species Act

25.     Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of [such species]." 16 U.S.C. § 1531(b).  The Supreme

Court has stated that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" and that the "plain intent of Congress in enacting th[e] statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978).

26.     The ESA delegates responsibility for administering the ESA to two cabinet-level Secretaries: Interior and Commerce. 16 U.S.C. § 1532(15).  The Secretary of the Interior has, in turn, delegated her authority for terrestrial species to FWS.  50 C.F.R. § 402.01(b).

27.     The ESA and its implementing regulations protect species that are listed under the Act as "endangered" or "threatened" in several ways.  The Act: (1) requires FWS to develop and implement a recovery plan for listed species, 16 U.S.C. § 1533(f); (2) requires all federal agencies to carry out their programs for the conservation of listed species and to avoid jeopardy to the continued existence of listed species, *id*. § 1536(a)(1), (a)(2); and (3) forbids anyone from "taking" listed species by any means, except where authorized.  *Id*. §§ 1538(a), 1539, 1532(19); 50 C.F.R. § 17.31.  However, the ESA provides more stringent and far-reaching protections for species listed as "endangered" rather than "threatened."  For example, the ESA itself prohibits the "taking" of endangered species, whereas that safeguard is only extended to threatened species by regulation.  In addition, endangered species generally receive higher priority for the preparation and implementation of recovery plans, and the FWS is more likely to determine that particular actions jeopardize the continued existence of endangered species – thereby violating section 7(a)(2) of the Act – as opposed to species that receive the less protective designation of "threatened."

28.     To receive the Act's protections, a species must first be "listed" as endangered or threatened.  An "endangered species" is a species that is "in danger of extinction throughout all

or a significant portion of its range …. "  16 U.S.C. § 1532(6).  A "threatened species" is one that is likely to become endangered within the "foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

29.     Section 4 of the ESA imposes a non-discretionary duty requiring FWS to list a species as endangered or threatened if any one of five statutory factors are met:

(A)     the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)     overutilization for commercial, recreational, scientific, or educational purposes;

(C)     disease or predation;

(D)     the inadequacy of existing regulatory mechanisms; and

(E)     other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1).

30.     The ESA requires FWS to make listing decisions – including whether to list a species as endangered versus threatened – "solely on the basis of the best scientific and commercial data available."  *Id.* § 1533(b)(1)(A).

31.     The ESA provides two methods by which a species may be "listed" under the Act and thereby afforded its protections.  First, a species may be listed internally – *i.e.*, at the Secretary's own initiative.  *Id.* § 1533(a).  Second, the public may submit a petition to the Secretary to list a species.  *Id.* § 1533(b)(3).  The petition must contain, *inter alia*, detailed information and documentation regarding the status of the species and the threats to its survival. 50 C.F.R. § 424.14.  This second method is known as the "petition" process.

32.     Within 90 days of receiving a petition from the public to list a species, to the maximum extent practicable, FWS must determine whether the petition presents substantial

scientific or commercial information indicating that a listing "may be warranted." 16 U.S.C. § 1533(b)(3)(A). If FWS finds that listing is "not warranted," the petition process concludes, and such a finding is immediately subject to judicial review. *Id*. § 1533(b)(3)(C)(ii).

33.     If FWS finds that a petition submitted presents substantial scientific or commercial information indicating that a listing "may be warranted," FWS must commence a 12-month review of the petition and other relevant information. *Id*. §§ 1533(b)(3)(A), (B). A "may be warranted" determination must be published in the *Federal Register*, and FWS must conduct a "status review" and solicit public comments for consideration in its final decision. *Id*. § 1533(b)(3)(A).

34.     At the close of the 12-month status review period, FWS must determine whether the petitioned action is: (i) "not warranted"; (ii) "warranted"; or (iii) "warranted but precluded" by "higher listing priorities." *Id*. § 1533(b)(3)(B).

35.     If FWS determines at the 12-month stage that a listing is "not warranted," it must promptly publish that determination in the *Federal Register*, and that is the end of the process. *Id*. § 1533(b)(3)(B)(i). FWS's "not warranted" 12-month finding is subject to judicial review. *Id*. § 1533(b)(3)(C)(ii).

36.     If FWS determines that a listing is "warranted," it must promptly publish a proposed rule in the *Federal Register*, *id*. § 1533(b)(3)(B)(ii), and, within one year of publishing the proposed rule, publish a final rule listing the species or withdraw the proposed rule. *Id*. § 1533(b)(6)(A).

37.     The ESA requires FWS, "not less than 90 days before the effective date of the regulation," to "publish a general notice and the complete text of the proposed regulation in the Federal Register …. " *Id*. § 1533(b)(5)(A)(i).

38.     A final regulation designating "critical habitat" of an endangered or threatened species must be published "concurrently with the final regulation implementing the determination that such species is endangered or threatened …. " *Id*. § 1533(b)(6)(C).  The ESA defines "critical habitat" as habitat that is "essential to the conservation of the species," *id*. §§ 1532(5)(A), with "conservation" in turn defined as the use of methods necessary to bring listed species "to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id*. § 1532(3).

39.     If FWS determines that listing a particular species is "warranted but precluded," the Secretary must publish a finding in the *Federal Register* that demonstrates that: (1) listing is "precluded by pending proposals to determine whether any species is an endangered species or a threatened species"; and (2) "expeditious progress is being made to add qualified species to either of the lists …. " *Id*. § 1533(b)(3)(B)(iii).  Species that are designated as "warranted but precluded" are placed on the FWS's "candidate" list.  FWS also may designate a species as a candidate for ESA protection on its own initiative.  Candidate species receive none of the substantive protections that are afforded to listed species under the ESA.  50 C.F.R. § 424.15(b).

40.     The ESA requires that before either the FWS and/or NOAA Fisheries may establish any criteria or guidelines for use in making listing decisions, they must first be issued in proposed form for public comment.  16 U.S.C. § 1533(h).

41.     When FWS designates a species as a candidate for ESA protection, it assigns it a "Listing Priority Number" ("LPN"), which is a number between 1 and 12.  The LPN ranking system assigns numbers to candidate species based on their taxonomy and the magnitude and immediacy of the threats that they face.  Under the agency's ranking system, candidate species with lower LPNs are to be prioritized for listing before candidates with higher LPNs – for

example, a listing priority of "2" means that threats to the species are of a "high" magnitude and that listing is "imminent." 48 Fed. Reg. 43,098, 43,102-3 (Sept. 21, 1983).

42.     Approximately once a year, FWS publishes in the *Federal Register* an updated list of candidate species. This is known as the "Candidate Notice of Review" ("CNOR"). *See*, *e.g.*, 78 Fed. Reg. 70,104 (Nov. 21, 2013). The CNOR summarizes the status and threats that FWS evaluated in order to determine that species qualify (or should be removed) as candidates and assigns LPNs to each candidate species.

43.     In 1999, FWS and its counterpart in the Department of Commerce issued a joint Policy for Candidate Conservation Agreements with Assurances ("CCAA") under the ESA. 64 Fed. Reg. 32,726 (June 17, 1999). Non-Federal property owners who voluntarily enter into a CCAA agree to implement conservation measures to improve the status of unlisted species, and they then can receive "assurances" from FWS that their conservation efforts will not result in future regulatory obligations in excess of those established in the CCAA. In return, if the species is listed under the ESA, FWS will provide ESA section 9 "take" authorization through enhancement of survival permits, 16 U.S.C. § 1539(a)(1)(A), that would allow the property owners to take the covered species as specified in the CCAA. Prior to entering into the CCAA and issuing a property owner a permit, FWS must determine that the benefits of the conservation measures to be implemented, when combined with the benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the covered species.

44.     Such agreements without assurances, called Candidate Conservation Agreements ("CCA"), seek to address threats to candidate species and avoid the need to list them as endangered or threatened through voluntary conservation agreements for public or private

parties, in which the parties identify threats to candidate species, plan measures needed to address those threats, identify willing landowners, develop agreements, and design and implement conservation measures and monitor their effectiveness.

B.      The Administrative Procedure Act

45.     The ESA requires that listing decisions must comply with the rulemaking provisions of the APA, which provides general rules governing the issuance of proposed and final regulations by federal agencies.  16 U.S.C. § 1533(b)(4).

46.     Fundamental to the APA's procedural framework is the requirement that, absent narrow circumstances, a federal agency publish as a proposal any rule that it is considering adopting and allow the public the opportunity to submit written comments on the proposal.  5 U.S.C. § 553.

47.     A "rule" is defined by the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency…." *Id*. § 551(4).

48.     Specifically, the APA provides that all federal agencies must give "general notice" of any "proposed rule making" to the public by publication in the *Federal Register*. *Id.* § 553(b).  The publication must, at a minimum, include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.*

49.     In addition, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without

opportunity for oral presentation," and, "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* § 553(c).

50.     An agency may only short-circuit the public notice and comment requirements of the APA if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B).

51.     The APA also provides the standard of review of FWS's ESA listing decisions. *Id.* § 706(2).  Under this standard, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

V.     FACTUAL ALLEGATIONS

A.     Gunnison Sage-Grouse

52.     Uniquely adapted to the sagebrush steppe ecosystems of the western United States and Canada – and found nowhere else in the world – the sage-grouse is a brownish-gray bird known for its unique mating ritual and colorful yellow, white, and black features on male birds.

53.     In 1977, Dr. Clait Braun, then a scientist with the Colorado Division of Wildlife ("CDOW"), noticed that sage-grouse wings collected in the Gunnison Basin of southwestern Colorado were smaller than sage-grouse wings collected in northern Colorado.  Over the following two decades, Dr. Braun and others documented the morphological and genetic differences between these Gunnison Basin sage-grouse and other sage-grouse populations. Those differences were significant, and in 2000 the American Ornithologists' Union formally determined that sage-grouse in southwestern Colorado – *i.e.*, today what is now known as the

Gunnison sage-grouse *(Centrocercus minimus)* – is a separate species, distinct from the greater sage-grouse *(Centrocercus urophasianus)*.

54.     With their elaborate mating dance, small size, and distinctive white barred tail feathers, Gunnison sage-grouse were once abundant in prairie habitats in southwestern Colorado, southeastern Utah, northeastern Arizona, and northwestern New Mexico.  Yet as illustrated below, today they are limited to southwestern Colorado and a small population in Utah, and they have been lost from 88-93 percent of their estimated historic range, primarily due to habitat destruction and fragmentation.  Endangered Proposal, 78 Fed. Reg. at 2495.



55.     The remaining birds are in decline and at risk of extinction from ongoing threats, including habitat destruction and fragmentation due to residential development, livestock grazing, energy development, motorized recreation, urbanization, and the related roads, power

lines, fence construction, and incursion of non-native plant species that accompanies these activities, as well as climate change, drought, disease, predation, small population size, and genetic risks.

56.     Gunnison sage-grouse rely on a variety of sagebrush habitats throughout the year. During the spring breeding season, males display on "leks" (*i.e.*, strutting grounds), which are open areas with good visibility and acoustics.  After breeding, females select nest sites in the vicinity of leks and in relatively tall and dense stands of sagebrush with residual grass and forbs that provide additional hiding cover.  As chicks mature through the summer, hens typically move their broods to wet meadow areas with succulent forbs and insects and tall grasses for hiding and foraging.  In fall, sage-grouse rely on upland areas that have at least 20 percent sagebrush cover and green forbs.  During winter, when snow cover is extensive and deep, sage-grouse forage in tall sagebrush in valleys and lower flat areas, and roost in shorter sagebrush along ridge tops.

57.     Because sage-grouse derive food, shelter, and cover from sagebrush and are dependent on sagebrush for survival, sage-grouse are an indicator species for the health of "sagebrush-steppe" ecosystems, including other species that rely on such ecosystems.

58.      There are now only seven, mostly isolated populations of Gunnison sage-grouse remaining in Colorado and Utah.  These populations and their estimated populations are: the Gunnison Basin population with 3,978 birds; the San Miguel Basin population with 206 birds; the Piñon Mesa population with 182 birds; the Crawford population with 157 birds; the Monticello-Dove Creek population with 98 birds; and the Cerro Summit-Cimarron-Sims Mesa population with 74 birds.  The Poncha Pass population exists only due to the translocation of birds from the Gunnison Basin population, and after translocations of birds in the fall of 2013 and spring of 2014, only 16 birds were known to survive into the summer in 2014.

59.     At an estimated 3,978 birds in 2014, only the Gunnison Basin population currently contains more than about 200 birds.  It has been estimated that the rangewide Gunnison sage-grouse population has declined between 42 and 90 percent since the 1950s.

60.     Due to habitat loss and degradation from residential development, resource extraction, agricultural activities, and other threats, the National Audubon Society has identified the Gunnison sage-grouse as one of the nation's 10 most endangered birds and maintains the Gunnison sage-grouse on its "Watch List 2007 Red Category," which is for species that are declining rapidly or have very small populations or limited ranges and face major conservation threats.  The International Union for Conservation of Nature ("IUCN") maintains the species on its Red List Category of "endangered," and NatureServe ranks the Gunnison sage-grouse as "critically imperiled."

B.     The "Significant Portion of Its Range" Policy

61.     For more than a decade the FWS and NOAA Fisheries (collectively the "Services") have been grappling with whether and how to define the terms "significant portion of its range" within the definition of an "endangered species" and a "threatened species."  16 U.S.C. § 1532(6), 1532(20).  Several efforts to apply these terms were vacated by reviewing courts, and in 2011 the Services voluntarily withdrew what had until that time been their most recent SPOR interpretation, called the "M-Opinion."

62.     In December 2011, the "Services" issued a revised proposed SPOR Policy with several elements.  76 Fed. Reg. 76,987 (Dec. 9, 2011).  Of relevance here, the proposed SPOR Policy provided that if a species is determined to be threatened or endangered throughout a significant portion of its range, it will be listed "across the species' entire range" – a proposal that reversed a central element of the M-Opinion.  *Id.* at 76,990.

63.     In explaining the manner in which the Proposed SPOR Policy would be implemented, the Services specifically addressed the relationship between a species' conservation status range-wide and its status within a SPOR.  In particular, the Services explained that when considering a species' conservation status:

> [t]he first step in our analysis … would be to determine the status of the species in all of its range.  If we determined that the species is in danger of extinction throughout all of its range, we would list the species as an endangered species, and no SPR analysis would be required.  If the species was threatened throughout all of its range, we would limit our SPR analysis to the question of whether the species is in danger of extinction in a significant portion of its range; if so, we would list the species as endangered; if not, we would list the species as threatened.  If the species was neither endangered nor threatened throughout all of its range, we would determine whether the species was endangered or threatened in a significant portion of its range; if so, we would list the species as endangered or threatened, respectively; if not, we would conclude that listing the species is not warranted.

76 Fed. Reg. at 77,002.  The Services' proposal thus provided that in considering the conservation status of a species, the Services would first look at a species' range-wide status, but after doing so they would separately consider the conservation status of any potential SPOR.  If such a SPOR is endangered, the species would be listed as endangered irrespective of whether the species might only be deemed to be threatened throughout the entirety of its range.

64.     On July 1, 2014, the Services issued the Final SPOR Policy.  79 Fed. Reg. 37,578.  Contrary to every prior interpretation the Services had provided for the SPOR language, including in the Proposed SPOR Policy, in the Final SPOR Policy the agencies announced a radically-new view of how the SPOR language would be applied in making listing determinations.

65.     Of relevance here, if a species is found to be threatened throughout its range, that is the end of the analysis under the Final SPOR Policy, and the Services will not separately consider whether the species should be listed as endangered in light of its conservation status in a

significant portion of its range. *Id.* at 37,609. This fundamental about-face from the Proposed

SPOR Policy was made to accommodate complaints from State agencies and others who argued

that allowing a species threatened range-wide to be listed as endangered based on its status in a

SPOR "is undesirable overregulation that would produce needless economic dislocation." *Id.* at

37,599.

66.     The Services sought to justify this departure from the Proposed SPOR Policy by

claiming it would be "confusing" were a species to be both "threatened" (based on range-wide

status) and "endangered" (based on status in a SPOR). *Id.* at 37,579. The Services did not

explain why it would be confusing to apply the approach set forth in the Proposed SPOR Policy,

whereby a species found to be endangered in a SPOR would be listed and protected as

endangered throughout its range, and its range-wide status would thus be neither relevant nor

separately identified.

67.     The Services also suggested the change was necessary to ensure a distinction

between a species' status "throughout all" of its range and its status in a SPOR, claiming that by

putting the terms "throughout all" ahead of "a significant portion of its range" in the definitions,

"Congress intended that an analysis based on consideration of the entire range should receive

primary focus, and thus that the agencies should do an SPR analysis as an alternative to a

rangewide analysis only if necessary." *Id.* at 37,580. The Services did not explain how that

interpretation could be reconciled with Congress's instruction to determine whether to list a

species as "an endangered species or a threatened species" based on the listing factors, 16 U.S.C.

§ 1533(a)(1), which makes plain that full consideration must first be given to whether a species

is an "endangered species" (in all or a significant portion of its range) before turning to whether,

if not endangered, it may nonetheless be "threatened."

68.     In providing its new interpretation, the Services also failed to explain how the SPOR language is not rendered superfluous by listing a species as "threatened" without at all considering whether it may be "endangered" in a "significant portion of its range."  Likewise, the Services flatly failed to address the Policy's disparate treatment of a species threatened range-wide as compared to a species that may be only threatened in a SPOR.  Under the Final SPOR Policy, the former species, with range-wide threats, may only be listed as threatened (even if endangered in a SPOR), while the latter species, because it is not threatened range-wide, may be listed throughout its range as endangered based on its endangered status in a SPOR.  The Service did not explain how this result, in which a species that is more imperiled range-wide may receive less protection, can be reconciled with the ESA

69.     The Final SPOR Policy represents the first time the Services announced this approach to considering whether a species is imperiled in a significant portion of its range.  In none of the prior iterations of the SPOR Policy, including in the Proposed SPOR Policy, did the Services suggest this approach.  The Services provided no public comment opportunity concerning this new interpretation of the ESA, which significantly changed the agencies' approach to their listing process and responsibilities.

C.     FWS's Treatment of the Gunnison Sage-Grouse under the ESA, Including the Application of the SPOR Policy

70.     After the Gunnison sage-grouse was recognized as a unique subspecies of sage-grouse in the late 1990s, local working groups began to develop conservation strategies to reverse its decades-long decline.  These efforts led to conservation plans for Gunnison sage-grouse populations in the Gunnison Basin, the San Miguel Basin, Dove Creek, Poncha Pass, and Piñon Mesa.  These plans generally incorporated voluntary measures to spread information about

the species and its plight, to develop "best management practices" for various activities, to conduct research and monitoring, and to map the species' habitat.

71.     On January 25, 2000, scientists and environmental organizations submitted a petition to the Secretary of the Interior to protect the Gunnison sage-grouse as endangered under the ESA.  The petition described significant declines in Gunnison sage-grouse population and range due to many threats.  The Secretary assigned the petition to FWS's Mountain-Prairie Regional office in Colorado.

72.     After FWS failed to issue the 90-day finding required by ESA section 4(b)(3)(A) for nearly a year, the petitioners challenged FWS's failure to do so.  *See American Lands Alliance v. Norton*, 242 F. Supp. 2d 1 (D.D.C. 2003) ("*ALA v. Norton I*").  Shortly thereafter, FWS designated the Gunnison sage-grouse as a candidate for ESA protection due to habitat loss, fragmentation, and degradation from myriad human activities, and because the agency found that existing conservation efforts were inadequate to reverse the habitat loss or its effects.  65 Fed. Reg. 82,310, 82,311-12 (Dec. 28, 2000).  FWS stated that listing the Gunnison sage-grouse as threatened was warranted at that time; however, it was "precluded" by higher-priority listing actions, and hence, FWS relegated the species to candidate status.  *Id*. at 82,312.

73.     In 2003, Judge Reggie Walton of the U.S. District Court for the District of Columbia ruled that in designating the species as a candidate, FWS had unlawfully failed to make the statutorily-required 90-day finding on the petition to list the Gunnison sage-grouse and, consequently, had failed to advance the species through the ESA listing process.  *ALA v. Norton I*, 242 F. Supp. 2d at 9-12.  Nevertheless, Judge Walton ruled that the plaintiffs in *ALA v. Norton I* would need to challenge FWS's December 28, 2000, candidate designation in a new action, *American Lands Alliance et al. v. Norton et al*., Civ. No. 00-2339, slip op. at 5-6 (D.D.C. May

13, 2003) (RBW), which they did. *American Lands Alliance et al. v. Norton et al.*, Civ. No. 04-434 (D.D.C.) (RBW) (*ALA v. Norton II*). .

74.     On November 14, 2005, the parties in *ALA v. Norton II* filed a stipulated settlement agreement that required defendants to publish a new 12-month listing determination for the Gunnison sage-grouse by March 31, 2006. *ALA v. Norton II*, Civ. No. 04-434 at Dkt. 50.

75.     FWS biologists, field staff, and regional officials then prepared several drafts of a proposed rule to list Gunnison sage-grouse as "endangered" under the ESA. They also drafted and mapped proposed "critical habitat" designations to be prepared with the proposed rule to list the species. In these proposed rules, FWS acknowledged that threats to Gunnison sage-grouse were high for virtually all populations, and that these threats endangered Gunnison sage-grouse throughout all and a significant portion of its range.

76.      In December 2005, after several drafts of a proposed rule had been prepared, high-ranking political appointees directed FWS to drastically reverse course and find that listing the Gunnison sage-grouse was "not warranted." FWS staff then produced several drafts of a "not warranted" listing determination.

77.     On April 18, 2006, FWS published a final listing determination that listing the Gunnison sage-grouse under the ESA was "not warranted." 71 Fed. Reg. 19,954 (Apr. 18, 2006). However, this finding implicitly acknowledged that the range of Gunnison sage-grouse had declined substantially from its historic extent – to as little as 8.5 percent of its historic range – and that the species' habitat would continue to decline in the foreseeable future. *Id*. at 19,557.

78.     A coalition of plaintiffs, including a Colorado county, challenged the 2006 not-warranted listing determination. *County of San Miguel et al. v. Kempthorne et al.*, Civ. No. 06-1946 (D.D.C.) (RBW). An investigation into political interference with ESA listing

determinations in 2008 concluded that Julie A. MacDonald, a former DOI deputy assistant secretary, had improperly interfered in the decisional process on the 12-month petition finding for the Gunnison sage-grouse, and FWS subsequently agreed to withdraw the not-warranted finding and to make a new 12-month listing determination by June 30, 2010.

79.     On September 28, 2010, FWS published a new 12-month listing determination for the Gunnison sage-grouse, in which it again concluded that the species warrants ESA protection due to myriad, high-magnitude, and imminent threats to its existence.  75 Fed. Reg. 59,804 (Sept. 28, 2010).  However, the agency asserted that listing the species was precluded by higher-priority listing actions.  *Id.*

80.     For 10 years, from when FWS first designated the Gunnison sage-grouse as a candidate species in 2000 until it made a new 12-month finding in 2010, the agency issued annual assessments that documented the species' ongoing decline and threats to its existence, as well as the inadequacy of voluntary conservation measures.  From 2000 through 2003, when the species' range was estimated to be reduced to 25 percent of its historic range, the agency gave the species a LPN of "5" due to "high magnitude" threats; insufficient state and federal regulatory authority to protect against habitat loss; and ineffective; voluntary conservation efforts that were reliant on uncertain funding.

81.     In 2004, the agency elevated the species LPN to a "2" – meaning that threats to the species are of a "high" magnitude and listing is "imminent."  48 Fed. Reg. 43,102-3.  FWS noted that threats to the species had increased due to drought-related effects, low chick survival and recruitment, and relaxation of land use restrictions in Gunnison County, which harbors the only large population of the species.  When it added the species back to the candidate species list

in 2010, FWS again assigned it a LPN of "2," a ranking it maintained until it proposed to list the species as endangered in January 2013.

82.     In September 2011, Judge Emmet Sullivan of the U.S. District Court for the District of Columbia approved a pair of settlement agreements between environmental organizations (including the Center for Biological Diversity) and FWS.  Stipulated Settlement Agreement, *In re Endangered Species Act Section 4 Deadline Litigation – MDL No. 2165*, No. 10-377 (D.D.C. July 12, 2011), ECF Nos. 31-1, 42-1.  Together, these agreements required FWS to make a listing determination for the Gunnison sage-grouse.

83.     On January 13, 2013, FWS proposed to list the Gunnison sage-grouse as endangered.  Endangered Proposal, 78 Fed. Reg. 2486.  In the Endangered Proposal, FWS determined that the species is at risk of extinction throughout all of its range, as all but one of the seven remaining populations are in decline, that habitat loss from many activities is the primary threat to the species' continued existence, and that voluntary local, state, and federal conservation measures are inadequate to protect the species from the risk of extinction.  *Id.*

84.     In the Endangered Proposal, FWS found that by the fall of 2012, only 14 landowners had enrolled in a CCAA that has been administered by the Colorado Division of Wildlife (now Colorado Parks and Wildlife ("CPW")) since 2006 and that landowners could opt out of the agreement at any time.  *Id.* at 2514.  Thus, FWS concluded that the CPW CCAA does not sufficiently protect the Gunnison sage-grouse from habitat loss and fragmentation to ensure the species' long-term survival and recovery.  *Id.*

85.     In the Endangered Proposal, FWS found that a CCA for the Gunnison Basin population, which was developed by BLM in 2010, has a limited geographic scope and would

not cover enough of the species' range to adequately protect the Gunnison sage-grouse from habitat loss and fragmentation on public lands. *Id.* at 2515.

86.　　After FWS finally proposed to list the Gunnison sage-grouse as an endangered species – 14 years after first acknowledging that the species is in need of the ESA's substantive protections – pro-development, grazing, and energy development interests and Colorado politicians took notice and waged a campaign to oppose listing the species altogether.

87.　　In response, on March 7, 2013, FWS extended the comment period on the endangered listing and critical habitat designation, citing requests for an extension "from the public." 78 Fed. Reg. 15,925, 15,926 (Mar. 13, 2013).

88.　　On July 18, 2013, FWS extended the endangered rulemaking and critical habitat designation again, by six months, citing "substantial disagreement regarding the sufficiency and accuracy of the available data relevant to our determinations." 78 Fed. Reg. 43,123 (July 18, 2013). While FWS cited some scientific concerns, it also cited to commenters' disagreement with FWS's characterization of Gunnison County's "regulatory mechanisms" and growth projections in the county. *Id*. at 43,124.

89.　　On September 19, 2013, FWS again requested comments on its endangered rulemaking and critical habitat designation. 78 Fed. Reg. 57,604 (Sept. 19, 2013). FWS asked for additional information relevant to the rulemakings, provided notice of information sessions, and provided supplementary documents related to critical habitat.

90.　　On November 4, 2013, FWS again reopened the comment period on its endangered rulemaking and critical habitat designation and announced the rescheduling of information sessions. 78 Fed. Reg. 65,936 (Nov. 4, 2013).

91.     FWS then sought and obtained an extension for the rulemakings, citing the appropriations lapse and need to review comments.  The six-week extension was announced via press release on February 12, 2014.  Press Release, FWS, *Service Announces Extension of Final Decisions on Listing the Gunnison Sage-Grouse and Designating Critical Habitat* (Feb. 12, 2014).  FWS did not reopen the comment period on the rules and did not indicate any intent to alter the endangered listing.

92.     On May 6, 2014, FWS announced another six-month extension of the rulemaking by press release.  In that announcement, for the first time, FWS indicated a possible intent to downgrade the listing from endangered to threatened.  Press Release, FWS, *U.S. Fish and Wildlife Service Announces Short Extension of Final Decision on Listing the Gunnison Sage-Grouse* (May 6, 2014).

93.     After FWS's ability to obtain even further delays in the listing process expired, the agency published the Final Rule to list the Gunnison sage-grouse on November 20, 2014. 79 Fed. Reg. 69,192.

94.     FWS downgraded the species' status from "endangered" to "threatened" in the Final Rule.  *Id.*

95.     FWS never opened a comment period on the threatened listing and never sought public comment on its application of the SPOR Policy to refuse to consider whether the species is endangered in a significant portion of its range because it was deemed threatened range-wide.

96.     In the Final Rule, FWS acknowledged that the threats to the species had not abated; to the contrary, FWS maintained that the species is threatened by habitat destruction, overutilization, disease or predation, inadequate regulatory mechanism, and other threats throughout its range.

97.     FWS also maintained that the CPW CCAA and BLM CCA are not sufficient to negate these threats.  *See*, *e.g.*, *id*. at 69,213.

98.     FWS justified its decision to downgrade the listing to threatened based on its "reconsideration" of the threat posed by residential development, which included a new consideration of purported conservation efforts for the species related to development and infrastructure.  *Id.* at 69,235-8.  In support of this assertion, FWS specifically highlighted conservation efforts, such as the CCAA, CCA, and other "non-regulatory conservation actions" that it had previously rejected in the Endangered Proposal because the efforts are voluntary or too limited in scope to sufficiently protect the species' long-term survival and recovery.

99.     In deciding to list the Gunnison sage-grouse as threatened rather than endangered, Defendants applied the SPOR Policy to expressly refuse even to analyze whether the species is endangered in a "significant portion of its range" within the meaning of section 3(6) of the ESA, 16 U.S.C. § 1532(6).

100.     In deciding to list the Gunnison sage-grouse as threatened rather than endangered, FWS determined that the Gunnison sage-grouse would become endangered in the "foreseeable future" – which the agency considered to be 40-60 years – even while it acknowledged that six of the species' seven remaining populations are in danger of extinction now and that the seventh, the Gunnison Basin population, has experienced recent declines and faces ongoing threats.

101.     Between proposing to list the species as endangered and downgrading it to threatened, FWS now considers one of the seven bird populations (Poncha Pass) to exist only due to the translocation of birds from the Gunnison Basin population.  79 Fed. Reg. at 69,200.

102.     Another five of the remaining populations are in decline and considered to be too small to maintain genetic integrity or survive stochastic fluctuations.  *Id.* at 69,288, 69,304.

103.    The remaining sage-grouse populations are scattered and isolated, and even the largest among them, Gunnison Basin, is not considered to be viable.  *Id.* at 69,294-5, 69,303-4.

104.    Cumulatively, population declines and instability, when combined with the changing climate and resulting drought, may cause the Gunnison Basin's population to go extinct in the next 30-58 years.  *Id.*

105.    Gunnison sage-grouse have lost 88-93 percent of their historic range and are threatened by continued habitat destruction and fragmentation due to livestock grazing, oil and gas drilling, residential development, motorized recreation, urbanization, and the related road and fence construction and incursion of non-native plant species that accompanies these activities.

106.    Areas of remaining sage-brush habitat are in degraded condition, and their degradation results in an inability to support sage-grouse populations.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Substantive Violations of the ESA With Regard to Sage-Grouse Listing

107.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

108.    FWS is required to list a species as "endangered" if it "is in danger of extinction throughout all or a significant portion of its range," based on consideration of the ESA's five listing factors.  16 U.S.C. §§ 1532(6), 1533(a)(1).

109.    FWS published the Final Rule on November 20, 2014, listing the Gunnison sage-grouse as a threatened species throughout its range.  79 Fed. Reg. 69,192.

110.    Defendants violated the ESA by failing to list the Gunnison sage-grouse as "endangered" throughout its range.

111.    Defendants' failure to list the Gunnison sage-grouse as "endangered" throughout its range was arbitrary, capricious, and inconsistent with the law because the Secretary failed to utilize the best available scientific data as required by the ESA.  16 U.S.C. § 1533(b)(1)(A).

112.    Defendants' failure to list the Gunnison sage-grouse as "endangered" throughout its range was arbitrary, capricious, and inconsistent with the law because FWS applied the wrong legal standards in making its determination.

113.    Defendants' failure to list the Gunnison sage-grouse as "endangered" throughout its range was arbitrary, capricious, and inconsistent with the law because they relied upon factors in making the listing determination, including political considerations, beyond those allowed by the ESA.  *Id.*

114.    Defendants' failure to list the Gunnison sage-grouse as "endangered" in all or parts of its range was arbitrary, capricious, and inconsistent with the law because, in reliance on the SPOR policy, Defendants' failed to properly consider and address whether the Gunnison sage-grouse is "endangered" throughout a "significant portion of its range."  *Id.* § 1532(6).  The application of the SPOR Policy to refuse to consider at all whether the species is "endangered" in a "significant portion of its range" because it was found to be "threatened" range-wide was arbitrary, capricious, and contrary to the ESA.

115.    Defendants' failure to list the Gunnison sage-grouse as "endangered" was arbitrary, capricious, and inconsistent with the law because FWS concluded that the species will be in danger of extinction in 40-60 years, the "foreseeable future," and disregarded the fact that the species is in danger of extinction now due to myriad threats that are ongoing and expected to continue.

116.     Defendants' failure to list the Gunnison sage-grouse as "endangered" throughout its range is arbitrary, capricious, and an abuse of discretion; in excess of statutory jurisdiction, authority or limitations; and without observance of procedure required by law.  Defendants' violation of the ESA is subject to judicial review under the ESA, 16 U.S.C. § 1540(g)(1)(C), and the APA, 5 U.S.C. §§ 701 through 706.

SECOND CLAIM FOR RELIEF
Substantive Violations of the ESA With Regard To SPOR Policy

117.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

118.     By adopting a Final SPOR Policy that prohibits the Services, where they have first determined that a species is a "threatened species" throughout its entire range, from also considering whether the species may be an "endangered species" based on its conservation status in a "significant portion of its range," the Services have violated the ESA and acted in an arbitrary and capricious manner in violation of the APA.  5 U.S.C. §§ 701 through 706.

THIRD CLAIM FOR RELIEF
Procedural Violations of the ESA and APA

119.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

120.     The ESA requires that listing decisions must comply with the rulemaking provisions of the APA, which provides general rules governing the issuance of proposed and final regulations by federal agencies.  16 U.S.C. § 1533(b)(4).  The APA requires, absent narrow circumstances, a federal agency to publish as a proposal any rule that it is considering adopting and allow the public the opportunity to submit written comments on the proposal.  5 U.S.C. § 553(b), (c).

31

121.   A "rule" is defined by the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency …. " *Id*. § 551(4).

122.   The APA provides that all federal agencies must give "general notice" of any "proposed rule making" to the public by publication in the *Federal Register*. *Id.* § 553(b). The publication must, at a minimum, include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.*

123.   The APA requires an agency to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation," and, after consideration of the relevant matter presented, to "incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* § 553(c).

124.   A final rule must be a logical outgrowth of the proposed rule.

125.   An agency may only short-circuit the public notice and comment requirements of the APA if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B).

126.   The ESA separately provides that any criteria imposed by the Services for use in making listing decisions must be subject to notice and comment.  16 U.S.C. § 1533(h).

A.     Notice and Comment Violation In Imposing Final Rule

127.    Defendants violated the public notice and comment requirements of the ESA and APA in listing the Gunnison sage-grouse as a threatened species.

128.    FWS published in the *Federal Register* a proposed rule to list the species as endangered in January 2013.  78 Fed. Reg. 2486.

129.    After several extensions and additional public comment opportunities, FWS published the Final Rule on November 20, 2014, listing the Gunnison sage-grouse as a threatened species throughout its range.  79 Fed. Reg. 69,192.

130.    FWS relied upon new information and studies to justify the threatened listing. Neither the studies nor FWS's justifications were ever shared with the public or offered up for public comment.

131.    Despite multiple comment opportunities, the public was never given an opportunity to review, or to comment on, a proposal to list the Gunnison sage-grouse as threatened or FWS's justifications for it, including the application of the SPOR Policy to refuse to consider whether the species may be "endangered" in a "significant portion of its range."

132.    As a result, the rule violates the procedural requirements of the ESA and APA.

B.     Notice and Comment Violation In Imposing the SPOR Policy

133.    Defendants violated the public notice and comment requirements of the ESA and APA in imposing the Final SPOR Policy.

134.    The Services published in the *Federal Register* a Proposed SPOR Policy whereby the Services, in considering whether to list a species and in accordance with the ESA, would always consider whether the species may be an "endangered species" in light of its conservation

status in a "significant portion of its range," irrespective of its range-wide status.  76 Fed. Reg. at 76,990.

135.    Without any opportunity for public comment, the Services announced in the Final SPOR Policy that where a species is determined to be "threatened" throughout its entire range, the Services would no longer consider whether the species may be an "endangered species," even if it may be endangered in a "significant portion of its range."  79 Fed. Reg. 37,578.

136.    As a result, the Final SPOR Policy violates the procedural requirements of the ESA and APA.

VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare that Defendants' failure to list the Gunnison sage-grouse as an endangered species throughout all of its range, or to adequately explain why it declined to do so, violated the ESA and APA, and is unlawful;

B.    Declare that Defendants' failure to provide the public an opportunity to submit comment on the complete text of the rule to list the Gunnison sage-grouse as threatened, including its application of the SPOR Policy, violated the ESA and APA;

C.    Declare that the aspect of Defendants' SPOR Policy at issue here, whereby a species deemed to be threatened throughout its range may not be listed as endangered even if it may be endangered in a "significant portion of its range," violated the ESA and APA;

D.    Declare that Defendants' failure to provide the public an opportunity to submit comment on this aspect of the SPOR Policy violated the ESA and APA;

E.      Remand the Gunnison sage-grouse Final Rule to FWS for an adequate finding that

complies with all requirements of the ESA and the APA by a date certain, with the

threatened listing left in place during the remand;

F.      Remand the Gunnison sage-grouse Final Rule to FWS with instruction to provide an

opportunity to the public to submit comment on the complete text to list the Gunnison

sage-grouse as threatened, with the threatened listing left in place during the remand;

G.      As a matter of equity and to ensure proper protection and conservation of the species,

preserve the FWS threatened listing while the agency seeks to comply with the ESA

and APA on remand;

H.      Vacate the aspect of the Final SPOR Policy whereby the Services does not consider if

a species is "endangered" in a "significant portion of its range" when the species is

determined to be threatened throughout its range, and direct that, in the event the

Services reissue a SPOR Policy, any new Policy must provide that, under any

circumstances, the Services will consider whether a species is endangered in a

significant portion of its range and will list the species throughout its range if so.

I.      Award Plaintiffs their costs of litigation, including reasonable attorneys' fees under the

citizen suit provision of the ESA and/or the Equal Access to Justice Act; and

J.      Grant Plaintiffs such other relief as the Court deems just and proper.


DATED: April 21, 2015                              Respectfully submitted,


                                                   */s/Amy R. Atwood*
                                                   Amy R. Atwood, OR Bar 060407
                                                   CENTER FOR BIOLOGICAL DIVERSITY
                                                   PO Box 11374
                                                   Portland, OR 97211

(971) 717-6401 phone
503-283-5528 fax
atwood@biologicaldiversity.org

*/s/Brad A. Bartlett*
Brad A. Bartlett, CO Bar 32816
UNIVERSITY OF DENVER
Environmental Law Clinic
2225 E. Evans Ave., Suite 335
Denver, CO 80208
(303) 871-7870 phone
bbartlett@law.du.edu

*Attorneys for Plaintiffs*

Of Counsel:

Williams W. Eubanks II
Eric R. Glitzenstein

MEYER GLITZENSTEIN & CRYSTAL
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
(202) 588-5206 phone
beubanks@meyerglitz.com
eglitzenstein@meyerglitz.com