# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-00130-AP

(Consolidated with Civil Action No. 1:15-cv-131 and Civil Action No. 1:15-cv-286)

IN RE: GUNNISON SAGE-GROUSE ENDANGERED SPECIES ACT LITIGATION

---

Civil Action No. 1:15-cv-286 ONLY

THE STATE OF COLORADO by and through the Colorado Department of Natural Resources, the Division of Parks and Wildlife, and the Parks and Wildlife Commission, Plaintiff,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
DANIEL ASHE, in his official capacity as Director of the United States Fish and Wildlife Service,
SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior,
Defendants.

---

### DEFENDANT-INTERVENORS' PROPOSED ANSWER TO PLAINTIFF COLORADO'S FIRST AMENDED COMPLAINT

---

1

COME NOW Intervenors, WildEarth Guardians and Dr. Clait E. Braun (collectively "Guardians") by and through Advocates for the West, and respectfully submit this Answer.  For this Court's ease of review, Plaintiff's claims are provided, with Intervenors' responses below in bold-faced print.

## INTRODUCTION

1.      Plaintiff, the State of Colorado, acting by and through the Colorado Department of Natural Resources, the Division of Parks and Wildlife, and the Parks and Wildlife Commission (collectively, "Colorado"), brings this action against the United States Fish and Wildlife Service ("FWS"); Daniel Ashe, in his official capacity as Director of FWS; and Sally Jewell in her official capacity as Secretary of the United States Department of the Interior (collectively "Defendants" or "FWS"). Colorado seeks declaratory and injunctive relief to enforce the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531—1544, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500—596.

**The allegations in Paragraph 1 are a characterization of Colorado's lawsuit to which no response is required.  To the extent the allegations in Paragraph 1 constitute material allegations of fact, Guardians denies them.**

2.      Colorado challenges the decision of the FWS to list the Gunnison sage-grouse (*Centrocercus minimus*) as a threatened species under the ESA, 16 U.S.C. § 1533. *See*

2

Threatened Status for Gunnison Sage-Grouse, Final Rule, 79 Fed. Reg. 69,192 (Nov. 20,

2014) ("Final Listing Rule").

**The allegations in Paragraph 2 are a characterization of Colorado's lawsuit
to which no response is required.  To the extent the allegations in Paragraph 2
constitute material allegations of fact, Guardians denies them.**

3.      Colorado also challenges FWS's designation of critical habitat for the Gunnison

sage-grouse under the ESA. *See* Designation of Critical Habitat for the Gunnison Sage-

Grouse, Final Rule, 79 Fed. Reg. 69,312 (Nov. 20, 2014) ("Final Critical Habitat Rule").

**The allegations in Paragraph 3 are a characterization of Colorado's lawsuit
to which no response is required.  To the extent the allegations in Paragraph 3
constitute material allegations of fact, Guardians denies them.**

4.      The Gunnison sage-grouse is a ground-dwelling bird found in central and

southwestern Colorado and southeastern Utah. It is a sagebrush-obligate species, meaning

that it depends on sagebrush communities for its survival.

**Guardians admits the allegations in Paragraph 4.**

5.      Approximately 84% of the members of the species reside in the Gunnison Basin,

which is located primarily in Gunnison County, Colorado. This group is called the

"Gunnison Basin Population."

**Guardians admits that approximately 84 percent of Gunnison sage-grouse are currently found in the Gunnison Basin and that this population is known as the "Gunnison Basin Population."  Guardians avers that approximately 72 percent of the Gunnison Basin Population is found in Gunnison County and approximately 28 percent in Saguache County.**

6.      Since before the Gunnison sage-grouse was formally recognized as a distinct species in 2000, Colorado has pursued extensive conservation efforts—with a total cost of over $40 million—to protect the Gunnison sage-grouse and its habitat. These efforts include

   a.   intensive habitat treatments;

   b.   predator control;

   c.   purchasing and managing land for use as protected habitat;

   d.   lek (breeding activity) monitoring;

   e.   research;

   f.   translocation of birds to augment small populations;

   g.   enrolling private landowners in, and managing, a conservation  agreement approved by federal authorities to protect thousands  of acres of privately owned habitat; and

   h.   captive breeding programs.

**Guardians lacks information or knowledge sufficient to form a belief about the truth of this statement and therefore denies it.**

7.      In addition, through the cooperative efforts of local government, federal officials, and private landowners, more than four-fifths of occupied Gunnison sage-grouse habitat—83%—in the Gunnison Basin includes some level of protection for the species.

**Guardians lacks information or knowledge sufficient to form a belief about the truth of this statement and therefore denies it.**

8.      These efforts have succeeded. The Gunnison Basin Population has grown to exceed, by over 30%, population targets set in 2005 by a team of conservation biologists—including experts from FWS itself.

**The first sentence of Paragraph 8 characterizes Colorado's view of the scientific evidence from 2005, to which no response is required.  To the extent that the allegations in Paragraph 8 constitute material allegations of fact, Guardians denies them.  The second sentence of Paragraph 8 appears to characterize the conclusion of the now-dated Gunnison Sage-Grouse Rangewide Conservation Plan (2005), which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning or context of the now-dated Gunnison Sage-Grouse Rangewide Conservation Plan (2005).**

9.      Despite these successful efforts, in November 2014, FWS issued a final rule listing the Gunnison sage-grouse as "threatened" throughout its range. *See* Final Listing Rule.

**Guardians admits that in November, 2014, FWS published a rule listing the Gunnison sage-grouse as threatened.**

10.     The best available science, however, shows that the Gunnison sage-grouse is not threatened throughout its range. The Gunnison Basin Population—which comprises the vast majority of the species—is not presently in danger of extinction, nor is it likely to be at risk of extinction in the foreseeable future. In fact, experts cited in FWS's Final Listing Rule estimated that the risk of extinction over the next 50 years is *no more than 1%.*

**The first and second sentences in Paragraph 10 are legal conclusions, which require no response. To the extent that the allegations in Paragraph 10 constitute material allegations of fact, Guardians denies them. The allegations in the third sentence purport to describe the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning or context of the Final Listing Rule.**

11.     Thus, FWS's decision to list the Gunnison sage-grouse as threatened was arbitrary, capricious, and not in accordance with law.

**The allegations in Paragraph 11 are legal conclusions, which require no response.  To the extent that the allegations in Paragraph 10 constitute material allegations of fact, Guardians denies them.**

12.     FWS also issued a separate final rule designating over 1.4 million acres of land in Colorado and Utah as "critical habitat." *See* Final Critical Habitat Rule.

**Guardians admits the allegations in Paragraph 12.**

13.     Half of the 1.4 million acres FWS designated as "critical habitat" are currently *unoccupied* by Gunnison sage-grouse, and much of that land is currently unsuitable as habitat. In designating this land as critical habitat, FWS failed to show that currently occupied habitat is insufficient for species conservation or that the designated unoccupied habitat is essential to conservation of the Gunnison sage-grouse. This was a violation of federal law. 16 U.S.C. § 1532(5)(A)(ii); 50 C.F.R. § 424.12(e).

**The first sentence is vague and Guardians denies it on that basis.  The allegations in the second sentence characterize the Final Critical Habitat Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the Final Critical Habitat Rule.  The allegations in the third sentence represent conclusions of law to which no response is required.  To the extent that the**

**allegations in the third sentence of Paragraph 13 constitute material allegations of fact, Guardians denies them.**

14.     FWS also failed to consider any alternatives to this 1.4-million-acre designation (aside from a "no action" alternative) and to take a "hard look" at the environmental impacts of the designation. This violated both NEPA and the APA.

**Portions of the allegations in the first sentence amount to conclusions of law, to which no response is required.  To the extent that the allegations in the third sentence of Paragraph 14 constitute material allegations of fact, Guardians denies them.  Guardians also denies that FWS failed to consider "any alternatives" to designating 1.4 million acres of Critical Habitat, as the Final Critical Habitat Rule clearly considered alternatives.  The allegations in the second sentence are conclusions of law to which no response is required.  To the extent that the allegations in the third sentence of Paragraph 14 constitute material allegations of fact, Guardians denies them.**

15.     Thus, the decision of FWS to designate critical habitat for the Gunnison sage-grouse was arbitrary and capricious and not in accordance with law.

**The allegations in Paragraph 15 are conclusions of law to which no response is required.  To the extent that the allegations in Paragraph 15 constitute material allegations of fact, Guardians denies them.**

16.     Accordingly, Colorado seeks judicial relief declaring that the Gunnison sage-grouse does not satisfy the requirements of the ESA for listing as a "threatened species," and that listing the species at this time is not warranted.

**The allegations in Paragraph 16 are a characterization of the Colorado's request for relief to which no response is required.  To the extent a response is required, Guardians denies that Colorado is entitled to the relief requested.**

17.     Colorado further seeks judicial relief declaring that FWS violated the ESA, NEPA, and the APA when it designated critical habitat for the Gunnison sage-grouse.

**The allegations in Paragraph 17 are a characterization of Colorado's request for relief, to which no response is required.  To the extent a response is required, Guardians denies that Colorado is entitled to the relief requested.**

18.     Colorado respectfully requests that the Court vacate the Final Listing Rule and the Final Critical Habitat Rule and remand both with an order that the FWS comply with ESA, NEPA, and the APA.

**The allegations in Paragraph 18 are a characterization of Colorado's request for relief, to which no response is required.  To the extent a response is required, Guardians denies that Colorado is entitled to the relief requested.**

## NOTICE OF RELATED CASES

19.     This case has been consolidated with two related cases currently pending in the

United States District Court for the District of Colorado: *Center for Biological Diversity,*

*et al. v. U.S. Fish and Wildlife Serv.,* Case No. 1:15-cv-00130 (filed January 20, 2015)

and *WildEarth Guardians, et al. v. Dan Ashe, et al.*, Case No. 1:15-cv-00131 (filed

January 20, 2015). Order Granting Joint Motions to Consolidate Civil Actions 15-cv-130,

131, and 286 and for Revised (Consolidated) JCMP, Docket No. 10 in 1:15-cv-286. In

the related cases, plaintiffs/petitioners challenge the Final Listing Rule on the grounds

that the Gunnison sage-grouse should have been listed as endangered, rather than

threatened. WildEarth Guardians also challenges the Final Critical Habitat Rule, arguing

that the designation should have been more extensive. Center for Biological Diversity

also challenges FWS's interpretive policy regarding the phrase "significant portion of the

range" as used in section 4 of the ESA.

**Guardians admits the allegations in Paragraph 19.**

**PARTIES**

20.     Plaintiff State of Colorado, acting by and through its Department of Natural

Resources, the Division of Colorado Parks and Wildlife, and the Parks and Wildlife

Commission, has authority over wildlife management within the state. The Division of

Parks and Wildlife ("Colorado Parks and Wildlife") and the Colorado Parks and Wildlife

Commission are responsible for protecting, preserving, enhancing, and managing wildlife

and wildlife habitats within the state. Colo. Rev. Stat. §§ 33-1-101, 33-1-104(1). Wildlife

within the State of Colorado is the property of the state. Colo. Rev. Stat. § 33-1-101(2).

**Guardians admits the allegations in Paragraph 20.**

21.     Colorado Parks and Wildlife is authorized to and has acquired properties for

management of the Gunnison sage-grouse, and is authorized to and has entered into

cooperative agreements with political subdivisions and private landowners for the benefit

of the Gunnison sage-grouse. Colo. Rev. Stat. § 33-1-105.

**Guardians lacks sufficient information or knowledge to form a belief about**

**the truth of these allegations and therefore denies them.**

22.     FWS's listing of the Gunnison sage-grouse as threatened and its designation of

critical habitat interfere with Colorado's primary role in wildlife management. The listing

and designation also impair the wildlife management programs Colorado has developed

for sage-grouse management. For example, state wildlife management programs directly

impacting Gunnison sage-grouse habitat or that have the potential to disturb any

individual sage-grouse may now be conducted only with the prior approval of FWS. This

applies to habitat management for other species inhabiting sagebrush areas, including

deer and elk, as well. Moreover, the Division of Parks and Wildlife may no longer

continue to enroll private landowners in a voluntary conservation program it has been

administering since 2006.

**Guardians lacks sufficient information or knowledge to form a belief about the truth of these allegations and therefore denies them.**

23.     Defendant FWS is a federal agency within the United States Department of the Interior that has been delegated the responsibility to administer the ESA. FWS has primary authority for day-to-day administration of the ESA with respect to non- marine species.

**Guardians admits the allegations in Paragraph 23.**

24.     Defendant Daniel Ashe is the Director of FWS, and is sued in his official capacity.

**Guardians admits the allegations in Paragraph 24.**

25.     Defendant Sally Jewell is the Secretary of the United States Department of the Interior. As Secretary of Interior, Secretary Jewell has ultimate responsibility for implementation of the ESA. She is sued in her official capacity.

**Guardians admits the allegations in Paragraph 25.**

## JURISDICTION AND VENUE

26.     This action arises under federal law, and specifically the ESA, 16 U.S.C. §§ 1531—1544, NEPA, 42 U.S.C. § 4321 *et seq.*, and the APA, 5 U.S.C. §§ 500—596.

**The allegations in Paragraph 26 are conclusions of law, to which no response is required.  To the extent that the allegations in Paragraph 26 constitute material allegations of fact, Guardians denies them.**

27.     This court has jurisdiction over this action under 16 U.S.C. § 1540(c) (granting jurisdiction to the district courts over "any actions arising under" the ESA) and 28 U.S.C. § 1331 (granting the district courts federal question jurisdiction).

**The allegations in Paragraph 27 are conclusions of law, to which no response is required.  To the extent that the allegations in Paragraph 27 constitute material allegations of fact, Guardians denies them.**

28.     As required by 16 U.S.C. § 1540(g), Colorado provided Defendants Jewell and Ashe with written notice of their violations of the ESA on December 12, 2014 via electronic and certified mail. More than 60 days have passed since notice was provided, and Defendants have not taken action to address the violations.

**Guardians lacks information or knowledge sufficient to form a belief about the truth of the first sentence and therefore denies it.  Guardians admits that more than 60 days has passed since December 12, 2014; the remainder of the second sentence are conclusions of law to which no response is required.  To the extent that the allegations in the second sentence of Paragraph 28 constitute material allegations of fact, Guardians denies them.**

13

29.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(e) because FWS is an agency of the United States with multiple offices in Colorado, Defendants Jewell and Ashe are employees or officers of the United States, and a substantial part of the events giving rise to this action occurred in Colorado. Specifically, the final rules under challenge were written by a regional office of FWS located in Lakewood, Colorado. Further, the Gunnison sage-grouse is found primarily in Colorado, and is protected by numerous conservation plans developed within Colorado, many of which are overseen or administered by Plaintiff.

**Guardians admits the allegations in the first sentence.  Guardians lacks sufficient information or knowledge to form a belief about the allegations in the second sentence and therefore denies them.  The third sentence is vague and ambiguous; Guardians lacks sufficient information or knowledge to form a belief about the truth of the allegations therein and denies them on that basis.**

<u>THE ENDANGERED SPECIES ACT</u>

**Listing a Species and the Requirement of "Best Scientific and Commercial Data"**

30.     Section 4 of the ESA requires FWS to determine whether species are eligible for listing as "endangered" or "threatened" with extinction. 16 U.S.C. § 1533(a).  Listing a species triggers the protections of the ESA for that species.

**The allegations in Paragraph 30 purport to describe the ESA, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute.**

31.  A species is "endangered" if the species is presently in danger of extinction throughout all or a significant portion of its range. 16 U.S.C. § 1532(6); 50 C.F.R. § 424.02(e).

**The allegations in Paragraph 31 purport to describe the ESA and its implementing regulations, which speak for themselves and are the best evidence of their own contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute and regulations.**

32.    A species is "threatened" if it is likely to become in danger of extinction within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C. § 1532(20); 50 C.F.R. § 424.02(m).

**The allegations in Paragraph 32 purport to describe the ESA and its implementing regulations, which speak for themselves and are the best evidence of their contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute and its regulations.**

33.    When assessing whether a species is eligible for listing as endangered or threatened, FWS must make its assessment "solely on the basis of the best scientific and

commercial data available," after reviewing the status of the species and considering state and local conservation efforts. 16 U.S.C. § 1533(b)(1); 50 C.F.R. § 424.11(f).

**The allegations in Paragraph 33 purport to describe the ESA and its implementing regulations, which speak for themselves and are the best evidence of their contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute and its regulations.**

34.     Once a species is listed as threatened or endangered, the ESA imposes express prohibitions on "take" of the species. These prohibitions drastically affect actions that may potentially affect a species or its habitat, including any actions to "harm" members of the species. 16 U.S.C. § 1532(19).  "Harm" is broadly defined to include "significant habitat modification or degradation." 50 C.F.R. § 17.3.

**The allegations in Paragraph 34 purport to describe the ESA and its implementing regulations, which speak for themselves and are the best evidence of their contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute and its regulations.**

**Required Evaluation of State and Local Conservation Efforts**

35.     When determining whether to list a species, FWS is required to take into account efforts made by states and their political subdivisions to protect the species and its habitat. 16 U.S.C. § 1533(b)(1)(A).

**The allegations in Paragraph 35 purport to describe the ESA, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute.**

36.     FWS has issued a policy to encourage agreements to voluntarily conserve species and their habitat before they are listed. Final Policy on Candidate Conservation Agreements with Assurances, 64 Fed. Reg. 32,726-01 (June 17, 1999). These agreements are called "Candidate Conservation Agreements with Assurances," or "CCAAs."

**The allegations in Paragraph 36 purport to describe a FWS Policy, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the regulations.**

37.     According to FWS guidance, the principal goal of CCAAs is to make listing a species unnecessary through coordination of conservation efforts with states, private landowners, and other non-federal partners.  Using Existing Tools To Expand Cooperative Conservation for Candidate Species Across Federal and Non- Federal Lands, https://www.fws.gov/endangered/esa-library/pdf/CCA-CCAA%20%20final%20guidance%20signed%208Sept08.PDF.

**The allegations in Paragraph 37 purport to describe a FWS guidance, which speaks for itself and is the best evidence of its contents.  Guardians denies any**

**allegations that are inconsistent with the plain language, meaning, or context of the guidance.**

38.     Specifically, the policy encourages states and private parties who own land containing habitat for candidate species to undertake measures to implement mutually-agreed-upon conservation measures. In return, participants obtain assurances that they will not be required to undertake additional conservation measures should the species be listed in the future. 64 Fed. Reg. at 32,733—34.

**The allegations in Paragraph 38 purport to describe a FWS policy or guidance, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the policy or guidance.**

39.     FWS must approve a CCAA before it takes effect, and may do so if "the benefits of the conservation measures implemented by a property owner under [the CCAA], when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, *would preclude or remove any need to list the species*." 64 Fed. Reg. at 32,726 (emphasis added). Thus, CCAAs are designed to preclude the need to list a species.

**The allegations in Paragraph 39 purport to describe a FWS Policy, which speaks for itself and is the best evidence of its contents.  Guardians denies any**

allegations that are inconsistent with the plain language, meaning, or context of the regulations.

40.     In 2003, FWS adopted a policy to guide its evaluation of voluntary conservation efforts such as CCAAs when considering whether to list a species. Policy for Evaluation of Conservation Efforts, 68 Fed. Reg. 15,100-02 (Mar. 28, 2003).

**The allegations in Paragraph 40 purport to describe a FWS Policy, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the regulations.**

41.     Under this policy, two primary criteria guide evaluation of conservation efforts in a listing decision: (a) the certainty that a conservation effort will be implemented; and (b) the certainty that the effort will be effective. 68 Fed. Reg. at 15,113.

**The allegations in Paragraph 41 purport to describe a FWS Policy, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the regulations.**

**Required written justification for not adopting recommendations of a state agency**

42.     Under section 4(i) of the ESA, if "a State agency ... files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation

which is in conflict with such comments ... the Secretary shall submit to the State agency

a written justification for [the] failure to adopt regulations consistent with the agency's

comments or petition." 16 U.S.C. § 1533(i). Section 3 of the ESA defines the term "state

agency" to mean "any State agency, department, board, commission, or other

governmental entity which is responsible for the management and conservation of fish,

plant, or wildlife resources within a State." 16 U.S.C. § 1532(18).

**The allegations in Paragraph 42 purport to describe the ESA, which speaks**

**for itself and is the best evidence of its contents.  Guardians denies any allegations**

**that are inconsistent with the plain language, meaning, or context of the statute.**

43.     FWS is required to provide the adequate justification required by section 4(i) in a

separate letter response; references to the agency's general comment responses in a final

rule do not suffice. *Alaska Oil & Gas Ass'n v. Salazar*, 916 F. Supp.2d 974, 1003 (D.

Alaska 2013), appeal pending, 9th Cir. Nos. 13-35619, 13-35662, 13- 35666, 13-35667,

13-35669.

**The allegations in Paragraph 43 purport to characterize caselaw, which**

**speaks for itself and is the best evidence of its context.  Guardians denies any**

**allegations that are inconsistent with the plain language, meaning or context of that**

**opinion.**

**Designating Critical Habitat**

44.    Once FWS has determined that a species will be listed as endangered or threatened, FWS must then determine whether any geographic areas are essential to conservation of the species. If so, FWS may propose to designate those areas as "critical habitat." 16 U.S.C. § 1533(a)(3).

**The allegations in Paragraph 44 purport to describe the ESA, which speaks for itself and is the best evidence of its context. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute.**

45.    Critical habitat may be designated in either occupied or unoccupied areas of the species' range. 16 U.S.C. § 1532(5)(A).

**The allegations in Paragraph 45 purport to describe the ESA, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute.**

46.    FWS may designate unoccupied areas "only when a designation limited to [a species'] current range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e). In addition, FWS must make a finding that all unoccupied areas designated as critical habitat are "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). Thus, designation of *unoccupied* areas is prohibited absent a finding that designation of *occupied* lands is "insufficient" and designation of unoccupied lands is "essential."

**The allegations in Paragraph 46 purport to describe the ESA and its implementing regulations, which speak for themselves and are the best evidence of their own contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute and regulations.**

47.     FWS is required to consider the economic impacts of a proposed critical habitat designation by preparing an Economic Impact Analysis. 16 U.S.C. § 1533(b); 50 U.S.C. § 424.19.

**The allegations in Paragraph 47 purport to describe the ESA and its implementing regulations, which speak for themselves and are the best evidence of their own contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of the statute and regulations.**

48.     Furthermore, NEPA requires FWS to study and consider the direct and indirect environmental impacts of a proposed critical habitat designation. *Catron County Bd. Of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996).

**The allegations in Paragraph 48 purport to describe caselaw, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning or context of the opinion.**
**Judicial Review**

49. Final listing decisions and designations of critical habitat are reviewable under the Administrative Procedure Act, 5 U.S.C. § 505, *et seq.* Under the APA, a reviewing court shall hold unlawful and set aside an administrative decision "if the decision is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" or if the agency decision was taken "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), 706(2)(D). 50. An agency's failure to draw rational conclusions from the evidence before it constitutes arbitrary and capricious action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**The allegations in Paragraph 49 are legal conclusions to which no response is required. To the extent the allegations in Paragraph 49 constitute material allegations of fact, Guardians denies them.**

## SPECIFIC ALLEGATIONS REGARDING THE UNLAWFUL LISTING AND DESIGNATION

**The Gunnison sage-grouse (*Centrocercus minimus*)**

51. The Gunnison sage-grouse is a chicken-sized ground-dwelling bird that depends on sagebrush communities, including native grasses and forbs (i.e., herbaceous non-grass plants), for food and cover. The species is well-known for its elaborate male courtship displays, in which males and females congregate on open areas called "leks."

**Guardians admits the allegations in Paragraph 51.**

52.     The Gunnison sage-grouse was officially designated as a distinct species in 2000. It is currently found only in southwestern Colorado and southeastern Utah. By contrast, its larger and more widespread relative, the Greater sage-grouse (*Centrocercus urophasianus*) inhabits parts of north-central and northwestern Colorado, as well as parts of ten other western states.

**Guardians admits the allegations in Paragraph 52.**

53.     Within its current range, the Gunnison sage-grouse is grouped into seven widely scattered populations. The largest population, found in the Gunnison Basin (located in Gunnison and Saguache Counties, Colorado), comprises approximately 84% of all known birds and covers 62% of the occupied habitat of the species. As of 2014, this population was estimated to contain 3,978 individuals. Final Listing Rule at 69,198.

**The allegations in Paragraph 53 are characterizations of the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, and context of the Final Listing Rule.**

54.     The remaining 16% of the species is divided among six "satellite populations," the largest of which, located in San Miguel County, Colorado, has only an estimated 206 birds. Final Listing Rule at 69,198. Three of the satellite populations contain fewer than 100 birds.

**The allegations in Paragraph 54 are characterizations of the Final Listing Rule, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, and context of the Final Listing Rule.**

55.     Estimates of the historic range of the Gunnison sage-grouse vary widely, are highly uncertain, and are based on anecdotal and unverifiable sources of information. At various times, the species may have occupied parts of Arizona and New Mexico, as well as parts of Colorado and Utah. At all times, however, the species occupied only portions of the total area; it never occupied the entire range at a single point in time.

**The allegations in Paragraph 55 appear to be characterizations of the Final Listing Rule, which speaks for itself and is the best evidence of its own contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, and context of the Final Listing Rule.**

56.     In the Gunnison Basin, 67% of occupied Gunnison sage-grouse habitat is owned by the federal government, 30% is in private ownership, and 2% is owned by Plaintiff.

**The allegations in Paragraph 56 appear to be characterizations of the Final Listing Rule, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, and context of the Final Listing Rule.**

**Pre-Listing Conservation Efforts**

57.     In 2005, a group of conservation biologists drawn from numerous state and federal agencies—including FWS—prepared an extensive and detailed Rangewide Conservation Plan ("RCP") for the Gunnison sage-grouse. Gunnison Sage-grouse Rangewide Conservation Plan (April 2005), http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx.

**The allegations in Paragraph 57 purport to characterize the RCP, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of this document.**

58.     The purpose of the RCP was "to protect, enhance, and conserve Gunnison sage-grouse populations and their habitats" by "providing a rangewide perspective, guidance and recommendations to local working groups and other interested or affected parties and stakeholders." The plan provided for "consistent and timely habitat improvements and population expansions" that would "eventually remove this species from listing consideration with the USFWS."

**The allegations in Paragraph 58 purport to characterize the RCP, which speaks for itself and is the best evidence of its contents.  Guardians denies any**

**allegations that are inconsistent with the plain language, meaning, or context of this document.**

59.     Among other things, the RCP provided population targets for each of the seven populations of Gunnison sage-grouse.

**The allegations in Paragraph 59 purport to characterize the RCP, which speaks for itself and is the best evidence of its contents.   Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of this document.**

60.     Through extensive efforts by state and local government, federal officials, and private landowners, the population and habitat protection goals of the RCP for the Gunnison Basin Population have been realized.

**Guardians denies that the so-called "population and habitat protection goals of the RCP for the Gunnison Basin population" have been realized.   For example, Colorado admits that one of the so-called "population and habitat protection goals" – i.e., securing and maintaining 90% of seasonally important habitat on private lands – has not been met.   *See* Petition for Review, ¶ 61.**

61.     The RCP set a goal of securing and maintaining 90% of seasonally important habitat on private lands in the Gunnison Basin through enrollments in the CCAA. This goal is very close to being met: enrollments have reached 98% of the target enrollment of

55,302 acres. Final Listing Rule at 69,263. Because the Gunnison sage-grouse is now a listed species, however, private landowners may no longer enroll in the CCAA.

**The allegations in Paragraph 61 purport to characterize the Final Listing Rule and RCP, which speak for themselves and are the best evidence of their contents. Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of these documents. Guardians admits that CCAAs are available for enrollment by private landowners only prior to a species listings.**

62.     Gunnison County and other counties have adopted land use regulations that ensure new development avoids sensitive Gunnison sage-grouse habitat, and have engaged in numerous other conservation-related activities as well.

**The allegations in Paragraph 62 are vague and ambiguous and Guardians lacks sufficient information or knowledge to form a belief about whether they are true or not.**

63.     Extensive areas of habitat in the Gunnison basin are protected from disturbance or development, including habitat on private land and on federal land. More than four-fifths of occupied Gunnison sage-grouse habitat in the Gunnison Basin—83%— includes some level of protection through

    a.  intensive federal management,

b.  conservation easements (i.e.,voluntary, legally binding, and  perpetual restrictions on land use to prevent future development  on restricted property),

c.  private land enrollment in the CCAA, and

d.  Gunnison County land use regulations.

**The allegations in Paragraph 63 are vague and ambiguous, and Guardians lacks sufficient information or knowledge to form a belief as to the extent of occupied habitat in Gunnison basin which includes "some level" of protection.  Therefore, Guardians denies this allegation.**

64.    Additionally, 82% of the most important Gunnison sage-grouse habitat in the Gunnison Basin—habitat located within four miles of leks (i.e., courting grounds)— has some level of protection against development or disturbance.

**The allegations in Paragraph 64 are vague and ambiguous, and Guardians lacks sufficient information or knowledge to form a belief as to the extent of occupied habitat in Gunnison basin which includes "some level" of protection. Therefore, Guardians denies this allegation.**

65.    Due in part to these extensive conservation efforts, the Gunnison Basin Population now exceeds the population target set in the 2005 RCP by over 30%. RCP at 256 (Table 32).

**The allegations in Paragraph 65 purport to characterize the RCP, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of this document.**

66.     In 2005, the RCP estimated the risk of extinction for the Gunnison Basin Population to be less than 1% over the next 50 years, assuming stable population growth. RCP at 303 (Table 41). Since that calculation was made, the Gunnison Basin Population has grown by almost one-third, to almost 4,000 birds.

**The allegations in Paragraph 66 purport to characterize the RCP, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of this document.  Guardians lacks sufficient information or knowledge to form a belief as to the second sentence of Paragraph 66, and, therefore, Guardians denies this allegation.**

67.     With a population size near 4,000, the Gunnison Basin Population is significantly less susceptible to the perils of small population size and structure than the much-smaller satellite populations.

**The allegations in Paragraph 67 are vague and ambiguous, and, therefore, Guardians lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 67, and, therefore, Guardians denies this allegation.**

68.     According to scientific analyses, disease, drought, and fire do not pose significant threats to the Gunnison Basin Population in the foreseeable future.

**Guardians denies the allegations in Paragraph 68.**

69.     According to FWS, current residential development is a threat of "low magnitude to the persistence of [the Gunnison Basin] population." Final Listing Rule at 69,236.

**The allegations in Paragraph 69 purport to characterize the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of this document.**

70.     FWS itself considers the Gunnison Basin Population to be relatively stable and resilient. Final Listing Rule at 69,178.

**The allegations in Paragraph 70 purport to characterize the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of this document.**

71.     In the Final Listing Rule, FWS acknowledged the effectiveness of state and local conservation efforts and in particular noted their impact in the Gunnison Basin.  FWS opined that proposed conservation programs involving habitat protections on private and federal land for Gunnison sage-grouse will provide a long-term, net benefit for the Gunnison sage-grouse on a landscape scale.

**The allegations in Paragraph 71 purport to characterize the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations that are inconsistent with the plain language, meaning, or context of this document.**

72.     Colorado has spent at least $40 million engaging in and managing conservation efforts for the Gunnison sage-grouse and its habitat. These efforts include intensive management actions by Colorado Parks and Wildlife such as habitat treatments, predator control, purchasing property and managing it for Gunnison sage-grouse, translocating birds to augment small populations, lek monitoring, research, and captive breeding programs.

**Guardians lacks sufficient information or knowledge to form a belief as to the allegations in Paragraph 72 and, therefore, Guardians denies this allegation.**

73.     Additionally, Colorado established and maintained a Candidate Conservation Agreement with Assurances, or CCAA, for the Gunnison sage-grouse. The CCAA, to which FWS is a party, has protected thousands of acres of privately owned habitat.

**Guardians admits that the State of Colorado has entered into a CCAA. Guardians lacks sufficient information or knowledge to form a belief as to the remaining allegations in Paragraph 73 and, therefore, Guardians denies this allegation.**

**The Listing and the Critical Habitat Designation**

74.     In 2000, the year the Gunnison sage-grouse was recognized as a distinct species, FWS received a petition to list it under the ESA. FWS determined that the species was warranted for listing but the listing was precluded by higher priority actions.

**Guardians admits the first sentence in Paragraph 74 and admits that the FWS effectively determined that the Gunnison sage-grouse was warranted but precluded for listing.**

75.     Upon further study, in 2006 FWS determined that the species did not warrant protection under the ESA. Final Listing Determination for the Gunnison Sage-Grouse as Threatened or Endangered, 71 Fed. Reg. 19,954 (April 18, 2006).

**The allegations in Paragraph 75 purport to characterize the 2006 listing rule, which speaks for itself and is the best evidence of its contents. Guardians denies any**

**allegations that are inconsistent with the plain language, meaning, or context of this document.**

76.     A coalition of conservation groups and others challenged this determination, and the parties subsequently reached an agreement under which FWS agreed to complete a new status review for the Gunnison sage-grouse by June 2010.

**Guardians admits the allegations in paragraph 76, and notes only that the settlement agreement required the Service to publish a final listing rule by June 2010.**

77.     In September 2010 the FWS determined that listing the Gunnison sage- grouse was warranted but precluded by other priorities, and the grouse was placed on the Candidate Species list. Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species, 75 Fed. Reg. 59804 (Sept. 28, 2010).

**Guardians admits the allegations in Paragraph 78.**

78.     Notwithstanding the extraordinary conservation efforts undertaken by Colorado, local governments, and private landowners, in January 2013 FWS published a rule proposing to list the Gunnison sage-grouse as endangered throughout its range, along with a rule proposing to designate 1.7 million acres of critical habitat for the species. Endangered Status for Gunnison Sage-Grouse, 78 Fed. Reg. 2486 (Jan. 11, 2013).

**Admit that FWS published a rule proposing to list as endangered the Gunnison sage-grouse and designate critical habitat for the species.  The remaining allegations in Paragraph 78 constitute characterizations of the Proposed Listing Rule and the Proposed Critical Habitat Rule, which speak for themselves and are the best evidence of their contents.  Guardians denies any allegations inconsistent with the plain language, meaning and context of these rules.**

79.     Colorado, through its Department of Natural Resources and Division of Parks and Wildlife, provided extensive comments on the proposed rules explaining why ESA protection for the species was not warranted. The State provided FWS with scientific and commercial data supporting a determination that listing the Gunnison sage-grouse as either endangered or threatened was not warranted under the relevant ESA factors.

**Guardians lacks sufficient information or knowledge to form a belief about the truth of the allegations in Paragraph 79 and denies them on that basis.**

80.     In November 2014, FWS published a final rule listing the Gunnison sage-grouse as "threatened" under the ESA. *See generally* Final Listing Rule. At the same time, FWS published a final rule designating approximately 1.4 million acres of critical habitat across nine counties in Colorado and two counties in Utah. *See generally* Final Critical Habitat Rule.

**Guardians admits that in November 2014, the Service published a final listing rule protecting Gunnison sage-grouse as threatened. The second sentence purports to characterize the Final Critical Habitat Rule, which speaks for itself and provides the best evidence of its contents. Guardians denies any allegation that is inconsistent with the plain language, meaning and intent of the Final Critical Habitat Rule.**

81.     The Final Listing Rule dismissed many of the successful conservation efforts implemented by Colorado, local governments, and private landowners.

**Paragraph 81 purports to characterize the Final Listing Rule, which speaks for itself and provides the best evidence of its contents. Guardians denies any allegation that is inconsistent with the plain language, meaning and intent of the Final Critical Habitat Rule.**

82.     The Final Listing Rule does not provide a detailed analysis pursuant to the Policy for Evaluation of Conservation Efforts, 68 Fed. Reg. 15,100 (Mar. 28, 2003), and the discussion it does provide does not recognize the certainty and effectiveness of many of the conservation efforts whose success has been demonstrated over the past decade.

**The allegations in Paragraph 82 purport to characterize the Final Listing Rule, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning, or context of**

**the rule.  To the extent the allegations in Paragraph 82 constitute material allegations of fact, Guardians denies them.**

83.     Without providing meaningful explanation, the Final Listing Rule states that existing regulatory mechanisms do not adequately address the substantial threats faced by the species.

**The allegations in Paragraph 83 purport to describe the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule. To the extent the allegations in Paragraph 83 constitute material allegations of fact, Guardians denies them.**

**FWS's Improper Evaluation of Potential Threats to Gunnison sage-grouse**

84.     In the Final Listing Rule, FWS identified the most substantial threats to the species as (a) habitat decline due to human disturbance; (b) small population size and structure; (c) drought and climate change; and (d) disease. FWS's determination of the magnitude of these threats, especially in the Gunnison Basin Population, is not based on the best available scientific information, and often conflicts with the data presented in the Final Listing Rule itself.

**The allegations in Paragraph 84 purport to describe the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule.**

*Habitat Decline*

85.     As explained above, the efforts of Colorado, local government, and private landowners have been highly successful in preserving and protecting habitat for the Gunnison sage-grouse, particularly in the Gunnison Basin where most of the birds reside. FWS did not adequately recognize or credit those efforts.

**Guardians denies the first sentence on Paragraph 85. The allegations in the second sentence of Paragraph 85 appear to describe the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians deny any allegations inconsistent with the plain language, meaning and context of the rule.**

*Population Size and Structure*

86.     FWS's conclusions regarding small population size and structure are not consistent with the best available scientific information.

**The allegations in Paragraph 86 purport to describe the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule.**

87.    According to the RCP, the Gunnison Basin Population is large enough to maintain a reasonably large degree of genetic variation over time. RCP at 202.

**The allegations in Paragraph 87 purport to characterize the RCP, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning and context of the RCP.**

88.    The Gunnison Basin Population has sufficient redundancy to survive stochastic (i.e., random) events that are likely to occur in the basin.

**Guardians denies the allegations in Paragraph 88.**

89.    Taken together, the four population viability analyses relied up on by the FWS indicate that the species is unlikely to face extinction within the foreseeable future.

**The allegations in Paragraph 89 purport to describe the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule.**

90.    One analysis cited by FWS, prepared in cooperation with the Steering Committee for the RCP, estimated the probability of extinction for the Gunnison Basin Population in the next 50 years to be less than 1%.

**The allegations in Paragraph 90 purport to describe the Final Listing Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule.**

91.    Another analysis cited by FWS also reported a less than 1% probability of extinction, absent catastrophic environmental events.

**The allegations in Paragraph 91 purport to characterize an uncited scientific study, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning, or context of this study.**

92.    The author of the only analysis that shows a greater than 1% chance of extinction in the next 60 years cautioned that her data—six years of demographic data—were based on a cyclical period when the population was experiencing a decline. She notes that if her study had been conducted a few years earlier or later, a different picture would have emerged, more consistent with the other population viability analyses. Her subsequent paper, proposing a more integrated model, showed an essentially stable population.

**The allegations in Paragraph 92 purport to characterize scientific determinations of a researcher, which speak for themselves and are the best evidence of their own contents. Guardians denies any allegations inconsistent with the plain language, meaning, or context of these determinations.**

93.    Although conservation efforts for some of the satellite populations have been successful, and enhancing these populations contributes to the conservation and vitality of the species, the size and stability of the Gunnison Basin Population alone indicate that

the species can survive, based on all foreseeable threats, even if the satellite populations do not.

**Guardians denies the allegations in Paragraph 93.**

*Drought and Climate Change*

94.    Gunnison sage-grouse are well-adapted to relatively short-term drought. The driest summer on record in the Gunnison Basin occurred in 2002. The Gunnison Basin Population declined during that period, but has since rebounded to pre- drought numbers, with virtually all lek complexes (i.e., courtship groups) recovering.

**The allegations in the first and third sentence are vague and ambiguous, and Guardians denies these allegations on this basis.   Guardians lacks sufficient information or knowledge to form a belief about the truth of the second sentence in Paragraph 94, and therefore denies it.**

95.    Current models of climate change suggest that increased temperatures and drought conditions will not impact the Gunnison Basin in the same way or with the same magnitude as drier, lower elevation areas to the west.

**Guardians lacks sufficient information or knowledge to form a belief about the truth of this allegation and therefore denies it.**

96.    The sagebrush ecosystems where Gunnison sage-grouse reside have "low" vulnerability to climate change. Indeed, montane sagebrush stands, already widespread

and dominant in the Gunnison Basin, are considered likely to expand with changing climate conditions. Gunnison Basin Climate Change Vulnerability Assessment http://wwa.colorado.edu/publications/reports/TNC-CNHP-WWA-UAF_GunnisonClimChangeVulnAssess_Report_2012.pdf at B-27. Low-elevation sagebrush shrublands are considered to be in fair to good condition now, and are presumed stable in the face of expected climate change. *Id*. at B-29.

**The allegations in Paragraph 96 purport to describe the so-called Gunnison Basin Climate Change Vulnerability Assessment, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning and context of this assessment.**

*Disease*

97.    FWS's conclusion that widespread disease, specifically West Nile virus, presents a grave threat rangewide is not based on the best available scientific information.

**The allegations in Paragraph 97 purport to describe the Final Listing Rule, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule.**

98.    To date, West Nile disease has not been documented in Gunnison sage-grouse.

**Guardians lacks sufficient information or knowledge to form a belief about the truth of this allegation and therefore denies it. Guardians avers that the Final**

**Listing Rule states that West Nile virus is present throughout the Gunnison sage-grouse's range.**

99.     Speculation that the virus may spread to Gunnison sage-grouse fails to distinguish between different climatic conditions across the species' habitat. Colder spring temperatures and shorter summer seasons at higher elevations decrease mosquito breeding activity and shorten the amount of time for West Nile virus to spread in the mosquito population to the extent required for transmission of the virus to avian hosts.

**The allegations in paragraph 99 are vague and ambiguous; Guardians lacks sufficient information or knowledge to form a belief about the truth of these allegations and therefore denies them.**

100.    West Nile virus does not present a future threat to the Gunnison sage-grouse rangewide.  Given the relatively high elevation of the Gunnison Basin and the stability and resiliency of the Gunnison Basin Population, West Nile virus would not challenge the survival of the Gunnison Basin Population.

**Guardians denies the allegations in Paragraph 100.**

**Designation of Critical Habitat Was Improper**

101.    FWS's designation of critical habitat for the Gunnison sage-grouse was likewise deficient.

**The allegations in Paragraph 101 purport to describe the Final Critical Habitat Rule, which speaks for itself and is the best evidence of its contents. Guardians deny any allegations inconsistent with the plain language, meaning and context of the rule.**

*Failure to Consider Alternatives*

102.    Before designating critical habitat for the Gunnison sage-grouse, FWS prepared an Environmental Assessment, available at http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSG_FinalEA_11122014.pdf.

**Guardians admits that FWS prepared an Environmental Assessment before designating critical habitat for the Gunnison sage-grouse, but denies that it appears at the hyperlinked site.**

103.    On November 10, 2014, FWS issued a Finding of No Significant Impact, determining that the proposed critical habitat designation would not have a significant impact on the environment. *See* http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSG_FONSI_11122014.pdf.

**Guardians admits that FWS issued a Finding of No Significant Impact related to the proposed critical habitat designation, but denies that it appears at the hyperlinked site.**

104.   The only alternatives FWS studied in the Environmental Assessment were a "no-action" alternative and FWS's proposed designation of over 1.4 million acres. In violation of Department of Interior directives, FWS did not study any variations on its proposed action, nor did it consider any other alternatives.  Dep't of Interior, Fish and Wildlife Service Manual, 550 FW 1 at 20.

**The allegations in Paragraph 104 purport to describe the Environmental Assessment and the FWS Manual, which speak for themselves and are the best evidence of their own contents.  Guardians denies the allegations in Paragraph 104 to the extent that they are inconsistent with the plain language, meaning or context of these documents.**

*Improper Designation of Unoccupied Habitat*

105.   In the Final Critical Habitat Rule, FWS designated 1,429,551 acres of critical habitat, of which 45%, or 644,940 acres, is currently unoccupied by Gunnison sage-grouse.

**The allegations in Paragraph 105 purport to describe the Final Critical Habitat Rule, which speaks for itself and is the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule.**

106.   Other than conclusory statements, FWS made no showing that the extensive tracts of unoccupied areas designated as critical habitat are essential to the conservation of the species or that currently occupied habitat is insufficient for conservation of the species.

**The allegations in Paragraph 106 purport to describe the Final Critical Habitat Rule, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule.**

107.   Large areas have been included as critical habitat that are not currently, nor will likely ever be, considered suitable habitat. Many of the unoccupied areas are not essential to the conservation of the species, in part because they cannot sustain the ecosystem needed by the Gunnison sage-grouse.

**The allegations in Paragraph 107 purport to describe the Final Critical Habitat Rule, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning and context of the rule.**

108.   FWS identified some unoccupied areas as habitat that "could be suitable for occupation of sage-grouse if practical restoration were applied." 79 Fed. Reg. at 69,335. These areas are "most commonly former sagebrush areas overtaken by pinon-juniper woodlands." *Id.* FWS did not make a showing that restoration of these areas is feasible,

46

much less practical. Some of the areas contain extensive stands of old-growth pinyon-juniper. Destruction of these stands to encourage growth of sagebrush is prohibitively expensive and unlikely to provide long-term sagebrush habitat.

**The allegations in the first, second and third sentences of Paragraph 108 purport to describe the Final Critical Habitat Rule, which speaks for itself and provides the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning or context of the rule. The remaining allegations in Paragraph 108 are vague and ambiguous; therefore, Guardians lacks sufficient information or knowledge to form a belief about the truth of these allegations and denies them on that basis.**

109.    Other areas designated as unoccupied critical habitat have been converted to agriculture or exurban development. FWS lacks both the legal authority and the resources to carry out systemic change in these existing patterns of private land use.

**Guardians lacks sufficient information or knowledge to form a belief about the truth of this allegation and therefore denies it.**

110.    The designated critical habitat also includes "vacant or unknown areas" that have not been adequately inventoried. 79 Fed. Reg. at 69,335.

**The allegations in Paragraph 110 purport to describe the Final Critical Habitat Rule, which speaks for itself and provides the best evidence of its contents.**

**Guardians denies any allegations inconsistent with the plain language, meaning or context of the rule.**

### *Failure to Consider Economic Impacts*

111.   The Economic Impact Analysis of the proposed critical habitat designation forecast an annual loss of economic activity resulting from lost oil and gas production in Colorado of $160 million. The analysis also showed a $1.5 million annual regional impact from grazing reductions associated with the designation of critical habitat. FWS dismissed these impacts as insignificant, and did not explain the inclusion of areas where economic impact is disproportional to benefit of special management considerations.

**Plaintiff is characterizing the contents of the Economic Impact Analysis, which speaks for itself and provides the best evidence of its contents.  Guardians denies any allegation inconsistent with the plain language, meaning and context of this document.**

### FWS's Failure to Provide Written Justification for Adopting Regulations Inconsistent with Comments from Colorado Parks and Wildlife

112.    A state wildlife agency is uniquely well positioned to opine on the biology and status of a species that the agency has been managing.

**The allegation in Paragraph 112 is vague and ambiguous, and Guardians denies the allegation on this basis.**

113.   Section 4(i) provides a mandatory mechanism to ensure that FWS seriously considers the recommendations made by a state agency concerning a proposed listing or critical habitat designation rule.

**The allegations in Paragraph 113 purport to describe the Endangered Species Act, which speaks for itself and provides the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning or context of this statute.  Morevoer, this allegation is a legal conclusion to which no response is required.  To the extent a response is required, Guardians denies this allegation.**

114.   Over the past decade, Colorado Parks and Wildlife has taken the lead in monitoring the status of Gunnison sage-grouse, collecting and providing critical data, engaging in species management and habitat treatments, and promoting stakeholders' efforts to conserve the species and its habitat.

**The allegation in Paragraph 112 is vague and ambiguous, and Guardians denies this allegation on this basis.  Guardians admits, however, that the Colorado Parks and Wildlife have monitored for Gunnison sage-grouse over the past decade.**

115.   Colorado Parks and Wildlife, the Colorado Department of Agriculture, and Colorado Governor Hickenlooper submitted multiple sets of comments to FWS regarding the proposed listing and critical habitat designation for the Gunnison sage-grouse.

Colorado Parks and Wildlife submitted comments on April 1 and December 2, 2013 and

October 15, 2014; the Colorado Department of Agriculture submitted comments on April

2, 2014; and Governor Hickenlooper submitted comments on July 2, 2014. These

comments raised numerous disagreements with the proposed rules, and provided

scientific information supporting the State's disagreements with the proposed rules.

**Guardians admits the allegation in the first sentence of Paragraph 115.**

**Guardians lacks sufficient information or knowledge on the precise date Colorado**

**Parks and Wildlife, the Colorado Department of Agriculture, and Colorado**

**Governor Hickenlooper submitted these comments, and therefore Guardians denies**

**the allegations in the second sentence.   The allegations in the third sentence of**

**Paragraph 115 purport to characterize these comments, which speak for themselves**

**and provides the best evidence of their contents.   Guardians denies any allegations**

**inconsistent with the plain language, meaning or context of these comments.**

116.    The materials submitted with Governor Hickenlooper's July 2, 2014 letter

included comments and recommendations previously filed by Gunnison County, on

which the Governor requested feedback from FWS.

**The allegations in the Paragraph 116 purport to describe a July 2, 2014 letter,**

**which speaks for itself and provides the best evidence of its contents.   Guardians**

**denies any allegations inconsistent with the plain language, meaning or context of this letter.**

117.    On December 23, 2014, Noreen Walsh, Regional Director of Region 6 of the FWS, sent a letter to Colorado Governor John Hickenlooper, with copies to Bob Broscheid, Director of Colorado Parks and Wildlife and John Salazar, Commissioner of Agriculture for the State of Colorado. Attached to the letter were FWS's responses to selected "key comments" from the governor's office, Colorado Parks and Wildlife, and the Colorado Department of Agriculture on the proposed rules regarding the Gunnison sage-grouse. The attachment did not respond to Gunnison County's comments, or acknowledge the Governor's request regarding the County's comments.

**The allegations in the Paragraph 117 purport to describe a December 23, 2014 letter, which speaks for itself and provides the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning or context of this letter.**

118.    Regional Director Walsh's letter failed to provide adequate written justification for the Service's failure to adopt regulations consistent with the State Agencies' comments, as required under Section 4(i). The letter did not respond at all to some of the State's comments and recommendations, and where it did respond, numerous responses were inadequate.

**The allegations in the Paragraph 118 purport to describe a December 23, 2014 letter, which speaks for itself and provides the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning or context of this letter.**

119.    For example, in its April 1, 2013 letter, Colorado Parks and Wildlife provided comments and information regarding (1) adequate protections for habitat in the Gunnison Basin, (2) the definition of "fragmentation" of habitat in the proposed rule, (3) FWS's misuse of a 1964 article by Glenn E. Rogers concerning habitat at Piñon Mesa; and (4) existing grazing practices.

**The allegations in the Paragraph 119 purport to describe the contents of an April 1, 2013 letter, which speaks for itself and provides the best evidence of its contents.  Guardians denies any allegations inconsistent with the plain language, meaning or context of this letter.**

120.    Regional Director Walsh's letter and attachment did not adequately address Colorado Parks and Wildlife's comments on these subjects.

**The allegations in the Paragraph 120 purport to describe a December 23, 2014 letter, which speaks for itself and provides the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning or context of this letter.**

121.    In its December 2, 2013 letter, Colorado Parks and Wildlife provided comments regarding West Nile virus and other bacterial and parasitic diseases and also provided comments regarding severe weather in Gunnison sage-grouse range.

**The allegations in the Paragraph 121 purport to describe a December 2, 2013 letter, which speaks for itself and provides the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning or context of this letter.**

122.    FWS did not adopt these comments in the Listing Rule or provide any written justification for not doing so in Regional Director Walsh's response letter.

**The allegations in the Paragraph 122 purport to describe the Final Listing Rule and the December 23, 2013 letter, which speak for themselves and provides the best evidence of their own contents.  Guardians denies any allegations inconsistent with the plain language, meaning or context of the Final Listing Rule and the December 23, 2014 letter.**

123.    In its October 15, 2014 letter, Colorado Parks and Wildlife provided comments and data regarding the risk of severe wildfires in the Gunnison Basin.

**The allegations in the Paragraph 123 purport to describe an October 15, 2014 letter, which speaks for itself and provides the best evidence of its contents.**

**Guardians denies any allegations inconsistent with the plain language, meaning or context of this letter.**

124.    FWS neither adopted the data and comments nor justified its decision not to in its response letter.

**The allegations in the Paragraph 124 purport to describe the Final Listing Rule and the December 23, 2014 letter, which speak for themselves and provide the best evidence of their own contents.  Guardians denies any allegations inconsistent with the plain language, meaning or context of the Final Listing Rule and the December 23, 2014 letter.**

125.    In response to some of Colorado Parks and Wildlife's comments, the letter impermissibly referenced the Final Listing Rule in lieu of providing a justification in the letter.

**The allegations in the Paragraph 125 purport to describe a December 23, 2014 letter, which speak for themselves and provide the best evidence of their own contents.  Guardians denies any allegations inconsistent with the plain language, meaning or context of this letter.**

### First Claim for Relief: Violation of Section 4 of the Endangered Species Act by Listing the Gunnison Sage-grouse as Threatened

126.    Colorado incorporates by reference Paragraphs 1-125 of this Complaint as if restated here in full.

**Guardians incorporates by reference its responses to Paragraphs 1-125 of the Complaint as if restated here in full.**

127.   Defendants violated the ESA by failing to use the best available scientific data and information when considering whether to list the Gunnison sage-grouse under section 4 of the ESA, and by failing to draw rational conclusions from the evidence before them.

**The allegations in Paragraph 127 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 127 constitute material allegations of fact, Guardians denies them.**

128.   Defendants arbitrarily and capriciously determined that the Gunnison sage- grouse is threatened throughout its range when the vast majority of the population—i.e., the Gunnison Basin Population—is stable and thriving, and not highly susceptible to foreseeable threats.

**The allegations in Paragraph 128 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 128 constitute material allegations of fact, Guardians denies them.**

129.   Defendants arbitrarily and capriciously failed to acknowledge or give sufficient weight to the certainty and efficacy of conservation efforts, including existing regulatory mechanisms.

**The allegations in Paragraph 129 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 129 constitute material allegations of fact, Guardians denies them.**

130.   Accordingly, Defendants' Final Listing Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

**The allegations in Paragraph 130 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 130 constitute material allegations of fact, Guardians denies them.**

**Second Claim for Relief: Violation of Section 4 of the Endangered Species Act and the Administrative Procedure Act by Failing to Provide Written Justification for Adopting Regulations Inconsistent with State Agency Recommendations**

131.   Colorado incorporates by reference Paragraphs 1-125 of this Complaint as if restated here in full.

**Guardians incorporates by reference its responses to Paragraphs 1-125 of the Complaint as if restated here in full.**

132.   FWS has adopted two final rules – the Final Listing Rule and the Final Critical Habitat Rule – that are not consistent with the Colorado state agencies' comments and recommendations, and failed to specifically address many of these comments in its December 23, 2014 response to the State.

**The allegations in Paragraph 132 are vague and ambiguous and Guardians denies them on that basis.**

133.    FWS's failure to provide an adequate written justification for the failure to adopt a regulation consistent with Colorado's comments on the proposed rules violates Section 4(i), 16 U.S.C. § 1533(i).

**The allegations in Paragraph 133 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 133 constitute material allegations of fact, Guardians denies them.**

134.    Accordingly, the Final Listing and Final Critical Habitat Rules were adopted without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

**The allegations in Paragraph 134 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 134 constitute material allegations of fact, Guardians denies them.**

<u>**Third Claim for Relief: Violation of Section 4 of the Endangered Species Act by Improperly Designating Critical Habitat**</u>

135.    Colorado incorporates by reference Paragraphs 1-125 of this Complaint as if restated here in full.

**Guardians incorporates by reference its responses to Paragraphs 1-125 of the Complaint as if restated here in full.**

136.    Section 4 of the ESA mandates that unoccupied areas may only be designated as critical habitat upon a finding that they are essential to the conservation of the species.

**The allegations in Paragraph 136 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 136 constitute material allegations of fact, Guardians denies them.**

137.    ESA regulations require that unoccupied areas may only be designated upon a determination that protection of occupied areas is insufficient for the conservation of the species.

**The allegations in Paragraph 137 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 137 constitute material allegations of fact, Guardians denies them.**

138.    Defendants designated unoccupied areas as critical habitat without showing that protection or special management of those areas is essential to the conservation of the species or that designation of only occupied areas was insufficient for the conservation of the species.

**The allegations in Paragraph 138 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 138 constitute material allegations of fact, Guardians denies them.**

139.    Defendants arbitrarily dismissed the results of the Economic Impact Analysis.

**The allegations in Paragraph 139 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 139 constitute material allegations of fact, Guardians denies them.**

140.   Accordingly, Defendants' designation of critical habitat for Gunnison sage- grouse is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

**The allegations in Paragraph 140 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 140 constitute material allegations of fact, Guardians denies them.**

**Fourth Claim for Relief: Violation of the National Environmental Policy Act and the Administrative Procedure Act**

141.   Colorado incorporates by reference Paragraphs 1-125 of this Complaint as if restated here in full.

**Guardians incorporates by reference its responses to Paragraphs 1-125 of the Complaint as if restated here in full.**

142.   NEPA requires that FWS take a hard look at the direct and indirect environmental impacts of its decision to designate critical habitat for the Gunnison sage-grouse.

**The allegations in Paragraph 142 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 142 constitute material allegations of fact, Guardians denies them.**

143.   FWS guidance requires that its Environmental Assessment include the proposed action, a no action alternative, and reasonable alternatives that satisfy the purpose and need of the proposed action.

**The allegations in Paragraph 143 purport to characterize FWS guidance, which speaks for itself and is the best evidence of its contents. Guardians denies any allegations inconsistent with the plain language, meaning or context of this guidance.**

144.   Defendants' decision to study only the proposed action and a no-action alternative resulted in a failure to take a hard look at the impacts of the proposed action, violated NEPA, and is arbitrary and capricious and an abuse of discretion in violation of the APA.

**The allegations in Paragraph 144 are conclusions of law to which no response is required. To the extent the allegations in Paragraph 144 constitute material allegations of fact, Guardians denies them.**

## REQUEST FOR RELIEF

Regarding Plaintiffs' "Prayer for Relief", Guardians is not required to respond; to the degree a response is required, Guardians denies that the requested relief is appropriate as founded in law or fact.

## GENERAL DENIALS

A.  In addition, Guardians denies every allegation of the Plaintiffs' Complaint, express or implied, that is not otherwise specifically admitted, denied, or qualified herein.

B.  Nothing in this Answer is, or shall be construed to be, a waiver of Guardians' right to timely bring their own claims.

C.  Guardians reserve the right to revise, supplement, answer, and plead further defenses as appropriate and necessary as this matter develops.

WHEREFORE, having fully answered, Guardians respectfully request for an Order and Judgment of the Court as follows:

1.  Dismissing Plaintiffs' Complaint in its entirety.

2.  Granting Guardians such additional relief as this Court deems just and equitable.

Respectfully submitted this 30th day of July, 2015.

WILDEARTH GUARDIANS and DR. CLAIT E. BRAUN

By:   _/s/ Talasi B. Brooks_
        Talasi B. Brooks (ISB #9712)
        Advocates for the West
        P.O. Box 1612
        Boise, ID 83701
        (208)342-7024 x208
        tbrooks@advocateswest.org

        Sarah K. McMillan (MTSB #3634)
        WildEarth Guardians
        PO Box 7516
        Missoula, MT 59807

61

(406) 549-3895 (phone)
(505) 213-1895 (fax)
smcmillan@wildearthguardians.org

Attorneys for WildEarth Guardians and
Dr. Clait E. Braun