## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-130
(Consolidated with Civil Action No. 1:15-cv-131 and Civil Action No. 1:15-cv-286)

IN re GUNNISON SAGE-GROUSE ENDANGERED SPECIES ACT LITIGATION
_____
Civil Action No.1:15-cv-286 - ONLY

THE STATE OF COLORADO by and through the Colorado Department of Natural
Resources, the Division of Parks and Wildlife, and the Parks and Wildlife Commission,
Plaintiff

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
DANIEL ASHE, in his official capacity as Director of the United States Fish and
        Wildlife Service,
SALLY JEWELL, in her official capacity as Secretary of the United States Department
        of the Interior,
Defendants

_____

### GUNNISON PLAINTIFF-INTERVENORS' COMPLAINT/PETITION IN
### INTERVENTION WITH ADDITIONAL CLAIMS
### IN CIVIL ACTION NO. 1:15-CV-286
_____

## INTRODUCTION

1.      Come now Plaintiff-Intervenors, the Board of County Commissioners of the

County of Gunnison, Colorado ("Gunnison County") by and through the office of the

Gunnison County Attorney, and the Gunnison County Stockgrowers' Association, Inc.

("Gunnison Stockgrowers" or "Association") by and through Trout, Raley, Montaño,

1

Witwer and Freeman, P.C. (collectively the "Gunnison Plaintiff-Intervenors"), and intervene in this action aligned with Plaintiff, the State of Colorado, in asserting claims against the United States Fish and Wildlife Service ("FWS"); Daniel Ashe in his official capacity as Director of FWS; and Sally Jewell in her official capacity as Secretary of the United States Department of the Interior (collectively "Defendants" or "FWS").

2.      The Gunnison Plaintiff-Intervenors seek declaratory, injunctive, and other relief to enforce the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"), the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. §§ 500-596 ("APA").

3.      The Gunnison Plaintiff-Intervenors challenge the decision of the FWS in its Final Listing Rule to list the Gunnison sage-grouse (*Centrocerus minimus*) as a threatened species under the ESA rather than find the species "not warranted" for listing at this time. *See* Threatened Status for Gunnison Sage-Grouse, Final Rule, 79 Fed. Reg. 69,192 (Nov. 20, 2014).

4.      The Gunnison Plaintiff-Intervenors also challenge FWS's designation of critical habitat under the ESA in its Final Critical Habitat Rule for the Gunnison sage-grouse. *See* Designation of Critical Habitat for the Gunnison Sage-Grouse, Final Rule, 79 Fed. Reg. 69,312 (Nov. 20, 2014).

5.      The Gunnison Plaintiff-Intervenors seek judicial relief declaring that the FWS

violated the ESA and APA in listing the Gunnison sage-grouse as a threatened species

and, further, declaring that listing of the species is not warranted at this time.

6.      The Gunnison Plaintiff-Intervenors also seek judicial relief declaring that FWS

violated the ESA, NEPA and APA when it designated critical habitat for the Gunnison

sage-grouse.

7.      The Gunnison Plaintiff-Intervenors request that the Court vacate the Final Listing

Rule and the Final Critical Habitat Rule and order such other relief as is appropriate.

8.      The Gunnison Plaintiff-Intervenors endorse the assertions and claims set forth by

the Plaintiff in paragraphs 4 through 15 of the Introduction to its Complaint/Petition for

Review of Agency Action ("State's Complaint"), and incorporate those paragraphs by

this reference as if set forth in full.  The Gunnison Plaintiff-Intervenors raise additional

claims in this case as set forth in this Complaint.

## NOTICE OF RELATED CASES

9.      This case is one of three related civil actions that have been consolidated by Order

of this Court dated May 1, 2015.  In the two other cases, Civil Action Nos. 1:15-cv-130

and 1:15-cv-131, the plaintiffs/petitioners challenge the Final Listing Rule on the grounds

that the Gunnison sage-grouse should have been listed as endangered, rather than

threatened.  The WildEarth Guardians' complaint also challenges the Final Critical

Habitat Rule, arguing that the designation should have been more extensive.  The Center

3

for Biological Diversity case also challenges an interpretive policy adopted by the FWS

on July 1, 2014 and relied upon by the FWS in its listing decision.  The Gunnison-

Intervenors have intervened, aligned as defendants, in these two other cases.

## PARTIES

10.      Gunnison Plaintiff-Intervenors endorse and incorporate herein the allegations

regarding Plaintiffs and Defendants in paragraphs 20 through 25 of the State's

Complaint.

### *Gunnison County*

11.      Plaintiff-Intervenor Board of County Commissioners of the County of Gunnison,

Colorado is the governing board of a Colorado county, a political subdivision of the State

of Colorado, with certain constitutional and statutory authority under Colorado law.  The

Board of County Commissioners is the local government of general jurisdiction for

Gunnison County, Colorado. Gunnison County has the authority to protect and promote

the health, welfare and safety of the people of Gunnison County, and the authority to plan

for and regulate the use of land so as to provide planned and orderly use of land and

protection of the environment.  This includes the authority to protect lands from activities

that would cause immediate or foreseeable material danger to significant wildlife habitat

and would endanger a wildlife species. C.R.S. § 29-20-104.

12.      Gunnison County has adopted and implemented policies and regulations

addressing the review, approval, conditioning and denial of proposed activities and uses

of land and natural resources that reasonably might impact the Gunnison sage-grouse.

Gunnison County has adopted land use, subdivision, road, weed management, and

domestic animal control regulatory mechanisms specific to conservation of Gunnison

sage-grouse.

13.     Gunnison County funds and administers a comprehensive Gunnison sage-grouse

conservation program.  Since 1995, Gunnison County has provided personnel, facilities,

financial support in excess of one million dollars, and scientifically-based efforts to

protect and foster the Gunnison sage-grouse and its habitat. *See* Affidavit of Paula

Swenson, Chairperson of the Board of County Commissioners of the County of

Gunnison, Colorado, attached hereto and incorporated herein as Exhibit "A".  Gunnison

County participates locally and across the range of the species with other public and

private entities to obtain conservation easements, promote habitat enhancement projects,

and conduct research beneficial to Gunnison sage-grouse. Gunnison County facilitates

and staffs the Gunnison Basin Sage-Grouse Strategic Committee which is a collaboration

of federal, state, and local government entities and private parties who work with the

Gunnison County Wildlife Conservation Coordinator in implementing efforts to protect

and conserve the Gunnison sage-grouse and its habitat.

14.     Gunnison County also owns real property impacted by the decisions at issue in

this matter and participates in the Gunnison Sage-Grouse Candidate Conservation

Agreement with Assurances ("CCAA") between the FWS and the Colorado Division of Parks and Wildlife ("CPW") (formerly the Division of Wildlife).

15.     The actions of FWS challenged in this case will directly and substantially impair and infringe upon the regulatory, land use, economic, governance, and other interests of Gunnison County.

16.     Gunnison County submitted three sets of formal comments to the FWS during the public comment period regarding its concerns with the proposed listing of the species and proposed designation of critical habitat.[1]

***Gunnison Stockgrowers***

17.     Plaintiff-Intervenor Gunnison County Stockgrowers' Association, Inc. was established in 1894 and is comprised of over 100 members of the local ranching community in Gunnison and Saguache Counties, Colorado.

18.     This case is germane to the organizational interests of the Association. The objectives and purposes of the Association include the protection of range privileges and the promotion and protection of the interests of the stock raising industry.  *See* Articles of Incorporation, attached hereto and incorporated herein by reference as Exhibit "B" .  The Gunnison County Stockgrowers' Association has a history of involvement in the conservation of the Gunnison sage-grouse and involvement in the listing process related

---

[1] The Gunnison County comments are dated April 2, 2013, October 18, 2013, and November 26, 2013. These comments were resubmitted to the FWS by the State of Colorado by letter dated July 2, 2014 signed by Governor John Hickenlooper.

to this species in order to protect those interests.  The Gunnison County Stockgrowers'

Association is a local affiliate of the Colorado Cattlemen's Association which was

granted intervenor-defendant status in the 2006 litigation concerning the listing status of

this species.  *See* Memorandum Opinion, August 21, 2007, Civil Action 1:06-cv-01946-

RBW.

19.     Members of the Gunnison Stockgrowers conduct grazing and other operations on

privately-owned lands that are now subject to federal regulatory restrictions on allowable

land uses as a result of the Final Listing and Critical Habitat Rules.  Certain members

previously enrolled their ranchlands under the CCAA between the FWS and CPW to take

steps in advance of the potential listing to conserve the grouse and help moderate the

regulatory impact of its listing on their properties.  *See* Affidavit of Burt Guerrieri,

President of Gunnison County Stockgrowers' Association, attached hereto and

incorporated herein as Exhibit "C".  One of the legal consequences of the Final Listing

Rule is that properties can no longer be enrolled and receive regulatory assurances under

the CCAA conservation program.

20.     Members of the Gunnison Stockgrowers also hold federal grazing leases and

participated in the development of the federal agency Candidate Conservation Agreement

("CCA") that addresses sage-grouse considerations for federal lands in the Gunnison

Basin.  Their interests in federal grazing leases stand to be impaired by additional

procedural and substantive restrictions on grazing permit renewals and allowable land

uses thereunder attendant to the listing.  For example, certain stockgrowers conduct grazing operations under federal permits on public land in unoccupied habitat now designated as critical and face new regulatory restrictions as a result of the challenged rulemaking. *See* Affidavit of Patrick Youmans, attached hereto and incorporated herein as Exhibit "D".

21.     Over 57,000 acres of private land have been placed under conservation easements in occupied and unoccupied habitat in the Gunnison Basin (Lohr and Gray 2013; CPW 2014).  The majority of these lands are owned by stockgrowers who are members of the Gunnison Stockgrowers.  *See* Affidavit of Burt Guerrieri, referenced above.  Gunnison Stockgrowers' members have also participated in significant additional voluntary habitat enhancement programs and projects to benefit the Gunnison sage-grouse. The benefits from these widespread efforts are evidenced through the healthy grouse population numbers in the Gunnison Basin.

22.     The Gunnison Stockgrowers and its members have made significant investments in reliance upon the very type of local-state-federal partnership efforts that have been encouraged by the FWS as the key to securing the future of the Gunnison sage-grouse. The FWS's Final Listing and Critical Habitat Rules now impose an ESA regulatory overlay on lands owned and used by Gunnison Stockgrowers' members and inject uncertainty into their future grazing operations. The Challenged Rules will negatively

impact the economic livelihood of stockgrowers individually as well as have a profound negative effect on the social and economic fabric of their community.

23.     The Gunnison Stockgrowers submitted three sets of formal comments to the FWS during the public comment period regarding its concerns with the proposed listing of the species and proposed designation of critical habitat.[2]

## JURISDICTION AND VENUE

24.     Gunnison Plaintiff-Intervenors endorse and incorporate herein the allegations regarding the jurisdiction of the Court over this action and the propriety of venue in the District of Colorado as stated in paragraphs 26 through 29 of the State's Complaint.

25.     By separate letters dated December 22, 2014 and January 5, 2015, Gunnison County and the Gunnison Stockgrowers provided notice of their intent to sue concerning legal violations of the ESA in connection with the FWS's decision to list the Gunnison sage-grouse and designate critical habitat, pursuant to the 60-day notice requirement of 16 U.S.C. § 1540(g).  More than 60 days have passed since those notices were provided, and Defendants have not taken action to address the violations.

## THE ENDANGERED SPECIES ACT

26.     Gunnison Plaintiff-Intervenors endorse and incorporate herein by this reference the allegations regarding the ESA as stated in paragraphs 30 through 47 of the State's Complaint.

---

[2] The Gunnison Stockgrowers' comments are dated March 29, 2013, September 3, 2013, and October 18, 2013.

27.     Once a species is listed and critical habitat designated, the ESA imposes

procedural and substantive prohibitions on federal agency actions and authorizations, and

on the "take" of the species, that limit and adversely impact activities that stand to affect

the species and its habitat.  16 U.S.C. §1536(a)(2); 16 U.S.C. § 1538.

28.     FWS is required to make its listing and critical habitat determinations solely on the

basis of the best scientific and commercial data available. The U.S. Supreme Court, in a

unanimous decision, has stated: "…the obvious purpose of the requirement that each

agency 'use the best scientific and commercial data available' is to ensure that the ESA

not be implemented haphazardly, on the basis of speculation or surmise. While this no

doubt serves to advance the ESA's overall goal of species preservation, we think it

readily apparent that another objective (if not the primary one) is to avoid needless

economic dislocation produced by agency officials zealously but unintelligently pursuing

their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176 (1997).

## NATIONAL ENVIRONMENTAL POLICY ACT

29.     Gunnison Plaintiff-Intervenors endorse and incorporate herein by this reference

the allegation regarding NEPA as stated in paragraph 48 of the State's Complaint.

30.     In the Tenth Circuit, FWS must comply with NEPA in making its critical habitat

determinations.  *Catron County Bd. of Comm'rs v. U.S. Fish and Wildlife Service*, 75

F.3d 1429 (10th Cir. 1996).   NEPA requires FWS to study and consider the direct and

indirect environmental impacts of a proposed critical habitat designation.  *Id*. at 1433.

31.     An Environmental Assessment ("EA") under NEPA is a public document that must provide sufficient evidence and analysis to determine whether the agency should issue a "finding of no significant impact" or prepare an "environmental impact statement" ("EIS"). 40 C.F.R. 1501.4(e); *Catron County, id.* at 1434, 1437, 1438 and 1439.

32.     Where a proposed decision to designate critical habitat is a "major federal action significantly affecting the quality of the human environment," FWS is required to prepare a full EIS, in draft and final, as part of the designation process and prior to its final decision. 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. § 1502.3; 40 C.F.R. § 1502.9; *Catron County, id.* at 1434.

33.     An EA or EIS must discuss and consider a reasonable range of alternatives to the proposed action, including the alternative of "no action." 40 C.F.R. §1502.14(d).

## ADMINISTRATIVE PROCEDURE ACT

34.     Gunnison Plaintiff-Intervenors endorse and incorporate herein by this reference the allegations regarding judicial review and the Administrative Procedure Act as stated in paragraphs 49 and 50 of the State's Complaint.

35.     Under the APA, FWS is required to publish notice of "either the terms or substance of the proposed rule or a description of the subjects and issues involved" in order to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments…" 5 U.S.C. § 533 (b)-(c).

36.     Under APA notice and comment requirements, "(a)mong the information that

must be revealed for public evaluation are the 'technical studies and data' upon which the

agency relies (in its rulemaking)." *Chamber of Commerce v. SEC*, 443 F. 3d 890, 899

(D.C. Cir. 2006).

37.     Public notice and comment regarding relied-upon technical analysis are "(t)he

safety valves in the use of… sophisticated methodology." *Sierra Club v. Costle*, 657

F.2d 298, 334 (D.C. Cir. 1981).  By requiring the "most critical factual material" used by

the agency to be subjected to informed comment, the APA provides a procedural device

to ensure that agency rules are tested through exposure to public comment, to afford

affected parties an opportunity to present comment and evidence to support their

positions, and thereby to enhance to quality of judicial review.  *Chamber of Commerce*,

*id*. at 900.

38.     Where an agency's determination "is based upon 'a complex mix of controversial

and uncommented upon data and calculations' there is no APA precedent allowing an

agency to cherry-pick a study on which it has chosen to rely in part." *American Radio*

*Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008).  The rationale for APA

public notice and comment requirement is to ensure that: "…a genuine interchange

occurs rather than allowing an agency to play hunt the peanut with technical information,

hiding or disguising the information that it employs." *Id*. (internal quotes and citations

omitted).

### SPECIFIC ALLEGATIONS REGARDING THE UNLAWFUL
### LISTING AND DESIGNATION

***The Gunnison sage-grouse (Centrocercus minimus)***

39.     Gunnison Plaintiff-Intervenors endorse and incorporate herein the statements

regarding the status of the Gunnison sage-grouse as described in paragraphs 51 through

56 of the State's Complaint.

40.     The Gunnison sage-grouse is grouped into seven populations.  The largest

population is found in the Gunnison Basin, located in Gunnison and Saguache Counties

in Colorado.  Approximately 84% of the birds reside in the Gunnison Basin.

41.     The Gunnison Basin population is itself composed of a number of subpopulations

distributed across the Gunnison Basin on over a half-million acres.

***Pre-Listing Conservation Efforts***

42.     Gunnison Plaintiff-Intervenors endorse and incorporate herein by this reference

the statements regarding pre-listing conservation efforts and the status of the species as

described in paragraphs 57 through 73 of the State's Complaint.

43.     The Gunnison Sage-Grouse Rangewide Conservation Plan (April 2005) ("RCP")

was prepared by a group of conservation biologists drawn from state and federal

agencies, including FWS.  The purpose of the RCP was "to protect, enhance, and

conserve Gunnison sage-grouse populations and their habitats" by "providing a

rangewide perspective, guidance and recommendations to local working groups and other

interested or affected parties and stakeholders."  The RCP provided for "consistent and

timely habitat improvements and population expansions" that would "eventually remove

this species from listing consideration with the USFWS."

44.      Through extensive efforts by state and local government, federal officials, and

private landowners, the population and habitat protection goals of the RCP for the

Gunnison Basin population have been substantially realized.

45.      The RCP set a goal of securing and maintaining 90% of seasonally important

habitat on private lands in the Gunnison Basin. This goal is very close to being met:

enrollments have reached 98% of the CCAA target enrollment of 55,302 acres; private

land conservation easements total over 57,000 acres. Submittal by CPW to FWS dated

October 15, 2014 ("CPW 2014).

46.      Additionally, 83% of Gunnison sage-grouse habitat in the Gunnison Basin located

within four miles of leks (courting grounds) has some level of protection against

development or disturbance. CPW 2014

47.      With the assistance of the State of Colorado and the Gunnison Basin Sage-Grouse

Strategic Committee, Gunnison County created a Gunnison Sage-Grouse Habitat

Prioritization Tool ("HPT"). The HPT was finalized in January 2012.  It is a scientific

foundation for the federal lands CCA in the Gunnison Basin; has been in continuous use

by Gunnison County for Gunnison sage-grouse related land use reviews since January

2012; and was incorporated into the Gunnison County Land Use Resolution ("LUR") as

the basis for updated Gunnison sage-grouse land use regulations in 2013 and 2014.

48.   Gunnison County has implemented local institutional controls to benefit Gunnison sage-grouse and its habitat, which include:

    A.   Regulatory controls applicable to private land parcels greater than 35 acres in size;

    B.   Land use regulations and subdivision regulations concerning wildlife on private land parcels regardless of size;

    C.   Designated road closures specific to conservation of Gunnison sage-grouse; and

    D.   Animal control ordinances and resolutions.

49.   Gunnison County retained a wildlife biologist who, since 2005, has evaluated over 500 land use related applications (including building permits, individual septic system permits, driveway permits, reclamation permits, and land use change applications) and prepared a Gunnison sage-grouse Site Specific Analysis for each. The Analysis identifies specific criteria as permit conditions to avoid, minimize and/or mitigate impacts to Gunnison sage-grouse and its habitat.

50.   Gunnison County has funded, participated in, and implemented Gunnison sage-grouse habitat projects.

51.   The Gunnison Stockgrowers and its members have coordinated for decades with FWS staff and have participated since 1995 at the working group level to secure on-the-ground protections for the Gunnison sage-grouse.

52.     Over 51,000 acres of agricultural lands, primarily ranchlands, in the Gunnison Basin have been enrolled under the CCAA; members of the Gunnison Stockgrowers have participated under the CCA in relation to activities on federal lands in the Gunnison Basin; and over 57,000 acres of private land has been placed under conservation easements in sage-grouse occupied and unoccupied habitat in the Gunnison Basin. Gunnison Stockgrowers have participated in significant additional voluntary sage-grouse habitat enhancement programs and projects.

53.     The percentages of Gunnison sage-grouse occupied habitat that has been conserved in the Gunnison Basin include:

A. Percent of occupied habitat on *public land* covered by the federal lands CCA: **100%**.

B. Percent of occupied habitat on *private land* covered by conservation easements and the CCAA between CPW and FWS: approximately **46%**.

C. Percent of occupied habitat on *all lands* (public and private) protected by some mechanism (e.g. conservation easement, CCAA) without overlap: approximately **83%**.

***FWS Statements regarding Conservation Efforts in the Gunnison Basin***

54.     FWS has acknowledged the strengths, benefits and successes of Gunnison sage-grouse conservation efforts in the Gunnison Basin.  These acknowledgements include but are not limited to the following:

A. On July 16, 2013, FWS Director Dan Ashe visited Gunnison County to observe local Gunnison sage-grouse conservation efforts and to meet with representatives of federal, state and local governments, local conservation groups, landowners, and private citizen partners in conservation efforts.

B. Director Ashe commented at a public meeting at Western State Colorado University on July 16, 2013 that the conservation efforts were "inspirational." He noted that regulatory measures are "highly certain… and highly likely to be implemented…" and that "incentive based measures are important…"  He noted also that the "amount of land covered by …conservation agreement… (is) highly relevant."

C. On September 9, 2013, FWS stated: "Gunnison County has set a standard for implementing local regulations designed to avoid or minimize impacts on Gunnison sage-grouse caused by land development and improvements."  (FWS Written Response to Gunnison Basin Sage-grouse Strategic Committee Questions, September 9, 2013.)

D. On September 16, 2013, the FWS issued a press release stating:

"'Thanks to collaborative conservation efforts, the largest Gunnison sage-grouse population has remained relatively stable over the past 12 years', said the Service's Mountain-Prairie Regional Director Noreen Walsh…. Gunnison County, Colorado, is committed to conservation of Gunnison sage-grouse and its habitat.  Likewise, federal agencies have completed a Candidate Conservation Agreement in the Gunnison Basin; a number of private landowners are currently enrolled in voluntary conservation agreements; and a portion of private lands are in conservation easements that help conserve

Gunnison sage-grouse. Combined, these conservation tools protect, at some level, the majority of occupied habitat in the Gunnison Basin.  Perhaps the greatest need and challenge is to expand the suite of conservation efforts completed and underway in the Gunnison Basin to other areas across the species range." (FWS Mountain-Prairie Region, Press Release, dated September 16, 2013.)

***Status of Gunnison Sage-Grouse Population in the Gunnison Basin***

55.     Conservation efforts in the Gunnison Basin have succeeded.  The Gunnison Basin sage-grouse population has grown to exceed, by over 30%, the population target set in 2005 in the Rangewide Conservation Plan.  RCP at 256 (Table 2).

56.     FWS itself considers the Gunnison Basin population to be relatively stable and resilient.  Final Listing Rule at 69,178.

***Final Listing Rule***

57.     Despite these successful efforts, in November 2014, FWS issued a final rule listing the Gunnison sage-grouse as threatened throughout its range.

58.     The best available science, however, establishes that the Gunnison sage-grouse is not threatened throughout its range.

59.     The Gunnison Basin population is neither presently in danger of extinction, nor is it likely to be at risk of extinction in the foreseeable future.  The FWS arbitrarily failed to recognize that the Gunnison Basin population is large and diverse enough to provide genetic variation over time and that it has sufficient redundancy to survive stochastic events that could occur in the Basin.

60.     The FWS arbitrarily failed to recognize that the size and stability of the Gunnison

Basin population alone show that the species can survive, based on foreseeable threats,

regardless of the status of the satellite populations.

61.     In making its determination that the Gunnison sage-grouse is threatened, FWS:

    A.  Improperly analyzed the required listing factors;

    B.  Failed to rely on the best scientific and commercial data available;

    C.  Failed to properly evaluate and credit the extensive regulatory and

        conservation efforts at the federal-state-local-and private level, and failed to

        provide an adequate analysis pursuant to the Policy for Evaluation of

        Conservation Efforts.  68 Fed. Reg. 15,100 (Mar. 28, 2003); and

    D.  Violated the APA by introducing significant new information into the rule

        making process related to PVA analyses without disclosing that information to

        the public until the Final Listing Rule was published.

 62.     FWS's decision to list the Gunnison sage-grouse as threatened was arbitrary,

capricious, and not in accordance with the law.

***Final Critical Habitat Rule***

63.     FWS issued a separate final rule designating over 1.4 million acres of land in

Colorado and Utah as "critical habitat."

64.     Half of the 1.4 million acres designated as "critical habitat" is currently

unoccupied by Gunnison sage-grouse, and much of that land is unsuitable as habitat.  In

designating this land as critical habitat, FWS failed to establish that currently occupied habitat is insufficient for the species' conservation or that the designated unoccupied habitat is essential to conservation of the species.

65.     In designating critical habitat for the Gunnison sage-grouse, FWS:

      A.  Designated habitat based on flawed and unsubstantiated conjecture regarding historic range;

      B.  Failed to appropriately consider the economic impacts of the designation;

      C.  Failed to fulfill the requirements of the APA and NEPA to take a "hard look" at the environmental impacts of the designation;

      D.  Failed to fulfill the requirements of NEPA to consider reasonable alternatives to the 1.4 million acre designation; and

      E.  Failed to prove, using the best available scientific and commercial data, that the unoccupied habitat designated as "critical" in the final rule is necessary for the conservation of the species.

66.     FWS's decision to designate critical habitat for the Gunnison sage-grouse was arbitrary, capricious, and not in accordance with the law.

## LEGAL VIOLATIONS BY THE FWS

67.     The FWS has violated the requirements of the ESA, the APA, and NEPA.

*Failure to Properly Analyze Listing Factors*

68.     The FWS's decision to list the Gunnison sage-grouse as threatened violated the ESA because the FWS failed to properly analyze the listing factors found in 16 U.S.C. § 1533(a)(l).  The FWS failed to base its decision on the best available science and arbitrarily failed to accord reasonable weight to the effect of conservation efforts when it evaluated the following factors:

> A. Factor A (the present or threatened destruction, modification, or curtailment of the species' habitat or range);
>
> B. Factor C (disease or predation);
>
> C. Factor D (the inadequacy of existing regulatory mechanisms); and
>
> D. Factor E (other natural or manmade factors affecting the species' continued existence).

69.     As a result, the FWS overestimated the degree of threat to the vast majority of the Gunnison sage-grouse population, which is located in the Gunnison Basin.  Further, the FWS's conclusion that extirpation of the satellite populations would lead to a risk of extinction for the entire species is not supported by the available data.

*Failure to Use the Best Available Scientific or Commercial Data*

70.     Gunnison Plaintiff-Intervenors endorse and incorporate herein the allegations in paragraphs 84-100 of the State's Complaint.

71.    The FWS failed to use the best available scientific or commercial data in its Final Decisions.  16 U.S.C. §§ 1533(a)(l );1533(b)(l )(A).  The best available scientific data clearly demonstrate that the species is not warranted for protection under the ESA because the Gunnison Basin population, which comprises the vast majority of the species' individuals and occupied range, is not in danger of extinction now or in the foreseeable future.  Specifically:

A.  The FWS arbitrarily discounted the evidence that the Gunnison Basin population is stable and thriving, including the facts that the current population now exceeds the targets set in the Rangewide Conservation Plan and that the Gunnison Basin lek counts are at all-time highs.

B.  The FWS failed to substantiate that the Gunnison Basin population is "threatened" or facing material threats.

C.  The FWS misinterpreted and selectively dismissed population viability analyses (RCP 2005) showing a very low probability (less than one percent) that the species will go extinct within the next 50 years.

D.  The FWS acknowledged that current residential development is a threat of "low magnitude to Gunnison Basin birds at the population level," but arbitrarily concluded that residential development *elsewhere* in some of the satellite populations poses a threat to the overall species, and that future development in Gunnison County poses a threat.  The record establishes that

residential development and habitat "fragmentation" and "loss" are significantly less than the FWS conjectured.

E. The FWS accorded little or no weight to scientific evidence submitted by CPW regarding the degree of threat to the Gunnison Basin population posed by disease, drought, fire, and climate change.

F. In determining that the Gunnison Basin population could not likely survive if the satellite populations were extirpated, the FWS engaged in speculation that is unsupported by the best available science and data.

G. In evaluating threats to sagebrush habitat in the Gunnison Basin, the FWS misinterpreted the best available science and data regarding the historical range and distribution of the species.  The FWS overestimated the extent of historical range and relied on an improper understanding of habitat fragmentation as applied to the Gunnison sage-grouse.

H. The FWS arbitrarily failed to recognize that the Gunnison Basin population is composed of at least six functioning subpopulations that are not subject to potential "threats" in the same manner as a single monolithic population.

I. Gunnison County has developed and implemented the best scientific tool available to identify and prioritize Gunnison sage-grouse habitat, the Habitat Prioritization Tool ("HPT").  The HPT was not utilized by the FWS in its listing or critical habitat determinations. FWS neglected to use in the Listing

Decision the tool that FWS itself accepted as a foundation for the CCA.
FWS's understanding of the habitat protections would have been different if
this tool had been utilized. The FWS discarded the HPT with one mention in
the Listing Decision and only the statement in the Critical Habitat Decision
that the Service "looked at" it.  This does not satisfy the ESA requirement
"to use the best available scientific and commercial data available" and the
APA requirement of a "hard look."

***Failure to Appropriately Consider Conservation Efforts in Gunnison Basin***

72.     The FWS arbitrarily underestimated the level of regulatory protections in place
for the Gunnison sage-grouse.

73.     The FWS also arbitrarily failed to properly credit the protection that has been
provided via federal, state, local, and private conservation efforts to conserve
sagebrush habitat in the Gunnison Basin.  The Gunnison Basin area has met or
exceeded the Rangewide Conservation Plan target for conservation and protection of
seasonally important habitat on private lands (RCP 2005; CPW 2014).  Federal and
State of Colorado agencies responsible for management of publicly owned habitat have
entered into a formal agreement to protect sage-grouse habitat on their lands, and other
federal programs have also resulted in the protection, improvement, and restoration of
habitat in the Gunnison Basin.

74.     The FWS's conference opinions (subsequently adopted by FWS as formal

Biological Opinions following the listing ) for the CCAA and the CCA found that

implementation of the conservation programs would provide a long-term, net benefit

for the Gunnison sage-grouse on a landscape scale.  The FWS acknowledged the

effectiveness of these efforts and noted that they have had the most impact in the

Gunnison Basin, but did not adequately weigh them in the Listing Decision.

75.     Without providing meaningful explanation, the Final Listing Rule states that

existing regulatory mechanisms do not adequately address the threats faced by the

species.

### *Misuse of Policy for Evaluation of Conservation Efforts*

76.     The FWS never released a draft or final analysis of conservation efforts under its

Policy for Evaluation of Conservation Efforts ("PECE") to the public for review. At a

minimum, this was not in accordance with procedural requirements under the ESA and

APA designed to enable informed public comment.

### *Improper Reliance on Davis 2012*

77.     The FWS relied on information and studies the FWS had in its possession, but

failed to disclose to the public, to justify the threatened listing and designation of critical

habitat.  Neither the information, nor studies, nor the FWS's justifications were shared

with the public or offered up for public comment.  As a result, the FWS has violated the

procedural requirements of the ESA and APA by failing to provide the opportunity for

comment on the studies on which the agency based its decision.  *See Idaho Farm Bureau Fed'n v. Babbit*, 58 F.3d 1392, 1404 (9th Cir. 1995).

78.     One study, "*Dissertation - Gunnison Sage-grouse Demography and Conservation*" by Amy Jane Davis, in partial fulfillment of the requirements for the Degree of Doctor of Philosophy, Colorado State University, Fort Collins, Colorado, Summer 2012 ("Davis (2012)"), is among the most critical material used by the FWS in its analysis and conclusions supporting its Listing Decision.  Davis (2012) is the only study, out of four population studies, identified by the FWS in the final Listing Decision that shows a greater than 1% chance of extinction in the next 60 years.

79.     While Davis (2012) was available to the FWS at the time the draft listing decision was published on January 11, 2013, the FWS failed to disclose to the public the FWS's knowledge or use of Davis (2012) at that time.  This denied the public a meaningful opportunity to comment.

80.     The FWS then placed significant emphasis on Davis (2012) in the Final Listing rule, making at least 140 references to Davis (2012). The FWS referred to it and a companion study, "*An Integrated Modeling Approach to Estimating Gunnison Sage-grouse Population Dynamics: Combining Index and Demographic Data*" by Amy J. Davis, Mevin B. Hooten, Michael L. Phillips and Paul F. Doherty, Jr. (2014) ("Davis (2014)"), as "the most current and best available scientific information regarding the viability of Gunnison sage-grouse."

81.     As noted above, under APA notice and comment requirements, "(a)mong the

information that *must be revealed for public evaluation* are the 'technical studies and

data' upon which agency relies (in its rulemaking)." *Chamber of Commerce v. SEC*, 443

F.3d 890, 899 (D.C. Cir. 2006) (emphasis added).

82.     The FWS also downplayed the limits of Davis (2012) identified by the author

herself in that document.  Davis cautioned that her data – six years of demographic data –

were based on a cyclical period when the population was experiencing a decline.  She

noted that if her study had been conducted a few years earlier or later, a different picture

would have emerged, more consistent with the other population viability analyses.  Davis

(2012) proposes a "novel method" (*id.* at 139) to link "population count data" with

"population demographic data" through a "population growth rate." The author herself

cautions that her proposal has "yet to have been fully vetted (*id*. at 140) and that while

"(t)he methodology shows promise…until more work is done it is important to view

these results as preliminary." (*Id.* at 140).

83.     In Davis (2014), the author candidly identifies that the "strategy we used to

calculate population sizes is likely to be biased low." (Davis (2014) at 4251).  Davis

(2014), proposing a more integrated model, showed an essentially stable population.

***Improper Designation of Critical Habitat***

84.     The FWS violated the ESA, 16 U.S.C. §§ 1533(a)(3) and 1533(b)(2), when

designating critical habitat for the Gunnison sage-grouse.  The ESA requires the

Secretary to consider economic impacts in designating critical habitat.  16 U.S.C. §

1533(b)(2).  The FWS had an economic analysis prepared that dismissed or failed to

consider relevant economic impacts.

85.     The Economic Analysis did not comply with the requirements of *New Mexico*

*Cattle Growers Ass'n v. U.S. Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001).

86.     The Economic Analysis improperly focused on the national economy.  The

Economic Analysis understated and/or did not consider multiple areas of regional and

local economic impacts, and impacts to specific economic sectors.

87.     The Economic Analysis did not evaluate the potential loss of local and state

investment in protecting the species.

88.     Moreover, the FWS did not properly take the results of the Economic Analysis

into account when designating critical habitat.

89.     Further, the FWS included areas as critical habitat that are not suitable for

Gunnison sage-grouse, and failed to demonstrate that inclusion of currently unsuitable

habitat was essential to the conservation of the species.

90.     The FWS also determined that all currently occupied areas are essential for the

persistence and conservation of the Gunnison sage-grouse, even though under the ESA,

barring unusual circumstances, critical habitat should not include the entire geographical

area which can be occupied by the species.  16 U.S.C. § 1532(5)(C).

91.    The Environmental Assessment does not analyze a true "no action" alternative of not designating against the alternative of designating, as required by NEPA.

92.    The Environmental Assessment does not consider a reasonable range of alternatives, as required by NEPA.

93.    The FWS arbitrarily performed an Environmental Assessment instead of an Environmental Impact Statement, which was warranted due to the significance of the impacts of designation.

***Failure to Consider Peer Reviews***

94.    FWS failed to address substantial infirmities in its analysis as identified in peer reviews conducted on the draft rules.

***Failure to Respond to Comments***

95.    The FWS failed to provide a written justification for its failure to adopt regulations consistent with the comments of the State of Colorado, the State of Utah, and Colorado and Utah counties (which are subdivisions of their respective states).

**First Claim for Relief: Violation of the Administrative Procedure Act**

96.    Gunnison Plaintiff-Intervenors incorporate by reference Paragraphs 1-95 of this Complaint as if restated here in full.

97.    The APA requires the FWS to notice the terms or substance of proposed rules in order to give the public an opportunity to participate in rulemaking.

98.    Under APA notice and comment requirements, among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking.

99.    FWS actions related to Davis (2012) precluded the opportunity for meaningful public comment on a critical aspect of the FWS proposed rule.

100.    Accordingly, Defendants' Final Listing Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

**Second Claim for Relief: Violation of Section 4 of the Endangered Species Act by Listing the Gunnison Sage-grouse as Threatened**

101.    Gunnison Plaintiff-Intervenors incorporate by reference Paragraphs 1-100 of this Complaint as if restated here in full.

102.    Defendants violated the ESA by failing to properly analyze the five listing factors found in 16 U.S.C. § 1533(a)(1).

103.    Defendants violated the ESA by failing to use the best available scientific data and information when considering whether to list the Gunnison sage-grouse under section 4 of the ESA, and by failing to draw rational conclusions from the evidence before them.

104.    Defendants arbitrarily and capriciously determined that the Gunnison sage-grouse is threatened throughout its range when the vast majority of the population – the Gunnison Basin Population – is stable and thriving, and not reasonably susceptible to foreseeable threats.

105.    Defendants arbitrarily and capriciously failed to acknowledge or give sufficient

weight to the certainty and efficacy of conservation efforts, including existing regulatory

mechanisms and private conservation efforts.

106.    Defendants never released to the public a draft or final version of an analysis

pursuant to the "Policy for Evaluation of Conservation Efforts," 68 Fed. Reg. 15,100

(March 28, 2003).

107.    Defendants misrepresented the content, purposes and conclusions of Davis (2012).

108.    Defendants downplayed the limits of Davis (2012) identified by the author herself.

109.    Defendants relied on Davis (2012) to the virtual exclusion of other relevant and

competent scientific data and information.

110.    The FWS discarded the "Habitat Prioritization Tool."  This violated the ESA

requirements "to use the best available scientific and commercial data available."

111.    The FWS failed to adequately consider and correct its analysis in view of the peer

reviews.

112.    The FWS improperly analyzed and applied the concept of "historic range."

113.    Accordingly, Defendants' Final Listing Rule is arbitrary and capricious, an abuse

of discretion, and not in accordance with law.

**Third Claim for Relief: Violation of Section 4 of the Endangered Species Act by**
**Improperly Designating Critical Habitat**

114.    Gunnison Plaintiff-Intervenors incorporate by reference Paragraphs 1-113 of this

Complaint as if restated here in full.

115.   Section 4 of the ESA mandates that unoccupied areas may only be designated as critical habitat upon a finding that they are essential to the conservation of the species.

116.   Under the ESA, unoccupied areas may be designated only upon a determination that protection of occupied areas is insufficient for the conservation of the species.

117.   Defendants designated unoccupied areas as critical habitat without showing that protection or special management of those areas is essential to conservation of the species or that designation of only occupied areas was insufficient for the conservation of the species.

118.   Defendants disregarded the full economic impacts of the designation.

119.   Defendants designated habitat based on flawed and unsubstantiated conjecture regarding "historic range."

120.   Accordingly, Defendants' designation of critical habitat for the Gunnison sage-grouse is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

**Fourth Claim for Relief: Violation of the National Environmental Policy Act and the Administrative Procedure Act**

121.   Gunnison Plaintiff-Intervenors incorporate by reference Paragraphs 1-120 of this Complaint as if restated here in full.

122.   FWS failed to take a hard look at the direct and indirect environmental impacts of its decision to designate critical habitat for the Gunnison sage-grouse.

123.   FWS failed to prepare an Environmental Impact Statement, as was required by law.

124.    FWS failed to analyze a reasonable range of alternatives in the Environmental

Assessment, including a proper no action alternative.

125.    Defendants' environmental analyses of the proposed critical habitat rule failed to

take a hard look at the impacts of the proposed action, violated NEPA, and is arbitrary

and capricious and an abuse of discretion in violation of the APA.

## REQUEST FOR RELIEF

WHEREFORE, Gunnison Plaintiff-Intervenors respectfully request this Court

enter a judgment in favor of Gunnison Plaintiff-Intervenors and against Defendants as

follows:

1.    Declare that the Defendants violated the APA by not disclosing for public

evaluation and comment the technical studies upon which the Final Listing rule is

founded, and declare that the Final Listing rule is unlawful because it was issued in

violation of the APA;

2.    Declare that the Gunnison sage-grouse does not satisfy the requirements of the

ESA for listing as a "threatened species" and that listing the species at this time is not

warranted;

3.    Declare that Defendants abused their discretion and acted arbitrarily, capriciously,

and not in accordance with the ESA in issuing the Final Listing Rule and the Final

Critical Habitat Rule;

4.      Declare that the Final Critical Habitat Rule is unlawful because Defendants did not comply with NEPA;

5.      Vacate both the Final Listing Rule and the Final Critical Habitat Rule;

6.      Award Gunnison Plaintiff-Intervenors their costs and expenses, including reasonable attorneys' fees under the citizen suit provision of the ESA and/or the Equal Access to Justice Act; and

7.      Grant Gunnison Plaintiff-Intervenors such other relief as the Court deems just and equitable.

Respectfully submitted this 29th day of June, 2015.

> s/ David Baumgarten
> David Baumgarten, Atty. Reg. #6050
> Office of the Gunnison County Attorney
> 200 E. Virginia Avenue
> Gunnison, CO  81230
> Telephone: (970) 641-5300
> Facsimile: (970) 641-7696
> E-mail: dbaumgarten@gunnisoncounty.org
>
> Attorney for the Board of County Commissioners of the County of Gunnison, Colorado
>
>
>
> TROUT, RALEY, MONTAÑO WITWER & FREEMAN, P.C.
>
> By:  s/ Deborah L. Freeman
>       Deborah L. Freeman, # 12278

TROUT, RALEY, MONTAÑO WITWER &
FREEMAN, P.C.

By: s/ Bennett W. Raley
    Bennett W. Raley, # 13429

Trout, Raley, Montaño, Witwer & Freeman, P.C.
1120 Lincoln Street, Suite 1600
Denver, CO  80203
Telephone: (303) 861-1963
Facsimile: (303) 832-4465
E-mail: braley@troutlaw.com
        dfreeman@troutlaw.com

Attorneys for Gunnison County Stockgrowers'
Association, Inc.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of June, 2015, I electronically filed a true and correct copy of the above and foregoing GUNNISON PLAINTIFF-INTERVENORS' COMPLAINT/PETITION IN INTERVENTION WITH ADDITIONAL CLAIMS IN CIVIL ACTION NO. 1:15-CV-286 with the Clerk of the United States District Court, District of Colorado using CW/ECF Filer which will send notification of such filing to the following:

Amy Rae Atwood
Center for Biological Diversity-Portland
P.O. Box 11374
Portland, OR 97211
atwood@biologicaldiversity.org

Rickey Doyle Turner
U.S. Department of Justice – DC-ENRD-#7369
P.O. Box 7369
Benjamin Franklin Station
Washington, DC 20044-7369
rickey.turner@usdoj.gov

Brad Arthur Bartlett, IV
University of Denver-Sturm College of Law
2255 East Evans venue, Suite 335
Denver, CO 80208-0632
bbartlett@law.du.edu

Joanna Kathryn Brinkman
U.S. Department of Justice
P.O. Box 663
Ben Franklin Station
Washington, DC 20044-0663
joanna.brinkman@usdoj.gov

Talasi Banas Brooks
Advocates for the West
PO Box 1612
Boise, ID 83701
tbrooks@advocateswest.org

Lisa Anne Reynolds
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
lisa.reynolds@state.co.us

Laurence J. Lucas
Advocates for the West
PO Box 1612
Boise, ID 83701
llucas@advocateswest.org

Frederick Richard Yarger
Colorado Attorney General's Office
 Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
fred.yarger@state.co.us

<u>Sarah Kate McMillan</u>
<u>WildEarth Guardians - Missoula</u>
<u>PO Box 7516</u>
<u>Missoula, MT  59807</u>
<u>smcmillan@wildearthguardians.org</u>

Todd Christopher Tucci
Advocates of the West
PO Box 1612
Boise, ID 83701
E-mail: <u>ttucci@advocateswest.org</u>

<u>/s/Rachel Magruder</u>