**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

IN RE GUNNISON SAGE-GROUSE            Civil Action No. 1:15-cv-130-AP
ENDANGERED SPECIES LITIGATION

This document relates to all consolidated cases

---

**PLAINTIFF WILDEARTH GUARDIANS AND CLAIT E. BRAUN'S MOTION
AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL
COMPLETION OF THE ADMINISTRATIVE RECORD**

---

## INTRODUCTION

Plaintiffs WildEarth Guardians and Dr. Clait E. Braun (Guardians) hereby move for an order requiring Federal Defendants U.S. Fish and Wildlife Service *et al.* (Service) to complete the Administrative Record to include 958 documents and communications improperly withheld under the attorney-client privilege. *See* CMA Civ. Practice Standard 10.1 ("The moving party shall not file a separate motion and brief.").

In this record review case, Guardians challenge two decisions by the Service concerning the Gunnison sage-grouse, including the Service's decision to abandon its proposed rule protecting the Gunnison sage-grouse as an "endangered" species under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* (ESA), and instead adopt a less protective "threatened" listing rule; and the Service's final critical habitat rule, which failed to designate habitat important to the Gunnison sage-grouse.

The Administrative Procedures Act (APA) requires the Service to supply the Court with the full administrative record supporting each challenged decision, including "all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993); 5 U.S.C. §§ 701 *et seq.* Here, the Service has produced a record containing over 11,500 records.

Yet, the Service has invoked the attorney-client privilege to withhold or redact 958 documents, including documents essential to assist this Court in understanding the basis for the Service's decisions at issue. As explained below, the attorney-client privilege does not apply to these documents because they lack any indicia of confidentiality, and the Service has waived any privilege by sharing the documents with third-party contractors and another individual outside of the Service.

For the reasons set forth below, this Court should order the Service to complete the administrative record with all documents withheld or redacted by the Service.

## FACTUAL BACKGROUND

### I. GUNNISON SAGE-GROUSE AND PRIOR LITIGATION.

The Gunnison sage-grouse is a bird native to parts of Colorado, Utah, Arizona and New Mexico, that now persists in just seven percent of its former range. It exists in seven populations, with a total population of 4,709.

Guardians and other conservation groups have been seeking to protect Gunnison sage-grouse and its habitat since before 2000, when various conservation groups petitioned the Service to list the Gunnison sage-grouse under the ESA. In 2006, the Service issued a finding that Gunnison sage-grouse did not warrant protection under the ESA, and Guardians and others challenged this decision. *See County of San Miguel, Colo. et al. v. MacDonald*, 244 F.R.D. 36 (D.D.C. 2007).

After settling *MacDonald*, the Service published a new finding on Gunnison sage-grouse, concluding that it was "warranted" for protection under the ESA, but the Service deferred protecting the species based on other priorities. *See* "Determination for the Gunnison Sage-Grouse as a Threatened or Endangered Species," 75 Fed. Reg. 59804 (Sept. 28, 2010). On January 11, 2013, the Service published a new proposed rule to list the Gunnison sage-grouse as an "endangered species" under the ESA, and to

designate 1.62 million acres of critical habitat.  *See* Proposed Rule, "Endangered Status for Gunnison Sage-Grouse," 78 Fed. Reg. 2486 (Jan. 11, 2013); Proposed Rule, "Designation of Critical Habitat for Gunnison Sage-Grouse," 78 Fed. Reg. 2540 (Jan. 11, 2013).  The Service found the bird was "endangered" due to threats from continued residential development, livestock grazing, proliferation of invasive plants, fire, agricultural conversion, and other threats. *Id.*

On November 20, 2014, the Service abandoned its proposed rule, and issued a final rule designating the Gunnison sage-grouse as a "threatened" species, and a separate final rule designating approximately three hundred thousand fewer acres of critical habitat than originally proposed. *See* Final Rule, "Threatened Status for Gunnison Sage-Grouse," 79 Fed. Reg. 69192 (Nov. 20, 2014); Final Rule, "Designation of Critical Habitat for Gunnison Sage-Grouse," 79 Fed. Reg. 69312 (Nov. 20, 2014).

## II.   CURRENT LITIGATION

On January 20, 2015, Guardians filed its complaint for declaratory and injunctive relief and petition for review in this case, and on September 11, 2015, the Service filed its Administrative Record (AR).  Complaint, ECF No. 1; Notice of Filing the Administrative Record, ECF No. 53.  The AR consists of three CD-ROMs containing approximately 11,500 documents, together with a 74-page "Formatted Privilege Log," which identifies 958 separate documents withheld or redacted under the claim of attorney-client privilege.  *See* AR, Disc 1. According to the Service, the subject matter of the withheld documents is limited to four issues, including the draft and final listing rules, and draft and final critical habitat rules.  *Id.*

According to the Privilege Log, 59 individuals had access to withheld communications, including 18 managers and supervisors, 15 biologists, a botanist, three third-party consultants, several agency press staff, as well as junior administrative

3

staff and even a temporary intern.  *See* Privilege Log; Gunnison Sage-Grouse AR Names and Organizations (located on AR Disc 1) (List of Names); Declaration of Todd C. Tucci (Tucci Decl.), Exhs. 1 & 2 (filed herewith).

## ARGUMENT

### I. THE ATTORNEY-CLIENT PRIVILEGE.

The attorney-client privilege is the oldest recognized privilege for confidential communications, and it protects from disclosure communications made in confidence between the client and attorney.  See *Upjohn Co. v. United States,* 499 U.S. 383, 389 (1981); *In re Qwest Communications Intern. Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006); *EEOC v. Outback Steakhouse of Florida*, 251 F.R.D. 603, 610 (D. Colo. 2008). The privilege is "narrowly construed" because it "obstructs the truthfinding process." *Barclaysamerican Corp. v. Kane*, 746 F.2d 653, 656 (10th Cir. 1984).

A party asserting the attorney-client privilege must prove the privilege applies to the documents at issue, and that the privilege has not been waived. *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999); *Roe v. Catholic Health Initiatives Colorado*, 281 F.R.D. 632, 635 (D. Colo. 2012). To properly invoke the privilege, a party must show that the document involves "confidential communications between an attorney and [his or her] client" and relates to a "legal matter for which the client has sought professional advice." *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).  Indeed, the "*sine qua non* for invocation of the privilege is that the communications in question were intended to be confidential." *Coorstek, Inc. v. Reiber*, No. 08-cv-01133, 2010 WL 1332845, *4 (D. Colo. April 5, 2010) (quoting *Gottlieb v. Wiles*, 143 F.R.D. 241, 249 (D. Colo. 1992)).  See also *Coastal States Gas Corp. v. Department of Energy*, 617 F2d 854, 863 (D.C. Cir. 1980) ("a fundamental prerequisite

to assertion of the privilege: confidentiality both at the time of the communication and maintained since").

When a government agency invokes the privilege, "the confidentiality element will be satisfied only if the documents in question were circulated among those agency employees who are authorized to speak on the matter dealt with in the documents; if circulated to a larger group of individuals, the privilege does not apply because the agency did not maintain the confidentiality of the information." *Wyoming v. USDA*, 239 F.Supp.2d 1219, 1230 (D. Wyo. 2002), *vacated as moot by* 414 F.3d 1207 (10th Cir. 2005) (citing *Lacefield v. United States*, No. 92-N-1680, 1993 WL 268392, *3 (D. Colo. March 10, 1993)). *See also Wyoming v. U.S. Dept. of the Interior*, No. 04-cv-213, 2007 WL 7307060 (D. Wyo. April 18, 2007) (articulating same test); *Coastal States,* 617 F.2d at 865; *FTC v. GlaxoSmithKline*, 294 F.3d 141, 147-48 (D.C. Cir. 2002) (the standard is whether the documents were distributed on a "need to know basis").

The attorney-client privilege is waived if the information has been shared with third parties. *In re Qwest Communications*, 450 F.3d at 1185 ("voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege"); *United States v. Ryan*, 903 F.2d 731, 741 n. 13 (10th Cir. 1990) (same); *United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir. 1989) (same). Indeed, courts have held "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989).

Under the doctrine of subject matter waiver, once the attorney-client privilege is waived, the waiver applies to all communications regarding the same subject matter, and not just the disclosed communication. *United States v. Graham*, No. 03-CR-089,

5

2003 WL 23198792, *3 (D. Colo. Dec. 2, 2003). In *Graham,* the court held,

> The subject-matter waiver rule apposite to the attorney-client privilege provides that a client's voluntary disclosure of documents otherwise protected by the attorney-client privilege breach the confidentiality of the attorney-client relationship and effects a waiver of the privilege not only as to the disclosed documents, but also as to all documents relating to the subject matter of the disclosed documents.

*Id*. (citing *In re Sealed Case,* 676 F.2d 793, 809 (D.C. Cir. 1982)). *See also Anaya v. CBS Broadcasting, Inc.*, No. 06-476, 2007 WL 2219394 (D. New Mexico April 30, 2007) ("The great weight of authority supports the doctrine of subject-matter waiver.").

**II.   THE ATTORNEY-CLIENT PRIVILEGE DOES NOT APPLY BECAUSE THE WITHHELD DOCUMENTS LACK ANY INDICIA OF CONFIDENTIALITY.**

The Service cannot now invoke the attorney-client privilege to shield disclosure of nearly 1,000 documents and communications because it disclosed these documents to 59 individuals, and, thus, these documents lack indicia of confidentiality. As noted above, when a government agency is invoking the attorney-client privilege, the confidentiality element will be satisfied only if disclosures were made on a "need to know basis." *GlaxoSmithKline*, 294 F.3d at 147-48, *Coastal States,* 617 F.2d at 865, *Wyoming*, 2007 WL 7307060 at *13. In the agency context, a communication is more likely to be privileged if the recipient is a policymaker or is responsible for the specific subject matter at issue in a way that depends upon the legal advice. *See Scholtisek v. Eldre Corp.*, 441 F.Supp.2d 459, 464 (W.D.N.Y 2006). The Service cannot meet this standard here because it shared the information far outside the "need to know" basis.

First, the Service cannot satisfy the confidentiality criterion because the Privilege Log shows that fully 59 persons had access to the "confidential" legal communications and documents, including at least 15 biologists, 18 supervisors and managers, and a host of other junior level or administrative staff, third-party contractors and other

individuals. *See* Privilege Log; List of Names; Tucci Decl., Exhs. 1 & 2.  Many of the recipients are not responsible for endangered and threatened listing decisions, however, and have a nominal role (at best) in making endangered and threatened species policy at the Service.  For example, Gina Glenne is a Service botanist, whose particular area of work concerns the study of plants.  *See* List of Names.  Yet, Glenne was privy to confidential legal advice regarding the "draft final GuSG listing rule" and the "draft final GuSG critical habitat rule."  *See, e.g.,* Privilege Log at Bates Nos. 131308-309, 131371-373, 131495-496, 156941, 160386-87.  Similarly, Maria Boroja coordinates the Service's regional climate and contaminants work, yet, Boroja also had open access to privileged legal advice on the draft final GuSG listing rule, too.  *See* Tucci Decl, Exh. 1; Privilege Log at Bates Nos. 150211, 155688.

      The Service compounded its error by sharing "confidential" information with junior level administrative staff.  For example, Lois Wellman is an administrative assistant, and, yet, she had access to the Department of the Interior's "Solicitors Office legal advice on draft final GuSG critical habitat rule."  *See* Tucci Decl, Exh. 1*;* Privilege Log at Bates No. 171508.  This same analysis holds true for Marcia Cash and Sara Prigan, especially because they are administrative staff apparently overseeing the publication of Federal Register documents, and, they, too, had access to privileged legal communications on the critical habitat and listing rules.  *See* Tucci Decl, Exhs. 1 & 2; Privilege Log at Bates Nos. 133747, 134229.

      This analysis applies with equal force to many of the 15 biologists, 18 supervisors and others provided unfettered access to the information, most of whom lack authority to speak for the agency in ESA listing decisions and similarly lack appropriate policy-making authority; and the Service has made no showing that these individuals had a "need to know" of the legal analysis contained in the communications.

7

Indeed, in its Privilege Log, the Service failed to provide any justification for its broad disclosure of these communications, and the Service has made no showing that the recipients of this information are authorized to speak for the Service in relation to the Gunnison sage-grouse listing and critical habitat rules. *Barclaysamerican*, 746 at 656 (the party assert the privilege "has the burden of establishing that [it] . . . is applicable").

Surprisingly, the record shows that very few of the 59 individuals with access to these confidential communications were on the Service's team charged with reviewing the status of Gunnison sage-grouse and making a recommendation on listing and critical habitat. More specifically, in December 2012, the Service convened a team of biologists and local and regional staff to "determine the most effective conservation strategy to move Gunnison sage-grouse from endangered to threatened status." AR 58800-810 (listing attendees). During this meeting, these agency staff discussed Gunnison sage-grouse population trends, extinction risks, critical habitat, and threats and challenges confronting Gunnison sage-grouse. AR 58800-810. In June 2013, nearly this same team reconvened to discuss new information received during the comment period and next steps to complete the final listing and critical habitat determination. AR 80477-497 (listing attendees).

Based on their roles on this team, the disclosure of confidential legal communications and documents to these team members would likely not run afoul of the "need to know" standard articulated in *Coastal States* and *Wyoming*. *Coastal States,* 617 F.2d at 865; *Wyoming*, 2007 WL 7307060 at *13. But, the Service did not "jealously guard" its disclosure to these individuals only, instead broadcasting its legal communications to an additional 49 agency and third-party personnel. *See In re Sealed Case*, 877 F.2d at 980.

8

Indeed, the Service's disclosure of legal communications and documents far outstrips the Service personnel who were responsible for approving the final listing and critical habitat rules – i.e., the personnel having actual policymaking authority over the subject matter at issue here, which further demonstrates the impropriety of the Service's invocation of the attorney-client privilege.  AR 114240, 193249, 163775 (local, regional and national surname pages).  *See Scholtisek*, 441 F.Supp.2d at 464 (disclosing document to personnel lacking policymaking authority waives attorney-client privilege).  *See also Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 93-94 (W.D. N.Y. 2011) (same), and cases cited.

Finally, this case is not one where the Court should permit the Service to sidestep demonstrating that each recipient individually meets to "need to know" requirement. In limited circumstances, this "need to know" basis may not require an individualized finding for each recipient of purportedly confidential communication, especially when the party invoking the attorney-client privilege demonstrates adequate measures were in place to protect against unwarranted disclosure of confidential information.  *See GlaxoSmithKline*, 294 F.3d at 148 (no individualized finding needed when party "provides a confidential document to certain specified employees or contractors with the admonition not to disseminate further its contents and the contents of the documents are related generally to the employees' corporate duties").  A court within the Tenth Circuit has adopted this approach in determining the scope of the "need to know" basis.  *See Williams v. Sprint/United Mgmt. Co.,* 238 F.R.D. 633, 642 (D. Kan 2006).

This more lenient approach is particularly inapposite here because the Service made no effort to keep the documents confidential.  For example, in *GlaxoSmithKline*, the disclosures were limited to attorneys or managers, all of whom "needed to provide

9

input to the legal department and/or receive the legal advice," and each recipient was advised to keep the communications confidential. *GlaxoSmithKline*, 294 F.3d at 148. Similarly, in *Williams*, the disclosures were limited to specific individuals in the legal and HR department, were protected from broad disclosure via password, most of the documents were marked as "Confidential," and the recipients were specifically made aware of the confidential nature of the documents. *Williams*, 238 F.R.D. at 642.

Unlike in *GlaxoSmithKline* and *Williams*, the Service employed none of the care in handling the attorney-client communications and documents shown in those cases. For example, the Privilege Log is devoid of any indication that the Service warned the recipients to keep the information confidential, and the Privilege Log demonstrates that the recipients of the communications routinely forwarded the communications and documents to other staff. *See, e.g.,* Privilege Log at Bates Nos. 44710, 170734, 171850, 173938, 174015. Moreover, unlike in *Williams*, the Service did not protect the confidential information behind a secure password, and none of the 549 email communications are marked "confidential" or have any other indicia of confidentiality. *See, e.g., id.* at Bates Nos. 156941, 134820, 195493, 195498, 191957 (redacted emails). And, unlike in *GlaxoSmithKline*, the disclosures were not limited to senior staff or attorneys, and there is no indication that the 15 biologists, 18 supervisors and mid-level staff, and 26 other junior or administrative staff, third-party contractors and other individuals who had access to the purportedly confidential communications needed to provide input to the legal department or received legal advice from counsel. *GlaxoSmithKline*, 294 F.3d at 148.

Where, as here, an agency has shown disregard in handling attorney-client communications and documents, this Court should "grant no greater protection to [the Service] than [its] own precautions warrant." *In re Sealed Case*, 877 F.2d at 976 ("[I]f a

client wishes to preserve the [attorney-client] privilege, it must treat the confidentiality of attorney-client communications like jewels – if not crown jewels."). Accordingly, this Court should find the attorney-client privilege inapplicable here.

### III. THE SERVICE WAIVED THE ATTORNEY-CLIENT PRIVILEGE FOR ALL COMMUNICATIONS AND DOCUMENTS RELATING TO THE CRITICAL HABITAT RULE.

Even if this Court finds that the Service maintained the confidentiality of the attorney-client privilege despite disclosing these communications and documents to 59 individuals, this Court must still order disclosure of all communications and documents relating to the critical habitat rule because the Service has knowingly and voluntarily waived the privilege. "The attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party." *In re Qwest*, 450 F.3d at 1185 (quoting *Ryans*, 903 F.2d at 741 n. 13).  See also *Bernard*, 877 F.2d at 1465 ("Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege"); *Sedillos v. Bd. of Educ. of Sch. Dist. No. 1*, 313 F.Supp.2d 1091, 1093 (D. Colo. 2004) ("the attorney-client privilege can be waived by [a]ny voluntary disclosure by the client of an otherwise privileged confidential communication").  When a government agency is asserting the attorney-client privilege, any disclosure outside of the agency waives the privilege. *Lacefield*, 1993 WL 268392 at *3, *citing Coastal States*, 617 F.2d at 863.  See also *Wyoming*, 2390 F.Supp.2d at 1232 (rejecting Federal Defendants "unprecedented argument" that the attorney-client privilege attaches between different agencies of the federal government).

Here, the Service waived the attorney-client privilege by voluntarily disclosing the communications to non-agency employees and other third parties.  For example, on November 5, 2014, the Service disclosed to Stuart Levenbach at the Office of Management and Budget the contents of attorney-client communications, including the

Service's "response to Department of Justice's legal advice on draft GUSG critical habitat rule." *See* Privilege Log at Bates Nos. 195546-47, 195505-06. The Service also disclosed privileged information to Jennifer Baxter and Jane Israel, third-party consultants with Industrial Economics, Inc. and JI Consulting, respectively. *See* Tucci Decl, Exh. 2; Privilege Log at Bates Nos. 71420-48. These disclosures included the Department of Interior's "Solicitors Office legal advice" on the Service's proposed Gunnison sage-grouse critical habitat rule. *Id*. The Service shared similar information on the critical habitat rule with Claire Santoro, another third-party associated with Industrial Economics, Inc. *See* Tucci Decl, Exh. 1; Privilege Log at Bates No. 71415-17.

In similar circumstances, courts have held a party waived the attorney-client privilege. For example, in *In re Sealed Case*, the D.C Circuit held that a company's disclosure of a memorandum to the Internal Revenue Service constituted a waiver of the attorney-client privilege. 877 F.2d at 981. The Tenth Circuit reached the same result in *In re Qwest*, also holding a corporation waived its attorney-client privilege when it circulated privileged documents to the Securities and Exchange Commission. 450 F.3d at 1201. *See also Ryans*, 903 F.2d at 741 n. 13 (holding defendant waived the attorney-client privilege by disclosing to third-party substance of attorney-client communication); *United States v. Bump*, 605 F.3d 548, 551 (10th Cir. 1979) (same). The District Court of Colorado has also found waiver of the attorney-client privilege when a party disclosed via email privileged communications to potential clients. *Roe*, 281 F.R.D. at 639.

This Court should follow *In re Sealed Case*, *In re Qwest*, *Ryans*, *Bump* and *Roe*, and hold that the Service waived its attorney-client privilege by disclosing to another federal agency and other third parties the contents of its attorney's "legal advice" on the proposed and final Gunnison sage-grouse critical habitat rule.

Under the subject-matter doctrine, the Service's waiver applies to all communications and documents relating to the same subject matter as the improperly disclosed communications, and not just to the specific communications. *See Graham*, 2003 WL 23198792 at *5. In *Graham*, defendant subpoenaed the production of documents from a third party (i.e., Qwest Communications), which Qwest had previously disclosed to the federal government. Qwest invoked the attorney-client privilege in moving to quash the subpoena. The district court rejected this approach, and held Qwest waived its attorney-client privilege "not only as to the disclosed documents, but also as to all documents relating to the subject matter of the disclosed documents." *Id. See also In re Sealed Case,* 676 F.2d at 809 (same); *Anaya*, 2007 WL 2219394 at *7 (same).

Here, the Service, itself, has described the subject matter of the previously disclosed communications and documents broadly, to include legal advice on the "draft GUSG critical habitat rule," "proposed GUSG critical habitat rule," and "draft incremental effects memorandum." *See* Privilege Log at Bates No. 195505-06, 195546-47, 71124-52, 71415-417, 71420-48, 72854-89, 73002-37, 73139, 73157-58. Thus, under the "subject matter waiver" doctrine, this Court should require the Service to disclose all communications and documents relating to the draft and final critical habitat rules, and the Service's incremental effects memorandum. *Graham*, 2003 WL 23198792 at *5.

### IV. THE SERVICE MUST DISCLOSE ALL DOCUMENTS SEEKING SIMULTANEOUS REVIEW BY LEGAL AND NON-LEGAL PERSONNEL.

The Service must also disclose documents and communications seeking simultaneous review by legal and non-legal personnel alike, as these documents are not protected by the attorney-client privilege. It is black letter law that the attorney-client privilege only protects communications and documents intended to secure legal advice.
13

*United States v Johnston*, 146 F.3d 785, 794 (10th Cir. 1998) ("In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client.").  The attorney-client privilege does not attach to documents prepared for simultaneous review by legal and non-legal personnel, however, because the primary purpose of the document is not to secure legal advice.  See *U.S. v. Chevron Corp.*, No. 94-1885, 1996 WL 264769, *3 (N.D. Cal. March 13, 1996) (rejecting attorney-client privilege); *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 110 F.R.D. 511, 514 (M.D.N.C. 1986) (same); *U.S. v. IBM Corp.*, 66 F.R.D. 206, 212-213 (S.D.N.Y. 1974) (same).  See also *El Paso Nat. Gas Co.*, 20 FERC 63021, 1982 FERC 41088, *3 (July 13, 1982) (holding it is "well-established" that the attorney-client privilege does not protect documents prepared for "simultaneous review" by lawyers and non-lawyers).

In *IBM Corp.*, Defendant invoked the privilege to withhold "documents requesting simultaneous review of a given problem by non-legal as well as legal personnel."  66 F.R.D. at 212.  Defendant argued the attorney-client privilege applies "[i]n a situation where several persons, including a lawyer, are asked for advice upon a course of conduct."  *Id.*  The court rejected this approach, and held that "no protection attached to a document prepared for simultaneous review by legal and non-legal personnel."  *Id.* at 213.  See also *Chevron*, 1996 WL 264769 at *3 (rejecting magistrate's findings and recommendations applying the privilege to documents prepared for simultaneous legal and non-legal review); *In re Vioxx Products Liability Litigation*, 501 F.Supp 789, 806 (E.D. Louisiana 2007) ("When . . . [a company] simultaneously sends communications to both lawyers and non-lawyers, it usually cannot claim that the primary purpose of the communication was for legal advice . . .   As a consequence, the privilege does not protect the communications." (citing *IBM* and *Chevron*)).

Despite these well-established principles, the Service here seeks to shield from disclosure several documents seeking simultaneous review by legal and non-legal personnel. For example, on October 15, 2014, Service biologist Sarah Fierce drafted an email entitled, "For review ASAP Poncha Pass language," and circulated this memo to eight co-workers, including other agency biologists, supervisors, and attorneys. *See* Privilege Log at Bates Nos. 163580, 164417, 164418, 164421. Fierce made the same broad request for simultaneous legal and non-legal review of the "GUSG final listing rule" and "GUSG critical habitat rule," too. *See id*. at Bates Nos. 152744 (email requesting simultaneous review of final listing rule circulated to biologists, botanist, and supervisors); 158186 (email requesting simultaneous review of final critical habitat rule circulated to biologist and attorneys); 159969 (same); 156941 (same).

This Court should follow *IBM* and *Chevron* and reject the Service's broad invocation of the attorney-client privilege here. Like in those cases, the record here shows that Fierce sought simultaneous legal and non-legal review of the Service's draft listing and critical habitat rules, and even forwarded this communication to other agency non-legal staff beyond original recipients, apparently seeking their advice, too. *See, e.g.,* Privilege Log at Bates Nos. 156941 (email).

## CONCLUSION

For the foregoing reasons, this Court should hold the Service has failed to adequately support its invocation of the attorney-client privilege, grant Plaintiffs WildEarth Guardians and Dr. Clait E. Braun's motion to complete the record, and order the Service to complete the Administrative Record by including all withheld documents.

Dated this 25th day of January, 2015        Respectfully submitted,
/s/ Todd C. Tucci
Todd C. Tucci (Pro Hac Vice)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
ttucci@advocateswest.org

Attorney for Plaintiffs WildEarth
Guardians and Dr. Clait E. Braun

## CERTIFICATE OF SERVICE

I hereby certify that today I electronically filed the foregoing document, together with the Declaration of Todd C. Tucci and all attendant exhibits, with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

/s/ Todd C. Tucci
Todd C. Tucci

16