**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:15-cv-130**

(Consolidated with Civil Action No. 1:15-cv-131 and Civil Action No. 1:15-cv-286)

This Document Relates to Civil Action No. 1:15-cv-131

IN RE GUNNISON SAGE GROUSE ENDANGERED SPECIES ACT LITIGATION

---

**OPENING MERITS BRIEF OF
PETITIONERS WILDEARTH GUARDIANS AND DR. CLAIT E. BRAUN**

---

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………..1

STATEMENT OF RELEVANT FACTS...........................................................................2

     A.  THE GUNNISON SAGE-GROUSE…………………………………………..2

     B.  PRIOR ESA LISTING HISTORY…………………………………………..4

     C.  PROPOSED ENDANGERED RULE AND 1.7 MILLION-ACRE
        CRITICAL HABITAT DESIGNATION.......................................................5

     D.  FINAL THREATENED RULE AND REDUCTION OF CRITICAL
        HABITAT BY 300,000 ACRES…………………………………………..8

LEGAL BACKGROUND………………………………………………………………12

     A.  THE ENDANGERED SPECIES ACT.................................................12

     B.  STANDARD OF REVIEW…………………………………………...14

ARGUMENT………………………………………………………………………15

    I.  THE GUNNISON SAGE-GROUSE WARRANTS PROTECTION AS AN
      ENDANGERED SPECIES……………………………………………………15

     A.  THE SERVICE MISAPPLIED THE STATUTORY TERMS
        “ENDANGERED” AND “THREATENED.”...........................................16

     B.  THE SERVICE’S RE-EVALUATION OF THE THREAT FROM
        RESIDENTIAL DEVELOPMENT IGNORED THE BEST AVAILABLE
        SCIENCE……………………………………………………………………...19

    II.  THE SERVICE UNLAWFULLY SHRUNK CRITICAL HABITAT……………...24

     A.  THE SERVICE’S USE OF A HABITAT OCCUPATION PROXY TO
        ELIMINATE CRITICAL HABITAT IN PONCHA PASS IS
        ARBITRARY…………………………………………………………………...25

     B.  THE SERVICE ERRED WHEN IT EXCLUDED CRITICAL HABITAT
        UNDER ESA SECTION 4(B)(2)…………………………………………..30

III.  THE COURT SHOULD LEAVE THE CURRENT RULES IN PLACE DURING REMAND WHILE THE SERVICE RE-CONSIDERS LISTING THE SPECIES AS ENDANGERED AND DESIGNATING FULL CRITICAL HABITAT AS PROPOSED…………………………………………………………………36

  A.  DECLARATORY RELIEF IS PROPER HERE…………………………36

  B.  REMAND WITHOUT VACATUR IS THE PROPER REMEDY……….37

CONCLUSION……………………………………………………………………………39

## TABLE OF AUTHORITIES

### Cases

*Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544 (9th Cir. 2016) ........................ 19, 26, 28

*Alliance for the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126 (D. Mont. 2010) 13, 26, 27, 29

*Am. Lands Alliance v. Norton*, 1:04-cv-00434-RBW (D.D.C. May 28, 2004) ................... 5

*Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010) .......................... 26

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687 (1995) 14

*Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977 (9th Cir. 2016) ....................... 15, 31

*Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249 (10th Cir. 1998) ........................... 14

*Carlton v. Babbitt*, 900 F. Supp. 526 (D.D.C. 1995)........................................... 21, 24, 36

*Cnty. of San Miguel, Colo. v. MacDonald*, 244 F.R.D. 36 (D.D.C. 2007)........................ 5

*Coal. of Ariz./New Mexico Counties for Stable Economic Growth v. Salazar*, No. 07–cv–00876 JEC/WPL, 2009 WL 8691098 (D.N.M. May 24, 2009) .................................... 38

*Colorado River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170 (D.D.C. 2006).... 36

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006). ........................................................................................... 31, 32, 33

*Ctr. for Biological Diversity v. Kelly*, 93 F. Supp. 3d 1193 (D. Idaho 2015)............. 31, 35

*Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090 (D. Ariz. 2003) .... 31, 35, 38

*Ctr. for Biological Diversity v. Salazar*, 770 F. Supp. 2d 68 (D.D.C. 2011) ............. 15, 31

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 5:09-cv-90, 2011 WL 73494 (C.D. Cal. Jan. 8, 2011) ...................................................................................... 27, 29

*Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236 (D. Colo. 2011) ......... 2, 38

*Ctr. for Native Ecosystems v. U.S. Fish & Wildlife Serv.*, 795 F. Supp. 2d 1199 (D. Colo. 2011) ........................................................................................................... 15, 21

*Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) ................................. 16

*Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975 (D. Mont. 2016) ................... 14, 20

*Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9 (D.D.C. 2002) ............................... 36

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ....................................... 36

*Friends of the Earth Inc. v. Laidlaw Environmental Serv.*, 528 U.S. 167 (2000).............. 3

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004) .................................................................................................................... 30

*Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1029-30 (9th Cir. 2011) ........ 22

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995)......... 2, 31, 34, 35, 38

*In Re Polar Bear Endangered Species Act and 4(d) Rule Litigation*, 748 F. Supp. 2d 19, (D.D.C. 2010) ......................................................................................................... 16

*In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation*, 794 F. Supp. 2d 65 (D.D.C. 2011) ................................................................................................ 17

*In re WildEarth Guardians v. Salazar*, No. 10-377 (EGS), MDL Docket No. 2165 (J.P.M.L. 2011)......................................................................................................... 5

*Kern Cnty. Farm Bureau v. Allen,* 450 F.3d 1072, 1080 (9th Cir. 2006) .................. 19, 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........ 15

*Nat'l Ski Areas Ass'n v. U.S. Forest Serv.*, 910 F. Supp. 2d 1269 (D. Colo. 2012) ....... 39

*Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*,  966 F.2d 1292 (9th Cir.1992).. 32

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) ........................ 15

*People for Ethical Treatment of Property Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990 (10th Cir. 2017) ................................................................................................. 11

*Rocky Mountain Wild v. U.S. Fish & Wildlife Serv.*, No. CV 13–42–M–DWM, 2014 WL 7176384 (D. Mont. Sept. 29, 2014) ............................................................................ 21

*S. Utah Wilderness All. v. Burke*, No. 2:12-cv-257-DAK, 2015 WL 2452932 (D. Utah May 22, 2015) ........................................................................................................... 38

*Southwest Ctr. for Biological Diversity v. Clark*, 90 F.Supp.2d 1300 (D.N.M. 1999)........ 3

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ....................................................... 14, 38

*Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929 (D. Or. 2007) .................................... 17, 20

*Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870 (9th Cir. 2009) ......................... 22

*W. Watersheds Project v. Foss*, No. CV 04-168-MHW, 2005 WL 2002473 (D. Idaho Aug. 19, 2005) ................................................................................................... 17, 36

*WildEarth Guardians v. U.S. Dep't of Interior*, 205 F. Supp. 3d 1176 (D. Mont. 2016) . 26, 29, 30, 38

**Statutes**

16 U.S.C. § 1531(a) ................................................................................................. 12, 13

16 U.S.C. § 1532(6), (20)......................................................................................... 12, 16

5 U.S.C. § 706 .............................................................................................................. 14

16 U.S.C. § 1532(5)(A) ............................................................................................ 13, 25

16 U.S.C. § 1533 ..................................................................................................... 12, 13

16 U.S.C. § 1533(b)(1)(A) ............................................................................... 13

16 U.S.C. § 1533(b)(2) .............................................................................. 13, 31

## Rules

Candidate Notice of Review, 69 Fed. Reg. 24876, 24881 (May 4, 2004) ........................ 4

Designation of Critical Habitat for Gunnison Sage-Grouse, 79 Fed. Reg. 69312 (Nov. 20, 2014) (Final Critical Habitat Rule) .................................................................. passim

Designation of Critical Habitat for Gunnison Sage-Grouse; Proposed Rule, 78 Fed. Reg. 2540 (Jan. 11, 2013) (Proposed Critical Habitat Rule) ..................................... 7, 29, 32

Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species; Proposed Rule, 75 Fed. Reg. 59804-05 (Sept. 28, 2010) (12-Month Finding) .... 2, 3, 5

Endangered Status for Gunnison Sage-Grouse; Proposed Rule, 78 Fed. Reg. 2486 (Jan. 11, 2013) (Proposed Endangered Rule) ..................................................... passim

Threatened Status for Gunnison Sage-Grouse; Final Rule, 79 Fed. Reg. 69192 (Nov. 20, 2014) (Final Threatened Rule) ..................................................................... passim

## Regulations

50 C.F.R. § 424.11(b) ................................................................................... 13

## INTRODUCTION

The Gunnison sage-grouse risks extinction in as few as 31 years.  The

sagebrush habitats upon which the bird depends have been destroyed and fragmented,

and it now occupies only a fraction of its historic range, centered around Colorado's

Gunnison Basin.  In 2014, just 4,705 Gunnison sage-grouse remained.

Despite these stark facts, the U.S. Fish and Wildlife Service (Service) determined

in November 2014 to downgrade the Gunnison sage-grouse to a "threatened" species

under the Endangered Species Act (ESA), instead of "endangered" as it had originally

proposed just the year before.  *See* Endangered Status for Gunnison Sage-Grouse;

Proposed Rule, 78 Fed. Reg. 2486 (Jan. 11, 2013) (Proposed Endangered Rule);

Threatened Status for Gunnison Sage-Grouse; Final Rule, 79 Fed. Reg. 69192 (Nov.

20, 2014) (Final Threatened Rule).  The Service also adopted a final critical habitat rule

that excluded almost 300,000 acres of land previously identified as essential for the

bird's survival and recovery. *See* Designation of Critical Habitat for Gunnison Sage-

Grouse, 79 Fed. Reg. 69312 (Nov. 20, 2014) (Final Critical Habitat Rule).  The Service

designated a mere 12 percent of the species' historic range as critical habitat.

The record before the Court demonstrates the Service acted unlawfully in

adopting the "threatened" listing instead of full "endangered" protection, and in reducing

the critical habitat designation for the Gunnison sage-grouse.  Under intense political

pressures from the State of Colorado and others, then-Interior Secretary Salazar

directed the Service to water down the proposed "endangered" listing and full critical

habitat designation that the Service's scientists had developed based on the best

available science.  The Service then scrambled to justify the lesser protections in the

Final Threatened and Critical Habitat Rules challenged here—and could only do so by

misapplying the ESA's definitions for endangered and threatened species, and

disregarding the best available science.

Because of these key defects, the Court should declare that the Service acted

unlawfully in not providing the Gunnison sage-grouse the full protection it deserves

under the ESA, and in failing to designate critical habitat in accordance with the Act.

However, because the Threatened and Critical Habitat Rules provide important

protection for this gravely imperiled species, Petitioners specifically request that the

Court leave the existing rules in place on remand. *See Idaho Farm Bureau Fed'n v.*

*Babbitt*, 58 F.3d 1392 (9th Cir. 1995) (listing rule should remain in place during remand);

*see also Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1238 (D. Colo.

2011) (considering purpose of ESA in fashioning equitable relief).

## STATEMENT OF RELEVANT FACTS

### A.  THE GUNNISON SAGE-GROUSE

In 2000, the American Ornithologists' Union recognized the Gunnison sage-

grouse as a separate species from the greater sage-grouse, thanks in part to Petitioner

Dr. Clait E. Braun's work.  *See* Determination for the Gunnison Sage-grouse as a

Threatened or Endangered Species; Proposed Rule, 75 Fed. Reg. 59804-05 (Sept. 28,

2010) (12-Month Finding); Braun Decl. ¶¶ 8-11, ECF No. 28-3.[1]  The Gunnison sage-

---

[1] Petitioners have submitted declarations from Dr. Clait E. Braun—one of the world's leading sage-grouse experts, who spent over two decades conducting sage-grouse research and management for Colorado Parks and Wildlife—and from WildEarth

grouse exists only in limited parts of Colorado and a sliver of Utah.  12-Month Finding,

75 Fed. Reg. at 59805.  The species evolved in, and depends upon, native sagebrush-

steppe habitat, which has been destroyed and fragmented over the past century.  As

the Service acknowledged in its Final Threatened Rule, the species is now limited to at

most 12 percent of its historic range. Final Threatened Rule, 79 Fed. Reg. at 69228.

Gunnison sage-grouse populations have collapsed with the destruction of their

habitat.  According to the Final Threatened Rule, only 4,705 Gunnison sage-grouse

persisted in the wild in 2014, in seven populations.  *Id.* at 69193, 69196.  A single

population, in Colorado's Gunnison Basin, comprised 84 percent of all remaining

Gunnison sage-grouse (3,978); the six smaller populations (San Miguel, Monticello-

Dove Creek, Pinon Mesa, Cerro Summit-Cimarron-Sims Mesa, Crawford, and Poncha

Pass) numbered only 206, 98, 182, 74, 157, and 10 birds, respectively.  *Id.* at 69197;

GUSG199496.  As the Service conceded, there were fewer Gunnison sage-grouse

remaining than the 5,000 birds needed to maintain a healthy population.  Final

Threatened Rule, 79 Fed. Reg. at 69290.

The population viability analysis which the Service identified as the best available

science, Davis (2012), indicates that the Gunnison Basin population is not as large or as

---

Guardians' staff and members to document their long-standing interests in protecting
the Gunnison sage-grouse and their frequent visits to observe and study the species in
the wild.  *See* Braun, Bernhardt, Cotton, Molvar, and Baker Declarations (ECF Nos. 28-
3, 28-2, 28-4, 28-5, & 28-6).  These declarations, along with the Administrative Record
showing their participation in the rule-making processes, confirm Petitioners' Article III
standing to bring this action. *See Friends of the Earth Inc. v. Laidlaw Environmental
Serv.*, 528 U.S. 167, 180-82 (2000) (addressing standing requirements for
environmental plaintiffs); *Southwest Ctr. for Biological Diversity v. Clark*, 90 F. Supp. 2d
1300, 1307 (D.N.M. 1999) (discussing ESA standing).

stable as the Service previously believed and is declining.  *Id*. at 69294.[2]  That study

projected that the Gunnison Basin population faces a minimum extinction time of 31

years and an expected extinction time of 58 years.  *Id*. at 69293.  The second-largest

population, at San Miguel, is "steeply declining" and faces a "high probability" of

extinction in the next 30 years.  *Id*. at 69293-94.  According to the Service, "the best

available information indicates the six satellite populations are at risk of extirpation in

approximately 30 years."  *Id*. at 69295.  In 2013, the small Poncha Pass population was

nearly wiped out, and birds had to be translocated from the Gunnison Basin to stave off

extirpation. *Id*. at 69200; GUSG.

## B.    PRIOR ESA LISTING HISTORY

Shortly after Dr. Braun and others identified the Gunnison sage-grouse as a

separate species, the Service placed it on the ESA candidate species list.  *See*

Proposed Endangered Rule, 78 Fed. Reg. at 2487. The Service assigned it a high

listing priority of "2," recognizing the high-magnitude and imminent threats to the bird's

survival and persistence.  *Id.*; Candidate Notice of Review, 69 Fed. Reg. 24876, 24881

(May 4, 2004).

Yet the Service repeatedly failed to move forward with ESA protection of the

imperiled species, triggering rounds of prior litigation.[3]  On September 28, 2010, the

Service published a "12-month finding" concluding that the Gunnison sage-grouse was

---

[2] A copy of the Davis (2012) study is in the Administrative Record at GUSG41438.  It discusses extinction projections relevant here at GUSG41530 and GUSG41605.
[3] *See Am. Lands Alliance v. Norton*, 1:04-cv-00434-RBW (D.D.C. May 28, 2004); *Cnty. of San Miguel, Colo. v. MacDonald*, 244 F.R.D. 36 (D.D.C. 2007).

"warranted, but precluded" for listing under the ESA. 12-Month Finding, 75 Fed. Reg. at 59804. This finding acknowledged the peril facing Gunnison sage-grouse from habitat losses and dwindling populations—yet cited the Service's lack of resources and bureaucratic backlogs to avoid moving forward with an ESA listing rule. *Id.* Litigation ensued; ultimately, the Service agreed to a settlement in September 2011, which required it to issue a final listing determination for the Gunnison sage-grouse no later than May 12, 2014, along with deadlines for other species. *In re WildEarth Guardians v. Salazar*, No. 10-377 (EGS), MDL Docket No. 2165 (J.P.M.L. 2011).

### C. PROPOSED ENDANGERED RULE AND 1.7 MILLION-ACRE CRITICAL HABITAT DESIGNATION.

To comply with that settlement, the Service issued its Proposed Endangered Rule in January 2013, proposing to list the Gunnison sage-grouse as "endangered" under the ESA. Proposed Endangered Rule, 78 Fed. Reg. 2486. Service scientists developed the Proposed Endangered Rule based on the best available scientific information and determined an endangered listing was justified under ESA Section 4 because habitat loss and fragmentation were adversely impacting the Gunnison sage-grouse, as were livestock grazing, predation, genetic risks in the smaller populations, and the inadequacy of regulatory mechanisms to conserve the species. *Id*. at 2535. The Service acknowledged that because each of the seven remaining populations contributes to the species' diversity and potential resilience to catastrophic events, "the loss of any one population would have a negative effect on the species as a whole." *Id*. at 2530.

Critical to the Service's proposal to list the bird as endangered were the high magnitude threats to the bird's persistence from habitat loss, degradation, and fragmentation due to residential, exurban, and commercial development and associated infrastructure. *Id*. at 2535; *see also* Final Threatened Rule, 79 Fed. Reg. at 69236 (explaining that residential development, particularly in the Gunnison Basin, is a principal threat to the species and was "critical" to the proposal to list it as endangered). The Proposed Rule relied on a study by Aldridge *et al*. (2011)[4] to infer that 49 percent of habitat in the Gunnison Basin was affected by residential development, which was "strongly decreasing the likelihood of Gunnison sage-grouse using these areas as nesting habitat," as well as threatening loss of early brood-rearing habitat. *Id*. at 2496.[5] The Service stated that "[l]imitations in the quality and quantity of nesting and early brood-rearing habitat are particularly problematic because Gunnison sage-grouse population dynamics are most sensitive during these life history stages." *Id*. (citation omitted). The Service found that habitats in the other population areas stood to be similarly impacted by residential development. *Id*. at 2497-98.

Simultaneously with the Proposed Endangered Rule, the Service proposed to designate 1.7 million acres as critical habitat for the Gunnison sage-grouse. *See* Designation of Critical Habitat for Gunnison Sage-Grouse; Proposed Rule, 78 Fed. Reg.

---

[4] The Proposed Rule cited this study as Aldridge *et al*. (2011); but the Final Rule referred to it as Aldridge *et al*. (2012), as the 2011 study was published in a 2012 issue of the Journal of Wildlife Management. Copies of both versions are in the record. *See* GUSG23260 & GUSG41922.

[5] The Service accepted the Aldridge study as the best available scientific information, and Colorado Parks and Wildlife confirmed that it is the "only peer-reviewed paper that directly addresses habitat use by Gunnison sage-grouse." GUSG162729, GUSG97318-19.

2540 (Jan. 11, 2013) (Proposed Critical Habitat Rule).  The proposed critical habitat included 48,292 acres for the Poncha Pass population.  *Id*. at 2569-70.

The Service identified critical habitat based on whether an area contained the physical and biological features needed for sage-grouse survival, known as "Primary Constituent Elements" (PCEs).  *Id*. at 2546.  The Service required that all occupied critical habitat had to meet a "landscape-scale PCE," defined as sagebrush habitats "of sufficient size and configuration to encompass all seasonal habitats for a given population of Gunnison sage-grouse, and facilitate movements within and among populations." *Id*.  In addition, each area had to meet one or more "site-specific" PCEs, which capture seasonal habitats important to the species for different parts of its life-cycle. *See id*. at 2546 (describing site-specific PCEs).  The Service concluded that the occupied critical habitat at Poncha Pass satisfied the PCEs.  *Id*. at 2556.  The Service also included in its proposed critical habitat lands enrolled in the State of Colorado's Candidate Conservation Agreement with Assurances (CCAA) and areas subject to conservation easements.  *Id*. at 2558-59.

### D.   FINAL THREATENED RULE AND REDUCTION OF CRITICAL HABITAT BY 300,000 ACRES.

Even as Service scientists were developing the Proposed Endangered Rule, fierce political opposition to an ESA listing was mounting.  The record indicates that then-Secretary Salazar (a former Colorado rancher and senator) responded by

internally directing the Service to arrive at a "threatened" finding in the final rule.  *See*

Nov. 14, 2012 Bell Memo (Attachment 1).[6]  In this memo, a Service employee wrote:

> [Y]esterday afternoon Nicole Alt, the new deputy for R6 ES (and my prior
> supervisor on this project in the HQ) said that Salazar had asked that R6 figure
> out how to get the Gunnison sage grouse from endangered (it is currently
> proposed as endangered) down to threatened status prior to the final rule. … We
> have one month to figure this out…. YIKES!!!!!!

*Id*.  In response, Service employees began working on a threatened rule. GUSG151876

(12/3/12 meeting notes showing discussion of how to get from endangered to

threatened); GUSG97319 (draft threatened rule circulated 12/15/13) (attached to

GUSG97318).

     The politically-motivated pressures to reduce ESA protections for the Gunnison

sage-grouse succeeded.  On November 20, 2014, the Service issued its Final

Threatened Rule downgrading the ESA listing to "threatened," rather than the

"endangered" listing the Service had proposed just the year before.  Final Threatened

Rule, 79 Fed. Reg. at 69192.  It also announced it "continue[d] to evaluate the potential

for issuing a Section 4(d) rule in the future" to further relax the ESA's restrictions.  *Id*. at

69193; *see also* Cotton Decl. ¶ 6, ECF No. 28-4 (discussing potential for a 4(d) Rule).

The same day, the Service issued its Final Critical Habitat Rule removing almost

300,000 acres previously identified as essential to the species' survival and recovery

from designated critical habitat. Final Critical Habitat Rule, 79 Fed. Reg. at 69312.

---

[6] Federal Defendants acknowledge they inadvertently omitted the Bell Memo from the
Administrative Record, but have consented to its inclusion in the record and to
Petitioners' attaching it to this brief.

The Service purported to justify backing away from the proposed "endangered" listing based on a "re-assessment" of the threat to Gunnison sage-grouse from residential development, even though the species' status had not improved.  As the record reveals, Service staff spent months trying to concoct this rationale to support a "threatened" finding. *See, e.g.*, GUSG151876 (12/3/12-12/5/12 meeting notes with no discussion of residential development rationale); GUSG84122 (7/26/13 draft response to comments reflecting threatened status); GUSG97318-19 (draft rule with revised residential development section dated 12/12/13), GUSG102711 (1/13/14 memo with rationale for threatened decision based on residential development (attached to GUSG102710)).  Following the lead of Colorado Parks & Wildlife (CPW),[7] the Service rejected its previous assessment of the threat from residential development, claiming that assessment was "at odds with the status of the Gunnison Basin population," which it characterized as "relatively stable based on lek count data."  Final Threatened Rule, 79 Fed. Reg. at 69236.   According to the Service's "re-assessment," its use of the Aldridge study supposedly caused it to overestimate the impacts of residential development, even though it concluded elsewhere that the Gunnison Basin population was "slightly declining" and "not … quite as stable as previously thought."  *E.g.*, *id*. at 69236, 69293, 69296. The Final Rule thus concluded that residential development poses only a low-magnitude threat in the Gunnison Basin, but that it poses a substantial threat to some of the smaller populations. *Id*. at 69238.

---

[7] *See* GUSG162729 (CPW's comments critiquing use of Aldridge study); GUSG80457 (discussing CPW's "disagreement" with Service's use of Aldridge study).

Both Final Rules departed from the Service's earlier conclusion that "the loss of any one population would have a negative effect on the species as a whole."  Proposed Endangered Rule, 78 Fed. Reg. at 2530.  Instead, in its Threatened Rule, the Service concluded that the Poncha Pass population was not necessary to the recovery of the species, and the Final Critical Habitat Rule did not protect as critical habitat any areas within Poncha Pass.  Final Threatened Rule, 79 Fed. Reg. at 69200, 69313.  While the Service decided, as early as April 2014, to drop critical habitat for Poncha Pass, it took another six months to manufacture the rationale for its decision.  *Compare* GUSG132789 (4/29/14 call agenda with item "justification for dropping Poncha Pass"), GUSG137400 (5/6/14 notes with "direction" to not include critical habitat for Poncha Pass (attachment to GUSG137399)), *with* GUSG147377 (7/29/14 memo reflecting direction to omit habitat for Poncha Pass), GUSG161032 (10/8/14 email re: "we changed the definition of occupancy to exclude Poncha Pass"), GUSG161251 (10/9/14 email re: once Poncha Pass no longer counts as occupied, it doesn't matter if it meets the PCEs), GUSG169704 (decision to omit Poncha Pass because it "cannot be self-sustaining over time").  Ultimately, the Service revised PCE 1 to require that all designated critical habitat be "capable of supporting a population of Gunnison sage-grouse," a requirement it concluded Poncha Pass did not meet.  Final Threatened Rule, 79 Fed. Reg. at 69338.

The Service also decided to exclude 191,457 acres of private lands from designated critical habitat, because they were enrolled in CCAA or were subject to conservation easements.  *See* Final Critical Habitat Rule, 79 Fed. Reg. at 69313.  The

Service asserted that the benefits of excluding these lands from critical habitat outweighed the benefits of inclusion, because allegedly little benefit would be gained from inclusion, while excluding them would alleviate any minimal regulatory burden on private landowners, which, in turn, would strengthen the partnership with CPW and facilitate future conservation actions on private lands. *Id*. at 69349. However, the Service failed to include in the record the Certificates of Inclusion in the CCAA, which specify which conservation actions would be implemented on private lands. *See* GUSG141169 (CIs excluded from record); *see also* GUSG14195-14230 (Colorado CCAA).

As a result of the Final Threatened Rule and Final Critical Habitat Rule, the Gunnison sage-grouse is now somewhat protected—but that protection is less than the protections afforded were it listed as "endangered" with full critical habitat designation. *See* Braun, Cotton, Baker Decls. In particular, the "threatened" listing allows the Service to develop a "4(d) Rule" under the ESA that provides far less protections from unlawful "take" under ESA Section 9 than apply to endangered species—as the Service has repeatedly stated it intends to do. *Id*. *See also People for Ethical Treatment of Property Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 995-97 (10th Cir. 2017) (explaining that heightened protections apply to endangered species, compared to threatened species, including because threatened species may be subject to greater "take" than endangered species).

In light of the extreme peril facing the species, and considering the political opposition to any ESA protections from numerous fronts (including the State of

Colorado), Petitioners brought this action seeking to ensure full ESA protection for the

Gunnison sage-grouse and its critical habitat, while leaving the existing Threatened and

Critical Habitat Rules in place until the Service has fully complied with its ESA duties.

## LEGAL BACKGROUND

### A.   THE ENDANGERED SPECIES ACT

Enacted in 1973 amid growing concern over the loss of biodiversity stemming

from "economic growth and development untempered by adequate concern and

conservation," the ESA establishes a comprehensive statutory program to protect and

conserve imperiled species, their habitat, and the ecosystems upon which they depend.

16 U.S.C. § 1531(a).  ESA Section 4 adopts a listing process to identify species that are

"endangered" or "threatened" with extinction, designate their critical habitat, and develop

plans to recover imperiled species.  *Id*. § 1533.

A species is "endangered" when it is "is in danger of extinction throughout all or a

significant portion of its range," *id*. § 1532(6); it is "threatened" when it "is likely to

become an endangered species within the foreseeable future throughout all or a

significant portion of its range," *id*. § 1532(20).  The Service must determine whether a

species is endangered or threatened based upon the following factors: "the present or

threatened destruction, modification, or curtailment of its habitat or range; overutilization

for commercial, recreational, scientific, or educational purposes; disease or predation;

the inadequacy of existing regulatory mechanisms; or other natural or manmade factors

affecting its continued existence."  *Id*. § 1533(a)(1). The Service must make listing

decisions "solely on the basis of the best scientific and commercial data available." *Id*. §

1533(b)(1)(A); 50 C.F.R. § 424.11(b).

Concurrently with listing a species, the Service must also designate "critical

habitat" for the species. 16 U.S.C. § 1533(a)(3)(A). Critical habitat includes:

> (i) the specific areas within the geographical area occupied by the species,
> at the time it is listed … on which are found those physical or biological
> features (I) essential to the conservation of the species and (II) which may
> require special management considerations or protection; and
> (ii) specific areas outside the geographical area occupied by the species
> at the time it is listed . . . upon a determination by the Secretary that such
> areas are essential for the conservation of the species.

*Id*. § 1532(5)(A). The Service must designate critical habitat "on the basis of the best

scientific data available and after taking into consideration the economic impact, the

impact on national security, and any other relevant impact, of specifying any particular

area as critical habitat." *Id*. § 1533(b)(2). The Service may exclude lands that

otherwise meet the definition of critical habitat if it:

> determines that the benefits of such exclusion outweigh the benefits of specifying
> such area as part of the critical habitat, unless [it] determines, based on the best
> scientific and commercial data available, that the failure to designate such area
> as critical habitat will result in the extinction of the species concerned.

*Id*. The Service must designate sufficient "critical habitat" to allow for the species'

survival and recovery. *Alliance for the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126,

1137 (D. Mont. 2010).

The "plain intent of Congress in passing the [ESA] was to halt and reverse the

trend toward extinction whatever the cost." *Babbitt v. Sweet Home Chapter of*

*Communities for a Great Or.*, 515 U.S. 687, 699 (1995) (citing *Tenn. Valley Auth. v. Hill*,

437 U.S. 153, 184 (1978)). To this end, Congress spoke "in the plainest of words . . .

affording endangered species the highest of priorities, [and] thereby adopting a policy which it described as 'institutionalized caution.'" *Tenn. Valley Auth.*, 437 U.S. at 194. "[I]f there is one thing required of the Service under the ESA, it is to take action at the earliest possible, defensible point in time to protect against the loss of biodiversity within our reach as a nation." *Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1010 (D. Mont. 2016).

### B.   STANDARD OF REVIEW

In examining whether the Service's actions violate the ESA, this Court relies upon the standards of review provided by the Administrative Procedure Act (APA). *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998).  Under the APA, the Court must determine whether the agency action was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, or in excess of statutory authority.  5 U.S.C. § 706; *Biodiversity Legal Found.*, 146 F.3d at 1252.

An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The court must review the agency's decision-making process to determine whether the agency has articulated a rational connection between the facts found and the decision made, and whether the agency's action was supported by substantial evidence in the record.  *Ctr. for Native Ecosystems v. U.S.*

*Fish & Wildlife Serv.*, 795 F. Supp. 2d 1199, 1201 (D. Colo. 2011); *Olenhouse v.*

*Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994). An agency's decision is

entitled to a presumption of regularity, but that presumption is not to shield the agency's

action from a thorough, probing, in-depth review. *Olenhouse*, 42 F.3d at 1575.

The Secretary's decision to exclude critical habitat, or not to designate critical

habitat, must have a rational basis. *See Ctr. for Biological Diversity v. Salazar*, 770 F.

Supp. 2d 68, 87-88 (D.D.C. 2011); *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977,

989-90 (9th Cir. 2016) (decision to exclude critical habitat is reviewable).

## ARGUMENT

## I.   THE GUNNISON SAGE-GROUSE WARRANTS PROTECTION AS AN ENDANGERED SPECIES.

The record shows that the Gunnison sage-grouse is on the brink of extinction,

and the Service arbitrarily failed to list the Gunnison sage-grouse as an endangered

species, as originally proposed.  As the Service initially recognized, the Gunnison sage-

grouse is currently in danger of extinction because the best available science shows

that it may be extinct within 31-58 years due to threats throughout its range.  When the

Service concluded that residential development in the Gunnison Basin poses less of a

threat to the population there than it had originally considered, and therefore reduced

the species' status to threatened from endangered, the Service failed to apply the best

available science and offered an explanation for its decision that ran counter to the

evidence before the agency.

**A.    THE SERVICE MISAPPLIED THE STATUTORY TERMS "ENDANGERED" AND "THREATENED."**

A species is "endangered" under the ESA if it is "is in danger <u>of extinction</u> throughout all or a significant portion of its range"; a species is "threatened" if it is "likely <u>to become an endangered species</u> within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(6), (20) (emphasis added).  According to the Service, the key difference between "endangered" and "threatened" is "the time of when a species may be in danger of extinction, either now (endangered) or in the foreseeable future (threatened)."  Final Threatened Rule, 79 Fed. Reg. at 69302. *See also* GUSG22937 (Service's interpretation of "endangered" on remand of its threatened finding for the polar bear) (Polar Bear Interpretation); GUSG80463-64 (meeting notes showing Service's use of the Polar Bear Interpretation factors to get to "threatened" finding).  A species need not be in imminent danger of extinction to meet the definition of an endangered species—it must only be "exposed to the harm of no longer existing." *In Re Polar Bear Endangered Species Act and 4(d) Rule Litigation*, 748 F. Supp. 2d 19, 25-26 (D.D.C. 2010).  Indeed, "Congress repeatedly explained that it intended to require the [Service] to take preventive measures *before* a species is conclusively headed for extinction."  *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997) (emphasis original) (internal quotation omitted).

The decision to list a species as threatened or endangered is "highly fact-specific," and the "required danger level for extinction necessarily depends on the applicable scientific viability assessments for the particular species."  *In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation*, 794 F. Supp. 2d 65, 89-90

(D.D.C. 2011); *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 948 (D. Or. 2007).  To require a "high risk" of extinction in the foreseeable future for a threatened listing is to conflate the terms endangered and threatened.  *W. Watersheds Project v. Foss*, No. CV 04-168-MHW, 2005 WL 2002473, at *17 (D. Idaho Aug. 19, 2005).  A standard requiring a species to be more likely than not (at least 50 percent) at risk of actually being extinct in the foreseeable future to qualify as threatened would violate the ESA.  *Lohn*, 645 F. Supp. 2d at 948-49.

The facts here show that the Gunnison sage-grouse is on the brink of extinction, based upon the best available science concerning population viability, and should have been listed as endangered.  *See* GUSG100726 (Gunnison sage-grouse is on the "brink").  The Service defines the foreseeable future as 40-60 years.  Final Threatened Rule, 79 Fed. Reg. at 69303.  The best available science on population viability, Davis (2012), concluded that the two largest populations together (Gunnison Basin and San Miguel) face a minimum extinction time of 20-41 years, and the Gunnison Basin population has an expected extinction time of 58 years.  *Id*. at 69293; GUSG41539, 41588 (Davis (2012)).  The Service projects the other small populations will be extirpated before that time.  *Id*. at 69295.  Reading Davis (2012) together with the Service's own 40 to 60 year foreseeable future timeframe, the record establishes that the Gunnison sage-grouse is expected to become extinct – not just endangered – within the foreseeable future.  Thus, the Gunnison sage-grouse currently meets the statutory definition of endangered.

Population trends confirm these model-based predictions. The largest population of Gunnison sage-grouse, in the Gunnison Basin, is neither as large nor as stable as previously believed, and the San Miguel population (the second-largest population) is "steeply declining."  Final Threatened Rule, 79 Fed. Reg. at 69293-94; *see also id.* at 69301 ("the Gunnison Basin and San Miguel populations, the two largest populations, are declining").  The small population at Poncha Pass teetered near extirpation in 2013, and remains propped up only by translocations.  *Id.* at 69200; *see* GUSG161013-14.  None of the remaining populations currently maintain a sufficiently large population size to avoid risk of inbreeding depression and loss of adaptive or evolutionary potential, and most of the small "satellite" populations are declining.  Final Threatened Rule, 79 Fed. Reg. at 69296.  The Service projects the six satellite populations will be extirpated within the next 30 years.  *Id.* at 69295.  The Service has stated that the vulnerability of the small populations to extirpation leaves the entire species vulnerable.  GUSG175819.

Courts have established that a species does not have to be in imminent peril of extinction to meet the definition of endangered, but here, the Gunnison sage-grouse faces that peril.  The best available science on population viability establishes the species is expected to be extinct within, or even before, the Service's foreseeable future of 40-60 years.  By improperly applying the ESA's definition of "endangered" here, and instead determining that the species only qualifies as "threatened," the Service erred, and the Court should declare that the Service unlawfully refused to provide full "endangered" listing protection to the Gunnison sage-grouse.

**B.   THE SERVICE'S RE-EVALUATION OF THE THREAT FROM RESIDENTIAL DEVELOPMENT IGNORED THE BEST AVAILABLE SCIENCE.**

When the Service backed away from its assessment that residential development currently poses a high-level threat to the Gunnison Basin population—and, thus, found that the threats presently impacting the species merit only a threatened listing—it failed to apply the best available science.  As the record shows, the "high in severity" threats to the species, including the "principal" threat of "habitat loss, degradation, and fragmentation due to residential, exurban, and commercial development and associated infrastructure such as roads and power lines," did not change appreciably in the 22 months between the Service's Proposed Rule and Final Threatened Rule.  Proposed Endangered Rule, 78 Fed. Reg. at 2535; *see* Final Threatened Rule, 79 Fed. Reg. at 69303.  Instead, the Service hinged its threatened finding on a reinterpretation of the threat from residential development in the Gunnison Basin.  But the Service's new analysis ignored the best available science and is contrary to the evidence in the record.

The ESA's "best available science" standard "prohibits [the Service] from disregarding available scientific evidence that is in some way better than the evidence it relies on." *Kern Cnty. Farm Bureau v. Allen,* 450 F.3d 1072, 1080 (9th Cir. 2006) (citations and alterations omitted); *see also Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 555 (9th Cir. 2016).  The ESA does not require scientific certainty to justify listing a species, but rather requires application of the best science available. *Lohn*, 645 F. Supp. 2d at 950.

In *Defenders of Wildlife v. Jewell*, the court found the Service violated the ESA's best available science requirement when the Service did not apply a key study regarding the impacts of climate change on the wolverine. 176 F. Supp. 3d 975, 1000 (D. Mont. 2016). The court noted that the agency had relied on an "unpublished, unreviewed, personal opinion" discrediting the study to backfill a foregone decision to withdraw the proposed rule, and the court held that the Service could not rely on the opinion—which relied on tangential science to discredit specific science—where better evidence was available. *Id*. at 1002 (finding the Service's scientific analysis and process was "the essence of arbitrary and capricious decision making") (citing *Kern Cnty. Farm Bureau*, 450 F.3d at 1080). Nor could the Service rely on rationales proffered by the states for attacking the Service's reliance on the study, particularly since no state provided any scientific evidence directly rebuffing the study's conclusions. *Id*.

This court should follow *Jewell* and hold that the Service wrongly refused to list the Gunnison sage-grouse as endangered. Similar to *Jewell*, the Service altered its previous reliance on the Aldridge study, which was the only science concerning the effects of residential development on Gunnison sage-grouse, in an effort to backfill Secretary Salazar's directive to downgrade the Gunnison sage-grouse's listing status to threatened. Indeed, the record shows that the Service decided to abandon its proposed endangered rule five months before it manufactured an analysis or explanation supporting its reversal. *See* Attach. 1 (11/14/12 Bell Memo reflecting Secretary Salazar asking Service to get to a final threatened listing), GUSG136927 (5/4/14 email reflecting

decision to adopt threatened listing rather than endangered); GUSG186246 (10/31/14 draft residential development analysis).  Just as in *Jewell*, the Service's revised analysis responded to criticism from a state agency (CPW), *see* GUSG162729, but neither the state agency nor the Service identified any specific science to supplant the Aldridge study.  Instead, like in *Jewell*, the Service relied on a characterization of tangential science regarding the stability "based on lek count data" of the Gunnison Basin population, rather than specific science predicting how the population might be affected by residential development.  *See* Final Threatened Rule, 79 Fed. Reg. at 69236 (residential development analysis).  This was arbitrary and capricious; the Service cannot ignore the available science in the absence of better science.  *Rocky Mountain Wild v. U.S. Fish & Wildlife Serv.*, No. CV 13–42–M–DWM, 2014 WL 7176384, at *12 (D. Mont. Sept. 29, 2014) (Service may not disregard available information); *see also Lohn*, 645 F. Supp. 2d at 950 (agency cannot ignore available science).

Moreover, the Service may not simply consider the ESA Section 4 listing factors individually, it must consider how all of the factors together impact the species.  *Ctr. for Native Ecosystems*, 795 F. Supp. 2d at 1206.  "[S]mall, non-threatening injuries can incrementally lead to a fatal result, whether it is the 'straw that broke the camel's back' or 'death by a thousand cuts.'"  *Id*. at 1207. That a small population is currently stable does not necessarily imply that the stable population is large enough to withstand threats it faces.  *See Carlton v. Babbitt*, 900 F. Supp. 526, 533-34 (D.D.C. 1995) (rejecting agency's finding that a grizzly population did not merit reclassification to endangered status, where agency ignored part of study showing the population—

though stable—would have difficulty recovering); s*ee also Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1029-30 (9th Cir. 2011) (lack of data showing a population decline in response to a threat is not enough to support the conclusion that the threat will not impact a species' population, especially where countervailing evidence exists); *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009) ("the Secretary cannot reasonably infer that the absence of evidence of population decline equates to evidence of persistence.").

Here, where the Service acknowledged that the Gunnison sage-grouse remains impacted by increasing, "high in severity" threats throughout its range, it erred by relying exclusively on the purported stability of the Gunnison Basin population—especially in the face of evidence that the population is actually declining.  The Service supported its re-interpretation of the impacts of residential development by asserting that, since the population in the Gunnison Basin was "relatively stable for the last 19 years, based on lek count data," ongoing residential development must not be adversely impacting the grouse.  Final Threatened Rule, 79 Fed. Reg. at 69236.  But, elsewhere in the same rule, the Service characterized the Gunnison Basin population as "declining," or "slightly declining", and admitted that "the Gunnison Basin population may not be as large as lek count-based estimates suggest."[8]  *Id*. at 69301, 69293, 69294.  Indeed, the Service

---

[8] Elsewhere, the Service acknowledged that emerging science showed the uncertainty of population estimates based on lek count data.  Final Threatened Rule, 79 Fed. Reg. at 69198.

noted that the Gunnison Basin population was not as secure or large as commonly accepted.  *See id.* at 69204-05, 69288, 69292-94 (same).[9]

Moreover, the Service did not adequately explain why the supposedly "stable" Gunnison Basin population rendered the entire species able to withstand the other "high in severity" threats the Service identified in the Proposed Rule.  *See* Proposed Endangered Rule, 78 Fed. Reg. at 2535.  The Service provided no evidence that the remaining threats to Gunnison sage-grouse populations and habitat abated over the 22 months between the draft endangered rule and final threatened rule.  In fact, the Service stated:  "The cumulative effects of ongoing and future threats…and small and declining population size and structure, in particular, are likely to further reduce the resiliency, redundancy, and representation of the species."  Final Threatened Rule, 79 Fed. Reg. at 69302. While the Service admitted the threats still exist, it relied on the conclusory assertion that they do not support an endangered finding, stating:

> [T]he other factors that we identified as threats in the proposed rule (inadequate regulatory mechanisms, genetic issues and small population sizes, predation,

---

[9] The Service also ignored evidence that residential development may be causing the population decline observed in the Gunnison Basin population.  Based on the Aldridge study, the Service recognized residential development was impacting 49 percent of habitat in the Gunnison Basin and that this impact led to less nesting or brood-rearing habitat in the basin.  Proposed Endangered Rule, 78 Fed. Reg. at 2496.  The Service later noted that decline of nesting or brood-rearing habitats can reduce recruitment.  Final Threatened Rule, 79 Fed. Reg. at 69229.  And the Service recognized that "lower juvenile recruitment may be contributing to the…observed population declines in the Gunnison Basin."  *Id.* at 69292.  The evidence in the record thus shows that residential development is reducing nesting and breeding habitat in the Gunnison Basin, and this reduction in nesting and breeding habitat reduces juvenile recruitment.  In turn, reduced juvenile recruitment contributes to the declines in sage-grouse in the Gunnison Basin.  Unfortunately, the Service never connected these dots, and instead provided the inaccurate, blanket characterization of the population as "stable."

improper grazing management, and the interaction among climate change, invasive plants and drought/weather) are still current threats to the species, but when considered individually and cumulatively with other current threats (including the lower level of the threat of development to the Gunnison Basin population) they do not support a finding that the species is currently in danger of extinction.

*Id*. at 69303.  In other words, even though all of the same threats impact the species, save for counter-factual reduction in threat from residential development in the Gunnison Basin, the Service found the Gunnison sage-grouse is now only threatened instead of endangered.  This conclusion relies solely on the security of the Gunnison Basin population to alleviate the species' peril, in spite of numerous record statements by the Service that it was not comfortable relying only on the Gunnison Basin population for species persistence.  *E.g.*, GUSG122114-15.

Just as in *Jewell*, the Service's re-analysis of the threat from residential development is "the essence of arbitrary and capricious decision-making" because it disregarded the only available science on point in an effort to justify a foregone conclusion.  The Service's Final Threatened Rule cannot rely on the stability of the Gunnison Basin population where evidence shows the population is in decline, and Gunnison sage-grouse continue to face threats throughout their range.  *See Carlton*, 900 F. Supp. at 533-34.  Accordingly, the Court should again hold that the Service unlawfully failed to list the species as endangered.

## II.    THE SERVICE UNLAWFULLY SHRUNK CRITICAL HABITAT.

The Service's decision to reduce critical habitat proposed for the Gunnison sage-grouse by approximately 300,000 acres, including by omitting all critical habitat for the Poncha Pass population and excluding private properties enrolled in Colorado's CCAA

or subject to conservation easements, was also arbitrary and capricious and contrary to the ESA.

### A.   THE SERVICE'S USE OF A HABITAT OCCUPATION PROXY TO ELIMINATE CRITICAL HABITAT IN PONCHA PASS IS ARBITRARY.

The Service failed to rely solely on the biological and physical features (Primary Constituent Elements or PCEs) essential to the conservation of Gunnison sage-grouse in eliminating all critical habitat for the Poncha Pass population.  Instead, the Service grafted a "habitat occupation proxy" onto one of the PCEs, and refused to designate any areas it determined could not support a sage-grouse population, even if the area, like Poncha Pass, contained all of the other essential biological and physical features to support sage-grouse.  *See* Final Critical Habitat Rule, 79 Fed. Reg. at 69333 (re-defining PCE 1); *id*. at 69338 (Poncha Pass, "for reasons unknown" is not capable of supporting a population of Gunnison sage-grouse).  The Service never explained why the occupation proxy captured the physical and biological features, and the Service's use of the population proxy violated well-established law.

The ESA defines occupied critical habitat as "the specific areas within the geographical area occupied by the species . . . on which are found those *physical or biological features* (I) essential to the conservation of the species and (II) which may require special management considerations or protection."  16 U.S.C. § 1532(5)(A)(i) (emphasis added).  For the Gunnison sage-grouse critical habitat rule, the Service defined whether areas of occupied habitat contained the physical or biological features essential to the species' conservation in terms of whether they contained certain "primary constituent elements" (PCEs).  Final Critical Habitat Rule, 79 Fed. Reg. at

69328.  Primary constituent elements are "the elements of physical or biological features that provide for a species' life-history processes and are essential to the conservation of the species." *Id*.

In deciding which lands meet the definition of occupied critical habitat, "the Service's role is to determine which physical and biological features are essential to the conservation of the species, not to determine which *lands* are essential to the conservation of the species." *WildEarth Guardians v. U.S. Dep't of Interior*, 205 F. Supp. 3d 1176, 1185 (D. Mont. 2016) (citation and alteration omitted) (emphasis in original).  "The latter presents the risk of interposing subjectivity into the task of identifying critical habitat, because the Service could objectively find a species' PCE in a location yet look to extra-PCE factors in determining whether the location held conservation value." *Id*. at 1185-86.  Courts have held, for example, that it is inappropriate to designate only areas with evidence of reproduction as occupied critical habitat, because this removes the need to consider the physical and biological features of the occupied area. *Alaska Oil & Gas Ass'n*, 815 F.3d at 555-56; *Lyder*, 728 F. Supp. 2d at 1135.  A species need not even reside in a designated area for it to qualify as occupied; the Service may designate "any habitat a species uses with sufficient regularity that it is likely to be present during any reasonable span of time." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1165-66 (9th Cir. 2010).

The Service may not define critical habitat in terms of whether it can support a core or breeding population of a listed species without explaining how this measure is a reliable proxy for habitat containing the PCEs.  *See Ctr. for Biological Diversity v. U.S.*

*Fish & Wildlife Serv.*, No. 5:09-cv-90, 2011 WL 73494, at *6 (C.D. Cal. Jan. 8, 2011).

There, conservation plaintiffs challenged a Service decision applying an occupancy

proxy to determine whether an area contained the physical biological features essential

to the conservation of the San Bernardino Kangaroo rat.  *Id.* at *4.  The court rejected

this approach and held that the Service may not define critical habitat in terms of

whether it can support a core or breeding population of a listed species without

explaining how this measure is a reliable proxy for habitat containing the PCEs.  *Id.* at

*6.  The court warned that applying an occupation proxy will frequently lead to an under-

inclusive critical habitat designation because it will "fail to identify areas that have these

essential features but, for whatever reason, do not happen to support an abundant

population."  *Id.*

 The District Court of Montana reached a similar conclusion in *Lyder*, 728 F.

Supp. 2d at 1135.  In that case, conservation plaintiffs challenged the Service's failure

to designate lynx critical habitat based on an asserted lack of species reproduction in

the challenged areas, even though there was no dispute that the areas contained the

physical and biological features lynx needed to survive.  *Id.* at 1133.  Like in *Center for

Biological Diversity*, the court rejected this species occupancy proxy, and held:

> [T]he Service improperly and arbitrarily excluded areas occupied by lynx in
> Idaho and Montana when it considered the absence of reproductive proof
> but did not consider the actual physical and biological features of the
> areas. On remand, the Service must consider the physical and biological
> features of the occupied areas to determine whether they should be
> designated as critical habitat under the ESA.

*Id.* at 1135.  *See also id.* at 1134 ("While it is rational to conclude areas with evidence of

reproduction contain the [PCEs] and should be designated as critical habitat, the

Service could not flip that logic so it means critical habitat only exists where there is evidence of reproduction."); *Alaska Oil & Gas Ass'n,* 815 F.3d at 556.

Here, as in *Center for Biological Diversity* and *Lyder*, the Service required that designated critical habitat be able to support a population of Gunnison sage-grouse without explaining why this definition adequately captured the physical and biological features essential to the species' conservation. The Service redefined PCE 1 in October 2014 to require that occupied habitat be capable of supporting a Gunnison sage-grouse population.[10]   In the Final Critical Habitat Rule, the Service omitted occupied habitat at Poncha Pass, reasoning that, "Poncha Pass, for reasons unknown, is not a landscape capable of supporting a population of Gunnison sage-grouse and therefore does not meet PCE 1."  Final Critical Habitat Rule, 79 Fed. Reg. at 69338.  But the Service never explained, and the record does not establish, how "a landscape capable of supporting a population" reliably captured the physical and biological features.

Indeed, facts before the agency showed that Poncha Pass contains the physical and biological features Gunnison sage-grouse need to survive.  In the Proposed Rule, the Service concluded that habitat at Poncha Pass met the PCEs.  Proposed Critical

---

[10] The record shows that the Service's new PCE 1 was merely a rationale for its decision to omit critical habitat in the Poncha Pass area, a decision it made months earlier.  Specifically, the Service decided to omit habitat for the Poncha Pass population between April and June of 2014, but did not come up with a rationale until shortly before the Final Critical Habitat Rule published.  *See* Proposed Critical Habitat Rule, 78 Fed. Reg. at 2546 (Proposed Rule PCE 1); GUSG137503 (memo re: decision to omit critical habitat for Poncha Pass); GUSG154277 (Poncha Pass omitted over concerns about whether population could be self-sustaining over time); GUSG161692 (efforts to exclude Poncha Pass based on definition of occupancy); GUSG167348 (draft rationale for removing Poncha Pass based on failure to meet PCE 1), GUSG170649 (draft critical habitat rule with new PCE 1 and Poncha Pass exclusion rationale).

Habitat Rule, 78 Fed. Reg. at 2556.  Early drafts of the Final Listing Rule recognized that "[s]agebrush in [Poncha Pass] is generally intact with little fragmentation, and habitat quality throughout the area…appears adequate to support a population of the species."  GUSG157832; *see* GUSG137860 (citing Colorado Rangewide Conservation Plan), GUSG137557.[11]  The Service could not even identify why the high-quality habitat was not supporting a population of Gunnison sage-grouse, asserting only that the population there was struggling "for reasons unknown."  Final Critical Habitat Rule, 79 Fed. Reg. at 69338.  Just as the court in *Center for Biological Diversity* cautioned, the Service's qualifier—"capable of supporting a population of Gunnison sage-grouse"— caused it to unlawfully omit occupied habitat that has the essential features but does not support an abundant population. 2011 WL 73493, at **5-6.  This Court should follow *Center for Biological Diversity* and *Lyder* and reject this approach.

The District of Montana also overturned a decision not to designate occupied critical habitat where evidence showed the area at issue actually contained the PCE the Service claimed was absent.  *WildEarth Guardians*, 205 F. Supp. 3d at 1186.  The Service there decided not to designate critical habitat for the Canada lynx in Colorado, claiming there was not enough evidence it met the PCE for prey density, even though evidence showed that the area did support the prey density PCE.  *Id*. at 1184-86 (citing *Lyder*, 728 F. Supp. 2d at 1134).  The court found the Service's failure to designate critical habitat in the face of this countervailing evidence was "arbitrary, capricious, and

---

[11] Service staff noted that the high percentage of Federal land within the Poncha Pass critical habitat designation made managing populations easier than in areas with a more checkerboard ownership pattern.  GUSG137504.

'offends the ESA.'" *Id*. at 1186 (citing *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004)).

Similarly here, record evidence refutes the Service's conclusion that Poncha Pass was incapable of supporting a population of Gunnison sage-grouse.  A Service biologist emphasized that Poncha Pass had supported a self-sustaining, breeding population for 20 years—until CPW inadvertently allowed hunting in the area in 1992.  GUSG137860; *see* GUSG14180 (hunting accidentally allowed).  This same expert also noted that Poncha Pass is ranked as the best area for transplanting Gunnison sage-grouse, and transplanted females had bred successfully in the area.  *Id*.  In a memo, researchers concluded: "Given the general declines in population numbers, it has been our recommendation in the past that all the populations are essential for the conservation of the species…."  GUSG13750, GUSG137507.  Even CPW "expressed…concern about the complete removal of Poncha Pass."  GUSG145066.  In the face of this evidence that habitat at Poncha Pass actually met the PCE, the Service's decision not to designate critical habitat there "offends the ESA."  *WildEarth Guardians*, 205 F. Supp. 3d at 1186.

## B.    THE SERVICE ERRED WHEN IT EXCLUDED CRITICAL HABITAT UNDER ESA SECTION 4(B)(2).

The Service further erred when it excluded approximately 200,000 acres of private lands from critical habitat, claiming the benefits of excluding these lands outweigh the benefits of designating them as critical habitat.  Final Critical Habitat Rule, 79 Fed. Reg. at 69348-50.  Under the ESA, the Service may, after considering "the economic impact…and any other relevant impact…exclude any area from critical habitat

if [it] determines that the benefits of such exclusion outweigh the benefits of specifying

such area as part of the critical habitat…."  16 U.S.C. § 1533(b)(2).  Maintaining positive

working relationships with stakeholders is a relevant impact in this calculus.  *Ctr. for*

*Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1105 (D. Ariz. 2003).  The Service

must provide a rational basis for a decision to exclude areas from critical habitat,

however, and may not rely on management plans or other habitat protections to justify

excluding critical habitat without making them available for public review and comment.

*See Ctr. for Biological Diversity v. Salazar*, 770 F. Supp. 2d at 87-89 (applying rational

basis review); *Bear Valley Mut. Water Co.*, 790 F.3d at 989-90 (finding decision to

exclude area from critical habitat reviewable); *Norton*, 240 F. Supp. 2d at 1106-07

(requiring disclosure of information used by Service to exclude critical habitat); *see also*

*Idaho Farm Bureau Fed'n*, 58 F.3d at 1404 (Service must provide for public review and

comment of important information it relies on in making listing decision), *Ctr. for*

*Biological Diversity v. Kelly*, 93 F. Supp. 3d 1193, 1204-05 (D. Idaho 2015) (same).

Courts have overturned decisions to exclude critical habitat under Section 4(b)(2)

when the Service has failed to properly weigh the benefits of inclusion and exclusion in

its analysis.  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d

1115, 1143-46 (N.D. Cal. 2006). In that case, a conservation plaintiff challenged the

Service's decision to eliminate critical habitat under Section 4(b)(2) because, according

to the Service, existing protections in the excluded areas had led to a decline in use and

additional protections for the species at issue.  *Id.* at 1148-50.  The court rejected the

Service's approach, finding there "was no factual basis in the record to support the

[Service's] assumption" that existing closures led to reduced use, and the court held "it was arbitrary and capricious for the Service to rely on a critical assumption that lacks support in the record to justify excluding significant portions of critical habitat." *Id.* (citing *Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 966 F.2d 1292, 1305 (9th Cir.1992)).

Here, like in *Center for Biological Diversity v. Bureau of Land Mgmt.*, the record does not support the assumptions informing the Service's Section 4(b)(2) balancing. First, the Service's assumption that removing areas from critical habitat subject to CCAAs and conservation easements would relieve any potential regulatory burden on landowners, communities, and counties and encourage future partnerships flies in the face of its own previous conclusion.  Final Critical Habitat Rule, 79 Fed. Reg. at 69350. In the Proposed Endangered Rule, the Service noted that "because these lands are privately owned, absent a Federal nexus, the designation of critical habitat on these lands will incur no additional regulatory burden beyond the prohibitions of section 9(a)(2) of the Act."  Proposed Critical Habitat Rule, 78 Fed. Reg. at 2559.  While the Service concluded that removing this virtually nonexistent burden would encourage partnerships, the Service never explained why alleviating a phantom regulatory burden helps maintain relationships.  Here, like in *Center for Biological Diversity v. Bureau of Land Mgmt.*, the record does not support the Service's assumption that eliminating areas from critical habitat would appreciably reduce the regulatory burdens on entities and individuals, and "it was arbitrary and capricious for the Service to rely on a critical assumption that lacks support in the record to justify excluding significant portions of

critical habitat." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d at 1149-51.

The Service also erred in assuming that removing these areas from critical habitat would benefit the species by encouraging application of conservation measures on private lands. *See* GUSG141169. The Service never identified which "conservation actions" would be implemented and which benefits to the species would flow from these measures. In fact, the Service provides almost no information about these so-called conservation measures, and the Service failed to include in the record the "certificates of inclusion" showing which actions would be implemented on the CCAA properties. Without identifying and discussing these "conservation measures" and their efficacy, the Service erred in concluding these measures tilted the Section 4(b)(2) balance toward excluding these areas from critical habitat. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d at 1149-51.

Including the actual actions in the record was even more important because, the scant information in the record suggests that the so-called "conservation actions" provide little or no benefit for the species. For example, a Service biologist was reluctant to rely on these conservation measures to benefit the species, and, instead, suggested the Service focus on the interplay between the conservation measures and resulting population increases. GUSG125820. The biologist noted

> In populations where habitat "protection" is substantial (nearing a point at which we are confident in their conservation…) how are the birds doing? For example, in the Pinon Mesa and Crawford areas, substantial habitat "protection" is in place, but the populations have declined overall since 1996 (in spite of transplant efforts).

GUSG125820; *see also* GUSG127507 ("Enrollment doesn't guarantee outcomes.").

Instead of following the biologist's precautionary approach, however, the Service

assumed that the benefits from implementing conservation measures outweighed the

established benefits to the species from fully designating its critical habitat.  Thus, the

record again lacks support for the Service's assumption that the application of

conservation measures would result in benefit to the species, outweighing the benefit

from critical habitat designation.

Moreover, the agency biologist's analysis applies to all Gunnison sage-grouse

populations, which have continued to decline despite conservation measures that have

been implemented.  GUSG173823 (listing regulations and other "protections"

implemented by County); Final Threatened Rule, 79 Fed. Reg. at 69288 (all satellite

populations except for two are declining, and where stability or increases are observed

it is likely due to increased survey effort and translocations).  Even the Service has

recognized that "to date, the data suggest that the results of these [conservation]

projects have been mixed, with the majority of the benefit experienced by the Gunnison

Basin population" and "[c]ontinued monitoring is needed to determine the impacts of

these efforts rangewide."  GUSG155694.

Where, as here, the accuracy of important material the Service relies upon is in

question, the public must be allowed to review and comment on it.  *See Idaho Farm

Bureau Fed'n*, 58 F.3d at 1404.  The Ninth Circuit there held that because the Service's

listing decision had relied heavily on a recent report, the validity of which was in

question, the Service erred by failing to make the report available for public review and

comment.  *Id*. at 1402-03.  Likewise, in *Norton*, where the Service relied on a

management plan in declining to designate certain lands as critical habitat, the District

of Arizona held the Service violated the APA by failing to make the plan available for

public review and comment.  240 F. Supp. 2d at 1107.  In *Kelly*, where the Service's

final critical habitat rule relied on new information to significantly decrease critical habitat

designated, the District of Idaho held the Service erred by failing to submit the new

information and rationale for public review and comment.  93 F. Supp. 3d at 1206-07.

The accuracy of the Service's assumption that the benefits from the purported

conservation actions outweighed the benefits from critical habitat designation is in

question here, further underscoring the need for public review and comment on the

conservation actions.  Just as in *Idaho Farm Bureau*, *Norton*, and *Kelly*, the Service

erred by relying on these conservation actions in its balancing analysis without allowing

the public an opportunity to scrutinize them and comment on their efficacy.

The Service's decision to exclude lands covered under CCAAs and CEs from

critical habitat was arbitrary and capricious and the Service failed to provide a rational

basis for its decision.  Instead, the Service focused on removing an imaginary regulatory

burden to maintain relationships that produce uncertain conservation values, without

informing the public about which specific conservation measures were to be

undertaken.  Without knowing which conservation measures will be implemented and

why they are expected to be effective, the basis for the Service's conclusion that the

need for new partnerships and "conservation benefits" outbalances established benefits

from critical habitat designation is absent from the record.

III.     THE COURT SHOULD LEAVE THE CURRENT RULES IN PLACE DURING
REMAND WHILE THE SERVICE RE-CONSIDERS LISTING THE SPECIES AS
ENDANGERED AND DESIGNATING FULL CRITICAL HABITAT AS PROPOSED.

A.  DECLARATORY RELIEF IS PROPER HERE.

To remedy the violations above, Petitioners request that this Court enter

declaratory relief holding that the Service violated the ESA and acted arbitrarily and

capriciously in listing the Gunnison sage-grouse as threatened where the best available

science clearly showed it meets the definition of an endangered species; and in

arbitrarily excluding from critical habitat lands previously deemed essential to its survival

and recovery when the Service grafted an unlawful occupancy requirement onto the

PCEs for occupied critical habitat and relied on an unsupported analysis to exclude

CCAA and CE lands.  Other courts have found similar declaratory relief appropriate.

*See Carlton*, 900 F. Supp. at 112 (declaring decision not to classify grizzly bears as

endangered was arbitrary and capricious); *Colorado River Cutthroat Trout v.*

*Kempthorne*, 448 F. Supp. 2d 170, 178-79 (D.D.C. 2006) (declaring Service violated

duties under ESA); *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 26 (D.D.C. 2002)

(granting declaratory relief) (remedy vacated in part on other grounds, 89 Fed. Appx.

273, 274 (D.C. Cir. 2004)); *Foss*, 2005 WL 2002473, at *19 (remanding with instructions

for reconsideration in accordance with legal standards set forth in opinion); *Forest*

*Guardians v. Babbitt*, 174 F.3d 1178, 1193 (10th Cir. 1999) (remanding with instructions

to publish a critical habitat rule for Rio Grande Silvery Minnow as soon as possible).

Declaratory relief is also warranted here, where the Gunnison sage-grouse has

continued to decline while the Service has dragged its feet on granting the bird

necessary protections for over a decade.

### B.  REMAND WITHOUT VACATUR IS THE PROPER REMEDY.

In addition, it is critical that this Court leave in place the existing Threatened Rule

and Critical Habitat Rule despite the Service's errors, because they provide essential

federal protections, without which the Gunnison sage-grouse will likely go extinct.

Petitioners have alleged the Service violated the ESA by making a politically-motivated

decision that flies in the face of the best available science to backtrack from the

endangered status and 1.7 million acres of critical habitat the Service itself originally

proposed for the Gunnison sage-grouse.  Through this litigation, Petitioners seek to

secure the ESA's strongest protections for the Gunnison sage-grouse and its critical

habitat.  The Gunnison sage-grouse is currently a Threatened species.  If this Court

were to vacate the current Threatened Rule and Final Critical Habitat Rule upon

remand, the Gunnison sage-grouse would have *no* federal protections until the Service

completed a new rule, leaving it vulnerable to further habitat and population losses and

driving it over the brink of extinction.  Molvar Decl. ¶ 12; Braun Decl. ¶¶ 28-29; Cotton

Decl. ¶¶ 13-14.

Many courts—including this Court—have exercised their equitable discretion to

fashion remedies for ESA violations that will provide the most benefit to imperiled

species, in light of the ESA's salient conservation purpose.  In *Hill*, the U.S. Supreme

Court determined that the "plain intent" of Congress when enacting the ESA "was to halt

and reverse the trend toward species extinction, whatever the cost," an intent which "is

reflected not only in the stated policies of the Act, but in literally every section of the statute." 437 U.S. at 184. "[W]hen equity demands, [an otherwise-unlawful] regulation can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405; *see also Norton*, 240 F. Supp. 2d at 1109 (rule left in place upon remand); *WildEarth Guardians*, 205 F. Supp. 3d at 1190 (same).

This Court has previously considered the ESA's purpose in crafting an equitable remedy for violations of the ESA. In *Ctr. for Native Ecosystems*, this Court considered remedies upon voluntary remand of the Service's decision to de-list the Preble's Meadow Jumping Mouse in only Wyoming, based upon a policy that the District of Montana had recently overturned. 795 F. Supp. 2d at 1238. The Court weighed "the seriousness of the deficiencies in the completed rulemaking and the doubts the deficiencies raise about whether the agency chose properly from the various alternatives open to it in light of statutory objectives…against any harm that might arise from vacating the existing rule," and found that the ESA's purposes warranted the result that would maintain the most protections for the species—in that case, vacatur of the de-listing rule at issue, to ensure the species remained protected under the ESA. *Id*. at 1243. Other courts in the Tenth Circuit have similarly recognized that "courts depart from the normal rule of setting aside illegal agency action where it would defeat the purpose of the statute at issue." *S. Utah Wilderness All. v. Burke*, No. 2:12-cv-257-DAK, 2015 WL 2452932, at *2 (D. Utah May 22, 2015); *see also Coal. of Ariz./New Mexico Counties for Stable Economic Growth v. Salazar*, No. 07–cv–00876 JEC/WPL, 2009 WL 8691098, at **3-4 (D.N.M. May 24, 2009) (considering purpose of ESA); *Nat'l Ski Areas*

*Ass'n v. U.S. Forest Serv.*, 910 F. Supp. 2d 1269, 1286 (D. Colo. 2012) (crafting equitable remedy under test from *Ctr. for Native Ecosystems*).

Here, to realize the ESA's overarching preference of protecting imperiled species, this Court should remand the challenged rules to the Service with instructions to consider whether the Gunnison sage-grouse should be listed as endangered and the full 1.7 million acres of critical habitat designated as proposed in 2013, while leaving the challenged rules in place upon remand.  This Court's balancing test favors this relief because serious harm to the species would result from vacating the existing rules. Without ESA protections, the Gunnison sage-grouse and its critical habitat would continue to decline under state management.  Molvar Decl. ¶ 12; Braun Decl. ¶¶ 28-29; Cotton Decl. ¶¶ 13-14.  Given the already-faltering populations, this could result in loss of the species' viability, or even its extinction, within 31 years or fewer.  This Court should consider the species' fragile status, and the purpose of the ESA, and leave the instant Threatened Listing Rule and Critical Habitat Rule in place on remand.

## CONCLUSION

For these reasons, the Court should declare that the Service acted unlawfully in not listing the Gunnison sage-grouse as an endangered species, and in reducing its critical habitat designation.  However, the Court should leave the Final Threatened and Critical Habitat Rules in place during the period of remand, while the Service considers new endangered listing and critical habitat rules that comply with the ESA.

Respectfully submitted this 21st day of July, 2017.

/s/Todd C. Tucci
Todd C. Tucci
Laird J. Lucas
Talasi Brooks
Advocates for the West
P.O. Box 1612
Boise ID 83701
(208) 342-7024
ttucci@advocateswest.org
llucas@advocateswest.org
tbrooks@advocateswest.org

Attorneys for Petitioners WildEarth
Guardians and Dr. Clait E. Braun

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

For Federal Defendants:

Joanna Kathryn Brinkman
Joanna.brinkman@usdoj.gov

Mary Elisabeth Hollingsworth
Mary.Hollingsworth@usdoj.gov

Rickey Doyle Turner
Rickey.turner@usdoj.gov

For Center for Biological Diversity and Western Watersheds Project:

Amy Rae Atwood
atwood@biologicaldiversity.org

Brad Arthur Bartlett, IV
bbartlett@law.du.edu

Kevin J. Lynch
klynch@law.du.edu

Ryan Adair Shannon
rshannon@biologicaldiversity.org

William Stewart Eubanks, II
beubanks@meyerglitz.com

For the State of Utah:

Brittany Lynn Wilson
brittanywilson@utah.gov

David Halverson
dhalverson@utah.gov

Kathy A.F. Davis
kathydavis@utah.gov

For Gunnison County:

Bennett W. Raley
bwraley@mac.com

For Gunnison County Commissioners:

David Baumgarten
Dbaumgarten@gunnisoncounty.org

For Gunnison County Stockgrowers:

Deborah Lynn Freeman
dfreeman@troutlaw.com

Bennett W. Raley
bwraley@mac.com

For the State of Colorado:

Frederick Richard Yarger
Fred.yarger@coag.gov

Lisa Reynolds
Lisa.reynolds@coag.gov

/s/Talasi B. Brooks
**Talasi B. Brooks**
Advocates for the West
P.O. Box 1612
Boise ID 83701
Ph: (208)342-7024
Email: tbrooks@advocateswest.org

Attorney for Petitioners WildEarth
Guardians and Dr. Clait E. Braun

**ATTACHMENT 1**:
Nov. 14, 2012 Bell Memo

(NOTE: Federal Defendants acknowledge they inadvertently omitted the Bell Memo from the Administrative Record, but have consented to its inclusion in the record and to Petitioners' attaching it to this brief).

| From: | Nathan Allan |
|---|---|
| To: | Heather Bell |
| Cc: | David R Smith |
| Subject: | Re: curious |
| Date: | 11/14/2012 08:48 AM |

Yes, someone else is now driving the bus and we are standing in the road trying to slow it down!

This application of the SSA (make a proposed endangered species either T or not warranted) is the trend, and it is not a good one. SSA is not well-suited for triage determinations. Short time frames with high political stakes are not helpful to strong science. Oh well, it is what it is.

Pilots in R2 currently:

RGCT candidate assessment and conservation AND 2 Brazos River shiners proposed listing rule.

Partial pilots include the 4 Texas salamander final rule (in a similar boat to your grouse) and the NM meadow jumping mouse propose (Eric deciding how much to incorporate may depend on if we (Sarah) give him more time on the schedule).

On the question of T/E definition, we've got to find a way to convince the mgt that this lack of guidance on the values is a fundamental flaw in our whole program. It will be hard to fix, but it is fixable.

I've been asked to make a presentation to the ES staff in R2 next month. So I'll be glad to hijack whatever you come up with.

Regarding fundamental flaws, I think our approach to asking what a population and species needs is currently a major flaw. How much is enough? For populations, the trout people had some tools to work with for a population (50 or 500 individuals). But at the species level, we were just grasping at straws for how many populations are enough. How would we lead a group of biologists to ever figure this out? I think we need to either develop some sort of tools for this or figure out a new way to ask the questions.

Just rambling thoughts, I've got to get back to my flycatcher rule. Fun stuff. THANKS, Nathan

_____
Nathan Allan
U.S. Fish and Wildlife Service, Region 2 Listing Biologist
10711 Burnet Road, Suite 200, Austin, Texas 78758
(512) 490-0057 x237

▼ Heather Bell/R6/FWS/DOI

|  |  |  |
|---|---|---|
| **Heather Bell/R6/FWS/DOI** | To | David R Smith/BRD/USGS/DOI@USGS |
|  | cc | Nathan Allan/R2/FWS/DOI@fws |
| 11/14/2012 09:27 AM | Subject | Re: curious |

E000904

Good question!  It was well received.  He has asked me to present to him what SSA "is" so i will be doing that perhaps on the 27th.  And I am briefing Gary Fraser, Michael Bean, and the WO solicitors on the 12th of December (i might need some help figuring out the best presentation for them!).   The one thing he wasn't too excited about was better definition of t/e......somehow i am still not able to make that case.  Paul did suggest that perhaps our foreign species division, which has biologists in the HQ that actually "do" listings, conduct a pilot so he can see how it works.  And he asked for a list of pilots (NATHAN can you just fire me a quick email so i know what to tell him from your region?)

I am following up with my supervisor, Marj Nelson and her supervisor, Martha Balis-Larsen on expanding our "team" to include your participation.  It might be a good idea for us to do a bit of thinking on that, as i am sure they will ask me "how much time and what will it cost."

And on a final note, yesterday afternoon Nicole Alt, the new deputy for R6 ES (and my prior supervisor on this project in the HQ) said that Salazar had asked that R6 figure out how to get the Gunnison sage grouse from endangered (it is currently proposed as endangered) down to threatened status prior to the final rule.   This would only be possible (and may not be possible) with a significant conservation strategy and firm commitments from BLM and others .   We have one month to figure this out.....so we have scheduled a meeting with FWS experts on the 3-5 of December and will use the SSA framework.  YIKES!!!!!!!!

I feel like i got run over by the SSA bus.

Heather Bell
Endangered Species Program - R 9
US Fish and Wildlife Service
134 S. Union Blvd.
Lakewood, CO   80228
303-236-4514
▼ David R Smith/BRD/USGS/DOI@USGS

| | | |
|---|---|---|
| **David R Smith/BRD/USGS/DOI@USGS** | To | Heather Bell/R6/FWS/DOI@FWS |
| | cc | Nathan Allan/R2/FWS/DOI@FWS |
| 11/14/2012 08:05 AM | Subject | curious |

How was your briefing with Paul?

David R. Smith
USGS - Leetown Science Center
Aquatic Ecology Lab
11649 Leetown Road

E000905

Kearneysville, WV 25430
drsmith@usgs.gov
304-724-4467
https://profile.usgs.gov/drsmith

E000906