# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

In re: Gunnison Sage-Grouse       Civil Action No. 1:15-cv-130-CMA-STV
Endangered Species Act Litigation

This document relates to case no. 1:15-cv-286.

---

## PETITIONER STATE OF COLORADO'S OPENING BRIEF

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................................iv

GLOSSARY OF TERMS .........................................................................................vii

INTRODUCTION...................................................................................................... 1

JURISDICTIONAL STATEMENT .............................................................................. 3

STANDARD OF REVIEW ......................................................................................... 5

LEGAL BACKGROUND ........................................................................................... 6

FACTS ..................................................................................................................... 7

   A. THE GUNNISON SAGE-GROUSE.................................................................... 7

   B. THE GUNNISON BASIN................................................................................... 9

   C. CONSERVATION EFFORTS IN THE GUNNISON BASIN.................................. 9

   D. LISTING HISTORY........................................................................................ 11

ARGUMENT........................................................................................................... 12

   A. BECAUSE THE GUNNISON BASIN POPULATION WILL SECURE THE
   SPECIES FOR THE FORESEEABLE FUTURE, THE GUNNISON SAGE-
   GROUSE IS NOT THREATENED WITH EXTINCTION........................................... 13

      1. The FWS determined that the Gunnison Basin Population is large,
        stable, and resilient ......................................................................... 14

      2. The four factors identified to support the threatened listing do not put
        the Gunnison Basin Population at risk of extinction now or in the
        foreseeable future ........................................................................... 15

         a) The threat of habitat fragmentation associated with
          residential development in the Gunnison Basin is low and unlikely to
         increase (Factor A) ..................................................................... 15

         b) Threats associated with climate change impacts (Factor A),
          prolonged drought (Factor E), and disease (Factor C) in the Gunnison
         Basin are based on speculation, not science........................................... 17

           (i) Climate change impacts (Factor A)...................................... 17

           (ii) Prolonged drought (Factor E)............................................. 19

           (iii) Disease (Factor C) ............................................................ 20

         c) Sage-grouse habitat in the Gunnison Basin is protected by adequate
          regulatory mechanisms (Factor D)........................................................ 22

           (i) Candidate Conservation Agreement with Assurances...................... 23

           (ii) Candidate Conservation Agreement ................................................ 24

**TABLE OF CONTENTS**

(iii) Gunnison County conservation mechanisms .................................. 25

B. IN THE ABSENCE OF SUBSTANTIAL, IDENTIFIABLE THREATS TO THE GUNNISON BASIN POPULATION, "SMALL POPLUATION SIZE AND STRUCTURE" (FACTOR E) DOES NOT PROVIDE A BASIS FOR THE THREATENED LISTING ............................................................. 27

1. The FWS determined that the Gunnison Basin is unlikely to be susceptible to inbreeding depression or other genetic problems................... 28

2. The population viability analysis relied on by FWS does not support a threatened listing ............................................................................................. 29

a) FWS erred by excluding consideration of two studies showing the Gunnison Basin Population does not face extinction in the foreseeable future.......................................................................................................... 29

b) The Davis PVA does not support the threatened listing ............................ 32

(i)     Davis's brief data set included years of steep population declines 33

(ii)    With the addition of data that reflect real-world events Davis's results are similar to the other two PVAs ......................... 33

(iii)   Davis's subsequent article showed a stable growth rate in the Gunnison Basin................................................................................. 35

3. The need for multiple "redundant" populations is a conservation principle, not a basis for listing the species ................................................... 36

4. The satellite populations cannot provide redundancy to the Gunnison Basin Population ............................................................................................. 38

CONCLUSION ......................................................................................................... 39

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Alaska Oil & Gas Ass'n v. Nat'l Marine Fisheries Serv.*, 2016 WL 1125744
(D. Alaska 2016) .................................................................................. 14

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................ 7

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ................................. 6

*Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191
 (D.D.C. 2012) ............................................................................... 6, 35

*Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236
 (D. Colo. 2011). ................................................................................ 5

*Defenders of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017) .............................. 22, 25

*Forest Guardians v. Babbitt*, 174 F.3d 1178, 1186 (10th Cir. 1999) ............................... 5

*Louisiana ex rel. Guste v. Verity*, 681 F. Supp. 1178, 1181(E.D. La., 1988) ................... 4

*Maine v. Norton*, 257 F. Supp. 2d 357 (D. Maine, 2003) ................................................ 3

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ................................................... 4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) .............. 5

*New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683 (10th Cir. 2009) ......................... 5

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) .................... 5, 18

*Or. Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139 (D. Or. 1998) .......................... 22

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914
 (D.C. Cir. 2011) ............................................................................. 20

*Safari Aviation Inc. v. Garvey*, 300 F.3d 1144 (9th Cir. 2002) ........................................ 5

*Western Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166
(D. Idaho, 2013) ......................................................................... 15, 22, 36

## FEDERAL STATUES

5 U.S.C. §§ 500–596 ............................................................................. 3

5 U.S.C. § 706(2) ................................................................................ 5

16 U.S.C. § 1532(6) .............................................................................. 6

16 U.S.C. § 1532(20) ............................................................................. 6

16 U.S.C. § 1533(a) .............................................................................. 6

16 U.S.C. § 1533(a)(1) ........................................................................... 7

# TABLE OF AUTHORITIES

**PAGE**

16 U.S.C. § 1533(a)(1)(A) .................................................................... 22

16 U.S.C. § 1533(b)(1)(A) ..................................................................... 7

16 U.S.C. § 1533(b)(2) .......................................................................... 7

16 U.S.C. § 1540(c) ............................................................................... 3

16 U.S.C. § 1540(g)(2)(A) ..................................................................... 3

16 U.S.C. § 1540(g)(4) and (6) ........................................................... 40

16 U.S.C. §§ 1531–1541 ............................................................... 1, 3, 7

28 U.S.C. § 1331 ................................................................................... 3

## STATE STATUES

Colo. Rev. Stat. § 33-1-101 .................................................................. 4

Colo. Rev. Stat. § 33-1-104 .................................................................. 4

Colo. Rev. Stat. § 33-1-105 .................................................................. 4

## REGULATIONS

75 Fed. Reg. 19,592 (Apr. 15, 2010) ................................................... 37

78 Fed. Reg. 2486 (Jan. 11, 2013) ...................................................... 11

79 Fed. Reg. 49,384 (Aug. 20, 2014) .................................................... 7

79 Fed. Reg. 49,399 (Aug. 20, 2014) ............................................... 7, 18

81 Fed. Reg. 22,710 (April 18, 2016) .................................................. 37

81 Fed. Reg. 53,315 (Aug. 12, 2016) .................................................. 37

**GLOSSARY OF TERMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| BLM | U.S. Bureau of Land Management |
| CCA | Candidate Conservation Agreement |
| CCAA | Candidate Conservation Agreement With Assurances |
| CPW | Colorado Division of Parks and Wildlife |
| ESA | Endangered Species Act |
| FLR | Final Listing Rule, found at AR 0199399 |
| FWS | U.S. Fish and Wildlife Service |
| PVA | Population viability analysis |
| RCP | Rangewide Conservation Plan |
| Service | U.S. Fish and Wildlife Service |

**INTRODUCTION**

In November 2014, the United States Fish and Wildlife Service (FWS or Service) listed the Gunnison sage-grouse as "threatened" under the Endangered Species Act, 16 U.S.C. §§ 1531–1541, in spite of the best available scientific information showing the species to be stable and secure into the foreseeable future. About 85% of the species— a large, resilient, and self-sustaining population—resides throughout the Gunnison Basin in Colorado. The size of that population substantially exceeds a target set by biologists in 2006, and it continues to grow, despite having endured the driest summer on record (2002) and the heaviest snowfall on record (2007–08).

The success of the Gunnison Basin Population is due in large part to twenty years of intensive community, state, and federal conservation efforts that have resulted in protection for over 83% of occupied sage-grouse habitat in the Gunnison Basin on both public and private lands. These efforts have been so successful that some experts have estimated the risk of extinction for this population in the foreseeable future to be *less than 1%*. With the overwhelming majority of the species facing a vanishingly small risk of extinction, the decision to list the Gunnison sage-grouse as threatened was arbitrary, capricious, and not in accordance with law.

The Service acknowledged the size and stability of the Gunnison Basin Population and the success of the conservation efforts in the Basin, but insisted that the species could not be considered safe from the risk of extinction until the remaining 15% of the species residing in much smaller populations scattered to the west of the Gunnison Basin had also been secured. These small populations seldom, if ever,

interact with or directly support the Gunnison Basin Population. Yet, the Service concluded that they are necessary to provide a redundant population of birds in the event that a catastrophic event were to destroy or radically reduce the size of the Gunnison Basin Population.

This concept, known as population "redundancy," was the driving factor behind the Service's decision to list the Gunnison sage-grouse as threatened. But absent specific, identifiable threats to the primary population likely to render it at risk of extinction in the foreseeable future, the ESA does not permit listing an otherwise secure species merely because it lacks redundant populations. Moreover, a population is not redundant if it is vulnerable to the same catastrophic event that might destroy the primary population. In this case, there is no evidence that the Gunnison Basin Population faces an existential threat in the foreseeable future. The only possible threat identified is prolonged drought. But any such drought would likely have an equal or greater impact on the redundant populations which are located in generally lower-elevation areas than the Gunnison Basin. Accordingly, FWS resorted to speculating about less existential threats to the Gunnison Basin in order to shore up its insistence on the need for a threatened listing. Its resulting decision to list the species is unreasonable, not supported by record evidence, and should be vacated.[1]

---

[1] The listing decision also suffered from procedural flaws, which will be briefed separately by Plaintiff-intervenors Gunnison County and the Gunnison County Stockgrowers. The State of Colorado joins in those procedural arguments but, for brevity's sake, does not restate them here.

**JURISDICTIONAL STATEMENT**

This action arises under the Endangered Species Act, 16 U.S.C. §§ 1531–1541 (ESA), and the Administrative Procedure Act, 5 U.S.C. §§ 500–596 (APA). This court has jurisdiction under 16 U.S.C. § 1540(c) (granting jurisdiction to the district courts over "any actions arising under" the ESA), as well as 28 U.S.C. § 1331 (granting jurisdiction over federal questions). Pursuant to 16 U.S.C. § 1540(g)(2)(A), Colorado provided written notice to Defendants more than sixty days before filing its complaint alleging violations of the ESA.

The State of Colorado has standing to invoke this Court's jurisdiction because it has and will continue to suffer concrete and particularized injury caused by Federal Defendants' violation of the ESA.[2] A State suffers injury sufficient to impart standing under the ESA when a listing interferes with the State's sovereign interest in managing and regulating wildlife and other natural resources found within its borders, or with the state's sovereign interest in enacting and enforcing its own legal codes. "A state has been injured when the action it seeks to challenge injures one of the state's sovereign interests." *Maine v. Norton*, 257 F. Supp. 2d 357, 374 (D. Maine, 2003) (concluding that a state had standing when FWS's listing of the Atlantic salmon nullified state laws that permitted activities that would be considered a "take" of salmon under the ESA listing and interfered with the state's ability to enforce its regulation of recreational and

---

[2] Current Federal defendants are Secretary of the Interior Ryan Zinke; Acting Director of the U.S. Fish and Wildlife Service Greg Sheehan; the U.S. Department of the Interior; and the U.S. Fish and Wildlife Service.

commercial fishing). A state is also injured by an ESA listing when the listed species is owned and managed by the state. *Louisiana ex rel. Guste v. Verity*, 681 F. Supp. 1178, 1181(E.D. La., 1988).[3]

Wildlife within the State of Colorado is the property of the state. Colo. Rev. Stat. § 33-1-101(2). The Colorado Division of Parks and Wildlife (CPW) and the Colorado Parks and Wildlife Commission are responsible for protecting, preserving, enhancing, and managing wildlife and wildlife habitats within the state. Colo. Rev. Stat. §§ 33-1-101, -104(1). Moreover, CPW is authorized to and has acquired properties for management of the Gunnison sage-grouse, and is authorized to and has entered into cooperative agreements with political subdivisions and private landowners for the benefit of the Gunnison sage-grouse. Colo. Rev. Stat. § 33-1-105.

FWS's listing of the Gunnison sage-grouse as threatened and its designation of critical habitat interfere with Colorado's primary role in wildlife management. Declaration of Bob Broscheid at ¶ 11 (Exhibit 1). The listing and designation also impair wildlife management programs Colorado has developed for sage-grouse management. *Id.* at ¶ 12. For example, many of the state wildlife management programs directly impacting Gunnison sage-grouse habitat or that have the potential to disturb any individual sage-grouse may now be conducted only with the prior approval of the FWS.

---

[3] These sovereign and proprietary injuries are sufficient, standing alone, to grant Colorado standing. In addition, however, States "are not normal litigants for the purposes of invoking federal jurisdiction," and are entitled to "special solicitude" in a standing analysis. *Massachusetts v. E.P.A.*, 549 U.S. 497, 518, 520 (2007), further supporting Colorado's standing here.

*Id.* This applies to habitat management for other species inhabiting sagebrush areas, including deer, elk, and other avian species. In addition, the listing prohibits Colorado from continuing to enroll private landowners in a voluntary conservation program for Gunnison sage-grouse that it has been administering since 2006. *Id.* at ¶ 10.

## STANDARD OF REVIEW

The APA provides the standard of review in actions relating to an agency's compliance with the ESA. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1186 (10th Cir. 1999). The APA directs a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and actions "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D); *accord Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1240 (D. Colo. 2011). This standard is appropriate for resolution of factual disputes implicating substantial agency expertise. *Safari Aviation Inc. v. Garvey*, 300 F.3d 1144, 1150 (9th Cir. 2002).

In order to survive a challenge under the APA, an agency must articulate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). The agency's decision is arbitrary and capricious, and should be overturned, if it offers an explanation for its decision that runs counter to the evidence in the record, or makes a clear error of judgment. *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009). Further, the agency's decision must be set aside if it lacks "substantial [supporting] evidence" in the record. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *Citizens to Preserve Overton Park v. Volpe*,

5

401 U.S. 402 (1971)). Substantial evidence "is more than a mere scintilla; it must be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1581 (citations omitted). "Evidence is not substantial . . . if it constitutes mere conclusion." *Id.* Further, "the presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned." *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 210 (D.D.C. 2012).

## LEGAL BACKGROUND

Section 4 of the ESA requires FWS to determine whether species are eligible for listing as "endangered" or "threatened" with extinction, thereby qualifying them for protection under the ESA. 16 U.S.C. § 1533(a). Endangered species are those "in danger of extinction throughout all or a significant portion of [their] range." 16 U.S.C. § 1532(6). Threatened species, meanwhile—the category at issue here—are "likely to become an endangered species . . . within the foreseeable future." 16 U.S.C. § 1532 (20). "Foreseeable future" is defined on a case-by-case basis, but extends "only so far as the Secretary can explain reliance on the data to formulate a reliable prediction. What must be avoided is reliance on assumption, speculation, or preconception." Administrative Record (AR) 0018843 at 18850 (Solicitor's M-Opinion, Jan. 16, 2009).

A species may be listed as endangered or threatened only if the FWS demonstrates that one or more of the following five factors applies: (A) the present or threatened destruction or modification of its habitat or range; (B) overutilization for commercial, recreation, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade

factors affecting its continued existence. 16 U.S.C. § 1533(a)(1). In addition, listing decisions must take into account efforts made by states and their political subdivisions to protect the species and its habitat, including measures relying on voluntary participation. 16 U.S.C. § 1533(b)(1)(A); 68 Fed. Reg. 15,100, 15,106, 15,113–14 (Mar. 28, 2003) (disregarding voluntary conservation efforts would be contrary to the ESA).

The ESA also requires the Service, in deciding whether to list a species, to rely on the "best scientific data available." 16 U.S.C. § 1533(b)(2). Although this provision does not impose an affirmative obligation on the Service to conduct its own research to supplement existing data, nonetheless the Service is not authorized to act unless it cites data that supports its conclusions. *Bennett v. Spear*, 520 U.S. 154, 176–77 (1997) (stating that ESA listings may not be based on "speculation or surmise"). Nor does merely identifying factors that could negatively impact a species suffice to support a listing; rather, the record must contain "evidence that these factors are operative threats that act on the species to the point that the species meets the definition of an endangered or a threatened species under the Act." 79 Fed. Reg. 49,384, 49,399 (Aug. 20, 2014) (12-month petition finding on arctic grayling).

**FACTS**

A. THE GUNNISON SAGE-GROUSE

Officially designated as a distinct species only in 2000, the Gunnison sage-grouse is a chicken-sized ground-dwelling bird that depends on sagebrush communities, including native grasses and forbs (herbaceous non-grass plants), throughout the year for food and cover. AR 0011261 at 11310. The current range of the

species includes southwestern Colorado and a small area in eastern Utah. AR 0094279 at 94280.

Within its current range, the Gunnison sage-grouse is grouped into seven populations, one containing the vast majority of the species and six much smaller ones. *Id.* This primary population, located in the Gunnison Basin (in Gunnison and Saguache Counties, Colorado), contains roughly 85% of the species and covers 62% of its occupied habitat. This is the "Gunnison Basin Population." As of 2014 (the date of the listing decision at issue here), this population had *increased* by approximately 25% over its 1996 population, and was estimated to contain 3,978 individuals. Final Listing Rule AR 0199399-0199518 (hereinafter cited as FLR) at 199404, 199406. The three-year running average for the Gunnison Basin Population has likewise increased steadily since 2010, and its long-term average is up by 10%. *Id.* at 199404, Fig. 2; 195700-702, 715. The remaining 15% of the species is divided among six "satellite populations," the largest of which (located in San Miguel County, Colorado, and known as the "San Miguel Basin Population") had only an estimated 206 birds. *Id.* at 199406. Three of the satellite populations contain fewer than 100 birds. *Id.* Rangewide, the 2014 population was estimated to contain 4,705 birds.

The Service has been reluctant to acknowledge the positive trend in the Gunnison Basin Population. A previous version of Figure 2 (cited above) in the Service's draft final listing rule included trend lines for the Gunnison Basin and the rangewide populations, both of which reflected upward trends in the populations. AR 0157653 at 157816; *see also* AR 0096459–96460 (showing upward trend). But, after an

internal FWS commenter questioned the wisdom of including these trend lines in light of FWS's claims later in the listing rule that the Gunnison Basin and rangewide populations are in decline (and hence warranted a threatened listing), the trend lines were removed from and not mentioned in the final rule. *Id.*; *compare* FLR at 199404.

B.  THE GUNNISON BASIN

The Gunnison Basin, home to the Gunnison Basin Population of Gunnison sage-grouse, occupies an expansive area in west-central Colorado containing the largest area of contiguous habitat for Gunnison sage-grouse. AR 011261 at 11360; map at 11337, Fig. 5. Named for the Gunnison River watershed, the Basin covers over half a million acres, with elevations ranging from 7,500 to 9,500 feet, and provides the full scope of seasonally required habitat for the species. AR 011261 at 11360. Considerable geographic, climatic, and terrain variation exists within the Basin. Generally, it is semi-arid, but higher elevation sagebrush stands receive more moisture and typically have healthier understories than those at lower elevations. *Id.* Many of the valley bottoms along the major stream corridors support hay and pastureland, which contain the grasses and forbs needed for the brood-rearing stage of the grouse's life-cycle. AR 0022326 at 22360. Sixty-seven percent of occupied sage-grouse habitat in the Gunnison Basin is owned by the federal government; 30% is in private ownership; 2% is owned by the State of Colorado. FLR at 199403; AR 011261 at 11361, Fig. 14.

C.  CONSERVATION EFFORTS IN THE GUNNISON BASIN

Concerted voluntary conservation efforts for Gunnison sage-grouse began in the mid-1990s in the Gunnison Basin, before the species was even formally identified as a distinct species. AR 0005707-5738. The Gunnison Basin Local Working Group

organized early conservation efforts, subsequently formalized in a 1997 Conservation Plan which emphasized the need for citizen involvement and engagement with federal and state wildlife management agencies. *Id. at* 5712.

This need has been met by subsequent conservation agreements involving landowners, federal agencies, CPW, and Gunnison County. Recognizing that pre-listing efforts may eliminate the need for listing a species under the ESA, FWS has issued a number of policies designed to encourage voluntary conservation of species and their habitat before a species has to be listed. Two of these, a "candidate conservation agreement with assurances" (CCAA) and a "candidate conservation agreement" (CCA), have been utilized for Gunnison sage-grouse. In addition, Gunnison County has adopted multiple land use regulations to ensure habitat protection for sage-grouse habitat, and 57,247 acres of privately-owned habitat have been protected by landowners securing their property with conservation easements. AR 0195641 at 195706.

Through the extensive efforts of state and local governments, federal officials, and private landowners, sage-grouse habitat in the Gunnison Basin is secure. A 2006 Rangewide Conservation Plan prepared by federal and state wildlife agencies set a goal of protecting 90% of seasonally important habitat in the Gunnison Basin, in part by conserving priority habitat from conversion to residential development. AR 0011261 at 11558. This goal has been met and exceeded. By 2014, over 91% of privately-owned land in seasonally important habitat was protected by a conservation easement or via inclusion in a CCAA. AR 0195641 at 195716. In total, 83% of occupied habitat in the

Gunnison Basin has been protected. *Id.* In addition, 100% of federally-owned occupied sage-grouse habitat in the Basin is managed under a CCA.[4]

D. LISTING HISTORY

Despite the successful conservation efforts undertaken by Colorado, Gunnison County, BLM, and private landowners, in January 2013 FWS published a rule proposing to list the Gunnison sage-grouse as "endangered" throughout its range. 78 Fed. Reg. 2486 (Jan. 11, 2013). Colorado provided extensive comments on the proposed rules explaining why ESA protection for the species was not warranted, as did the State of Utah and others who had participated in conservation efforts for the species. *E.g.,* AR 0074021; 0067706; 0164457 (Colorado); AR 0096092 (Utah); AR 0073464; 0091217 (Gunnison County Stockgrowers Ass'n). Gunnison County submitted hundreds of pages of comments, detailing the conservation efforts FWS had overlooked or undervalued, and exposing the many errors the Service committed in assessing the potential impacts of future residential development in the County. AR 0067729; 0091282; 0201022.

In November 2014, FWS published a final rule listing the Gunnison sage-grouse as "threatened" under the ESA, meaning that, in the view of FWS, the species is not currently at risk of extinction but is likely to become so in the foreseeable future. AR 0199399-0199518 (Final Listing Rule or FLR). The Final Listing Rule identified four of the five listing factors as present. Specifically, FWS determined that the most substantial threats to the species included "habitat decline due to human disturbance

---

[4] *See* discussion of the CCAA and CCA at pp. 24-26 below.

(Factor A), small population size and structure (Factor E), drought (Factor E), climate change (Factor A), and disease (Factor C)." FLR at 199400. In addition, the Service concluded that existing regulatory mechanisms (Factor D) "do not fully address the substantial threats faced by the species." *Id.*

In moving from the proposed "endangered" listing to the final "threatened" listing, the Service acknowledged many of the errors it made in analyzing the impact of future residential development, and revised its analysis to conclude that residential development in the Gunnison Basin posed a threat of only low magnitude to the species. Without supporting data, however, and in spite of the fact that the habitat protection goals in the Rangewide Conservation Plan had been met for the Gunnison Basin, the Service continued to insist that habitat decline caused by residential development in the Gunnison Basin would increase in the foreseeable future. *Id.* at 199445. FWS also acknowledged CPW's comments explaining why climate change, drought, and disease did not threaten the Gunnison Basin Population in the foreseeable future, but disregarded or downplayed CPW's arguments. Instead, FWS argued these threats, combined with the species' population structure, would put it—including the Gunnison Basin Population—at risk of extinction rangewide in the foreseeable future.

**ARGUMENT**

The threats FWS identified in the Final Listing Rule may be legitimate concerns for some of the satellite populations. But those concerns do not apply to the large, secure Gunnison Basin Population. And if the record shows the Gunnison Basin

Population is not likely to be at risk of extinction in the foreseeable future, the
threatened listing is likewise unsupported.

A.  BECAUSE THE GUNNISON BASIN POPULATION WILL SECURE THE
    SPECIES FOR THE FORESEEABLE FUTURE, THE GUNNISON SAGE-
    GROUSE IS NOT THREATENED WITH EXTINCTION

In November 2013, the listing team informed the FWS Regional Director that the
Gunnison Basin Population was *not* likely to be at risk of extinction in the foreseeable
future: "[d]espite past and ongoing threats, the [Gunnison Basin] population appears to
be stable and secure *currently and for the foreseeable future.*" AR at 096308 (emphasis
added). But the team recommended a threatened listing anyway, based largely on its
concern that the species required more than one stable and secure population to
ensure long term stability: "The Gunnison Basin Population, albeit large and apparently
secure, does not provide the redundancy necessary to ensure the species' long-term
conservation in the face of stochastic or catastrophic disturbances and/or combined with
other known threats over time." AR 0094233 at 94234 (Nov. 1 2013 briefing memo from
field office to regional director); AR 0104113 at 104119 (presentation prepared by FWS
listing team).

While general principles of conservation biology hold that a species benefits from
multiple populations spread out over the landscape, and that conservation efforts should
aim to increase and protect smaller populations to achieve redundancy, the general
desirability of redundant populations cannot independently support a threatened listing
under the ESA unless record evidence shows that a lack thereof is likely to put the

13

species at risk of extinction in the foreseeable future. Here, the record simply does not support threats of this magnitude to the Gunnison Basin Population.

When a population is healthy and strong, the Service may not reasonably list a species based primarily on speculation as to what circumstances may or may not exist in the future. *Alaska Oil & Gas Ass'n v. Nat'l Marine Fisheries Serv.*, 2016 WL 1125744 at *1 (D. Alaska March 2016) (appeal pending). And yet, based on speculative conclusions regarding "continuing, new, and increasing threats," FWS determined the Gunnison sage-grouse is likely to become endangered rangewide within the foreseeable future. FWS erred, however, by overstating the threats to the Gunnison Basin Population from habitat decline associated with residential development, climate change, drought, and disease. FWS also misinterpreted the results of a population viability study, claiming the study showed an "expected extinction time" of fifty-eight years for the Gunnison Basin Population. FLR at 199512. To the contrary, because the Gunnison Basin Population is healthy and stable and its habitat protected, neither the Gunnison Basin Population nor the species as a whole faces a risk of extinction in the foreseeable future. Accordingly, the decision to list the species as threatened is not supported by the record, is not reasonable, was reached in violation of the ESA, and should be vacated and remanded back to FWS.

1. **The FWS determined that the Gunnison Basin Population is large, stable, and resilient**

FWS's own threats analysis concluded that the Gunnison Basin Population "is currently large and relatively stable and appears to be resilient." FLR at 199444. In conservation biology, resiliency refers to the ability of a species or population to

withstand and recover from stochastic, or random, disturbances to the population. *Id.* at 199503. Typically these disturbances result from environmental events such as a particularly severe winter or dry summer.

Resiliency depends in part on population size, as well as quality and extent of habitat. *Western Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1187 (D. Idaho, 2013). With a population size near 4,000 (as of the date of the listing rule) the Gunnison Basin Population is capable of surviving and rebounding from stochastic events. AR 0199504 ("resilience currently appears to be relatively high in the Gunnison Basin Population, likely due to a large effective population"); AR 0094233 at 94234 ("the best available information indicates the Gunnison Basin is highly resilient.") A decade ago the authors of the RCP similarly concluded that that "the Gunnison Basin Population is . . . large enough to have a very high probability of surviving random demographic stochastic events" in the foreseeable future. AR 0011261 at 11489.

    **2.  The four factors identified to support the threatened listing do not put the Gunnison Basin Population at risk of extinction now or in the foreseeable future**

The administrative record does not support FWS's conjecture that threats to the Gunnison Basin Population, though currently low, are likely to increase in the foreseeable future.

    **a)       The threat of habitat fragmentation associated with residential development in the Gunnison Basin is low and unlikely to increase (Factor A)**

In the Final Listing Rule, FWS concluded that habitat decline resulting from "current residential development in the Gunnison Basin Population area is *a threat of*

*low magnitude.*" FLR at 199444 (emphasis added). FWS also determined that levels of development in the Gunnison Basin since the mid-1990s had not negatively impacted the population: "Despite past residential development in the Gunnison Basin, the Gunnison Basin Population of Gunnison sage-grouse has remained relatively stable over the past 19 years . . . ." *Id.* Moreover, FWS noted that future residential development in Gunnison County is "constrained by the relatively limited area of developable private lands," and is expected to occur primarily outside of sage-grouse habitat, within areas that are already developed. *Id.*

Notwithstanding these clear determinations, FWS concluded that residential development in the Gunnison Basin is an "increasing threat in the future." *Id.* Even though most occupied habitat in the Gunnison Basin has substantial protections from further development, and most development is expected to occur outside sage-grouse habitat, the Service declared that expected development on a portion of the remaining high priority private land would endanger the Gunnison Basin Population. *Id.* at 199445 That conclusion is arbitrary. The vast majority of occupied habitat in the Gunnison Basin occurs either on public land or private land that already has protections from development; less than 12% of Tier 1 habitat is on developable land. And, any development on this land is subject to Gunnison County's land use code provisions regulating development in sage-grouse habitat.

In its initial eagerness to list the Gunnison sage-grouse as endangered in the Proposed Listing Rule, the Service made serious errors in its analysis of residential development. *See* AR 0157653 at 157865 (admitting "there's no getting around the fact

that in [the Proposed Rule] we *grossly overestimated* human population growth rates

and indirect impacts from residential developments in the Gunnison Basin ... [t]his was

to champion the desired E conclusion") (emphasis added); *see also* AR 0094233-34

(internal memo to Regional Director Walsh acknowledging misunderstanding of the

County's regulatory mechanisms). Although FWS corrected some of its errors before

issuing the Final Listing Rule, the agency still marshalled no evidence to support its

conclusion that the potential for residential development on a fraction of the remaining

developable sage-grouse habitat will pose an increasingly serious threat to the

Gunnison Basin Population in the foreseeable future. On the contrary, the only evidence

in the record demonstrates that threats from residential development to Gunnison sage-

grouse habitat in the Basin are low and likely to remain so.

> **b)** **Threats associated with climate change impacts (Factor A), prolonged drought (Factor E), and disease (Factor C) in the Gunnison Basin are based on speculation, not science**

> (i) <u>Climate change impacts (Factor A)</u>

The threat to the Gunnison Basin Population from impacts associated with

climate change is overstated in the Listing Rule and weakly supported in the record.

FWS relied heavily in its analysis on a climate change vulnerability assessment for the

Gunnison Basin prepared in 2011, AR at 0025222, but according to that report, the

sagebrush ecosystems where Gunnison sage-grouse reside have "low" vulnerability to

climate change. *Id. at* 25250. Indeed, montane sagebrush stands, already widespread

and dominant in the Gunnison Basin, are considered likely to *expand* with changing

climate conditions. *Id.* at 25251. Low-elevation sagebrush shrublands are considered to

be in fair to good condition now, and are presumed stable in the face of expected climate change. *Id.*

The ecosystem relied upon by Gunnison sage-grouse that will be most vulnerable to climate change is montane groundwater-dependent wetlands, utilized by the species for brood-rearing habitat. *Id.* at 25367. These springs and seeps may be vulnerable to severe droughts associated with climate change. *Id.* In the Gunnison Basin, however, many of the areas used for brood-rearing habitat are located on private ranch land protected by conservation easements and landowner participation in the CCAA. These areas also benefit from irrigation of hay meadows in cultivated valleys, and hence are less susceptible to the effects of drought. AR 0073464 at 73473; AR 0199399 at 199437. Low elevation riparian systems, some of which have been converted into irrigated hay meadows, are also used by Gunnison sage-grouse for brood-rearing habitat. AR 0025222 at 25348. These areas are less vulnerable than montane groundwater-dependent wetlands. *Id.* Irrigated hay meadows will also likely continue to provide brood-rearing habitat, and also have only moderate vulnerability to climate change. *Id.* at 25350.

Lacking sufficient evidence in the record, FWS cannot simply assert a conclusion that climate change presents a future threat to the Gunnison sage-grouse, including specifically the Gunnison Basin Population. Rather, it must point to evidence that shows how the threat will act on the species such that it will be likely to face extinction in the foreseeable future. 79 Fed. Reg. at 49399; *Olenhouse*, 42 F.3d at 1581 (stating that

evidence is not substantial if it is a mere conclusion.) With respect to climate change, one of the Factor A threats, it has not done so.

<div align="center">(ii)    <u>Prolonged drought (Factor E)</u></div>

FWS also failed to demonstrate that a prolonged drought could threaten extirpation of the species, including the Gunnison Basin Population.

It is undisputed that sage-grouse evolved with and adapted to cyclical drought: "drought has been a consistent and natural part of the sagebrush-steppe ecosystem," FLR at 199505. Their adaptation is borne out by studies (generally based on greater sage-grouse) showing only a mild impact of drought on sage-grouse populations. *Id.* Although "drought has been shown to have a negative effect on chick survival rates in greater sage-grouse," severe droughts in the 53-year period between 1950 and 2003 had only a "weak negative effect" on greater sage-grouse populations. *Id.*

FWS also acknowledged that "adult survival rates of Gunnison sage-grouse in the Gunnison Basin were not apparently influenced by drought conditions in 2005." *Id.* To the contrary, record evidence shows that the Gunnison Basin Population has successfully *rebounded* from past droughts, including a 3-year drought that featured the driest summer on record. Drought conditions during those years resulted in reductions in all populations of Gunnison sage-grouse, with the Gunnison Basin Population declining by almost 30% by 2003. *Id.* Since then, however, the Gunnison Basin Population has rebounded beyond and now consistently exceeds pre-drought numbers. *Id.* at 199404 (Fig. 2).

Notwithstanding this rebound, and discounting the positive effects a drought can have on sagebrush habitats in the long term by allowing for greater herbaceous growth and stimulating the onset of sagebrush seed crops (consistent with an ecosystem accustomed to drought), FWS asserted that "negative impacts of drought appear to outweigh any positive effects" and that past drought "has contributed to substantial declines in all Gunnison sage-grouse populations," *Id.* at 199505. FWS then states that "we conclude that drought is a substantial threat to Gunnison sage-grouse rangewide, both now and into the future." *Id.* at 199507. This conclusion is the very essence of arbitrary: after reviewing data showing that the Gunnison Basin Population rebounded to pre-drought levels within two to three years of the drought, that it has remained above pre-drought levels ever since then, and that even severe droughts have had only a weak negative effect on greater sage-grouse, FWS cannot reasonably conclude that drought poses a substantial threat to the Gunnison Basin Population.

As with climate change, the record does not support the possibility of prolonged drought threatening the existence of the Gunnison Basin Population in the foreseeable future. The mere possibility of a prolonged severe drought, with speculative impacts on the Gunnison Basin Population, does not meet the requirements of the ESA, which do not authorize the Service to act without supporting data. *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior,* 646 F.3d 914, 918 (D.C. Cir. 2011) (even acknowledging deference due to agency expertise, FWS may not act without data to support its conclusions.)

<div align="center">

(iii)   <u>Disease</u>

</div>

Likewise, the record does not support a threat of devastating West Nile outbreak in the Gunnison Basin in the next forty to sixty years.

First, despite the presence of West Nile virus across most of the species' range, West Nile virus has never been documented in Gunnison sage-grouse in the wild. FLR at 199480. Second, the Gunnison Basin's climate and elevation appear to be inhospitable to the mosquitos that transmit West Nile virus. *Id.* at 0199481; *see also* AR 0063121 at 63122 (minutes from listing team meeting stating West Nile is "likely rare in Gunnison due to elevation"). Third, based on its analysis, FWS concluded that even if a West Nile outbreak *did* occur in the Gunnison Basin, as long as the population in the Basin remains large and resilient, the outbreak *would not challenge the survival of the Gunnison Basin Population.* FLR at 199481.

In spite of these factors, which weigh heavily against West Nile as a serious threat to the Gunnison Basin Population, FWS concluded, in the face of its own contrary statements, that West Nile is a potential future threat to Gunnison sage-grouse throughout its range, and that the threat of West Nile "is expected to increase in the near term due to increased drought and the predicted effects of climate change." FLR at 199410. FWS could not support this expectation with evidence, however, as noted by internal FWS comments on a draft that recommended the Service provide a citation to support this conclusion. AR 0157653 at 157666. In spite of the suggestion, the Final Listing Rule still provides no scientific study showing that higher temperatures and increased drought would lead to the spread of West Nile virus in the Gunnison Basin,

making it a substantial threat to the species. FLR at 0199481. And speculation cannot support a listing decision. *Western Watersheds*, 948 F. Supp. 2d at 1178.

<div align="center">

**c)**      **Sage-grouse habitat in the Gunnison Basin is protected by adequate regulatory mechanisms (Factor D)**

</div>

In addition to population characteristics, habitat must be secured in order for a species to be considered stable into the foreseeable future. One of the ESA's five listing factors requires FWS to consider whether existing regulatory mechanisms ensure protections for the species in the future. 16 U.S.C. § 1533(a)(1)(A). Regulatory mechanisms may preclude the need to list a species if they adequately address the threats to the species. FLR at 199485. Here, relying on an impermissibly narrow interpretation of "regulatory mechanism," the Service concluded, the face of contrary evidence, that the regulatory mechanisms in the Gunnison Basin do not adequately protect the sage-grouse. *Id.* at 199400.

The ESA does not define "regulatory mechanisms." Courts have held that to be considered as a regulatory mechanism, a conservation mechanism must be presently existing and legally enforceable, *Or. Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1152–53 (D. Or. 1998), but not necessarily legally binding. *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1084 (D.C. Cir. 2017). In *Zinke*, the district court had vacated a de-listing rule for Wyoming gray wolves because a key provision in Wyoming's wolf management plan was not legally binding on the state. *Id.* The D.C. Circuit reversed, noting that "nothing in the ESA demands that level of certainty," and that the Service's decision to de-list in the absence of legal certainty was reasonable based on its conclusion that the "strength of the state's incentives" to comply with the management

plan provided sufficient protection for de-listed wolves. *Id.* Under this D.C. Circuit's interpretation, regulatory mechanisms in the Gunnison Basin would include both the Gunnison Basin CCAA and the CCA, as well as and Gunnison County's land use regulations. Between them, these regulatory mechanisms cover virtually all of the occupied Gunnison sage-grouse habitat in the Basin. FWS did not acknowledge the CCA or CCAA as "regulatory mechanisms," FLR at 199485, nor did it deem the County's land use regulations adequate to protect sage-grouse habitat from fragmentation. *Id.* at 199487. This was unreasonable.

(i)     Candidate Conservation Agreement with Assurances

Together, the CCAA and CCA protect non-federally and federally-owned habitat in the Basin. In 2006 FWS and CPW (then the Colorado Division of Wildlife) signed a CCAA (described at *id.* at 199470-472) with the goal of protecting non-federally owned Gunnison sage-grouse habitat in Colorado. A CCAA requires participating landowners to engage in specified habitat protection measures on their property in exchange for assurances they will not be required to engage in further measures if the species is listed. Because it is designed to incentivize pre-listing conservation measures, if a species is listed, the CCAA is then closed to potential new enrollees. For this CCAA, the FWS authorized CPW to serve as the permittee/administrator, with CPW enrolling individual landowners and taking responsibility for ensuring their compliance with the conservation measures. AR 0013779. This agreement is legally enforceable against any of the signatory parties – the landowner, CPW, or FWS.

The Gunnison sage-grouse CCAA aimed to secure 90% of seasonally important habitat on non-federally-owned land in the Gunnison Basin, and was within 1% of meeting its target when the species was listed and new properties could no longer be enrolled. AR 0199471. As of the date of listing, 54,580 acres of sage-grouse habitat on private lands in the Gunnison Basin were protected under the CCAA, which should have been considered a regulatory mechanism under Factor D. AR 0195700 at 195704.

(ii)     Candidate Conservation Agreement

In 2012, federal land management agencies in the Gunnison Basin signed a CCA with FWS designed to promote the conservation of the Gunnison Basin Population on federal lands in the Basin. AR 0088471 at 88471; AR 0120478. The CCA covers all lands managed by federal agencies in the Gunnison Basin (roughly two-thirds of all occupied sage-grouse habitat in the Basin), and its provisions are binding on the federal signatories. AR 0088471 at 88474 ("Conservation measures are non-discretionary actions that the action agencies agree to implement.") FWS's approval of the CCA required a finding that the conservation measures in it would provide a long-term, net benefit for the species and its habitat on a landscape scale, and would help reduce several primary threats to the species. *Id.* at 88484, 487.

The CCA serves as a project screen, requiring imposition of conservation measures, including avoidance and minimization, on approvals for the most common land use authorizations in sage-grouse habitat areas in the Basin. FLR at 199472. Designed to address negative impacts associated with these activities as well as to prevent the potential cumulative impacts of habitat fragmentation, the CCA requires that

any habitat loss or disturbance resulting from a new land use authorization in the covered area be offset to ensure a *net increase* in priority habitat, and no net loss of secondary habitat for Gunnison sage-grouse. AR 0088471 at 88474-75. In short, under the CCA, project approvals for the most common land uses on over 250,000 acres of federal lands in the Basin cannot issue from the federal land management agency unless they will result in a net increase of the highest priority habitat and no net loss of the remainder of sage-grouse habitat. AR 1020446 at 120489.

FWS did not count the CCAA and CCA as regulatory mechanisms, contending that they should be considered "voluntary conservation measures" under Factor A instead. FLR at 199485. But as the D.C. Circuit recently held, the ESA does not require something be legally binding to be considered a regulatory mechanism under Factor D. *Defenders of Wildlife*, 849 F.3d at 1084. Ranchers have strong incentives to protect the regulatory certainty provided by participation in the CCAA, and the federal agencies participating in the CCA are required to comply with its terms or face onerous consequences under section 7 of the ESA if the species is listed.  As a result, the extensive acreage protected by these agreements *does* enjoy adequate protection as required by listing Factor D.

(iii)     Gunnison County conservation mechanisms

FWS likewise erroneously discounted the effectiveness of Gunnison County's conservation mechanisms. The County has implemented numerous land use and other police-power regulatory mechanisms to protect Gunnison sage-grouse, including an umbrella land use zoning regime; requirements to review permit applications on any

parcel within 0.60 miles of a Gunnison sage-grouse lek or occupied habitat; that oil and gas operations not cause significant degradation of sensitive wildlife habitat; that applications for a road-access permits within sage-grouse habitat must receive special scrutiny and include specific conditions in an approval; and authorizations to temporarily close roads for protection of Gunnison sage-grouse. AR 0075586 at 75609-75616.

In addition to these mechanisms, the County developed and implemented a "Habitat Prioritization Tool" that identifies and targets the highest priority sage-grouse habitat for protection. AR 0091282 at 91306. Since its development in 2012, the County has incorporated the Habitat Prioritization Tool into its land use regulations and relies on it when considering permit applications for construction in sage-grouse habitat. AR 0201022 at 201025. Between the date reviews began pursuant to these authorities and the date of the issuance of the Final Listing Rule, Gunnison County conducted more than 390 land use reviews, including on-site reviews as appropriate, by the county wildlife biologist and CPW biologists. AR 0075586 at 75643. The County's planning department uses this process to revise project proposals, change building envelopes, alter building locations, require mitigation, or take other steps to ensure that priority habitat is protected from adverse impacts. *See* AR 0067772-0067784 for a detailed example of the extensive reviews and subsequent modifications and mitigation measures implemented through the County's review process.

Few counties have expended the level of resources or enacted the number of regulations to preserve unfragmented habitat as Gunnison County, and these efforts have contributed to the continued growth of the Gunnison Basin Population. FWS acted

unreasonably in dismissing the effectiveness of the County's efforts to devise regulatory mechanisms to conserve the grouse and its habitat in the Basin.

B.  IN THE ABSENCE OF SUBSTANTIAL, IDENTIFIABLE THREATS TO THE GUNNISON BASIN POPULATION, "SMALL POPULATION SIZE AND STRUCTURE" (FACTOR E) DOES NOT PROVIDE A BASIS FOR THE THREATENED LISTING

The Final Listing Rule identifies "small population size and structure" as one of the substantial threats facing the Gunnison sage-grouse. FLR at 0199400. Small population size can be associated with reduced reproductive success or loss of genetic variation and diversity, making a population more susceptible to other stressors such as weather patterns, habitat loss, or increased mortality rates. *Id.* at 199496. FWS makes three claims about this threat with regard to the Gunnison sage-grouse. First, as a result of their small population size (the largest being 206 birds), the satellite populations may be compromised: "declining population trends and apparent isolation indicate long-term population persistence and evolutionary potential are compromised in the satellite populations." *Id.* Loss of the satellite populations would impact the long-term viability of the species, according to FWS, in part because they provide a measure of genetic diversity to the population as a whole. *Id.* at 199497. Second, while FWS acknowledges the Gunnison Basin Population to be large, stable and resilient, it also claims, based on a single Ph.D. dissertation that it misinterprets, that the Gunnison Basin Population may be slightly declining, rather than stable, implying a vulnerability to stochastic events that is not supported by the record. Finally, FWS claimed the satellite populations are necessary because they provide redundant populations across a broad geographic area, insuring the species can survive catastrophic events, such as prolonged drought.

*Id.* However, because the satellite populations would be *more* susceptible to impacts from a prolonged drought than the Gunnison Basin, they cannot provide the redundancy for which FWS claims they are needed. None of the concerns regarding small population size and structure pertain to the Gunnison Basin Population, and hence this "threat" does not put the species at risk of extinction in the foreseeable future.

### 1. The FWS determined that the Gunnison Basin is unlikely to be susceptible to inbreeding depression or other genetic problems

Although the persistence of a population "is typically influenced more by demographic processes than by environmental or genetic effects," AR 0011261 at 11396, "once populations are reduced in size, genetic factors become increasingly important." FLR at 199498. But, "it is highly debated whether reduced variation reduces the viability of a population." AR 0011261 at 11400. Regardless of whether the population viability is seriously impacted though, there are concerns that populations of less than a few hundred individuals may face genetic-based risks such as inbreeding depression, loss of genetic variation and accumulation of new mutations. *Id.* at AR 0011396; FLR at 199496.

By contrast, populations the size of the Gunnison Basin Population (3,000-4,000 or greater) are not thought to be as susceptible to inbreeding depression or other genetic problems. *See* AR 0012130 (noting that populations smaller than a few hundred are the ones that warrant "careful scrutiny" for genetic decline). Moreover, levels of genetic diversity among Gunnison sage-grouse population are highest in the Gunnison Basin Population, which contains 76% of the overall genetic variation of the species. FLR at 199497. As such, the Gunnison Basin Population likely has a large enough

effective size and sufficient breadth of genetic diversity to adapt to changing environmental conditions and to avoid the inbreeding depression that can be associated with much smaller populations. AR 0011261 at 11489.

## 2. The population viability analysis relied on by FWS does not support a threatened listing

In attempting to shore up its conclusions regarding the threat posed by small population size and structure, FWS also mischaracterized a series of studies concerning extinction risks for the species. Two of the studies modeling the viability of the Gunnison sage-grouse confirm that the Gunnison Basin Population—and hence the species—is very likely stable and secure for the foreseeable future. FLR at 199498-099499. A third study, relied upon by FWS to the exclusion of the other two, concluded that the Gunnison Basin Population's viability could be at risk in the future. *Id.* at 199503. This third study, however, is of limited utility because of its reliance on a brief period of declining population to estimate demographic parameters for the entire study. When its author simulated another year of data that better approximated real-world population changes in the Gunnison Basin, her model no longer indicated a likely decline in the population. Accordingly, FWS erred in relying on the third study without fully acknowledging its limitations and without according greater weight to one or both of the other two studies. In the face of the three studies, to conclude that the population is likely to be in danger of extinction in the next 50 years is unreasonable and contradicted by the evidence.

### a) FWS erred by excluding consideration of two studies showing the Gunnison Basin Population does not face extinction in the foreseeable future

FWS reviewed three population studies in its listing decision: a 2005 population study by Edward Garton, FLR at 199498; a population viability analysis (PVA) prepared in 2005-06 as part of the RCP (the "RCP PVA"), AR 0011261; and a 2012 Ph.D. dissertation by Amy J. Davis, which included a PVA, AR 0041438. (*See* AR 0011261 at 11455 for an explanation of population viability analysis). Garton relied entirely on lek-count data in his population study, while the RCP and Davis PVAs also incorporated demographic data (*e.g.,* birth, reproduction, and death rates, chick and yearling survival, and nest success rates). Whereas the RCP PVA's extensive demographic data came primarily from studies of greater sage-grouse, Davis's more abbreviated demographic data was the product of six years of field work on the Gunnison and San Miguel populations of Gunnison sage-grouse. AR 0041438 at 41458. FWS improperly ignored the results of the Garton study and the RCP PVA. FLR at 199503.

Those two studies both found a risk of extinction for the Gunnison Basin Population of less than 1% in the next 50 years. *Id. at* 199498-199499. The RCP PVA, prepared in 2005, evaluated the relative extinction risks of various-sized starting populations of Gunnison sage-grouse, finding a low risk of extinction over a 50-year period for a population of just 500 birds with an essentially stable growth rate. AR 0011261 at 11715. Expanding the initial population size to 3,000, the authors found even lower extinction probabilities: an initial population of 3,000 faced a nearly zero probability of extinction over 50 years. *Id.* at 11459, 557. In these models, the population also retained 90–93% of its genetic diversity. *Id.* at 11557.

According to this study, individual Gunnison sage-grouse populations can be considered "secure" (<5% extinction probability) if they contain as few as 500 birds and have a stable growth rate, even one that is barely above zero; barring a catastrophic event, they are almost certain to survive the next 50 years if they contain over 3,000 birds. *Id.* at 11457 Fig 30, 11459. Given its size, which easily exceeds 3,000, and assuming a stable growth rate—which a subsequent article by Davis showed to be a reasonable assumption—the Gunnison Basin Population has an almost zero risk of extinction in the next 50 years.

FWS dismissed the results of the RCP PVA because (1) it combined demographic data from both greater and Gunnison sage-grouse studies, FLR at 199498, and (2) it did not account for unpredictable ("stochastic") environmental events such as fire and disease. *Id.* at 199502. Neither of these arguments is compelling. First, according to the Service, reliance on greater sage-grouse demographic data is problematic because of behavioral and genetic differences and potentially different vital rates vis-à-vis Gunnison sage-grouse. *Id.* at 199498. But the behavioral differences in the article FWS cited to support this concern included things like different mating vocalizations and the kinds of areas the birds seek out as winter habitat, not the kinds of behavioral differences that would cause demographic data to lead to inaccurate conclusions regarding population viability. AR 0007246 at 7247. Moreover, as noted above, FWS relied heavily on greater sage-grouse studies to assess the impacts of drought on Gunnison sage-grouse.  FLR at 199505.

Second, FWS criticized the RCP PVA for failing to incorporate environmental stochasticity in the model. *Id.* at 199498, 199502. This was not an oversight by the study's author, however, but a deliberate choice. *See* AR 011261 at 11709. The RCP PVA was developed to estimate annual mortality rates consistent with stable or slightly increasing populations—in other words, minimum levels of survival necessary to prevent population decline. *Id.* For the purposes of establishing a benchmark for wildlife managers, simulating a catastrophic drought or other stochastic environmental variable was not useful. *Id.* PVA results must be understood in the context of the other scenarios tested in the model. The RCP PVA was designed to evaluate scenarios for different-sized starting populations, and did just that.

Thus, FWS's justifications for dismissing the results of a study that showed a miniscule risk of extinction for the Gunnison Basin Population in the foreseeable future are arbitrary and capricious, and should be rejected.

> b)      **The Davis PVA does not support the threatened listing**

FWS decided that Davis's PVA represented the "best available science" on Gunnison sage-grouse viability, but failed to account for weaknesses Davis herself acknowledged in the study. According to FWS, the PVA in Davis's dissertation indicated that (1) the Gunnison Basin Population has been relatively stable since 1996 (up through 2011), but with a slight decline toward the end of the period; (2) the Gunnison Basin Population is likely to decline in the future, and (3) the Gunnison Basin Population faces a mean extinction time of fifty-eight years. FLR at 199502. FWS also repeated Davis's disclaimer that her demographic data regarding survival and mortality rates

were collected during years of declining population, and that if she had conducted her study a few years earlier or later, she might have had different results; but did not incorporate that disclaimer into their interpretation of her results. *Id.*

<div align="center">

(i)     <u>Davis's brief data set included years of steep population declines</u>

</div>

Critically, the six years during which Davis collected her demographic data on Gunnison sage-grouse, 2006–2011, included four years of population decline. *Id.* at 199501. Those four years likely had lower chick and yearling survival rates, lower nest success rates, and higher adult mortality rates, than years of stability or increase. Davis's population model indicated slightly declining growth rates for the Gunnison Basin and San Miguel Basin Populations, and she concluded that *if* her demographic data were indicative of future trends, these two populations would likely continue to decline. AR 0041438 at 41542. However, *she immediately qualified this prediction* with the observation that the negative growth rate could be simply a result of examining a short segment of time during which the population was declining. *Id.* And indeed, the short-term declining trend changed course. Lek counts in 2012-2014 in the Gunnison Basin increased, with 2013 showing an 11% increase over 2011. AR 0195641 at 195702.

<div align="center">

(ii)     <u>With the addition of data that reflect real-world events Davis's results are similar to the other two PVAs</u>

</div>

Davis hypothesized that had she collected the demographic data a few years earlier or later, her results could have been different. To test how dependent her results were on the specific years included in her data, Davis ran further simulations, with an

additional year of positive growth, with an additional year of stable growth, and with an additional year of declining growth. AR 0041438 at 41543.

Although FWS never acknowledged, much less discussed, these simulations, the results are striking. They show that the addition of a *single year of growth dramatically changes the long-term predictions* for the species. *Id.* at 41556, Fig. 4.4 (shown on the next page). In the four graphs from the results the y-axis shows the estimated population size and the x-axis shows the number of years. Each colored line represents a single simulated population trend. Graphs A (the original model) and D (with an additional year of decline) show the simulations clustering in a pattern of declining population over the 30-year period. Graph C, with an additional year of stable growth, shows a somewhat more stable pattern, albeit with the population mostly staying below 5000 by the 25-year mark.

By contrast, Graph B, which represents what happened in the real world, *i.e.*, an additional year of increasing growth, looks dramatically different from the other three. *Id.* It shows the 30-year population simulations being highly variable and utterly unpredictable, with many of the simulations after 30 years ending up with a population of 10,000-15,000 birds in the Gunnison Basin. *Id.* Inexplicably, even though the Service acknowledged Davis's concerns about the biasing effect of her particular dataset, it ignored her exploration of that effect as well as the opportunity to understand how the



**Figure 4.4.** Gunnison Basin population projection of Gunnison Sage-grouse with environmental stochasticity for: A) projection based on the six years of data, B) projection with one additional year with a positive growth rate ($\lambda = 1.27$), C) projection with one additional year with a constant growth rate ($\lambda = 1.00$), D) projection with one additional year with a decreasing population growth rate ($\lambda = 0.74$). Each line represents a simulation of one population projection.

addition of another year or two of data would have impacted her results. Consequently FWS's repeated invocation in the Final Listing Rule of the "mean extinction time of 58 years" merely states and restates a result that Davis's second set of simulations showed to be inconsistent with the increased growth the Gunnison Basin actually experienced in 2012 and 2013. FLR at 199404.

As a general rule, FWS's technical conclusions—those within its area of expertise—are to be accorded the highest level of deference. But even the agency's conclusions in its area of scientific expertise do not deserve deference if they are "not reasoned," *Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 210 (citation omitted). That is the case with FWS's discussion of the population studies here and accordingly, the Service's use of the Davis 2012 study to claim a declining trend or a mean extinction time of fifty-eight years for the Gunnison Basin Population deserves no deference and should be rejected.

<div align="center">(iii)     <u>Davis's subsequent article showed a stable growth rate in the Gunnison Basin</u></div>

Subsequent to her dissertation, Davis co-authored an article in a peer-reviewed journal in 2014 (AR 0195641 at 164463, referred to in the Final Listing Rule as "Davis, *in press*") in which she added an additional year of lek count data (collected in 2012). Using a different type of model, Davis and her co-authors found that the Gunnison Basin Population experienced an essentially stable growth rate between 1996 and 2012 (growth rate = 0.99, with the 95% confidence interval including stable and slightly increasing growth rates). FLR at 199496. This is consistent with the finding in her dissertation regarding the effect of an additional year of growth, and confirms that the

Gunnison Basin Population is not declining; rather, notwithstanding fluctuations in the population, its growth rate has remained stable since 1996. Thus, FWS's repeated assertions in the Final Listing Rule that the Gunnison Basin Population is declining are simply not tenable. *E.g., id.* at 199504. A thoughtful reading of Davis 2012, along with her peer-reviewed article in 2014, reveals a stable population. This result, for the population containing the vast majority of the species, does not support the conclusion that the species is likely to face extinction in the foreseeable future. FWS's claim to the contrary runs counter to the evidence.

### 3. The need for multiple "redundant" populations is a conservation principle, not a basis for listing the species

The third "R" in the trio of conservation biology principles FWS often refers to—"redundancy"—holds that multiple populations may be needed to provide a margin of safety for the species to withstand catastrophic events that may threaten an otherwise resilient population. *See Western Watersheds*, 948 F. Supp. 2d at 1188. The "3 Rs" test is not derived from the ESA, however, nor from any Service or Department of Interior policy; it is simply a framework adopted from general principles of conservation biology to facilitate analysis of species' status. *Id.* As such, while they can provide a structure for analysis, the concepts of the 3 Rs do not by themselves provide evidence of population health or lack thereof; under the ESA the Service still must provide evidence of threats to the species' status. *Id.* at 1189. And as discussed above, the record is replete with evidence, including the Service's own statements, that the Gunnison Basin Population is secure for the foreseeable future.

FWS has insisted, however, that without redundant populations, the Gunnison Basin Population alone cannot secure the species. *See, e.g.,* FLR at 199515 ("redundancy to the Gunnison Basin Population is a necessary element to have confidence in the conservation of the Gunnison sage-grouse"); AR 0085898 at 85899 ("the [listing team] felt the species is viable now, but many expressed discomfort with relying on only one population in GB.")

This view reflects mainstream thinking among conservation biologists about how to achieve a maximally stable population; it does not, however, help determine whether a species is likely to face extinction in the foreseeable future. FWS itself has noted elsewhere that the "general theoretical principles" of the 3 Rs don't apply equally well to all species. *See, e.g.,* 81 Fed. Reg. 22,710, 22726 (April 18, 2016) (withdrawing proposed listing of Pacific fisher). FWS has repeatedly found narrow endemic populations lacking redundancy not to be endangered or threatened even though they may be vulnerable to an unspecified future catastrophic event. *E.g.,* 81 Fed. Reg. 53,315 (Aug. 12, 2016) (de-listing three species of Channel Island foxes); 75 Fed. Reg. 19,592, 19,604 (Apr. 15, 2010) (not warranted finding for Wyoming pocket gopher). Indeed, FWS has explained elsewhere that "in the absence of increased threats," even "rarity or extremely limited ranges alone do not necessarily require listing as endangered or threatened." AR 0022937 at 22940.

Moreover, basing a threatened listing on the need for insurance against catastrophic events presumes that catastrophic events may loom in the foreseeable future. The record must contain some evidence of the likelihood of these looming

catastrophes, but a review of the record here fails to turn up evidence of any catastrophic event in the next forty to sixty years—the foreseeable future for this species—that could wipe out all or most of the Gunnison Basin Population. *See, e.g.*, AR 0056196-97 (FWS staff noting redundancy analysis should consider "catastrophic events that are *likely*") (emphasis in original); AR 0085898 at 85899 (discussing remote probability of a catastrophic event wiping out the Gunnison Basin Population: "while it may be low, it is possible."). An unspecified, low probability catastrophic event resulting in extirpation of the entire sage-grouse population in the Gunnison Basin does not provide "sufficient evidence" for listing, as required under the APA and the ESA. This is speculation, not evidence.

### 4. The satellite populations cannot provide redundancy to the Gunnison Basin Population

Further, any catastrophic event that could pose an existential threat to the Gunnison Basin would likely not spare the satellite populations. FWS identifies prolonged drought as having a potentially catastrophic effect on all of the populations, but the satellite populations, generally at lower elevations, and consequently in warmer, drier areas, than the Gunnison Basin, are more vulnerable to drought than the Gunnison Basin Population. *See* AR 0002353 at 2366 (variability of precipitation is dependent on elevation); AR 0011261 at 11360 (higher elevation sagebrush stands receive more moisture). Accordingly, it is unreasonable to conclude that the satellite populations, even if their size increased, could provide redundancy if prolonged drought resulted in catastrophic loss of the vastly larger population in the Gunnison Basin.

Given the abundance and distribution of the Gunnison Basin Population throughout the Basin, the satellite populations are not needed for and at any rate cannot provide a "margin of safety" for the Gunnison sage-grouse to withstand catastrophic or stochastic events in the Gunnison Basin. Moreover, in the absence of evidence supporting a reasonable likelihood of a catastrophic event endangering the Gunnison Basin Population in the foreseeable future, the generalized benefits of redundant populations do not provide the required "substantial evidence" on which to base a listing. Maintaining and even increasing the size of the satellite populations may be a reasonable conservation strategy for the species, but the record does not support a conclusion that it is necessary for the long-term survival of the species.

Thus, the first two types of threats associated with small population size and structure (resiliency and representation) do not threaten the Gunnison Basin Population. And the third, redundancy, has not been shown to pose a meaningful threat to the species in the foreseeable future.

## CONCLUSION

To support its listing decision, FWS identified five substantial threats to the Gunnison sage-grouse. None of these—habitat decline due to residential development, climate change, drought, disease, or small population size and structure—poses a threat to the Gunnison Basin Population in the foreseeable future. As a result, the Service made a clear error of judgment when it decided to list the Gunnison sage-grouse as threatened. The agency's decision does not provide a rational connection between the facts before it and the conclusion that a threatened listing was warranted.

To the contrary, the record evidence supports a determination that the Gunnison sage-grouse is *not* likely to be in danger of extinction in the next fifty to sixty years. With a large and stable population in the Gunnison Basin secure for the foreseeable future, concerns about the viability of the satellite populations cannot serve as the basis for a threatened listing.

Accordingly, Colorado respectfully requests that this Court: (1) declare that the Gunnison sage-grouse does not satisfy the requirements of the ESA for listing as a "threatened species"; (2) declare that Federal Defendants abused their discretion in issuing a threatened listing instead of a not warranted determination; (3) vacate the Final Listing Rule; (4) remand the Final Listing Rule to FWS for further proceedings consistent with the Court's findings; (5) award Colorado its costs and expenses, including reasonable attorneys' fees, under 16 U.S.C. § 1540(g)(4); and (6) grant Colorado such other relief as the Court deems just and equitable.

Respectfully submitted on this 21st day of July, 2017,

<div style="margin-left:40%">

CYNTHIA H. COFFMAN
Attorney General

*/s/ Lisa A. Reynolds*
FREDERICK R. YARGER
Solicitor General
LISA A. REYNOLDS
Assistant Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Tel: (720) 508-6252, Fax: (720) 508-6039
E-Mail: lisa.reynolds@state.co.us

*Counsel for Petitioner State of Colorado*

</div>

CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2017, I electronically filed the foregoing PETITIONER STATE OF COLORADO'S OPENING BRIEF using the court's CM/ECF system, which will send notifications of such filing to all counsel of record.

DATED:  July 21, 2017                    /s/ Lisa A. Reynolds
                                         Lisa A. Reynolds