**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-00130-CMA-STV
(Consolidated with Civil Action Nos. 1:15-cv-131 and 1:15-cv-286)

IN RE: GUNNISON SAGE-GROUSE ENDANGERED SPECIES ACT LITIGATION

*This document relates ONLY to Civil Action No. 1:15-cv-00130*

---

CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT,

     Petitioners,

v.

U.S. FISH AND WILDLIFE SERVICE; GREG SHEEHAN, in his official capacity as Deputy Director of the U.S. Fish and Wildlife Service; U.S. DEPARTMENT OF THE INTERIOR; RYAN ZINKE, in his official capacity as Secretary of the U.S. Department of the Interior, NOAA FISHERIES; CHRIS OLIVER, in his official capacity as Assistant Administrator for NOAA Fisheries; U.S. DEPARTMENT OF COMMERCE; WILBUR ROSS, in his official capacity as Secretary of Commerce,[1]

     Respondents.

---

**PETITIONERS' OPENING BRIEF**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Greg Sheehan, Deputy Director, U.S. Fish and Wildlife Service, and Ryan Zinke, Secretary, U.S. Department of the Interior, are substituted in their official capacities for Respondents Daniel M. Ashe and Sally M.K. Jewell.  Chris Oliver, Assistant Administrator for NOAA Fisheries, and Wilbur Ross, Secretary, U.S. Department of Commerce, are substituted in their official capacities for Respondents Eileen Sobeck and Penny Pritzker.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

LEGAL BACKGROUND ........................................................................................ 4

    A. THE ENDANGERED SPECIES ACT ....................................................... 4

    B. THE ESA INCLUDES TWO CLASSIFICATIONS FOR IMPERILED SPECIES: ENDANGERED AND THREATENED. ............................................................................ 5

    C. A SPECIES MAY BE ENDANGERED OR THREATENED "THROUGHOUT ALL OR A SIGNIFICANT PORTION OF ITS RANGE." .............................................. 7

    D. STANDARD OF REVIEW ....................................................................... 8

FACTUAL BACKGROUND ................................................................................. 10

    A. THE GUNNISON SAGE-GROUSE ....................................................... 10

    B. THE "SIGNIFICANT PORTION OF ITS RANGE" POLICY ........................... 15

ARGUMENT ....................................................................................................... 20

I. THE SPR POLICY IS MANIFESTLY CONTRARY TO AND INCONSISTENT WITH THE ESA. ........................................................................................... 20

    A. THE SPR POLICY VIOLATES THE ESA'S PLAIN LANGUAGE, FAILS UNDER THE APA AND *CHEVRON* STEP I, AND MUST BE VACATED BECAUSE IT ALLOWS THE SERVICES TO FOREGO ANY ANALYSIS OF WHETHER A SPECIES IS ENDANGERED IN AN SPR SO LONG AS IT IS THREATENED THROUGHOUT ALL OF ITS RANGE. ............................ 20

    B. EVEN IF THE PHRASE "OR IN A SIGNIFICANT PORTION OF ITS RANGE" IS CONSIDERED AMBIGUOUS, THE SPR POLICY IS BASED ON AN IMPERMISSIBLE CONSTRUCTION OF THE ESA AND CANNOT SURVIVE SCRUTINY UNDER *CHEVRON* STEP II. ............................................................................... 26

II. THE SPR POLICY PROVISION FORECLOSING CONSIDERATION OF WHETHER A SPECIES IS ENDANGERED IN AN SPR VIOLATES APA AND ESA NOTICE AND COMMENT PROCEDURES AS IT IS NOT A LOGICAL

OUTGROWTH OF THE DRAFT SPR POLICY, AND MUST BE VACATED FOR THIS REASON AS WELL. ................................................................................ 30

III. FWS APPLIED THE INVALID SPR POLICY TO FORECLOSE ANY ANALYSIS OF WHETHER THE GROUSE IS ENDANGERED IN AN SPR AS THE ESA REQUIRES, AND SHOULD BE ORDERED TO CONDUCT THIS ANALYSIS. ... 33

**CONCLUSION** ............................................................................................................. **36**

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth.*,
    836 F.3d 1291 (10th Cir. 2016) ................................................................. 20

*Am. Lands All. v. Norton*, 242 F. Supp. 2d 1 (D.D.C. 2003),
    *vac'd in part on reconsideration*, 360 F. Supp. 2d 1 (D.D.C. 2003) ......... 12, 28, 31, 33

*Am. Lands All. v. Norton*, No. 00-2239,
    2004 WL 3246687 (D.D.C. June 2, 2004) ............................................. 26, 33

*Am. Mining Cong. v. Thomas*,
    772 F.2d 617 (10th Cir. 1985) ......................................................... 10, 31, 33

*Anderson v. U.S. Dep't of Labor*,
    422 F.3d 1155 (10th Cir. 2005) ............................................................... 23

*Berneike v. CitiMortgage, Inc.*,
    708 F.3d 1141 (10th Cir. 2013) ............................................................... 26

*Biodiversity Legal Found. v. Babbitt*,
    146 F.3d 1249 (10th Cir. 1998) ................................................................. 8

*Chevron U.S.A. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984) ........................................................................ passim

*Coal. for Sustainable Res. v. U.S. Forest Serv.*,
    259 F.3d 1244 (10th Cir. 2001) ................................................................. 4

*Colo. River Cutthroat Trout v. Salazar*,
    898 F. Supp. 2d 191 (D.D.C. 2012) ......................................................... 35

*CSX Transp., Inc. v. Surface Transp. Bd.*,
    584 F.3d 1076 (D.C. Cir. 2009) ............................................................... 31

*Ctr. for Biological Diversity v. Jewell*, No. 14-2506-TUC-RM,
    2017 WL 2438327 (D. Ariz. Mar. 29, 2017) ....................................... passim

*Ctr. for Biological Diversity v. Kempthorne*, No. 06-4186-WHA,
    2007 WL 163244 (N.D. Cal. Jan. 19, 2007) ............................................. 16

*Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency*, No. 14-1036,
    2017 WL 2818634 (D.C. Cir. June 30, 2017) ........................................... 28

*Ctr. for Envtl. Health v. Vilsack*, No. 15-1690-JSC,
    2016 WL 3383954 (N.D. Cal. June 20, 2016) ........................................... 33

*Ctr. for Native Ecosystems v. Salazar*,
    795 F. Supp. 2d 1236 (D. Colo. 2011) ................................................ 26, 36

*Cty. of San Miguel v. Kempthorne*,
    587 F. Supp. 2d 64 (D.D.C. 2008) ........................................................... 12

*Defs. of Wildlife v. Babbitt*,
    130 F. Supp. 2d 121 (D.D.C. 2001) ........................................................... 6

*Defs. of Wildlife v. Norton*, 239 F. Supp. 2d 9 (D.D.C. 2001),
   *vacated in part on other grounds*, 89 F. App'x 273 (D.C. Cir. 2004) ...................passim

*Defs. of Wildlife v. Norton*,
   258 F.3d 1136 (9th Cir. 2001).............................................................................passim

*Defs. of Wildlife v. Salazar*,
   729 F. Supp. 2d 1207 (D. Mont. 2010) ..................................................................... 17

*Defs. of Wildlife v. Sec'y, U.S. Dept. of the Interior*,
   354 F. Supp. 2d 1156 (D. Or. 2005) .......................................................................... 16

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ..................................................................................................... 8

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999),
   *as amended on denial of reh'g*, 784 F.3d 677 (10th Cir. 2015)............................ 25, 28

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................................................... 21

*Hanover Bank v. Comm'r of Internal Revenue*,
   369 U.S. 672 (1962) ................................................................................................... 22

*HRI, Inc. v. Envtl. Prot. Agency*,
   198 F.3d 1224 (10th Cir. 2000)..................................................................................... 9

*Humane Soc'y of the U.S. v. Jewell*,
   76 F. Supp. 3d 69 (D.D.C. 2014).................................................................................. 23

*Humane Soc'y of the U.S. v. Kempthorne*,
   579 F. Supp. 2d 7 (D.D.C. 2008) ................................................................................. 35

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................................................... 21

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995)....................................................................................... 36

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
   407 F.3d 1250 (D.C. Cir. 2005) ...................................................................... 31, 32, 33

*Mission Grp. Kan. v. Riley*,
   146 F.3d 775 (10th Cir. 1998)..................................................................................... 31

*N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*,
   248 F.3d 1277 (10th Cir. 2001)................................................................................... 21

*Nat'l Wildlife Fed'n v. Norton*,
   386 F. Supp. 2d 553 (D. Vt. 2005) .............................................................................. 16

*Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033 (10th Cir. 2006),
   *cert. denied,* 550 U.S. 993 (2007)......................................................................... 8, 25

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
   475 F.3d 1136 (9th Cir. 2007)..................................................................................... 10

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
   183 F. Supp. 3d 1137 (D. Colo. 2016) .......................................................................... 8

*People v. U.S. Fish & Wildlife Serv.*, 57 F. Supp. 3d 1337 (D. Utah 2014),
   *rev'd on other grounds*, 852 F.3d 990 (10th Cir. 2017) ................................................ 5

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ............................................................................................... 21

*See Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ..........................................................................................passim

*Small Refiner Lead Phase-Down Task Force v. U.S. Envtl. Prot. Agency*,
   705 F.2d 506 (D.C. Cir. 1983) ............................................................................... 33

*Sw. Ctr. for Biological Diversity v. Norton*, No. 98-934-RMU,
   2002 WL 1733618 (D.D.C. July 29, 2002),
   *adopted in rel. part*, slip op. (D.D.C. May 24, 2004) ............................................ 16

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2002) ................................................................................................. 24

*United Keetoowah Band of Cherokee Indians of Okla. v. Dep't of Hous. & Urban Dev.*,
   567 F.3d 1235 (10th Cir. 2009) ............................................................................... 9

*United States v. Adame-Orozco*,
   607 F.3d 647 (10th Cir. 2010) ............................................................................... 23

*United States v. Woods*,
   134 S. Ct. 557 (2013) ............................................................................................. 21

*WildEarth Guardians* v. *Salazar,* No. 09-574-PHX-FJM,
   2010 WL 3895682 (D. Ariz. Sept. 30, 2010) ......................................................... 17

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
   784 F.3d 677 (10th Cir. 2015) ................................................................. 9, 21, 25, 26

*Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*,
   841 F.3d 1141 (10th Cir. 2016) ............................................................................. 31


**Statutes**

5 U.S.C. § 533(b) .......................................................................................................... 33

5 U.S.C. § 533(c) .......................................................................................................... 33

5 U.S.C. § 553 .......................................................................................................... 3, 10

5 U.S.C. § 706 ................................................................................................................ 8

5 U.S.C. § 706(2)(A) ................................................................................................ 1, 2, 8

5 U.S.C. § 706(2)(C) ....................................................................................... 2, 9, 21, 26

5 U.S.C. § 706(2)(D) ....................................................................................................... 3

16 U.S.C. § 1531(b) ........................................................................................... 4, 26, 35

16 U.S.C. § 1532(3) .................................................................................................. 4, 27

16 U.S.C. § 1532(6) ..............................................................................................passim

16 U.S.C. § 1532(16) ....................................................................................................... 4

16 U.S.C. § 1532(19) ............................................................................... 6

16 U.S.C. § 1532(20) ........................................................................ passim

16 U.S.C. § 1533 ..................................................................................... 4

16 U.S.C. § 1533(a)(1) ............................................................... 8, 21, 27

16 U.S.C. § 1533(b)(1)(A) ................................................................. 8, 27

16 U.S.C. § 1533(d) ............................................................................... 6

16 U.S.C. § 1533(f) ................................................................................ 6

16 U.S.C. § 1533(f)(1)(A) ...................................................................... 6

16 U.S.C. § 1533(h) ....................................................... 3, 10, 31, 33

16 U.S.C. § 1536(a)(1) ........................................................................ 27

16 U.S.C. § 1536(a)(2) .......................................................................... 6

16 U.S.C. § 1538(a)(1) .......................................................................... 5

16 U.S.C. § 1540(g) .............................................................................. 1

Endangered Species Conservation Act, Pub. L. 91-135 § 3(a),
     83 Stat. 275 (Dec. 5, 1969) .......................................................... 7

Endangered Species Preservation Act, Pub. L. 89-669 § 1(c),
     80 Stat. 926 (Oct. 15, 1966) ......................................................... 7

## Legislative History

120 Cong. Rec. 25,668 (1973) (statement of Sen. Tunney) ............................................. 5

H.R. Rep. No. 93-412 (1973) *reprinted in* Cong. Research Service, A Legislative
     History of the Endangered Species Act of 1973 (1982) ................................... 8, 24

## Regulations

50 C.F.R. § 424.11(b) .............................................................................. 27

## Federal Register Notices

Amended Procedures to Comply with the 1982 Amendments to the Endangered
     Species Act, 49 Fed. Reg. 38,900 (Oct. 1, 1984) ................................. 27, 30

Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species;
     Proposed Rule, 75 Fed. Reg. 59,804 (proposed Sept. 28, 2010) (to be codified
     at 50 U.S.C §17.11(h)) ....................................................................... passim

Draft Policy on Interpretation of the Phrase "Significant Portion of Its Range,"
     76 Fed. Reg. 76,987 (Dec. 9, 2011) ................................................. passim

Endangered and Threatened Species Listing and Recovery Priority Guidelines,
     48 Fed. Reg. 43,098 (Sept. 21, 1983) ................................................ 5, 6

Endangered Status for Gunnison Sage-grouse; Proposed Rule,
     78 Fed. Reg. 2486, 2495 (proposed Jan. 11, 2013)
     (to be codified at 50 U.S.C §17.11(h)) ................................................................passim

Final Policy on Interpretation of the Phrase "Significant Portion of its Range" in the
     Endangered Species Act's Definitions of 'Endangered Species' and 'Threatened
     Species,'" 79 Fed. Reg. 37,578 (July 1, 2014)......................................................passim

Threatened Status for Gunnison Sage-Grouse; Final Rule,
     79 Fed. Reg. 69,192 (Nov. 20, 2014) (to be codified at 50 U.S.C. §17.11(h) .....passim

Withdrawal of the Proposed Rule to List the Flat-Tailed Horned Lizard as Threatened,
     62 Fed. Reg. 37,852 (July 15, 1997) ........................................................................ 15


**Other Authorities**

FWS & NMFS, Consultation Handbook (1998),
     https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf............7

Patrick Parenteau, *Rearranging the Deck Chairs:*
     *Endangered Species Act Reforms in an Era of Mass Extinction*,
     22 Wm. & Mary Envtl. L. & Pol'y Rev. 227, 227-29 (1998).........................................4

## INTRODUCTION

This petition concerns the Gunnison sage-grouse (*Centrocercus minimus*) ("Grouse"), a unique sage-grouse species that now occurs in just a few isolated areas of the disappearing sagebrush ecosystems of southwest Colorado and southeast Utah. GUSG0199399 (Threatened Status for Gunnison Sage-Grouse; Final Rule, 79 Fed. Reg. 69,192 (Nov. 20, 2014) (to be codified at 50 U.S.C. §17.11(h)) ("Threatened Rule")). Decades of human activity have destroyed the sagebrush habitats that the Grouse needs, and less than 5,000 birds inhabit less than 12 percent of their historic range. GUSG0069994 (Endangered Status for Gunnison Sage-grouse; Proposed Rule, 78 Fed. Reg. 2486, 2495 (proposed Jan. 11, 2013) (to be codified at 50 U.S.C §17.11(h)) ("Endangered Proposal").

The Center for Biological Diversity ("the Center") and Western Watersheds Project ("WWP") ("Petitioners") challenge the November 2014 decision of Federal Respondents (U.S. Fish and Wildlife Service, Greg Sheehan, and Ryan Zinke (collectively "FWS")) to designate the Grouse as a "threatened" species under the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531-1544, instead of "endangered," as FWS proposed. *See* GUSG0070037 (Endangered Proposal); GUSG0199518 (Threatened Rule); 16 U.S.C. § 1532(6), (20) (definitions of "endangered" and "threatened," respectively). Petitioners challenge this unlawful classification of the Grouse as "threatened" rather than the more-protective "endangered" classification, pursuant to the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g), and the standard of review in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), because it fails to account for the imminence of the threats to the

species' existence and is less certain to result in the resources necessary to halt and reverse its decline toward extinction.[2]

In addition, Petitioners challenge the unlawful Final Policy on Interpretation of the Phrase "Significant Portion of its Range" in the Endangered Species Act's Definitions of 'Endangered Species' and 'Threatened Species,'" SPR000074 (79 Fed. Reg. 37,578, 37,578 (July 1, 2014)) ("Final SPR Policy," "SPR Policy" or "Policy").  According to this Policy, if FWS or the National Marine Fisheries Service ("NMFS") (collectively the "Services") concludes that a species is "threatened" *throughout all* of its range, then *they will not consider*, *at all*, whether the species is endangered in a *significant portion* of its range, which would require the species to be listed and protected as endangered rangewide.  SPR000082 ("If we determine that the species is in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range, we will list the species as endangered (or threatened) and no SPR analysis will be required.").[3]  This interpretation goes beyond the scope of, and is "manifestly contrary" to, the ESA's plain language requirement that the Services consider whether a species is "endangered" due to its status in any "significant portion of its range" ("SPR"), thus Petitioners request vacatur of the SPR Policy.  5 U.S.C. § 706(2)(A), (C); *Chevron U.S.A. v. Nat. Res. Def. Council,* 467 U.S. 837, 844 (1984) (hereinafter *"Chevron"*).[4]

---

[2]  WildEarth Guardians and Dr. Clait Braun ("Guardians") are also challenging FWS's listing decision in Civil Action No. 1:15-cv-131.  To avoid duplicative briefing and to focus their briefing on the issues raised by the SPR Policy, Petitioners incorporate Guardians' arguments, which support Petitioners' First Claim for Relief.  Pls' Am. Compl. ¶¶ 107-116, ECF No. 9.

[3]  Citations to the Administrative Record for the Threatened Rule (ECF No. 107) are indicated by the prefix "GUSG."  Citations to FWS's Administrative Record for the SPR Policy (ECF No. 99) are indicated by the prefix "SPR."

[4]  On March 29, 2017, U.S. District Judge Rosemary Marquez of the District Court of Arizona vacated the Policy nationwide because "[t]he SPR interpretation set forth in the Final SPR Policy impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA."  *Ctr. for Biological Diversity v. Jewell*, No. 14-2506-TUC-RM,

Petitioners also contend that the Services promulgated the Policy in violation of the public notice and comment requirements of the APA, 5 U.S.C. § 553, and Section 4(h) of the ESA, 16 U.S.C. § 1533(h), and request the Court to vacate the Policy on this basis as well.  *See* 5 U.S.C. § 706(2)(D) (reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law").

Last, Petitioners challenge FWS's application of the Policy to the Grouse.  After determining the species was threatened throughout *all* of its (current) range, FWS applied the SPR Policy to ignore the requisite inquiry: whether myriad threats to the Grouse in any (undetermined) *significant portions* of its range render the species endangered.  GUSG0199421 (in accordance with the SPR Policy, "we have determined … that the Gunnison sage-grouse is threatened throughout all of its range, therefore we did not perform an SPR analysis").  "Significant portions" of the Grouse's range may include, *e.g.*, one or more of the six "satellite populations" where the species would have already disappeared were it not for ongoing augmentation with birds translocated from other populations, or the Gunnison Basin, where the species is considered relatively secure but is nevertheless in decline in the face of substantial threats.  FWS may have determined that the species is endangered due to its status in one or more of these portions of its range, but in applying the Policy, blinded itself to this inquiry altogether, thereby compromising the likelihood that the Grouse will secure the entire suite of substantive legal protections that it plainly needs to survive and recover from the threat of extinction, which is the very purpose of the ESA.  *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (hereinafter "*TVA*"); *Coal. for Sustainable Res. v. U.S.*

---

2017 WL 2438327, at *8 (D. Ariz. Mar. 29, 2017) (citation omitted).  The Services have moved Judge Marquez to amend or correct the court's judgment, which is pending. Motion to Amend/Correct Order, No. 14-2506, ECF No. 76.

*Forest Serv.*, 259 F.3d 1244, 1247 (10th Cir. 2001) (citing 16 U.S.C. §§ 1531(b),

1532(3)) ("The Act's ultimate goal is 'conservation,' bringing these species to the point

where legal protections are no longer necessary.").  Thus, Petitioners also challenge the

application of the SPR Policy to the Grouse and request an Order directing FWS to

consider whether the Grouse is endangered in a significant portion of its range while

leaving the Threatened Rule in place.

## Legal Background

### A. The Endangered Species Act

The ESA is the world's strongest biodiversity-protection law.  *See TVA*, 437 U.S.

at 180, 184.  It reflects a considered policy choice to protect species from extinction due

to human activities.  *See*, *e.g.*, Patrick Parenteau, *Rearranging the Deck Chairs:*

*Endangered Species Act Reforms in an Era of Mass Extinction*, 22 Wm. & Mary Envtl.

L. & Pol'y Rev. 227, 227-29 (1998) (summarizing human-driven era of mass extinction).

However, before a declining species is entitled to any of the ESA's protections, it

must be formally designated—or "listed"—as "endangered" or "threatened" by the

Services.  *See* 16 U.S.C. § 1533.[5]  A "species" under the Act is "any subspecies of fish

or wildlife or plants, and any distinct population segment of any species of vertebrate

fish or wildlife which interbreeds when mature."  *Id.* § 1532(16).  An "endangered

species" is one that is "in danger of extinction throughout all or a significant portion of its

range . . . ."  *Id.* § 1532(6).  A "threatened species" is one that "is likely to become an

endangered species within the foreseeable future throughout all or a significant portion

---

[5]  The Secretary of Interior has delegated his authority to FWS to implement the ESA for terrestrial species such as the Grouse, including making listing determinations.  50 C.F.R. § 402.01(b).  The Secretary of Commerce has similarly delegated his authority over marine species to NMFS.  *Id.*

of its range." *Id.* § 1532(20).  The ESA applies substantive legal protections to endangered species, with most but not all of these protections also extended to threatened species.

## B. The ESA Includes Two Classifications for Imperiled Species: Endangered and Threatened.

The inclusion of two classifications for protecting imperiled species, endangered and threatened, is intended to "provide incremental protection to species in varying degrees of danger . . . ."  *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001) (hereinafter "*Defenders (Lizard)*").  Under this two-tiered approach, endangered species receive stricter substantive legal protections than do threatened species, helping to ensure that management accurately accounts for the magnitude of threats that species face.  *Id.*; *see also id.* at 1142 (quoting 120 Cong. Rec. 25,668 (1973) (statement of Sen. Tunney) (noting that this approach provides "the ability not only to protect the last remaining members of the species but to take steps to insure that species which are likely to be threatened with extinction never reach the state of being presently endangered"); *People v. U.S. Fish & Wildlife Serv.*, 57 F. Supp. 3d 1337, 1339-40 (D. Utah 2014) (describing definitions of endangered and threatened), *rev'd on other grounds*, 852 F.3d 990 (10th Cir. 2017).[6]

For example, the Act prohibits any person from importing any endangered species into, or exporting any such species from, the United States or from causing the "take" an endangered species without permission.  16 U.S.C. § 1538(a)(1).  To "take" an endangered species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap,

---

[6]  *See also* Endangered and Threatened Species Listing and Recovery Priority Guidelines, 48 Fed. Reg. 43,098 (Sept. 21, 1983) ("Service Recovery Guidelines") ("It is generally understood that the Degree of Threat is greater for Endangered species than for Threatened species.").

capture, or collect" it "or to attempt to engage in any such conduct."  *Id.* § 1532(19).

The Service "'may,' but is not required to, extend these prohibitions on taking and

export" to threatened species.  *Defs. of Wildlife v. Norton*, 239 F. Supp. 2d 9, 13 (D.D.C.

2001) (hereinafter "*Defenders (Lynx)*") (quoting 16 U.S.C. § 1533(d)), *vacated in part on

other grounds*, 89 F. App'x 273 (D.C. Cir. 2004).

Endangered species also receive priority for the development and

implementation of recovery plans, 16 U.S.C. § 1533(f), which is a species' "basic road

map to recovery, *i.e.*, the process that stops or reverses the decline of a species and

neutralizes threats to its existence."  *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121,

131 (D.D.C. 2001) (citation omitted).  In developing recovery plans, the Service must

"give priority to those endangered or threatened species . . . most likely to benefit from

such plans, particularly those species that are, or may be, in conflict with construction or

other development projects or other forms of economic activity."  16 U.S.C. §

1533(f)(1)(A);  Endangered and Threatened Species Listing and Recovery Priority

Guidelines, 48 Fed. Reg. 43,098, 43,104 (Sept. 21, 1983) ("Service Recovery

Guidelines") ("species with the highest degree of threat have the highest priority for …

recovery plans"); *id.* at 43,101 (Service will first take "emergency" measures or

"minimum survival efforts" to "stabilize [a species'] status and prevent its extinction"

before other recovery measures).

Pursuant to the implementing regulations for Section 7 of the ESA, 16 U.S.C. §

1536(a)(2), the Service is more likely to require stronger conservation measures for, or

to determine that specific federal actions jeopardize the continued existence of,

endangered species, and to develop "reasonable and prudent alternatives" to avoid

jeopardy.  *See* Service Recovery Guidelines, 48 Fed. Reg. at 43,100 (noting "degree-of-

threat" considerations in the context of Section 7 consultations); *see also* FWS & NMFS,

CONSULTATION HANDBOOK 4-37 (1998), https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf ("[i]n determining whether an action is likely to jeopardize the continued existence of a species, the action is viewed against the aggregate effects of everything that has led to the species' current status").

### C. A Species May Be Endangered or Threatened "Throughout All or a Significant Portion of Its Range."

The ESA also includes language to help ensure that imperiled species receive protection before they are threatened with extinction everywhere. *Defenders (Lizard)*, 258 F.3d at 1142. The "endangered" and "threatened" definitions each require the Service to list a species if it is endangered or threatened throughout "all" or "a significant portion of its range." 16 U.S.C. § 1532(6), (20). The "significant-portion" phrase contrasts with two previous species-conservation laws from the late 1960s and early 1970s, which defined "endangered" species narrowly to mean species that were facing worldwide extinction, and which did not protect species that were endangered in a "significant portion of [their] range." *Defenders (Lizard)*, 258 F.3d at 1144; Endangered Species Conservation Act, Pub. L. 91-135 § 3(a), 83 Stat. 275 (Dec. 5, 1969) (endangered species are threatened by "worldwide extinction"); Endangered Species Preservation Act, Pub. L. 89-669 § 1(c), 80 Stat. 926 (Oct. 15, 1966) (endangered species are ones whose "existence is endangered").

But with the enactment of the ESA in 1973, Congress expanded the definitions of "endangered" and "threatened" to include those species that are in danger of extinction throughout all *or* "a significant portion of [their] range." The House Report explained that this was "a significant shift in the definition in existing law which considers a species to be endangered only when it is threatened with worldwide extinction." *Defenders (Lizard)*, 258 F.3d at 1144 (quoting H.R. REP. No. 93-412 (1973) *reprinted in* Cong.

Research Service, A LEGISLATIVE HISTORY OF THE ENDANGERED SPECIES ACT OF 1973 (1982)

Accordingly, the Service must review the species' status, 16 U.S.C. § 1533(b)(1)(A), weigh threats pursuant to five statutory listing factors, *id.* § 1533(a)(1), and apply the "best scientific and commercial data available," *id.* § 1533(b)(1)(A), to determine whether a species is "endangered" or "threatened" due to threats to the species in "all" or a "significant portion of its range."  *See id.* (incorporating by reference § 1532(6), (20));  SPR000079 (Draft Policy on Interpretation of the Phrase "Significant Portion of Its Range," 76 Fed. Reg. 76,987, 76,995 (Dec. 9, 2011) ("Draft SPR Policy") (ESA has "four discrete bases, or categories, for listing"); *Defenders (Lizard)*, 258 F.3d at 1142 ("When interpreting a statute, we must follow a 'natural reading . . . , which would give effect to *all* of [the statute's] provisions.'") (emphasis and alteration in original) (citation omitted), *accord*, *Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1039 (10th Cir. 2006), *cert. denied,* 550 U.S. 993 (2007).

### D.  Standard of Review

The APA supplies the standard for judicial review of ESA listing determinations. *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998); *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 183 F. Supp. 3d 1137, 1144 (D. Colo. 2016) (citing 5 U.S.C. § 706 and quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)) (the Court's task is "to apply the appropriate APA standard of review . . . based on the record the agency presents to the reviewing court").  Thus, the reviewing court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

When addressing an agency's interpretation of a law that it administers, courts apply the standard of review in APA section 706(2)(C), which directs courts to set aside agency actions that are taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).  Under this provision, "an essential function of our review under the APA is determining whether an agency acted within the scope of its authority."  *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015) (citation omitted).  In addition, courts apply the analysis in *Chevron*.  *Id.* Under "*Chevron* Step I," if "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43.  Under Step I, no deference is due to the agency's interpretation.  *See HRI, Inc. v. Envtl. Prot. Agency*, 198 F.3d 1224, 1241 (10th Cir. 2000) (citations omitted) ("If [the agency's] action represents a direct violation of statutory terms that are not ambiguous, the action is of course 'not in accordance with the law' and entitled to no deference.").

Only if the statute is ambiguous on the pertinent issue should the Court reach "*Chevron* Step II" and ask "whether the agency's answer is based on a permissible construction of the statute."  *Chevron,* 467 U.S. at 843.  At Step II, although the Court cannot impose its own statutory construction, it "will not defer to an agency's construction" if it is "manifestly contrary" to the statutory scheme.  *United Keetoowah Band of Cherokee Indians of Okla. v. Dep't of Hous. & Urban Dev.*, 567 F.3d 1235, 1240 (10th Cir. 2009).  At *Chevron* Step II, the Tenth Circuit Court of Appeals applies the standard of review found in section 706(2)(A) of the APA, which provides that an agency's interpretation is permissible so long as it "is not 'arbitrary, capricious, or manifestly contrary to the statute.'"  *WildEarth Guardians*, 784 F.3d at 685 (quoting *Chevron*, 467 U.S. at 843-44).

Rulemakings are also governed by the APA, which (in addition to the standards of review discussed above) requires an agency to provide notice of, and an opportunity to comment on, proposed rules.  5 U.S.C. § 553.  Section 4(h) of the ESA extends the APA's notice-and-comment procedures to the Services' adoption of any guidelines for making listing determinations.  16 U.S.C. § 1533(h); *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1142 (9th Cir. 2007) ("In substance, the formality § 1533(h) requires for policy statements is indistinguishable from notice-and-comment rulemaking under the APA.").  An agency's final rule also must be a "logical outgrowth" of the proposed rule.  *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 639 (10th Cir. 1985).

## FACTUAL BACKGROUND

### A. The Gunnison Sage-Grouse

The Grouse's habitat has been decimated by human activities and the species now occupies only 12 percent of its historic range.  GUSG0022597 (Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species; Proposed Rule, 75 Fed. Reg. 59,804, 59,808 (proposed Sept. 28, 2010) (to be codified at 50 U.S.C §17.11(h)); *see also* Exhibit ("Ex.") A (depiction of historic and current ranges).[7]  This decline is from habitat loss and degradation from human activities including agriculture, residential and commercial development, energy exploration and development, road and transmission line construction, livestock grazing, outdoor recreation, off-road vehicle use, dam construction, the disruption of natural fire ecology, and climate change.  GUSG0199416  ("Habitat fragmentation resulting from human development patterns is especially detrimental to Gunnison sage-grouse . . . .").  These threats

---

[7]  *But see* GUSG0199412 (Threatened Rule) ("the species' current range represents about 8.5 percent of its historical range"); GUSG0069994 (Grouse "currently occupy approximately . . . 7 percent of the species' potential historic range").

compound in accumulation, and have driven not only declines in the Grouse's habitat and range, but also declines in its abundance where it still persists.  GUSG0070033 ("Many of the threats described in this finding may cumulatively or synergistically impact [the Grouse] beyond the scope of each individual threat.").

Today, there are only seven isolated Grouse populations left scattered throughout southwestern Colorado and a sliver of southeastern Utah.  GUSG0199401-09.  Six of these populations, the so-called "satellite populations," are in steep decline, and nearly all persist only due to ongoing active management and augmentation with translocated birds, an effort which is not likely to save these populations from extirpation in the long-term.  GUSG0070016-17 (discussing translocation efforts); GUSG0070029 (predicting extirpation of satellite populations); GUSG0199416 ("The overall declining status of several of the satellite populations (despite translocation/augmentation efforts) does not support the idea that the species is capable of persisting at low levels or in isolated conditions.").

One population—the Gunnison Basin population—accounts for 84 percent of the species' total population and 63 percent of its occupied habitat.  GUSG0199496.  But even this population is in decline and may be lost within 31 years.  GUSG0199501-02. Even assuming it is stable, its "survival . . . alone would be insufficient to ensure the species' long-term persistence in the face of ongoing and future threats . . . ." GUSG0199413.  The second-largest population, San Miguel, is "steeply declining," GUSG0199501, and faces a "high probability" of loss in the next 30 years. GUSG0199502.  It totals only about 206 birds across six subpopulations, and FWS predicts it will be lost due to residential development, oil and gas drilling, and roads and power lines.  GUSG0199424, 0199442, 0199448, 0199450, 0199463.

FWS dragged its feet for over 14 years before it finally protected the Grouse as "threatened" in November 2014.  FWS first designated the Grouse as a "candidate" for ESA protection in 2000, and drafted multiple versions of an "endangered" rule in 2005. *See Cty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 76 (D.D.C. 2008) (describing multiple drafts of endangered rule).  But for a decade, FWS did not make a final listing determination even as it acknowledged the species' precarious status. GUSG0070034 (describing imminence and high magnitude of threats to the Grouse). The agency's foot-dragging lead to lawsuits from conservation organizations, until finally, after being forced to action under a 2011 settlement agreement, GUSG0069987, FWS issued the Threatened Rule in November 2014.[8]

Before it finally listed the Grouse as threatened, in January 2013 FWS proposed to list the species as "endangered" due to threats to the species "throughout all of its range."  GUSG0069994.  As FWS noted then, only the Gunnison Basin population was even remotely viable by that time, GUSG0069987—and is in fact, in decline, GUSG41438—and the satellite populations are on the brink of extirpation. GUSG0070010; GUSG0070030.

The Grouse's status—its range, habitat conditions, and abundance—did not improve between January 2013, when FWS issued the Endangered Proposal, and

---

[8]  *Am. Lands All. v. Norton*, 242 F. Supp. 2d 1, 11 (D.D.C. 2003) (hereinafter "*ALA v. Norton I*") ("[T]he defendants have placed the [Grouse] on their internal candidate list, where it has remained in a virtual 'black-hole' with no action having been taken."), *vac'd in part on reconsideration*, 360 F. Supp. 2d 1 (D.D.C. 2003); Stipulated Settlement Agreement, *Am. Lands All. v. Norton*, No. 04-434-RBW (D.D.C. Nov. 14, 2005), at ECF No. 50 (settlement agreement requiring FWS to publish a new listing determination for the Grouse); Stipulated Settlement Agreement & Order, *Cty. of San Miguel v. Kempthorne*, No. 06-1946-RBW (D.D.C. Aug. 19, 2009), ECF No. Dkt. 69 (settlement agreement forcing FWS to withraw "not warranted" listing determination for the Grouse); Order Granting Joint Motion for Approval of Settlement Agreement, *In Re Endangered Species Act Deadline Litigation*, No. 10-377-EGS, (D.D.C. Sept. 9, 2011), ECF No. 55 (requiring timeline for proposed and final rules for listing and critical habitat).

November 2014, when it issued the Threatened Rule.  To the contrary, in the Threatened Rule FWS implicitly acknowledged that the species may be lost within 31 years.  GUSG0199501.  No birds were counted in 2013 for the smallest satellite population, the Poncha Pass population, which now persists only due to active translocation efforts.  GUSG0199406.

Rather, what occurred during the time between the Endangered Proposal and the Threatened Rule is that residential and commercial developers (represented by their state and county governments), electric companies, livestock grazers, and others— perhaps having become complacent after years of FWS foot-dragging on an ESA listing determination for the Grouse—organized in adamant opposition to any ESA protection for the Grouse whatsoever.  *E.g.*, GUSG0075477, GUSG0074926 (comments of oil and gas industry opposing listing); GUSG0229780, GUSG0200769 (electricity providers opposing listing); Gunnison County residential development projections); GUSG0096067; GUSG0076995 (livestock ranchers opposing ESA listing); GUSG0094326 (Colorado Gov. Hickenlooper opposing ESA protection for the Grouse).

Then, in late 2012, weeks before FWS issued the Endangered Proposal, then-Secretary of Interior Ken Salazar (a political appointee from Colorado) directed FWS to "figure out how to get the Gunnison sage grouse from endangered . . . down to threatened status prior to the final rule."  Ex. B (Email from H. Bell to D. Smith, *et al.* (Nov. 14, 2012) ("Bell Emails")).  With an enforceable deadline of September 30, 2013, looming for issuance of the final listing determination for the Grouse, *supra* note 8, GUSG0072297, FWS biologists questioned whether they could meet Secretary

Salazar's demand, as such "[s]hort time frames with high political stakes are not helpful to strong science."  Ex. B (Email from N. Allen to H. Bell, *et al.* (Nov. 14, 2012)).[9]

Shortly thereafter, in January 2013, FWS issued the Endangered Proposal and throughout 2013, extended multiple rounds of public comment.  GUSG0072800; GUSG0236090.  After taking multiple extensions in the deadline for the final rule, *e.g.*, GUSG0095284, FWS issued the Final Rule in November 2014, and reduced the species' status from "endangered" to "threatened."  GUSG0199399.  In doing so, FWS did not emphasize any particular improvement in the Grouse's status, but simply reconfigured the same set of facts to lead to a "threatened" determination, and suggested a forthcoming "special rule" that would exempt threats from the ESA section 9 "take" prohibition.  GUSG0199401 (FWS "continue[s] to evaluate the potential for issuing a section 4(d) rule").[10]

Yet, in reducing the Grouse to threatened status, FWS did not analyze whether the species should be listed as *endangered*—and, hence, fully protected as endangered rangewide—due to threats in *a significant portion of its range*, such as all or some of the satellite populations, or in the Gunnison Basin.  In avoiding this inquiry, FWS applied the

---

[9]  The Bell Emails were omitted from FWS's Administrative Record for the Gunnison sage-grouse that the agency filed in these consolidated matters.  *See* Decl. of Amy R. Atwood at ¶ 5 ("I first became aware of this document in January 2017, after receiving it from a colleague who is counsel for the Center in the Rio Grande cutthroat trout case."). Counsel for the Federal Respondents agreed to add the Bell Emails to the Administrative Record.  *Id.* ¶ 6.  The parties agreed that Petitioners may attach the Bell Emails to their brief rather than for the Federal Respondents to re-produce the full Administrative Record with Bates numbering for the Bell Emails.  *Id.* ¶ 7.

[10]  *See also* GUSG0073641 (FWS biologist advising rancher that "a threatened determination would allow for what are called 'special rules' ([ESA] section 4d) that may provide more management flexibility and, in some cases, exceptions from the 'take' prohibition"); GUSG0179453 ("A 4(d) rule could substantially reduce the opposition of many local landowners to the listing.").  FWS has drafted a proposed 4(d) rule that would exempt categories of threats to the Grouse, including agriculture, livestock grazing, and development.  GUSG0127435, GUSG0127460-66; GUSG0143517.

Final SPR Policy, which the Services had issued just a few months before.
SPR000074.

### B. The "Significant Portion of Its Range" Policy

Although the ESA's definitions of "endangered species" and "threatened species" have been part of the Act since its enactment in 1973, "prior to 2007 neither agency had adopted a regulation or binding policy defining or explaining the application of the "significant portion of its range" language," an element common to both definitions. SPR000002; 16 U.S.C. § 1532(6), (20).  For 34 years, the Services implemented the Act and made hundreds of listing determinations without ever adopting a binding interpretation of this particular statutory language.  The language was applied through case-by-case application to listing determinations and judicial review.

This began to change with the Ninth Circuit's 2001 decision in *Defenders v. Norton*.  *Defenders (Lizard)*, 258 F.3d at 1141-46.  There, environmental plaintiffs sought endangered or threatened status for the flat-tailed horned lizard, which had been lost from 34 percent of its historic range.  *Id.* at 1138; Withdrawal of the Proposed Rule to List the Flat-Tailed Horned Lizard as Threatened, 62 Fed. Reg. 37,852 (July 15, 1997).  FWS decided the lizard did not warrant listing as threatened, but it did not explicitly consider whether the species was endangered or threatened in a significant portion of its range.  *See generally Defenders (Lizard)*, 258 F.3d 1136.  FWS claimed that the phrase meant that a species was eligible for protection applying the phrase only if the species "face[d] threats in enough key portions of its range that the *entire species is in danger of extinction, or will be within the foreseeable future.*"  *Id.* at 1141 (emphasis in original).  The Service assumed that a species could be "in danger of extinction in 'a significant portion of its range' only if it is in danger of extinction everywhere."  *Id.*  The Ninth Circuit rejected this interpretation.  As the ESA already provides for listing a

species "throughout all" of its range, interpreting the SPR language to mean the same thing rendered it superfluous. *Id.* at 1142 (finding that FWS's "interpretation thus conflates the distinct ESA protections for species facing extinction throughout 'all' and throughout 'a significant portion' of their range with the separate protections for 'threatened' and for 'endangered species'" and "[a]s such, say[s] the same thing twice.").

Following this ruling, federal courts around the country vacated a host of listing determinations where FWS completely failed to consider whether species faced threats in a significant portion of their range at all, or where FWS did so unlawfully.[11]  To address these court decisions, and to attempt to gain judicial deference for their legal interpretations of the SPR language and its application to listing determinations, the Services set about developing a formal policy for interpreting the phrase, invoking the rulemaking provisions of the APA.  SPR000001; SPR000016.[12]

---

[11]   *See Defenders (Lynx)*, 239 F. Supp. 2d at 19 ("[FWS's] focus on only one region of the Lynx's population—the Northern Rockies/Cascades—to the exclusion of the remaining three-quarters of the Lynx's historical regions, is antithetical to the ESA's broad purpose to protect endangered and threatened species"); *Sw. Ctr. for Biological Diversity v. Norton*, No. 98-934-RMU, 2002 WL 1733618 (D.D.C. July 29, 2002) (magistrate's recommendation) (FWS's decision that the Queen Charlotte goshawk was not threatened or endangered on the Queen Charlotte Islands was unreasonable), *adopted in rel. part*, slip op. (D.D.C. May 24, 2004); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005) (vacating and remanding final rule reclassifying the gray wolf as threatened due to rule's limitation of the significant portion of the wolf's range to only those "areas that ensure the validity of the DPS"); *Defs. of Wildlife v. Sec'y, U.S. Dept. of the Interior*, 354 F. Supp. 2d 1156, 1167-69 (D. Or. 2005) (rejecting and remanding reclassification of gray wolf, where rule limited the wolf's SPR to core areas that would ensure viability); *Ctr. for Biological Diversity v. Kempthorne*, No. 06-4186-WHA, 2007 WL 163244, *9-10 (N.D. Cal. Jan. 19, 2007) (vacating and remanding negative listing determination where FWS failed to assess whether two species were in danger of extinction in a significant portion of their range).

[12]   In 2007, a few years before the Draft SPR Policy, the Department of Interior Solicitor issued a Memorandum Opinion—called the "M-Opinion"—to provide a uniform interpretation of the SPR language.  SPR000427. District courts subsequently held that the M-Opinion unlawfully allowed species determined to be endangered or threatened in a significant portion of their ranges to be protected only in those portions of their ranges where they were found to be imperiled, and FWS withdrew the M-Opinion. *Defs. of*

In 2011, the Services released the Draft SPR Policy, which defined a portion of a species' range to be "significant" if it "is so important to the species that its hypothetical loss would render the species endangered rangewide." SPR000008; SPR000009 ("under this draft policy we ask whether the species would be in danger of extinction everywhere without that portion, *i.e.*, if that portion were completely extirpated"). In rationalizing this "high threshold" for significance, the Services noted a likelihood of "much overlap among these four categories." SPR000010. This included "simultaneous" determinations, such as species that "appear[ ] to have the status of 'endangered' in a significant portion of its range and also to have the status of 'threatened' throughout [their] entire range." *Id.* While this could be "confusing to the public or to biologists conducting status evaluations," the Services nonetheless concluded that "in practice it will not be a significant hurdle to implementing our draft policy" and in any event, "a species should be afforded, at the rangewide level, the highest level of protection for which the best available science indicates it is qualified in any significant portion of its range." *Id; see also id.* ("Therefore, if a species is determined to be endangered in an SPR, under this draft policy, the species would be listed as endangered throughout all of its range, even in situations where the facts simultaneously support a determination that the species is threatened throughout all of its range.").

Accordingly, the Services proposed that they would analyze a species' status as follows:

> [t]he first step ... would be to determine the status of the species in *all of its range.* If we determined that the species is in danger of extinction throughout all of its range, we would list the species as an endangered species, and no SPR analysis would be required. If

*Wildlife v. Salazar,* 729 F. Supp. 2d 1207 (D. Mont. 2010); *WildEarth Guardians* v. *Salazar,* No. 09-574-PHX-FJM, 2010 WL 3895682 (D. Ariz. Sept. 30, 2010).

> the species was *threatened* throughout all of its range, *we would limit our SPR analysis to the question of whether the species is in danger of extinction in a significant portion of its range; if so, we would list the species as endangered*; if not, we would list the species as threatened.  If the species was neither endangered nor threatened throughout all of its range, we would determine whether the species was endangered or threatened in a significant portion of its range; if so, we would list the species as endangered or threatened, respectively; if not, we would conclude that listing the species is not warranted.

SPR000016 (emphasis added).  Under this approach, if the Services found a species to be endangered throughout its range, that would be the end of the matter; the species would be listed as endangered.  If the Service found the species to be threatened throughout its range, it would still consider whether the species was endangered in an SPR, and if so, the species would be protected as endangered.  And if a species was neither endangered nor threatened throughout its range, then the Services would analyze whether is the species is endangered or threatened in an SPR, and if so, would list the species as endangered or threatened accordingly.  *Id.*

Yet, in the Final Policy, the Services changed course in a few substantive—and fundamentally different—ways.  SPR000074.  First, FWS purported to "lower the [significance] threshold" with a new definition—*i.e.*, that "[a] portion of the range of a species is 'significant' if . . . the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range," SPR000075—still a "relatively high" standard.  SPR000076.[13]

Second, and directly pertinent here, the Services took a radically different

---

[13]  As Judge Marquez found, the revised standard still "impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA.  Accordingly, it is not a permissible administrative construction of the ESA's SPR language," and thus is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ctr. for Biological Diversity v. Jewell*, No. 14-2605-TUC-RM, 2017 WL 2438327, at *8 (D. Ariz. Mar. 28, 2017).

approach from their proposal.  The SPR Policy announced, for the first time, that if a species is *threatened* throughout *all* of its range, *then that is the end of the analysis*, and the Services will *not* separately consider whether the species is *endangered* in a *significant portion of its range*.  SPR000082.  The Services made this change—which was not set forth in the Draft SPR Policy—to appease states who complained that "the more flexible threatened listing" should be favored over an endangered listing, because listing a threatened-throughout-its-range species as endangered (in an SPR) would be "undesirable overregulation that would produce needless economic dislocation." SPR000096.  Yet, aware that this change actually provided species with *less* protection than did the Draft SPR Policy, the Services claimed that the scenario encompassed by this change would be "relatively uncommon" and would "in no circumstances . . . lead to a reduction in protections" since the Services could extend the same protections to threatened species as are extended to endangered species.  SPR000078.

The Services also attempted to justify the change from the Draft SPR Policy on the basis that it would be "extremely confusing" if a species were both threatened throughout its range and endangered in an SPR—a rationale that the Services had explicitly rejected in the Draft SPR Policy.  SPR000010 ("while partial overlap among categories could potentially be confusing to the public or to biologists conducting status reviews, we conclude that in practice it will not be a significant hurdle to implementing our draft policy").  The Services also claimed that the new provision would "reduce the circumstances in which additional legal determinations are necessary," facilitating the "efficient[ ] use [of] limited resources."  SPR000078.

The Services publicly announced this approach, for the first time, in the Final SPR Policy, and provided no opportunity for public comment on it.  And despite the Services' assurances that its use would be "relatively uncommon," SPR000078, FWS

applied it to the Grouse just four months later.  GUSG0199421.[14]

## ARGUMENT

**I.**  **THE SPR POLICY IS MANIFESTLY CONTRARY TO AND INCONSISTENT WITH THE ESA.**

**A. The SPR Policy Violates the ESA's Plain Language, Fails Under the APA and *Chevron* Step I, and Must Be Vacated Because It Allows the Services to Forego Any Analysis of Whether a Species is Endangered in an SPR So Long As it is Threatened Throughout All of Its Range.**

An agency's interpretation of a statute must fail when it contravenes the "unambiguous expressed intent of Congress." *Chevron*, 467 U.S. at 842–43 (establishing "*Chevron* Step I").  Here, the intent of Congress is clear:  as the Services concede, the plain language of the ESA unambiguously requires "four discrete bases, or categories, for listing." *See, e.g.*, SPR00009 (a species may be "endangered throughout all of its range; threatened throughout all of its range; endangered in a significant portion of its range; or threatened in a significant portion of its range"). Despite this, the Final SPR Policy eviscerates any potential that the Services will ever consider one of these bases, *i.e.*, whether a species is "in danger of extinction throughout all *or a significant portion of its range*" 16 U.S.C. § 1532(6) (emphasis added), as long as it is found to be threatened throughout all of its range.  Thus, when applying "traditional tools of statutory construction" to the Policy, *see Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016) (citation omitted)—including an examination of the ESA's plain text, structure, purpose, and history, *id.* at 1298 (citation omitted)—and "giv[ing] effect . . . to every word

---

[14]  The Services have applied this provision of the Final SPR Policy to at least 14 other species that are now listed as threatened.  Greenwald Dec. at ¶ 7.  The Center and others are challenging FWS's application of the SPR Policy to the northern long-eared bat, as well as FWS's 4(d) rule for the bat, in the U.S. District Court for the District of Columbia.  *See Ctr. for Biological Diversity v. Kurth*, No. 1:16-cv-00910-EGS (D.D.C. 2015).

Congress used," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (citation omitted),

the inescapable conclusion is that the Services acted outside of their authority in

interpreting the clear statutory definitions of endangered and threatened.  *See WildEarth*

*Guardians*, 784 F.3d at 683.  Accordingly, "that is the end of the matter," *Chevron*, 467

U.S. at 842–43, and the SPR Policy must be vacated because it is "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §

706(2)(C); *WildEarth Guardians,* 784 F.3d at 683; *N.M. Cattle Growers Ass'n v. U.S.*

*Fish & Wildlife Serv.*, 248 F.3d 1277, 1281–82 (10th Cir. 2001) (citations omitted).[15]

The text of the ESA plainly and unambiguously requires the Services to assess

whether a species is "endangered" in a "significant portion of its range."  It states that

the Services "shall" make listing determinations for endangered and threatened species,

16 U.S.C. § 1533(a)(1), by considering whether a species is 'in danger of extinction

throughout all *or* a significant portion of its range," or whether it is 'likely to become an

endangered species within the foreseeable future throughout all *or* a significant portion

of its range[.]"  *Id.* § 1532(6), (20) (definitions of "endangered" and "threatened")

(emphases added).  By using the conjunction "or," Congress gave words "separate

meanings," *United States v. Woods*, 134 S. Ct. 557, 567 (2013) (citation omitted); *cf.*

*Ctr. for Biological Diversity v. Jewell*, No. 14-02506-TUC-RM, 2017 WL 2438327, at *8

(D. Ariz. Mar. 28, 2017).  The Services cannot reinterpret the statute to circumvent the

clear intent of Congress.  *Ctr. for Biological Diversity v. Jewell*, 2017 WL 2438327, at *8

---

[15]  Petitioners have Art. III standing to bring this action.  *See Friends of the Earth, Inc. v.
Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000); *Hunt v. Wash. State
Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977).  *See* Decls. of Noah Greenwald,
Taylor McKinnon, James Woods, Erik Molvar, Jonathan Ratner, and David Becker.

(vacating SPR Policy as Final SPR Policy impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA.").[16]

Rather than "clarifying" Congress' intent (as the Services will likely claim), the SPR Policy categorically *eliminates* from consideration altogether the question of whether a species is endangered in a significant portion of its range, as long as the Service first determines that the species is threatened throughout its range. *See, e.g.*, SPR000010 ("the best available scientific and commercial information may simultaneously support determinations that a species appears to have the status of 'endangered' in a [SPR] and also to have the status of 'threatened' throughout its range."). The Services admit that "a species should be afforded, at the rangewide level, the highest level of protection for which the best available science indicates it is qualified in any significant portion of its range," SPR000010, but under the Policy, a species that qualifies as "endangered" in a SPR, simply because it *also* qualifies as threatened throughout its range, would never receive the highest level of protection. Species that are by definition at *greater* risk of extinction will receive *less* protection.

Even were the Services to progress beyond a determination that a species is threatened throughout all of its range to the question of whether it is endangered in a significant portion of its range, because the Services have set the threshold for "significant" in the Policy so high (despite the Ninth Circuit's admonition in *Defenders (Lizard)*), an entire species would have to be at risk throughout its range for the Service to protect a species due to its status in an SPR at all. *See* SPR000106 ("[a] portion of the range of a species is 'significant' if . . . the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be

---

[16]  *See also Hanover Bank v. Comm'r of Internal Revenue*, 369 U.S. 672, 687 (1962) ("[W]e are not at liberty . . . to add to or alter the words employed to effect a purpose which does not appear on the face of the statute.").

in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range"); *Ctr. for Biological Diversity v. Jewell*, 2017 WL 2438327, at *8 (citation omitted) ("[t]he SPR interpretation set forth in the Final SPR Policy impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA.").  This flaw, when considered in light of the Policy's foreclosure against considering whether a species is endangered in a significant portion of its range (so long as it first finds it to be threatened throughout all of its range), further underscores the failure of the Final Policy fails to maintain four independent bases for listing a species under the ESA. SPR000079 (ESA has "four discrete bases, or categories, for listing").[17]

With such a diametric contradiction between the words of the ESA and the Services' interpretation of them, the Court's analysis should end here, as "the [ESA]'s language is plain" and "the sole function of the courts can only be to enforce it according to its terms."  *United States v. Adame-Orozco,* 607 F.3d 647, 652 (10th Cir. 2010) (citations and internal quotation marks omitted).[18]  Yet the Service's fatally flawed interpretation is also refuted by the legislative history of the Act.  *See Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1180 (10th Cir. 2005) (*citing Chevron*, 467 U.S. at 842-843, 843 n.9 respectively) ("To determine whether Congress had an intent on the

---

[17]  The Services all but acknowledge this flaw.  *See* SPR000076 (the threshold for "significance" in the final SPR Policy for relevant portions of the range to be considered is "relatively high," and as a result, the Services anticipate that "listings dependent on an SPR determination still will be infrequent").

[18]  While courts have observed that the phrase "significant portion of its range" is ambiguous*, see Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 128–29 (D.D.C. 2014) (discussing prior court decisions), the ultimate meaning of the phrase itself is not at issue here.  Rather, this case concerns the Services' unlawful policy choice to avoid any consideration of whether a species is endangered in a significant portion of its range, as long as they find a species to be threatened throughout its range, which renders one of the four discrete bases for listing a species superfluous.  *Nutraceutical Corp.*, 459 F.3d at 1034 ("The rule against surplusage encourages courts to give meaning to every word used in a statute to realize congressional intent.").

precise question at issue, courts utilize the traditional tools of statutory construction, including the statutory language and legislative history.").

When Congress enacted the ESA in 1973, one of the most significant changes it made was to expand the definitions of "endangered species" and "threatened species." The two previous species-conservation laws defined endangered narrowly, to include "only those species facing total extinction." *Defenders (Lynx)*, 239 F. Supp. 2d at 19 (citations omitted).[19] Congress explicitly added the "significant portion of its range" phrase to enable the Services to act sooner to protect a species from extinction, rather than having to wait until it is threatened with extinction worldwide. The phrase was "a significant shift in the definition of the existing law which considers a species to be endangered only when it is threatened with worldwide extinction." H.R. REP. No. 93-412 (1973) *reprinted in* Cong. Research Service, A LEGISLATIVE HISTORY OF THE ENDANGERED SPECIES ACT OF 1973, at 149 (1982); *Defenders (Lizard)*, 258 F.3d at 1144 (quoting H.R. REP. No. 93-412 (1973)). As this legislative history shows, Congress intended that there be two independent bases for listing species as endangered: its endangered status rangewide, or its endangered status in a significant portion of that range. Because the SPR policy renders a portion of the "endangered species" definition superfluous, it fails at *Chevron* Step I. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2002) (citations and internal quotation marks omitted) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word should be superfluous, void, or insignificant.").

---

[19]  Endangered Species Conservation Act, Pub. L. 91-135 § 3(a), 83 Stat. 275 (Dec. 5, 1969) (endangered species are threatened by "worldwide extinction"); Endangered Species Preservation Act, Pub. L. 89-669 § 1(c), 80 Stat. 926 (Oct. 15, 1966).

None of the Services' stated rationales justifies their policy choice to foreclose any analysis of whether a species is endangered in a significant portion of its range wherever it is at least threatened throughout its range.  For instance, the Services assert that by "plac[ing] the 'all' language *before* the SPR phrase" in the definitions of endangered and threatened species, "Congress intended that an analysis based on ... the entire range should receive *primary* focus," and "that the agencies should do an SPR analysis ... *only if necessary*."  SPR000077 (emphasis added).  The Services would seek to invent a new canon of statutory interpretation, as no such canon exists.

Rather, courts regularly apply the canons that "'shall' means shall," *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999), *as amended on denial of reh'g*, 784 F.3d 677 (10th Cir. 2015), and "or means or," as well as the canon forbidding surplusage.  *Defenders (Lizard)*, 258 F.3d at 1142; *Defenders (Lynx)*, 239 F. Supp. 2d at 16 n.10 ("Because the Court concludes that FWS misinterpreted ESA's statutory scheme, it owes the Secretary's interpretation no deference under *Chevron . . . .*") (citations and internal quotation marks omitted); *Nutraceutical Corp.*, 459 F.3d at 1039 ("The rule against surplusage encourages courts to give meaning to every word used in a statute to realize congressional intent."); *Ctr. for Biological Diversity v. Jewell*, 2017 WL 2438327 at *8 ("[t]he SPR interpretation set forth in the Final SPR Policy impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA.").

For the foregoing reasons, the SPR Policy violates the plain meaning of the ESA, fails under *Chevron* Step I, and must be set aside under the APA.  *WildEarth Guardians*, 784 F.3d at 683; *Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d

1236, 1240 (D. Colo. 2011) (citation omitted) ("[W]hen a rule has been found to be legally invalid, the ordinary result is vacatur.").[20]

**B. Even if the Phrase "Or In A Significant Portion of Its Range" Is Considered Ambiguous, the SPR Policy is Based on an Impermissible Construction of the ESA and Cannot Survive Scrutiny Under *Chevron* Step II.**

Even if the Act's use of "or in a significant portion of its range" as an independent basis for listing were considered ambiguous, the Service's interpretation of the SPR phrase in the Policy is not based on a permissible construction of the ESA. Accordingly, it warrants no judicial deference and must be found to be "arbitrary, capricious" and "manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44 (detailing the analysis of an ambiguous statute—known as "*Chevron* Step II"); *see also Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1148 (10th Cir. 2013); *WildEarth Guardians*, 784 F.3d at 685 (citation omitted) (court must reject agency interpretation that fails to consider the "statutory language in context" and "effectuate[ ] the intent of Congress").

The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). Agencies must use "all methods and procedures . .

---

[20] Since Judge Marquez issued her decision in *Ctr. for Biological Diversity v. Jewell*, WL 2438327, FWS has moved the court to limit the reach of her ruling to the species at issue in that case (the cactus ferruginous pygmy owl), in part so that this Court may decide the SPR Policy issue that is presented here. *See* Fed. Defs.' Mot. to Alter or Amend Court's J., *Ctr. for Biological Diversity v. Zinke,* No. 14-2506-RM (D.Ariz. April 26, 2017), ECF No. 76 (objecting to nationwide vacatur so that other district courts may decide challenges to the Policy). To "avoid future redundant and duplicative litigation," this Court should also set aside the Policy in its entirety. 5 U.S.C. § 706(2)(C) (a "reviewing court shall … hold unlawful and set aside agency action found to be … in excess of statutory jurisdiction, authority, limitations, or short of statutory right."); *cf. Am. Lands All. v. Norton*, No. 00-2239, 2004 WL 3246687, at *3 (D.D.C. June 2, 2004) (citation omitted) (enjoining offending policy to "avoid future redundant and duplicative litigation").

. necessary to bring any endangered species or threatened species to the point at which the measures provided [by the ESA] are no longer necessary." *Id.* §§ 1532(3), 1536(a)(1).  As the Supreme Court has elaborated, the ESA's purpose is to "to halt and reverse the trend toward species extinction, whatever the cost.  This [purpose] is reflected not only in the stated policies of the Act, but in literally every section of the statute." *TVA*, 437 U.S. at 184.  The ESA also explicitly limits FWS to making listing determinations solely on the basis of the best available scientific and commercial data and the five listing factors.  16 U.S.C. § 1533(a)(1), (b)(1)(A); 50 C.F.R. § 424.11(b); *see also* Amended Procedures to Comply with the 1982 Amendments to the Endangered Species Act, 49 Fed. Reg. 38,900 (Oct. 1, 1984) (explaining "[c]hanges made by the 1982 Amendments were designed to ensure that decisions in every phase of the listing process are based *solely* on biological considerations") (emphasis in original).

Thus, the SPR Policy must also be rejected at Step II because it is based on considerations Congress did not intend for the Services to consider when making listing determinations.  Ignoring the conservation purpose of the ESA and its heavy emphasis on science-based listing determination, the Services contend that "limiting the applicability of the SPR language [would] reduce the circumstances in which additional legal determinations are necessary," allowing the Services "to more efficiently use [their] limited resources . . . ."  SPR000078.  The Services also implicitly blessed the policy objective of management flexibility, in effect adopting the policy recommendations of industry and state commenters who complained "that it was inappropriate to protect the entire range of a species as endangered if the species, viewed rangewide, met the definition of a 'threatened species.'"  SPR000076; SPR044724-28 (comments of CropLife America); SPR001126 (comments of National Mining Association).

Yet, the Supreme Court has noted that "the plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, *whatever the cost*," *TVA*, 437 U.S. at 184 (emphasis added), and many courts have rejected such a rationale in addressing FWS's concerns about limited resources to comply with Section 4. *See*, *e.g.*, *Forest Guardians v. Babbitt*, 174 F.3d at 1184 (holding that "resource limitations can[not] justify the Secretary's failure to comply with mandatory, non-discretionary duties imposed by the ESA"); *cf. Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency*, No. 14-1036, 2017 WL 2818634, at *13 n.10 (D.C. Cir. June 30, 2017) (citations omitted) ("an agency may not duck its consultation requirement, whether based on limited resources, agency priorities or otherwise").  In reviewing an argument by FWS that it could avoid its mandatory duties under Section 4 with respect to the Grouse by invoking an policy that was based in part on the need to maximize agency resources, Judge Reggie Walton of the U.S. District Court for the District of Columbia rejected this argument, stating that "it is beyond th[e] Court's authority to excuse congressional mandates for budgetary reasons."  *ALA v. Norton I*, 242 F. Supp. 2d at 18.

Even if this were a valid basis for policies implementing Section 4 of the ESA, the Services have provided no support in the Policy or Administrative Record for their assertion that they have such limited resources that they cannot designate species that qualify as "endangered" as such, let alone provided any support (factual or legal) that the complete evisceration of one of the four discrete bases for classifying species under the Act would be an effective remedy to this problem.  Moreover, had they provided such support, they still have not explained why limited resources should not be prioritized for species which are most at risk of extinction, *i.e.*, "endangered" species.

In short, the ESA simply does not contemplate such a skewed interpretation of the law to preserve management flexibility or to avoid "over-regulation."  Expending agency resources to regulate based on an SPR is not wasteful; to the contrary, expending resources to protect species at imminent risk of extinction is the ESA's clear statutory directive.  *TVA*, 437 U.S. at 174 ("[T]he language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.").  Nowhere in the ESA's text, history, or purpose does the Act contemplate taking into account the regulatory burden that a classification of "endangered" may have, or direct the Service to consider whether it would be a better use of resources to list a species as threatened rather than endangered, let alone render these predominant considerations on which to base agency policy.[21]

Finally, the Services further contend—for the first time in the Final SPR Policy—that it would be "confusing" if a species was both "threatened" (based on its rangewide status) and "endangered" (based on its status in an SPR).  SPR000076.  Yet the Services had already *explicitly considered and rejected* the argument that the potential for "two status" listings would create confusion.  SPR000010 (stating that there would be no opportunity for a species to be both threatened and endangered, but rather the more protective listing determination for a species would apply rangewide); *id.* ("we conclude that in practice it will not be a significant hurdle to implementing our draft policy"); *see also* SPR000096.[22]  Moreover, the administrative record does not support

---

[21]   Even if the Services did list a species endangered due to its status in a significant portion of its range (which will not occur under the SPR Policy), they would have "many tools . . . to focus implementation of the Act on those actions with greatest effect on the conservation of the species."  SPR000006.  For instance, they can "focus recovery planning and implementation efforts on specific areas where threats are acting on the species" and "use various mechanisms to streamline permitting and consultation processes under sections 7 and 10 . . . ."  *Id.*

[22]   The Services' concerns about "extreme confus[ion]" are not only unsupported, but are overstated, SPR000076, since under both the draft and final versions of the Policy,

the argument that commenters expressed confusion about a species being both threatened throughout its range and endangered in an SPR.[23]

Regulatory burdens and potential confusion are not factors Congress intended the Services to consider under the ESA, nor are they relevant to the best available scientific data standard or the five listing factors.  *See*, *e.g.*, Amended Procedures to Comply with the 1982 Amendments to the Endangered Species Act, 49 Fed. Reg. 38,900 (Oct. 1, 1984) (codified at 50 C.F.R. pt. 424) ("Congress has clearly indicated its intention that any costs of eventual protection not be considered as part of the identification and listing process").  These are non-biological factors that the ESA expressly forecloses from consideration in listing determinations under Section 4.  For these and all the foregoing reasons, even if the phrase "significant portion of range" is construed as ambiguous, that aspect of the Policy that forecloses an analysis of whether a species is endangered in a SPR where it is at least threatened throughout its range must fail under *Chevron* Step II as it is inconsistent with the Act's conservation purpose and requirements.  Therefore, it must be vacated.

**II.     THE SPR POLICY PROVISION FORECLOSING CONSIDERATION OF WHETHER A SPECIES IS ENDANGERED IN AN SPR VIOLATES APA AND ESA NOTICE AND COMMENT PROCEDURES AS IT IS NOT A LOGICAL OUTGROWTH OF THE DRAFT SPR POLICY, AND MUST BE VACATED FOR THIS REASON AS WELL.**

Section 553 of the APA and Section 4(h) of the ESA require the Services to provide notice of, and an opportunity for comment on, any "agency guidelines to insure that the purposes of [Section 4] are achieved efficiently and effectively." 16 U.S.C. §

---

species that are endangered or threatened in an SPR would receive that listing status rangewide.  Therefore, if a species was endangered in an SPR, it would be listed as endangered rangewide—superseding any "threatened throughout all" finding.

[23]  "Confusion" was raised by commenters in connection with other issues. SPR001155; SPR000815; SPR001132; SPR000984; SPR044668.

1533(h); *see also ALA v. Norton I*, 242 F. Supp. 2d at 14 (finding FWS failed to provide a meaningful opportunity to comment on agency policy in prior suit concerning the Grouse).   These requirements help ensure that rulemakings are subject to diverse public comment from interested parties who have "an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."   *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) (hereinafter "*United Mine Workers*") (citation omitted).

However, this opportunity for comment must be "meaningful," *Mission Grp. Kan. v. Riley*, 146 F.3d 775, 781 (10th Cir. 1998), and an agency's final rule must be a "logical outgrowth" of a proposed rule.   *Am. Mining Cong. v. Thomas*, 772 F.2d at 639. A final rule is not a logical outgrowth when, as here, "the proposed rule gave no indication that the agency was considering a different approach, and the final rule revealed that the agency had completely changed its position." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009); *see also Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141, 1154 (10th Cir. 2016) (adopting the logical-outgrowth standard in *CSX Transp.*).

The Services gave no indication that they were contemplating the policy choice at issue here: elimination of any consideration of whether a species is endangered in an SPR when it is found to be threatened throughout all of its range.   To the contrary, the Services consistently maintained in the Draft SPR Policy that the ESA sets forth four independent bases for listing species, and that the more protective listing determination for a species would apply rangewide.   SPR000010.   The Services were also clear that "[i]f [a] species was threatened throughout all of its range, we would limit our SPR analysis to the question of whether the species is in danger of extinction in a significant

portion of its range; if so, we would list the species as endangered[.]"  SPR000016;

SPR000010 ("if a species is determined to be endangered in an SPR" then it "would be

listed as endangered throughout all of its range, even in situations where the facts

simultaneously support a determination that the species is threatened throughout all of

its range").

While the Services requested public comment on whether there would be

concerns about protecting an endangered (in an SPR) species as "endangered"

rangewide, SPR000010, they never requested comment on the wholesale elimination of

any consideration of a species' status in a SPR (as endangered) if it is threatened

throughout its range, and the public could not reasonably have anticipated such an

approach.  Even when developing alternatives in the Draft SPR Policy, the Services

never suggested that a species found to be threatened throughout all of its range would

*never be considered* for protection as endangered due to its status in an SPR.[24]  At no

point did the Services mention this possibility.  There was no way for interested parties

such as Petitioners "to divine [the Services'] unspoken thoughts . . . because the final

rule was surprisingly distant from the proposed rule."  *United Mine Workers*, 407 F.3d at

1259-60 (citations and internal quotations marks omitted).  Indeed, the Services

received very few comments recommending this radical change.  *Small Refiner Lead

Phase-Down Task Force v. U.S. Envtl. Prot. Agency*, 705 F.2d 506, 543 (D.C. Cir.

---

[24]  The Services discussed three alternatives: (1) That the SPR and DPS language comprise a single authority; (2) that the SPR language provides clarification of the endangered and threatened definitional language; and (3) that the SPR language provides an independent basis for listing, and protections of the Act would apply only in the SPR. SPR000013.  However, the Services rejected each of these alternatives because they deemed them "less acceptable" due to inconsistencies with the plain language of the Act, inconsistencies with court decisions on SPR, or both.  SPR000014.

1983) (agency failed to give adequate notice of a change from a proposed rule to the final rule, as evidenced by the fact that no one commented on the change).[25]

Consequently, the SPR Policy is not a "logical outgrowth" of the Draft SPR Policy, *Am. Mining Cong. v. Thomas*, 772 F.2d at 639, and violates the APA's notice and comment procedures. *See* 5 U.S.C. § 533(b), (c); 16 U.S.C. § 1533(h); *ALA v. Norton I*, 242 F. Supp. at 14-15 ("The public is precluded from a meaningful opportunity to participate in the comment process if an agency makes available one version of a guideline, in which it specifically outlines how it will treat public petitions, provides the opportunity to comment on that version, and then adopts a completely different approach in its final guideline, without having provided an opportunity to the public to comment on the adopted version."). Hence, the Policy must be vacated for this reason as well. *See United Mine Workers*, 407 F.3d at 1261 (vacating and remanding rule suffering from lack of notice-and-comment under the APA); *see also Ctr. for Envtl. Health v. Vilsack*, No. 15-1690-JSC, 2016 WL 3383954, *13 (N.D. Cal. June 20, 2016) ("vacatur is the presumptive remedy for a procedural violation" under the APA, and "it is Defendants' burden to show that vacatur is unwarranted"); *Am. Lands All. v. Norton*, No. 00-2339-RBW, 2004 WL 3246687 at *3 (D.D.C. June 2, 2004) (citation omitted) (enjoining unlawful ESA policy to "avoid future duplicative litigation").

### III.    III.    FWS APPLIED THE INVALID SPR POLICY TO FORECLOSE ANY ANALYSIS OF WHETHER THE GROUSE IS ENDANGERED IN AN SPR AS THE ESA REQUIRES, AND SHOULD BE ORDERED TO CONDUCT THIS ANALYSIS.

---

[25] Those commenters who did address the issue generally were industry trade organizations who argued for listing such "dual status" species as threatened" not "endangered" to advance economic considerations, management flexibility in the form of 4(d) rules, and/or the efficient use of agency resources. *See, e.g.*, SPR044724-28 (comments of CropLife America, Inc.); SPR001126 (comments of National Mining Association). However, as explained above, *see supra* at 26-30, such considerations have no place in ESA listing determinations.

Applying the SPR Policy to the final listing rule for the Grouse, FWS did not consider, at all, whether the Grouse is in danger of extinction throughout a significant portion of its range.  GUSG0199513 (citing the Final SPR Policy) ("Because we have determined that Gunnison sage-grouse is threatened throughout all of its range, no portion of its range can be 'significant' for purposes of the definitions of 'endangered species' and 'threatened species.'").  The Grouse provides an example of how the Policy violates the ESA.

When it found the Grouse to be endangered throughout all of its range in January 2013, FWS said that the species was being impacted primarily by the threat of habitat loss and fragmentation, as well as improper grazing management, predation, genetic risks resulting from small populations, and the inadequacy of regulatory mechanisms to conserve the species.  GUSG0069994.  FWS also noted that because each of the seven remaining populations contributes to the species' diversity and resilience to catastrophic events, "the loss of any one population would have a negative effect on the species as a whole."  GUSG0070029.

Yet when it later applied the SPR Policy to the Grouse, FWS completely ignored the undisputed facts from its own analysis, which are that the Grouse (1) has declined significantly from historic levels, GUSG0199415; (2) struggles to hang on in five of seven remaining, genetically isolated satellite populations, *e.g.*, GUSG0199434, GUSG0199503; *see also* GUSG0070029 (population sizes of six of the populations "are low enough to induce inbreeding depression"); (3) is experiencing steep declines in its San Miguel population, the second-largest, GUSG0199501; and (4) will likely go extinct in the Gunnison Basin within 31 to 58 years.  GUSG0199501.  Indeed, FWS has even stated that these vulnerabilities may compromise the entire species, which, if true, would appear to satisfy its own "relatively high" (yet now vacated) significance

threshold.  SPR000008 (an area and population may constitute an SPR if "the spatial structure of the entire species could be disrupted, resulting in fragmentation that could preclude individuals from moving from degraded habitat to better habitat" should that area and population cease to exist).

But none of this mattered.  Applying the SPR Policy, FWS did not consider—at all—whether any of these portions of the Grouse's range should be considered significant enough to warrant applying the Act's strongest possible protections to all remaining individual birds and their habitat, wherever they may occur rangewide.

The agency's Grouse analysis is similar to prior FWS listing determinations that were invalidated by federal courts due to the agency's failure to consider whether areas of a species' range were significant.  *E.g.*, *Defenders (Lynx)*, 239 F. Supp. 2d at 19 ("FWS's focus on only one region of the Lynx's population—the Northern Rockies/Cascades—to the exclusion of the remaining three-quarters of the Lynx's [range was] antithetical to the ESA's broad purpose to protect endangered and threatened species") (citing 16 U.S.C. § 1531(b)); *supra* note 11 (collecting cases). Here too, FWS focused on the Gunnison Basin population, almost entirely to the exclusion of the satellite populations.  Yet, as held by another federal court, "[w]here a species or subspecies is unlikely to survive in a sizeable portion of its current habitat, the agency must provide some explanation as to why this portion is not 'a significant portion of its range.'"  *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 203-04 (D.D.C. 2012) (citation omitted).  FWS provided no such explanation here.

As FWS applied the SPR Policy to unlawfully refuse to consider whether the Grouse is endangered in an SPR, GUSG0199513, this court should remand the Grouse listing determination without vacatur.  *See Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d

1392, 1406 (9th Cir. 1995) ("[E]quitable concerns weigh toward leaving the listing rule in place while FWS remedies its procedural error and considers anew whether to list [the species.]"); *Ctr. for Native Ecosystems*, 795 F. Supp. 2d at 1243 (remanding decision while ordering re-listing of species most "[c]onsistent with the ESA").

## <u>CONCLUSION</u>

For all of the foregoing reasons, the SPR Policy is in excess of statutory authority, arbitrary and capricious, and in violation of rulemaking procedures, and must be vacated.  The listing determination for the Grouse must be remanded to FWS for a determination as to whether the Grouse is endangered in a significant portion of its range while maintaining protection of the Grouse as a threatened species under the ESA.

Respectfully submitted on this 21st day of July, 2017,

*s/ Amy Rae Atwood*
Amy Rae Atwood
Ryan Adair Shannon
*Center for Biological Diversity*
P.O. Box 11374
Portland, OR 97211
Telephone: (503) 283-5474
Fax: (503) 283-5528
Email: atwood@biologicaldiversity.org
Email: rshannon@biologicaldiversity.org


Brad Arthur Bartlett, IV
Kevin J. Lynch
Alexa Carreno
Jeremy McKay
*University of Denver-Sturm College of Law*
2255 East Evans Avenue
Suite 335
Denver, CO 80208-0632

Telephone: (303) 871-6140
Email: bbartlett@law.du.edu
Email: klynch@law.du.edu


William Stewart Eubanks, II
*Meyer Glitzenstein & Eubanks LLP*
3206 Norwood Court
Unit 7-240
Fort Collins, CO 80525
Telephone: (970) 703-6060
Email: beubanks@meyerglitz.com


*Counsel for Petitioners*
*Center for Biological Diversity*
*and Western Watersheds Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2017, I electronically filed the foregoing PETITIONER'S

OPENING BRIEF with the Clerk of the Court using the CM/ECF system, which will send

notification of this filing to all counsel of record, as follows:

For WildEarth Guardians and Dr. Clait E. Braun:

    Todd C. Tucci
    ttucci@advocateswest.org

    Laird J. Lucas
    llucas@advocateswest.org

    Talasi Brooks
    tbrooks@advocateswest.org

For Federal Defendants:

    Joanna Kathryn Brinkman
    Joanna.brinkman@usdoj.gov

    Mary Elisabeth Hollingsworth
    Mary.Hollingsworth@usdoj.gov

    Rickey Doyle Turner
    Rickey.turner@usdoj.gov

For the State of Utah:

    Brittany Lynn Wilson
    brittanywilson@utah.gov

    David Halverson
    dhalverson@utah.gov

    Kathy A.F. Davis
    kathydavis@utah.gov

For Gunnison County:

>    Bennett W. Raley
>    bwraley@mac.com

For Gunnison County Commissioners:

>    David Baumgarten
>    Dbaumgarten@gunnisoncounty.org

For Gunnison County Stockgrowers:

>    Deborah Lynn Freeman
>    dfreeman@troutlaw.com
>
>    Bennett W. Raley
>    bwraley@mac.com

For the State of Colorado:

>    Frederick Richard Yarger
>    Fred.yarger@coag.gov
>
>    Lisa Reynolds
>    Lisa.reynolds@coag.gov

Respectfully submitted,

*/s/ Amy Rae Atwood*
Amy Rae Atwood