IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-00130-CMA-STV
(Consolidated with Civil Action Nos. 1:15-cv-00131 and 1:15-cv-00286)

This document relates to Civil Action No. 1:15-cv-00286

IN RE: GUNNISON SAGE-GROUSE ENDANGERED SPECIES ACT LITIGATION

_____

OPENING BRIEF OF
GUNNISON PLAINTIFF-INTERVENORS

_____

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES

INTRODUCTION

JURISDICTIONAL STATEMENT

ARGUMENT

    A.  THE FWS VIOLATED LAW AND PROCEDURE BY FAILING TO PROVIDE
ADVANCE NOTICE OF, AND OPPORTUNITY FOR PUBLIC COMMENT ON,
THE TECHNICAL BASIS FOR ITS FINAL RULE.

        A.  Under APA notice and comment requirements, the FWS must disclose for
public review the technical studies upon which it relies in its rulemaking.

        B.  The Proposed Rule relied on Population Viability Analysis (PVA) in its
evaluation of the risk of extinction to the Gunnison Basin Population.

        C.  The PVA studies upon which the FWS relied changed dramatically with
publication of the Final Rule.

        D.  The FWS never made the Davis PVA study available for public comment
notwithstanding having Davis in its possession at the time of the Proposed
Rule.

    B.  THE FWS FAILED TO APPLY THE CRITERIA MANDATED BY ITS PECE
POLICY IN EVALUATING CONSERVATION EFFORTS.

        A.  The FWS failed to conduct an analysis of conservation efforts by local
governments pursuant to its Policy for Evaluation of Conservation Efforts
When Making Listing Decisions (PECE).

        B.  The FWS failed to apply the PECE criteria to prospective enrollments of
private lands under the CCAA.

        C.  The Administrative Record shows confusion by FWS on how to conduct its
PECE analysis that persisted through finalization of the Listing Rule.

CONCLUSION

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Federal Cases

*American Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008)………….....4

*Bennett v. Spear*, 520 U.S. 154 (1997)……………………………………………………...10

*Carlton v. Babbitt,* 900 F.Supp. 526 (D.D.C. 1995)…………………………………………19

*Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006)……………………........ 4

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402 (1971)…………………………19

*McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)……………..10

*Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29 (1983)………19

*National Black Media Coal v. FCC*, 791 F.2d 1016 (2nd Cir. 1986)…………………….....10

*Permian Basin Petroleum Ass'n v. Department of the Interior,*
127 F.Supp.3d 700 (W.D. Tex. 2015)…………………………………………..…………11, 12, 19

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981)…………………………………………..4

## Federal Statutes

5 U.S.C. §§ 500-596……………………………………………………………………….3

5 U.S.C. § 533(b)-(c)………………………………………………………………………3, 4

5 U.S.C. §§ 551, *et seq.*…………………………………………………………………….3

5 U.S.C. § 706(2)……………………………………………………………………………11

16 U.S.C. §§1531-1544……………………………………………………………………..3

16 U.S.C. §1540(c)…………………………………………………………………………..3

16 U.S.C. §1540(g)………………………………………………………………………....3

28 U.S.C. §1331...................................................................................................3

## Federal Register Notices

*Endangered and Threatened Wildlife and Plants: Endangered Status for Gunnison sage-Grouse; Proposed Rule*, 78 Fed. Reg. 2486 (January 11, 2013) (Proposed Rule).....................................................................................................passim

*Endangered and Threatened Wildlife and Plants: Threatened Status for Gunnison sage-Grouse; Final Rule*, 79 Fed. Reg. 69192 (November 20, 2014) (Final Rule)……………………………………………………………………......…passim

*Policy for Evaluation of Conservation Efforts When Making Listing Decisions*, 68 Fed. Reg. 15100 (March 28, 2003) (PECE)……………………………….……passim

**INTRODUCTION**

As set forth in the State of Colorado's Opening Brief, the Administrative Record shows that the Gunnison Basin population of Gunnison sage-grouse (GuSG) was unequivocally robust and resilient under the best scientific information available to the U.S. Fish and Wildlife Service (FWS) at the time of its listing decision. We endorse but do not reiterate that information here.  We simply note that at the time of the rulemaking:

- The vast majority of GuSG (approximately 85%) were found in the Gunnison Basin population.  AR 0069984 at 0069992; AR 0199399 at 0199412.

- The Gunnison Basin population increased by approximately 35% from 2002 to 2012, and was estimated to be 4,082 birds at the time of publication of the Proposed Rule.  AR 0069984 at 0069990, Figure 2.

- This population exceeded by over 30% the population target of 3,000 birds for the Gunnison Basin set in the Gunnison Sage-Grouse Rangewide Conservation Plan (RCP) that had been prepared by the FWS, U.S. Forest Service, U.S. Bureau of Land Management, National Park Service, Colorado Division of Parks and Wildlife (CPW), Utah Division of Wildlife Resources, and others as the first rigorous assessment of population and habitat data for GuSG.  AR 0011261 at 0011290 and 0011543 (Table 2).

- The Gunnison Basin population itself was composed of a number of functioning subpopulations that were not subject to potential "threats" in the same manner as a single monolithic population.  AR 0069984 at 0067995; AR 0073464 at 0073467; AR 0099524 at 0099663; AR 0199399 at 0199406.

- The FWS acknowledged that "the Gunnison Basin Population, while showing variation over the years, has been relatively stable…." AR 0069984 at 0069987; s*ee also* AR 0199399 at 0199406, 0199409, 0199437, 0199496.

As set forth in Colorado's Opening Brief, the FWS arbitrarily failed to recognize that the Gunnison sage-grouse was stable and secure into the foreseeable future, and not threatened with extinction in view of foreseeable threats, based on the size and resiliency of the Gunnison Basin population alone.

This Opening Brief of the Board of County Commissioners of the County of Gunnison, Colorado and the Gunnison County Stockgrowers' Association, Inc. (Gunnison Intervenors) focuses on two issues that have not been addressed in Colorado's Brief.[1]  These are: (1) FWS violated law and procedure by failing to provide advance notice of and opportunity for public comment on the technical basis for its Final Rule; and (2) FWS arbitrarily failed to apply the criteria mandated under its PECE Policy in evaluating local conservation efforts.  These errors are fatal flaws. The rulemaking process that ensued both frustrated public input and truncated required evaluations that were key to the assessment of the status of the species. This led, ultimately, to ill-informed and arbitrary decision making by the FWS in choosing to list the Gunnison sage-grouse as "threatened" under the ESA.

---

[1] Gunnison Intervenors hereby certify that they have conferred with counsel for Plaintiff State of Colorado before filing this Opening Brief and that the issues addressed herein are not adequately covered by Plaintiff's submittal.

**JURISDICTIONAL STATEMENT**

This action arises under federal law, specifically the ESA, 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act, 5 U.S.C. §§ 500-596 (APA). This Court has jurisdiction over this action under 16 U.S.C. § 1540(c) and 28 U.S.C. § 1331. As required by 16 U.S.C. § 1540(g), Gunnison Intervenors provided then-Defendants Secretary of Interior Sally Jewell and U.S. Fish and Wildlife Service Director Daniel Ashe with written notice of their violations of the ESA by separate letters dated December 22, 2014 and January 5, 2015. More than 60 days passed before the Gunnison Intervenors filed their Complaint/Petition in Intervention with Additional Claims alleging violations of the ESA.

Gunnison Intervenors have standing to bring these claims for the reasons stated in their Memorandum in Support of Unopposed Joint Motion Seeking Leave to Intervene, including Exhibits A – D submitted therewith, and Complaint/Petition in Intervention with Additional Claims. ECF No. 23. We incorporate those pleadings and affidavits herein by this reference as if set forth in full.

**ARGUMENT**

**1. The FWS violated law and procedure by failing to provide advance notice of, and opportunity for public comment on, the technical basis for its Final Rule.**

A. *Under APA notice and comment requirements, the FWS must disclose for public review the technical studies upon which it relies in its rulemaking.*

Under the APA, 5 U.S.C. §§ 551 *et seq.*, the FWS is required to publish notice of a proposed rule sufficient to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments…." 5 U.S.C. § 533

(b)-(c).  "Among the information that must be revealed for public evaluation are the 'technical studies and data' upon which the agency relies." *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006) (citation omitted).  This is to allow for useful criticism, to allow the parties to focus on the information being relied on by the agency, and to point out where that information is erroneous or where the agency may be drawing improper conclusions. *See American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008).

Public notice and the consideration of public comment regarding relied-upon technical analyses are "[t]he safety valves in the use of… sophisticated methodology." *Sierra Club v. Costle*, 657 F.2d 298, 334 (D.C. Cir. 1981).  By requiring the "most critical factual material" used by the agency to be subjected to informed comment, the APA provides a procedural device to ensure that agency rules are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to support their positions, and thereby to enhance the quality of judicial review. *Chamber of Commerce*, 443 F.3d at 900.  Where an agency's determination "is based upon 'a complex mix of controversial and uncommented upon data and calculations' there is no APA precedent allowing an agency to cherry-pick a study on which it has chosen to rely in part." *American Radio Relay League*, 524 F.3d at 237.  The rationale for the APA requirement to reveal the technical basis for a rule in time to allow for meaningful commentary is to ensure that "…a genuine interchange occurs rather than allowing an agency to play hunt the peanut with technical

4

information, hiding or disguising the information that it employs." *Id.* (internal quotes and citations omitted).

> B. *The Proposed Rule relied on Population Viability Analysis in its evaluation of the risk of extinction to the Gunnison Basin Population.*

The FWS rulemaking relied on Population Viability Analysis in evaluating the risk of extinction to the Gunnison sage-grouse. A PVA is a species-specific method of risk assessment that is frequently used in conservation biology to determine the relative probability that a population will go extinct within a given number of years. AR 0011261 at 0011455; AR 0199399 at 0199498.

The Proposed Rule relied on a PVA developed by the Conservation Breeding Specialist Group (CBSG) in connection with the GuSG Rangewide Conservation Plan. AR 0011261 at 0011694; AR 0069984 at 0070029 & 0070030; AR 0199399 at 0199498. Dr. Miller of CBSG used a simulation software program called VORTEX that simulated the effects of demographic, environmental, and genetic stochastic events, as well as other deterministic forces, on wild populations. AR 0011261 at 0011456 & 0011697. The PVA used this information to estimate relative extinction probabilities and potential loss of genetic diversity over time for various GuSG population sizes and to determine the sensitivity of GuSG population growth rates to various demographic parameters. *Id.*; AR 0069984 at 0070030. Demographic parameters used in this PVA included type of breeding system, age at first reproduction, measures of reproductive success, sex ratio, mortality rates, and environmental carrying capacity. The PVA also incorporated a severe drought frequency and estimated an increase in chick mortality over the drought period. *Id.*

The FWS disclosed and considered this PVA in its Proposed Rule. The FWS referred to this multiple times as "the" PVA.  *See id.*  The FWS recognized that, under this PVA, "… populations in excess of 500 birds had an extinction risk of less than 5% within the next 50 years." AR 0069984 at 0070030. Under the PVA, for a population in excess of 3,000 birds (which was the largest population this PVA considered), the risk of extinction within the next 50 years was shown to be **less than one-half of 1%.**  AR 0011261 at 0011712-0011716.  During the rulemaking, the evidence unquestionably established that the Gunnison Basin population was consistently well in excess of that 3,000 bird population number. FWS recognized in the Proposed Rule that "[t]he results suggested that the Gunnison Basin Population is likely to persist long term in the absence of threats acting on it."  AR 0069984 at 0070030; *see also* AR 0199399 at 0199498 ("The model concluded that the Gunnison Basin population, and therefore the species, is likely to survive over the long term, barring catastrophic events….").

C.  *The PVA studies upon which the FWS relied changed dramatically with publication of the Final Rule.*

The PVA studies upon which the FWS relied changed dramatically after close of the public comment period.  The FWS selectively dismissed the above-described PVA that had been used in the Proposed Rule. The Final Rule placed its reliance instead on a different study: a "*Dissertation - Gunnison Sage-grouse Demography and Conservation*" by A. Davis, in partial fulfillment of the requirements for the Degree of Doctor of Philosophy (Colorado State University, Fort Collins, Colorado, Summer 2012) ("Davis 2012"). AR 0041438.

Davis 2012 became among the most critical material used by the FWS to justify its conclusions supporting its listing decision. The Final Rule refers to Davis 2012 over 140 times. It relies on Davis for a sweeping array of technical statements and conclusions. By way of example, Davis 2012 is cited as a basis informing:

- The influence of juvenile survival on vital rate in the Gunnison Basin population. AR 0199399 at 0199409, 0199437, 0199462, 0199500, 0199501.

- The role of adult survival in species' viability. AR 0199409, 0199500, 0199501.

- The influence of drought conditions on adult survival rates. AR 0199420, 0199462, 0199505.

- Comparative nest success rates between populations. AR 0199434, 0199500.

- The influence of nest site vegetation characteristics on nest success between populations. AR 0199451, 0199500.

- The role of temporal factors on nesting success. AR 0199451, 0199500.

- The association of predation with lack of recruitment. AR 0199483, 0199484.

- The effect of harsh winter conditions on demographic rates. AR 0199507.

- The effect of bird translocation efforts. AR 0199501.

Davis 2012 was also relied on heavily to support the FWS's conclusions on long-term viability of the species.  Remarkably, Davis 2012 is the only study – out of several population studies identified by the FWS in the Final Rule – that shows a greater than 1% chance of extinction in the next 60 years. AR 0199399 at 0199511.

The FWS recognized that the other population studies collectively suggested that most GuSG populations are relatively stable. AR 0199502.  However, as discussed in

Colorado's Opening Brief and not repeated here, the FWS largely dismissed those in assessing the viability of the species. Instead, the FWS arbitrarily chose to focus on Davis 2012 as "the best available scientific information regarding the viability of Gunnison sage-grouse," AR 0199509, and relied on Davis to conclude that the Gunnison Basin population's viability was at risk in the future.  AR 0199503.

There are striking limitations to the use of Davis 2012 that were identified by the author herself.  Davis cautioned that her data – six years of demographic data – were based on a cyclical period when the population was experiencing a decline. AR 0041542 -0041543.  Davis noted that if her study had been conducted a few years earlier or later, a different picture would have emerged, *i.e.,* more consistent with the other population viability analyses. Davis 2012 also proposed, in her own words, a "novel method" to link "population count data" with "population demographic data" through a "population growth rate."  AR 0041590.  The author herself cautioned that her proposal had "yet to have been fully vetted" and that while "(t)he methodology shows promise…until more work is done it is important to view these results as preliminary." AR 0041591. The Final Rule mentioned but marginalized these points.  In a subsequent 2014 analysis, Davis candidly identified that the "strategy we used to calculate population sizes is likely to be biased low." AR 0099524 at 0099540.  Davis 2014, proposing a more integrated model, showed an essentially stable population. AR 0099541 - 0099542.  Colorado's Brief addresses how FWS selectively and arbitrarily interpreted and relied upon this Ph.D. student's work.  Here, we focus not on the

substance, but rather on the procedural infirmities presented by the FWS's use of Davis 2012 in the Final Rule.

D. *FWS never made the Davis PVA study available for public comment notwithstanding having Davis in its possession at the time of the Proposed Rule.*

The problem is that the FWS never disclosed the existence of Davis 2012 in its Proposed Rule, notwithstanding having had this study in its possession at the time. AR 0049805. The Federal Defendants admit this, having averred in their Answer to Gunnison Intervenors' Complaint that "FWS received a copy of Davis 2012, a recently completed doctoral dissertation, from Plaintiff Colorado in September 2012, but did not incorporate this study in proposing to list the species on January 11, 2013." ECF No. 65, Para. 79. Neither the Davis studies, nor FWS's justifications based on Davis, were shared with the public or identified for public comment. Plaintiff-Intervenor Gunnison County Stockgrowers' Association, Inc. had no notice of Davis through the Proposed Rule or otherwise, and offered no comments on it. Affidavit of Burt Guerrieri, Exhibit A hereto. Gunnison County, the other Plaintiff-Intervenor, submitted comments during rulemaking related to nest success and certain demographic aspects of the Davis study, e.g., AR 0075682 - 0075683, but did not know to comment on the relevance of this study to a judgment on overall species viability. The Davis PVA then appeared as a controlling technical study and rationale in the Final Rule for why the GuSG population was at risk and in need of listing. The FWS went from "0" notice of it or dependence on it in the Proposed Rule to substantial and arbitrary reliance on it in the Federal Register as the best science – without telling anyone.

The lack of notice regarding the FWS's use of Davis precluded meaningful input on this issue to the prejudice of members of the public, including the Gunnison Intervenors.  Had Davis been disclosed, the bias inherent in placing reliance on it for judgment calls on viability could have been fully vetted through public review and comment. The public should have been afforded an opportunity to dialogue on the methodology and inaccuracies of the Davis PVA to fully inform the FWS's reliance on and interpretation of that information. The public could not do so, because one must be aware of a technical study and how it is to be used in order to be able to comment on it. There was no opportunity through this rulemaking to comment squarely on the FWS's use of this report. This process simply did not alert a reader to the stakes. See *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988).  As a result, the FWS has violated the procedural requirements of the APA.  *Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decision making.").  This also created a substantive infirmity insofar as it prevented the FWS from considering all relevant factors when deciding whether to list the species. *See National Black Media Coal v. FCC*, 791 F.2d 1016, 1023-24 (2d Cir. 1986) ("This non-disclosure thus prevented petitioners and perhaps others from making relevant comments. . . . The agency, therefore, cannot be said to have taken into account all relevant factors in reaching its decision.").

An error such as this falls within the Court's special area of competence and requires an exacting review.  It is cause for the Court to "hold unlawful and set aside"

10

the Final Rule because it was arbitrary and capricious and promulgated without observance of procedure required by law. 5 U.S.C. § 706(2). For these reasons, the Gunnison Intervenors respectfully urge this Court to vacate the Final Rule.

## 2. The FWS failed to apply the criteria mandated under its PECE Policy in evaluating conservation efforts.

The FWS made a solemn commitment to all stakeholders whose activities and livelihoods could be curtailed by the legal prohibitions and regulatory requirements that result from a decision to list a species under the ESA. If those parties would work together to make significant commitments of resources, land, and the expertise of wildlife biologists and other knowledgeable personnel to carry out conservation efforts to reduce threats to a candidate species, then the FWS would conduct a "rigorous review" of those efforts. Through this evaluation, the FWS would determine whether implementation of those efforts – that may yet to have been fully implemented or had a chance to show effectiveness – would likely reduce threats sufficiently to justify not listing the species, in the context of other conservation efforts. The FWS embodied this promise in its formal "Policy for Evaluation of Conservation Efforts When Making Listing Decisions," 68 Fed. Reg. 15100 (March 28, 2003)(PECE).

The PECE evaluation and its criteria are mandatory. *Permian Basin Petroleum Ass'n v. Department of the Interior*, 127 F.Supp.3d 700, at 706, 708 & 710 n.7 (W.D. Tex. 2015); AR 0009110 at 0009123. PECE requires that the FWS consider all pertinent conservation efforts, not just selected ones and not merely when requested to do so. In the FWS's words: "If we receive new information on a formalized conservation effort that

has not yet been implemented or not yet determined effective prior to a listing decision, we <u>will</u> evaluate [it] in the context of the PECE criteria." AR 0009112 (*emphasis added*). PECE sets forth the precise criteria to be used in this analysis. AR 0009118. PECE specifies nine criteria that must be considered in assessing the likelihood that conservation efforts will be implemented,[2] and six criteria for assessing whether those efforts will be effective.[3]  The FWS must affirmatively "count" the benefits anticipated from actions shown to be sufficiently certain under those criteria in making its determination whether to list a species.

By their very nature, formalized plans not yet fully implemented may not have produced meaningful results at the time of a listing decision. Yet they may be the key to securing the species and avoiding the need to list it for protection under the ESA.  This is at the core of PECE.  "The PECE ensures fledgling plans have the opportunity to make listing unnecessary, or contribute to that determination."  *Permian Basin,* 127 F.Supp.3d at 711 (citing PECE, 68 Fed. Reg. at 15102). The FWS disregarded both the spirit and the requirements of PECE.  In doing so, it violated its promise to stakeholders

---

[2] For implementation, the FWS must evaluate whether the plan identifies: (1) the conservation efforts, parties, and funding; (2) legal authority to implement; (3) legal procedural requirements for implementation; (4) necessary authorizations; (5) necessary voluntary participation; (6) necessary regulatory mechanisms; (7) a high level of certainty that necessary funds will be obtained; (8) an implementation schedule; and (9) approval of the plan by all parties to the agreement. AR 0009124 - 0009125.

[3] For effectiveness, the FWS must evaluate whether the plan: (1) adequately describes the nature and extent of threats addressed; (2) includes incremental objectives and a timeline; (3) includes steps necessary for implementation; (4) identifies parameters for measuring achievement; (5) provides for monitoring and reporting on implementation progress; and (6) incorporates adaptive management principles. AR 0009125.

at the state and local level who stood to be affected by the listing of the Gunnison sage-grouse and were putting in place and implementing significant efforts toward conserving the species at the time of listing.

A.  *The FWS failed to conduct a PECE analysis on conservation efforts by local governments.*

Federal and state agencies, county governments, and private landowners came together during the pre-listing timeframe to develop substantial conservation efforts to ensure the viability, vitality, and abundance of the GuSG and its habitat.  Focusing here on the Gunnison Basin, Gunnison County alone contributed well in excess of $1 million to these efforts.  AR 0075587, 0075803.  Approximately 60,000 acres of private land in occupied and unoccupied habitat in the Gunnison Basin had been placed under conservation easements protective of the species as of 2014.  AR 0092103 at 0092157. Approximately 55,000 acres of private land were enrolled in certificates of inclusion under the GuSG Candidate Conservation Agreement with Assurances (CCAA), and an estimated 397,267 acres of public land were covered under the federal land management agencies' Candidate Conservation Agreement (CCA) in the Gunnison Basin.  AR 0199399 at 0199472. Collectively, the CCAA and CCA covered approximately 83% of occupied GuSG habitat in the Basin.  AR 0099524 at 0099589 & 0099599.

The FWS openly acknowledged the success and value of these pre-listing efforts.  On July 16, 2013, FWS Director Ashe described these efforts in the Gunnison Basin as "inspirational." AR 0067959. He noted that local regulatory measures were "highly certain… and highly likely to be implemented" and that "incentive based

measures are important…." He noted also that the "amount of land covered by …conservation agreement… (was) highly relevant." AR 0067960. On September 16, 2013, the FWS issued a press release:

> "Thanks to collaborative conservation efforts, the largest Gunnison sage-grouse population has remained relatively stable over the past 12 years," said the Service's Mountain-Prairie Regional Director Noreen Walsh…. Gunnison County, Colorado, is committed to conservation of Gunnison sage-grouse and its habitat. Likewise, federal agencies have completed a Candidate Conservation Agreement in the Gunnison Basin; a number of private landowners are currently enrolled in voluntary conservation agreements; and a portion of private lands are in conservation easements that help conserve Gunnison sage-grouse. Combined, these conservation tools protect, at some level, the majority of occupied habitat in the Gunnison Basin. Perhaps the greatest need and challenge is to expand the suite of conservation efforts completed and underway in the Gunnison Basin to other areas across the species range." (FWS Mountain-Prairie Region Press Release dated September 16, 2013) AR 0236086.

The FWS was provided a chart and a list identifying 118 separate local government regulatory and policy actions to conserve GuSG undertaken by nine counties in southwest Colorado and southeast Utah in conjunction with state and federal agencies and local individuals and entities. AR 0099651-0099661. This built upon and supplemented the successes in the Gunnison Basin. The FWS was also invited to formally join a 2013 "Conservation Agreement for Gunnison Sage-grouse" (Conservation Agreement) that was executed by the Governors of Colorado and Utah and all counties comprising the range of the GuSG, and which explicitly was written to "continue and expand" prospectively those existing public and private conservation efforts in each state and local government jurisdiction. AR 0067654 at 0067659. This was a meaningful and significant document. The FWS not only did not sign the

Agreement, but never responded.  And when it came to its PECE analysis, internal

FWS emails evidenced confusion by staff on how to analyze these local efforts:

- **February 5, 2014**: "I removed the focus on county-specific conservation efforts" and "added a little more language to the background section."  AR 0109581.

- **February 7, 2014**: "This is not sufficient to show that we really analyzed all of the conservation actions under each of the PECE criteria… Also, we should really be looking at the individual conservation actions that are contained in a plan and not just evaluate the plan as a 'whole.' It appears there are several plans that were evaluated as a 'whole.' The reason we don't do this is that there could be some actions within a plan that meet PECE and others that don't. So you would want to be able to take the ones that meet PECE into consideration in the listing decision, rather than not being able to consider any if the plan as a whole didn't meet PECE."   AR 0109581.

- **February 12, 2014**:  "It now sounds like we won't get away with an abbreviated PECE as we'd hoped… Did we decide to evaluate regulatory mechanisms, such as county resolutions? (Seems like a slippery slope.)"  AR 0111753.

But abbreviated and treated as a "whole" this remained.

- **September 18, 2014**:  "Big Picture Changes …The PECE analysis needs to be done on the efforts within a plan/agreement/etc. The Gunnison sage-grouse PECE analysis analyzes the plan/agreement/etc/ not the efforts. If there are no specific efforts, then we should say so and move on.  In this respect we need to broaden our analysis."  AR 0154178.

At some point along the line, the FWS did in fact conduct some analyses of the

Conservation Agreement.  In undated PECE analyses, the Agreement was deemed to

"meet" the majority of PECE implementation criteria including identification of

conservation efforts, parties, and funding; legal authority to implement; legal procedural

requirements for implementation; necessary authorizations; necessary voluntary

participation; necessary regulatory mechanisms; obtaining of necessary funding; and

approval of the plan by all parties to the agreement. AR 0121816 at 0121822; AR

0152003 at 0152009.  It was also deemed to "meet" the effectiveness criteria for identification of threats to be addressed, inclusion of scientifically valid parameters to demonstrate achievement of objectives, and incorporation of adaptive management principles. AR 0108362 at 0108365. But these conclusions did not make it into the actual PECE document or the Final Rule. Instead, and with no explanation for the about-face, the latest dated PECE analysis dismissed the Conservation Agreement in two perfunctory conclusive sentences.[4] Unfortunately, those sentences refer to this Agreement as an "MOU" (which was a separate document preceding execution of the Conservation Agreement) and simply dismiss it as offering nothing to reduce threats or otherwise improve the status of the species.  AR 0199230 at 0199235.

B. *The FWS also failed to apply the PECE criteria to prospective enrollments of private lands under the CCAA.*

One of the key successes in the Gunnison Basin is the CCAA. The range-wide CCAA was created pursuant to FWS policy to encourage states and private actors to undertake voluntary efforts to conserve "candidate species" being considered for an ESA listing. 64 Fed. Reg. 32726, 32727 (June 17, 1999). The standard that a CCAA must meet is that the "benefits of the conservation measures implemented by a property owner under a CCAA, when combined with those benefits that would be achieved if it is

_____

[4] The sentences were: "Because the actions discussed refer almost entirely to other documents and efforts, with the exception of counties developing a 'habitat prioritization tool' (which would not address threats) we find no 'specific actions, activities, or programs designed to eliminate or reduce threats or otherwise improve the status of a species' within this MOU.  As such, we have not conducted a further analysis of the PECE criteria because the efforts in the MOU do not meet the definition."  AR 0199235.

assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the species." 64 Fed. Reg. at 32726. The GuSG CCAA and its associated permit were approved by the FWS pursuant to this criterion. AR 0199399 at 0199471.

The FWS recognized that there had been "great strides" in landowner enrollments under the CCAA as of the time of its listing decision on the grouse. *Id.* It recognized that lands enrolled under the CCAA were a net gain for GuSG conservation. *Id.* at 69264. The Listing Rule identified the percentage of enrollments relative to targets in respective counties, showing that while enrollment was close to or in excess of targets in the Gunnison Basin, Crawford, and Pinon Mesa population areas, AR 0199471 & 0199472, enrollments in other areas had yet to mature. But that's where the analysis stopped. *Future* enrollments under the CCAA were never evaluated under PECE. And the Final Rule concluded that "the *existing* CCAA benefits Gunnison sage-grouse on *participating* lands, but does not provide sufficient coverage of the species' range to ensure the species' long-term conservation." AR 0199476 (*emphasis added*).

The FWS never went through the mandatory "implementation" and/or "effectiveness" criteria to assess the prospects for further implementation of the CCAA on private lands both within and outside of the Gunnison Basin. This range-wide vehicle was designed for and open to future enrollment by additional private landowners following the highly successful example set in the Gunnison Basin. FWS did not consider the conservation benefits that would be accrued under the CCAA if even a percentage of the remaining un-enrolled lands (756,562 acres as of October 2014, immediately prior to the time of

the final listing decision) were enrolled in the CCAA.  AR 099524 at 0099589.  The

CCAA's prospective conservation benefits warranted consideration under the PECE

criteria.  Had they been counted, a materially different picture of the range-wide

projected private lands conservation landscape would have emerged.  This is a glaring

omission.

    C. *The Administrative Record shows confusion by FWS on how to conduct its PECE analysis that persisted through finalization of the Listing Rule.*

The Administrative Record reveals initial, ongoing, and ultimate confusion by the

FWS in how to apply PECE to the GuSG conservation efforts.  For example, an internal

draft of the Final Rule stated:

> "We also evaluated future conservation efforts, including those that are yet to be
> implemented or shown to be effective.  While these future efforts are important
> and we encourage implementation, we are not relying on those yet to be
> implemented or shown to be effective efforts in this determination."  AR 0176156.

The FWS never released its draft or final analysis of the conservation efforts

pursuant to PECE.  In the most recent (November 4, 2014) PECE document in the

Administrative Record, the FWS continued to misapprehend its obligations under

PECE.  It is inconsistent and incomplete. It states that "Conservation efforts that have

not yet been finalized are also not evaluated," AR 0199230, but also postures that "[a]ll

planned or recent formalized conservation efforts known to the Service at a county,

population, state, or rangewide scale are included in this evaluation." *Id.* Then it

proceeds to cherry-pick and evaluate only four efforts under PECE.  And of these, only

two (the Ute Mountain Ute Tribe Council Resolution No. 2014-059 and the CCA) were

evaluated by the requisite PECE criteria. AR 0199230.

There is no final, inclusive, analytic PECE document available to the public to date. PECE requires that the FWS evaluate (1) all planned formal conservation efforts, whether new, prospective, or yet to be shown effective, and to do so (2) according to its established criteria. The FWS failed to meet either prong of this requirement. When it came time for the FWS to undertake its rigorous evaluation of the cumulative benefits to be expected from all of these efforts, the FWS thus reneged on its promise and violated its own policy.

The FWS's failure to apply its PECE to all GuSG conservation efforts renders its Final Listing Decision arbitrary and capricious. It did not make its decision "based on a consideration of the relevant factors." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *Carlton v. Babbitt*, 900 F.Supp. 526, 530, 532 (D.D.C. 1995). The FWS also "failed to consider an important aspect of the problem" concerning whether the *collective* efforts to protect the Gunnison sage-grouse were likely to be sufficiently effective that the species should not be deemed "threatened." See *Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The FWS PECE determination is not entitled to deference when, as here, the "…analysis was not sufficiently thorough, nor was its reasoning valid as important and material information were not considered in reaching the decision." *Permian Basin*, 127 F.Supp.3d at 712.

## CONCLUSION

The Gunnison Intervenors have made significant investments in reliance upon the very type of local-state-federal partnership efforts that have been encouraged by the FWS as the key to securing the future of the Gunnison sage-grouse. The benefits from

these widespread efforts are evidenced through the health of the species and habitat in the Gunnison Basin. The FWS's decision to list the Gunnison sage-grouse as a "threatened" species under the ESA will negatively impact the citizens, the ranchers, and the social, economic, and environmental fabric and future of the Gunnison County community. The FWS reached its decision arbitrarily and through a rulemaking process that compromised the procedures for public participation and truncated the evaluations required under its policies that exist to protect interests such as ours.

We respectfully request that this Court: (1) declare that FWS violated the APA by not disclosing for public evaluation and comment the technical studies upon which the Final Rule is founded; (2) declare that the FWS acted arbitrarily and in violation of the APA in failing to conduct the required PECE analysis; (3) declare that the Gunnison sage-grouse does not satisfy the requirements of the ESA for listing as a "threatened species" and that listing the species at this time is not warranted; (4) declare that Defendants abused their discretion and acted arbitrarily, capriciously, and not in accordance with the ESA in issuing the Final Rule;[5] (5) vacate the Final Rule; (6) award Gunnison Intervenors their costs and expenses, including reasonable attorneys' fees under the citizen suit provision of the ESA and/or the Equal Access to Justice Act; and (7) grant Gunnison Intervenors such other relief as the Court deems just and equitable.

---

[5] Gunnison Intervenors' Complaint also seeks vacatur of the related Final Critical Habitat Rule. Issues related to the FWS designation of critical habitat for the GuSG are addressed in the State of Utah's Opening Brief. We endorse and join in the arguments and relief requested therein.

Respectfully submitted on this 2nd day of August, 2017.

By*: s/ David Baumgarten*
**David Baumgarten**
Office of the Gunnison County Attorney
200 E. Virginia Avenue
Gunnison, CO 81230
Telephone: (970) 641-5300
Facsimile: (970) 641-7696
E-mail: dbaumgarten@gunnisoncounty.org

Attorney for the Board of County Commissioners of the
County of Gunnison, Colorado

By: s/ Deborah L. Freeman
**Deborah L. Freeman**
Bennett W. Raley
TROUT RALEY
1120 Lincoln Street, Suite 1600
Denver, CO 80203
Telephone: (303) 861-1963
Facsimile: (303) 832-4465
E-mail: dfreeman@troutlaw.com
braley@troutlaw.com

Attorneys for Gunnison County Stockgrowers'
Association, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of August, 2017, I electronically filed the foregoing

OPENING BRIEF OF GUNNISON PLAINTIFF-INTERVENORS with the Clerk of the

Court using the CM/ECF system, which will send notification of this filing to all counsel

of record, as follows:

For WildEarth Guardians and Dr. Clait E. Braun:

>Todd C. Tucci
>ttucci@advocateswest.org
>
>Laird J. Lucas
>llucas@advocateswest.org
>
>Talasi Brooks
>tbrooks@advocateswest.org

For Center for Biological Diversity and Western Watersheds Project:

>Amy Rae Atwood
>atwood@biologicaldiversity.org
>
>Brad Arthur Bartlett, IV
>bbartlett@law.du.edu
>
>Kevin J. Lynch
>Klynch@law.du.edu
>
>Ryan Adair Shannon
>rshannon@biologicaldiversity.org
>
>William Stewart Eubanks, II
>Beubanks@meyerglitz.com

For Federal Defendants:

>Joanna Kathryn Brinkman
>Joanna.brinkman@usdoj.gov

Mary Elisabeth Hollingsworth
Mary.Hollingsworth@usdoj.gov

Rickey Doyle Turner
Rickey.turner@usdoj.gov

For the State of Colorado:

Frederick Richard Yarger
Fred.yarger@coag.gov

Lisa Reynolds
Lisa.reynolds@coag.gov

For the State of Utah:

Brittany Lynn Wilson
brittanywilson@utah.gov

David Halverson
dhalverson@utah.gov

Kathy A.F. Davis
kathydavis@utah.gov

s/  Rachel Magruder
**_Rachel Magruder_**