**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**In re Gunnison Sage-Grouse**                    Lead Case No. 1:15-cv-130-CMA-STV
**Endangered Species Act Litigation**

This document relates to Case No. 1:15-cv-286

---

**OPENING BRIEF OF PETITIONER-INTERVENORS STATE OF UTAH AND SAN JUAN COUNTY, UTAH**

---

**TABLE OF CONTENTS**

PAGE

Table of Authorities……………………………………………………………………..ii

Introduction………………………………………………………………………....…1

Standard of Review…………………………………………………………………..…..2

Statutory Background………………………………………………………………….....3

Factual Background…………………………………………………………………....4

Argument………………………………………………………………………....…6

I.     The Service Vastly Over-designated Critical Habitat………………………..…..6

       A.     Occupied Habitat is Sufficient for a Viable Population……………..…..6

       B.     Habitat is Not Habitat if it Cannot Support the Species………………....8

II.    The Service's NEPA Analysis Was a Sham Process Designed to
       Reach a Foregone Conclusion…………………………………………...……..11

       A.     The Service's NEPA Analysis Unlawfully Excludes
              Reasonable Alternatives…………….……………………………….....11

       B.     The NEPA Analysis Leads Inexorably to a
              Predetermined Outcome…………………………………….………..13

       C.     The Flawed NEPA Analysis is Fatal to the
              Critical Habitat Designation………………………………………..15

III.   FWS Failed to Consider All Economic Impacts…………………………….…16

Conclusion…………………………………………………………...……..20

PAGE

**CASES**

*All Indian Pueblo Council v. United States*, 975 F.2d 1437 (10th Cir. 1992) …………...11

*Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010) ……………….3

*Bennett v. Spear*, 520 U.S. 154 (1997) ………………………………………………14, 16, 17

*Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249 (10th Cir. 1998) ……………………2

*Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce*,
792 F.3d 1027 (9th Cir. 2015) ……………………………………………….……………..19-20

*Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610 (1986) …………………………………………..7

*Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108
(D.D.C. 2004) …………………………………………………………………………………...3

*Catron County Bd. Of Com'rs, New Mexico v. U.S. FWS*, 75 F.3d 1429
(10th Cir. 1996) …………………………………………………………………………………6

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 F. App'x 440 (9th Cir. 2007) ………12, 13

*Forest Guardians v. U.S. FWS*, 611 F.3d 692 (10th Cir. 2010) ………………………...13-15

*Markle Interests, L.L.C. v. U.S. FWS*, 40 F. Supp. 3d 744 (E.D. La. 2014) ……………10

*Markle Interests, L.L.C. v. U.S. FWS*, 848 F.3d 635 (5th Cir. 2017) …………………8, 11

*Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156
(D.N.M. 2000) ………………………………………………………………………………..3-4

*New Mexico Cattle Growers Ass'n v. U.S. FWS*, 248 F.3d 1277
(10th Cir. 2001) ……………………………………………………………………17, 18, 20

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683
(10th Cir. 2009) ………………………………………………………………………………..11

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) ………………….2

*Otay Mesa Property, L.P. v. U.S. Dep't. of Interior*, 646 F.3d 914 (D.C. Cir. 2011) …….8

*Richardson v. Perales*, 402 U.S. 389 (1971) ……………………………………………..2

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ……………………11

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988) …………………………..11

*Utah Envtl. Cong. v. Bosworth*, 372 F.3d 1219 (10th Cir. 2004) …………………………2

*Wyoming State Snowmobile Ass'n. v. U.S. FWS*, 741 F. Supp. 2d 1245
(D. Wyo. 2010) ………………………………………………………………………………..18

**STATUTES**

5 U.S.C. §500, *et. seq.* …………………………………………………………………2

16 U.S.C. §1532 ……………………………………………………………………*passim*

16 U.S.C. §1533 ……………………………………………………………………*passim*

42 U.S.C. § 4332 ……………………………………………………………………...12

**REGULATIONS**

40 C.F.R. § 1500.1 …...………………………………………………………………...11

40 C.F.R. § 1502.2 ……………………………………………………………………13

40 C.F.R. § 1502.5 ……………………………………………………………………13, 14

40 C.F.R. § 1502.14 ………………………………………………………………...…14

50 C.F.R. § 424.12 (2012) …………..…………………………………………………3, 6

**OTHER AUTHORITIES**

78 Fed. Reg. 2540 (Jan. 11, 2013) ………………………………………………………...5

79 Fed. Reg. 69192 (Nov. 20, 2014) ………………………………………………7, 10

79 Fed. Reg. 69312 (Nov. 20, 2014) …………………………………………………*passim*

H.R. Conf.Rep.No. 95-1625 at 18 (Conf. Rep.)
(*reprinted in* 1978 U.S.C.C.A.N. 9453) …………………………………………………4, 11

H.R. REP. 97-567 at 12 (1982) (*reprinted in* 1982 U.S.C.C.A.N. 2807) ……………....16

*Habitat*, Black's Law Dictionary (10th ed. 2014) ……………………………………………9

**Introduction**

When a species is listed under the Endangered Species Act (ESA), the statute also directs the Fish and Wildlife Service (FWS or Service) to consider designating critical habitat. Designation of critical habitat is meant to safeguard that portion of a species' habitat that is most important and most in need of special protections. Designation of critical habitat is a significant federal decision, with enormous implications on how federal, state, and private landowners can use their land. As such, and in order to ensure a well-informed decision, the Service must (1) meet statutory criteria for designating land, including that such land is, or contains features which are, essential for the conservation of the species; (2) conduct a thorough environmental analysis under the National Environmental Policy Act (NEPA); and (3) consider the economic impact of any designation.

The Service ignored all three of these requirements when it designated 1.4 million acres in Colorado and Utah as critical habitat for the Gunnison sage-grouse. The Service vastly over-designated land by ignoring the essentiality criteria and including more land than the bird needs and, in many instances, land the bird cannot even use. The Service failed its NEPA responsibilities when it conducted an analysis which ignored reasonable alternatives and left the Service with only its pre-determined, preferred course of action. And the Service knowingly ignored economic impacts which the Tenth Circuit has required it consider.

The State of Utah and San Juan County, Utah (collectively, the State), challenge the critical habitat designation as arbitrary, capricious, and unlawful.[1] The designation rests on faulty analyses and produces faulty conclusions. As discussed in detail below, the Gunnison sage-grouse critical habitat designation should be vacated in full.

**Standard of Review**

Challenges to violations of the ESA are governed by the standards set forth in the Administrative Procedure Act (APA), 5 U.S.C. §500, *et. seq.* "Under the APA, administrative decisions involving the ESA are upheld unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998) (quoting 5 U.S.C. § 706(2)(A)). An agency's decision should be overturned if it "is not supported by substantial evidence." *Utah Envtl. Cong. v. Bosworth*, 372 F.3d 1219, 1223 (10th Cir. 2004) (citations omitted). Substantial evidence is "more than a mere scintilla" and certainly more than a "mere conclusion;" there must be enough evidence to adequately support a conclusion. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994) (citations omitted); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The "substantial inquiry" conducted by a reviewing court is deferential to the agency, but nevertheless requires a "thorough, probing, in-depth review." *Olenhouse*, 42 F.3d at 1574 (citations omitted).

---

[1] In accordance with the Order granting the State intervention (Doc. No. 44) and the Amended Case Management Plan (Doc. No. 68), the State certifies that it has conferred with Colorado to avoid duplicative briefing and that this Brief is limited in scope to issues not adequately covered by Colorado. The State also adopts in full those arguments put forth in the Brief of Colorado (Doc. No. 143), as well as those by Petitioner-Intervenors Gunnison County and Gunnison County Stockgrowers' Association (Doc. No. 147).

**Statutory Background**

Under most circumstances, the ESA directs that concurrent with the listing of a species as either endangered or threatened, the listing agency shall also "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. §1533(a)(3)(A)(i). Critical habitat comes in two categories, each with statutory requirements which must be met in order to be designated. First, occupied habitat must be (1) occupied by the species at the time of listing, (2) contain physical or biological features essential to the conservation of the species, and (3) require special management considerations or protection. 16 U.S.C. §1532(5)(A)(i). Second, unoccupied habitat may also be designated, but only if the agency determines that "such areas are essential for the conservation of the species." 16 U.S.C. §1532(5)(A)(ii).

Designation of unoccupied habitat is "a more onerous procedure" and "a more extraordinary event" than designation of occupied habitat. *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010); *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 125 (D.D.C. 2004). Indeed, agency regulations effective at the time of designation directed that unoccupied critical habitat would only be designated if the agency determined occupied habitat was insufficient for conservation of the species. 50 C.F.R. § 424.12(e) (2012); 79 Fed. Reg. 69312, 69328 (Nov. 20, 2014).

Except in special circumstances, critical habitat "shall not include the entire geographical area which can be occupied by the … species." 16 U.S.C. §1532(5)(C). Rather, "critical habitat only includes the *minimum* amount of habitat needed to avoid

short-term jeopardy or habitat in need of immediate intervention." *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1169 (D.N.M. 2000), *aff'd*, 294 F.3d 1220 (10th Cir. 2002) (emphasis added). When designating unoccupied habitat, Congress has directed the agency to be "exceedingly circumspect." H.R. Conf.Rep.No. 95-1625 at 18 (Conf. Rep.) (*reprinted in* 1978 U.S.C.C.A.N. 9453). And, unlike the initial decision to list a species, designation of critical habitat must "tak[e] into consideration the economic impact" of the designation. 16 U.S.C. §1533(b)(2).

**Factual Background**

The State began taking steps to protect and recover the Gunnison sage-grouse long before the species gained protections under the ESA. As early as 1996, San Juan County formed a local working group consisting of representatives from county, state, and federal government, as well as interested private landowners, to identify and implement conservation strategies. *See, e.g.,* GUSG0007380. Over the years, the State has invested approximately $18 million, all voluntarily, to protect the bird through programs such as land acquisitions, research and monitoring, habitat treatments, translocation, and predator control. Voluntary conservation programs resulted in protection of over 30,000 acres of privately owned habitat in Utah. GUSG0092986. This is particularly significant because, while the vast majority of land in San Juan County is federally owned, the majority of Gunnison sage-grouse habitat is on private land. Utah and San Juan County also joined with Colorado and ten Colorado counties to participate in joint conservation efforts. *See, e.g.*, GUSG0081990.

Nevertheless, in 2013 the Service proposed to designate 1.7 million acres in Colorado and Utah as critical habitat. 78 Fed. Reg. 2540 (Jan. 11, 2013). The State and County were actively engaged in the public commenting process. *E.g.* GUSG0075358; GUSG0096092; GUSG0203419; GUSG0200984. Unfortunately, these comments were largely disregarded[2] and, in the final critical habitat designation, the Service designated 1.4 million acres as critical habitat. 79 Fed. Reg. 69312 (Nov. 20, 2014). The habitat is comprised of six units across southwestern Colorado and southeastern Utah. Overall, approximately 55% of the designated critical habitat is occupied by the species, with the remainder unoccupied yet allegedly still "essential to [the species'] conservation." 79 Fed. Reg. at 69314; 16 U.S.C. §1532(5)(A)(ii). Approximately 43% of total critical habitat is on private lands. 79 Fed. Reg. at 69322. In Utah, those figures are much higher: private land ownership accounts for more than 95% of the designated area. GUSG0091750. And in Unit 1 (Monticello, Utah and Dove-Creek, Colorado), a mere 33% of the critical habitat is currently occupied. *Id.* at 69340.

As part of the process for designating critical habitat, the Service is required to complete an economic analysis of the designation and have it inform the decision-making process. 16 U.S.C. §1533(b)(2). The Service contracted with a consultant to perform the required analysis, which was completed on November 7, 2014, less than

---

[2] The States' and Counties' position that species conservation was more likely to be successful outside of the ESA was supported by many federal agencies. *See* GUSG0235882 (memo from Director of FWS noting BLM, Forest Service, and National Park Service are "unsupportive" and "generally feel that a listing will limit their ability to continue implementing conservation actions"); GUSG0120698 (memo from Director of FWS noting BLM, Forest Service, Natural Resources Conservation Service, and Farm Service Agency are concerned critical habitat designation "will limit their ability to continue conservation efforts for the species.").

one week before the final rule. GUSG0194449. The Economic Analysis predicted that, over a 20 year period, the designation would cost between $54.9 million and $73.8 million. GUSG0194456.

The Service is also required to consider the environmental impacts of a critical habitat designation under NEPA. *Catron County Bd. Of Com'rs, New Mexico v. U.S. FWS*, 75 F.3d 1429, 1436 (10th Cir. 1996). The Final Environmental Assessment was completed on November 9, 2014, also less than a week prior to the final rule. GUSG0198238. It considered the proposed action and a no-action alternative, but failed to fully evaluate any other alternatives.

**Argument**

## I. The Service Vastly Over-designated Critical Habitat

### A. Occupied Habitat is Sufficient for a Viable Population

Critical habitat designation under the ESA focuses first and foremost on occupied habitat. Only if occupied habitat is insufficient will the Service consider unoccupied habitat. 50 C.F.R. § 424.12(e) (2012). For the Gunnison sage-grouse, the best scientific evidence supports a conclusion that currently occupied habitat is sufficient to support a viable population. Thus, there is no need to designate any unoccupied habitat.

The critical habitat rule, citing multiple scientific studies, states that "[a] minimum of 500 birds may be necessary to support a viable population" and that "[a]pproximately 100,000 [acres] likely would be needed to support 500 birds." 79 Fed. Reg. at 69316. As discussed in Colorado's opening brief, Doc. No. 143, the Gunnison Basin population alone secures the species for the foreseeable future, and occupied habitat for that

6

population is over five times the necessary 100,000 acres. 79 Fed. Reg at 69314. Two satellite populations – Monticello-Dove Creek and San Miguel Basin – also have occupied habitat in excess of 100,000 acres. *Id.* There is no need, therefore, to designate additional unoccupied habitat, and particularly not in the excessive amount chosen by the Service (almost as much unoccupied habitat as occupied).

The Service relies on a *non sequitur* to justify its intrusion into unoccupied habitat. In the Final Rule, the Service cites the scientific studies calling for 100,000 acres of habitat, but then notes that Gunnsion sage-grouse populations outside the Gunnison Basin are declining. Therefore, it leaps to conclude, "occupied habitat for the five satellite populations … may be less than the minimum amount of habitat necessary for their long-term viability." 79 Fed. Reg. at 69316. This conclusion is supported by absolutely no scientific evidence and does not even make basic logical sense. *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626, (1986) ("It is an axiom of administrative law that an agency's explanation of the basis for its decision must include a rational connection between the facts found and the choice made.") (citation omitted). The conclusion of the Service that declining population numbers is the result of insufficient land acreage ignores a plethora of other possible factors, such as predation, disease, drought, climate change, human disturbance, etc. [3] Any one of these other factors could explain why populations are decreasing, but to conclude that downward trends result only from

---

[3] Furthermore, the record suggests the carrying capacity of habitat has been underestimated. The Rangewide Conservation Plan estimated that occupied habitat in the Gunnison Basin could support 3,039 birds. GUSG0011543. Yet at the time of the listing, 3,978 birds lived in that habitat. 79 Fed. Reg. 69192 at 69198 (Nov. 20, 2014). This 30% underestimate of how many birds the habitat could support is further evidence of the arbitrary nature of the Service's attempt to justify including unoccupied habitat.

insufficient habitat, without any attempt at scientific corroboration, is arbitrary and capricious. See *Otay Mesa Property, L.P. v. U.S. Dep't. of Interior*, 646 F.3d 914, 918 (D.C. Cir. 2011) ("But the absence of a requirement for the Service to collect more data on its own is not the same as an authorization to act without data to support its conclusions, even acknowledging the deference due to agency expertise."). Based on the data available, the Service simply cannot conclude, as it has done, that declining population trends in spite of at least 100,000 acres of occupied habitat means that "the designation of unoccupied critical habitat … [is] essential for conservation of the species." 79 Fed. Reg. at 69316.

### B.  Habitat is Not Habitat if it Cannot Support the Species

The ESA sets a high bar for the designation of unoccupied critical habitat. Such land can only be designated if it is "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). In designating vast swaths of the landscape as unoccupied critical habitat, the Service has completely ignored this statutory requirement and designated land that cannot even support the Gunnison sage-grouse, let alone be "essential" for its survival.

As an initial matter of pure statutory construction, critical habitat must be a portion of the species' habitat. *Markle Interests, L.L.C. v. U.S. FWS*, 848 F.3d 635, 639-45 (5th Cir. 2017) (Jones, J., dissenting from denial of rehearing *en banc*).[4] The ESA

---

[4] The State commends to the Court's attention the entirety of the *Markle Interests* dissent. Signed by six Circuit Judges of the Fifth Circuit Court of Appeals, the dissent goes into much more detail than space allows here explaining why, based on both the language and legislative history of the statute, critical habitat must be habitable and why

directs the Service to "designate **any habitat** of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i) (emphasis added). Habitat is where a species lives or is normally found, a description that does not apply to unoccupied, unsuitable habitat. *E.g., Habitat*, Black's Law Dictionary (10th ed. 2014) ("The place where a particular species of animal or plant is normally found."). Yet the Service has explicitly, and knowingly, included as critical habitat vast areas where the Gunnison sage-grouse does not live and is not found. Indeed, much of this land can provide *no* benefit to the species.

Gunnison sage-grouse live in habitat predominantly populated by sagebrush. They are dependent on sagebrush-dominant plant communities for food, nesting, and cover from predators. 79 Fed. Reg. at 69329. In designating occupied habitat, the Service's first requirement was "extensive sagebrush landscape."[5] 79 Fed. Reg. at 69333. Unfortunately, this requirement was left by the wayside when considering unoccupied habitat. For example, in designating Unit 1 (Monticello, Utah and Dove Creek, Colorado) the Service admitted "that portions of these unoccupied lands are locally **unsuitable as habitat** for Gunnison sage-grouse." *Id.* at 69340 (emphasis added). Much of this land is in agricultural production. *Id.*; GUSG0091750. Farmland does not provide the Gunnison sage-grouse necessary forage or cover for survival. Other designated critical habitat is dominated by coniferous trees or shrubs, such as

---

unoccupied critical habitat must be narrowly designated. The case is currently before the Supreme Court on a petition for *certiorari*. (Case No. 17-71, July 11, 2017).

[5] Even this criterion was overbroad. The Service used a "landscape scale" which was so broad that it allows areas to be included as habitat even when 75% of the area is not dominated by sagebrush. 79 Fed. Reg. at 69316.

piñon-juniper woodlands. 79 Fed. Reg. at 69340-41. The bird also will not live or feed here. *See* 79 Fed. Reg. 69192, 69260 (Nov. 20, 2014) ("Gunnison sage-grouse avoid areas with piñon-juniper.") Yet, the Service would have us believe that land "unsuitable as habitat" is "essential for the conservation of the species."

In theory, this land could undergo extensive (and expensive) habitat modification – removing piñon-juniper communities or plowing over cropland and planting and maintaining sagebrush. *See* 79 Fed. Reg. at 69341 ("These areas require management to reestablish or enhance sagebrush communities."). But the Service has no plans to do so[6] and, indeed, often no authority to require it. *Markle Interests, L.L.C. v. U.S. FWS*, 40 F. Supp. 3d 744, 750 (E.D. La. 2014) ("[A]bsent a federal nexus, FWS cannot compel a private landowner to make changes to restore his designated property into optimal habitat."). Only 55% of the overall critical habitat designation is on federal land and in some areas, such as Utah, private land ownership accounts for more than 95% of the designated area. 79 Fed. Reg. at 69322; GUSG0091750. If the only limitation to designating critical habitat is that it may be theoretically possible to transform the land into something the species could use then this is no limitation at all and virtually any land could be critical habitat for any species.

The unoccupied, and 'unoccupiable', habitat at issue is of no use to the Gunnison sage-grouse. It certainly is not "essential for the conservation of the species." 16 U.S.C.

---

[6] In evaluating whether state or county conservation plans are likely to benefit the species, the Service requires a "reasonable expectation" the plan will be implemented. 79 Fed. Reg. at 69348. If the same standard were applied to the Service's own expectation of habitat modification, all areas requiring modification would be excluded from habitat designation. A "reasonable expectation" is required for the State's plans, but the Service apparently sees fit to rely on utter, unsubstantiated conjecture.

§ 1532(5)(A)(ii). The Service's designation of farmland, piñon-juniper communities, and other non-suitable habitat is in direct contravention of Congress' direction to be "exceedingly circumspect" in designating critical habitat. H.R. Conf.Rep.No. 95-1625 at 18 (Conf. Rep.) (*reprinted in* 1978 U.S.C.C.A.N. 9453). The court should recognize "the oxymoron of uninhabitable critical habitat," *Markle Interests,* 848 F.3d at 645 (Jones, J., dissenting), and reverse the Service's unlawful designation.

## II.     The Service's NEPA Analysis Was a Sham Process Designed to Reach a Foregone Conclusion

### A.  The Service's NEPA Analysis Unlawfully Excludes Reasonable Alternatives

NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA does not require particular outcomes, but rather requires agencies to take a "hard look" at environmental consequences so as to lead to fully informed decision making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). This outcome is achieved by following proper NEPA procedures, and "agency action taken without observance of the procedure required by law will be set aside." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

"The 'heart' of an [environmental impact statement] is its exploration of possible alternatives to the action an agency wishes to pursue." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir. 2009) (citing 40 C.F.R. § 1502.14); *see also All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992) (stating that "a thorough discussion of the alternatives is imperative"

and "the linchpin" of the analysis).[7] The directive to "study, develop, and describe appropriate alternatives," 42 U.S.C. § 4332(2)(E), helps ensure that the agency has carefully examined all options before it and makes an informed choice among competing alternatives. Yet, for the Gunnison sage-grouse, the Service excluded reasonable alternatives so it was left with only the option it wanted.

Besides the required no-action alternative, the Service excluded all other options using flimsy and unconvincing excuses. *See* GUSG0198254-55; *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 F. App'x 440, 443 (9th Cir. 2007) ("A cursory dismissal of a proposed alternative, unsupported by agency analysis, does not help an agency satisfy its NEPA duty to consider a reasonable range of alternatives."). Chief among the alternatives that should have been considered was designating only occupied habitat. As discussed above, the Service's reasoning that occupied habitat was insufficient is logically unjustifiable. Even if the Service had adequate reasons to look beyond occupied habitat, which it did not, it should have at least considered confining additional critical habitat to habitat that can actually support the species. Doing so could have provided the Service with an alternative that excluded hundreds of thousands of acres.

The Service could also have considered in detail designating critical habitat only in the Gunnison Basin. In dismissing this alternative, the Service only repeated the listing decision's conclusion that populations outside the Gunnison Basin were necessary. But it does not follow that *critical habitat* for satellite populations must also

---

[7] A thorough examination of alternatives is required regardless of whether an Environmental Assessment or an Environmental Impact Statement is prepared. *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 F. App'x 440, 442 (9th Cir. 2007).

be necessary. Recall, for example, that the statute requires occupied critical habitat to "require special management considerations or protection." 16 U.S.C.A. § 1532. A proper NEPA alternatives analysis could have recognized that, even if satellite populations are necessary, critical habitat in those populations is unnecessary because no special protections are required. But because reasonable, plausible alternatives were excluded early on, such alternatives were never evaluated and, thus, never considered. With the "heart" of the analysis missing, the Service's final critical habitat designation cannot help but be unlawfully ill-informed. *See Envtl. Prot. Info. Ctr.*, 234 F. App'x at 442-43 (holding environmental assessment inadequate where agency did not propose any alternatives of its own and did not perform full analysis of alternative suggested by commenters).

## B. The NEPA Analysis Leads Inexorably to a Predetermined Outcome

The entire point of a NEPA analysis is to aid the decision maker in coming to an informed decision. Thus, the analysis is only helpful if it comes *before* the decision is made. 40 C.F.R. § 1502.2 ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."); 40 C.F.R. § 1502.5 ("The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.") The Environmental Assessment (EA) conducted for the Gunnison sage-grouse, however, is a "subterfuge designed to rationalize a decision already made." *Forest Guardians v. U.S. FWS*, 611 F.3d 692, 712 (10th Cir. 2010).

As discussed above, failing to consider alternatives is a violation of NEPA. But it is particularly fatal in the critical habitat context, as it leads to a predetermined outcome. In general, a NEPA analysis should be conducted before an irretrievable commitment of resources, giving the agency an opportunity to back out before it is committed. *See, e.g.*, 40 C.F.R. § 1502.5(a). The no-action alternative, which must be considered, is the means by which agencies analyze whether doing nothing is preferable to doing something. But, for critical habitat designations, the no-action alternative is largely illusory. The ESA states that the agency "**shall** designate critical habitat." 16 U.S.C.A. § 1533(b)(2) (emphasis added); *see also Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("the terms of § 1533(b)(2) are plainly those of obligation rather than discretion"). Although exceptions can apply, these generally arise for reasons of economics or national security, not the type of environmental considerations that NEPA is designed to consider. Because the ESA requires critical habitat designation in most instances, and does not allow an exception based on environmental concerns, the no-action alternative is an unimportant part of the NEPA analysis that gets little real consideration.

What the agency is left with, then, are (1) the proposed or favored action and (2) the alternatives. But, as explained above, the Service did not include any alternatives in their EA. An agency is supposed to have "a clear basis for choice **among** options." 40 C.F.R. § 1502.14 (emphasis added). But the only option the Service could really choose from in designating critical habitat for the Gunnison sage-grouse was its single, preferred alternative. Having only one choice is the very definition of a pre-determined outcome. "[A]n agency may violate NEPA, and consequently the APA, when it

predetermines the result of its environmental analysis." *Forest Guardians*, 611 F.3d at

714. The Service has done exactly that here. Its purported compliance with NEPA was

nothing more than a *pro forma* attempt to hide the fact that the Service had already

decided what it was going to do.

### C. The Flawed NEPA Analysis is Fatal to the Critical Habitat Designation

Even ignoring its flaws, the record provides little evidence that the Service took a

"hard look" at the final EA. The "hard look" required by the statute "must be timely, and it

must be taken objectively and in good faith, not as an exercise in form over substance,

and not as a subterfuge designed to rationalize a decision already made." *Forest*

*Guardians,* 611 F.3d at 712 (citations omitted).

The Service never gave itself adequate time to take a hard look at its fatally

flawed EA. The EA was completed on a Sunday (November 9, 2014), and the Finding of

No Significant Impact, purportedly based on the EA, was signed the next day.

GUSG0198238; GUSG0198293. Apparently 48 hours was all the Service needed to

take a "hard look," because by November 12, 2014, the final rules were sent for

publication. GUSG0236643. But even worse, the record makes clear that final decisions

were made a month before the NEPA analyses were completed. On October 8, 2014,

the Service's Director wrote to the OMB recommending a threatened listing with 1.4

million acres of critical habitat. GUSG0173583; *see also* GUSG0236367 (October 27,

2014 news article reporting White House reviewing final rules). [8]

---

[8] As further evidence that the Service placed little importance on the quality and
substance of the EA, the staff member who appears to have been given primary
responsibility to revise and finalize the EA did not start working on the document until

"It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. 154, 172 (1997). Yet the Service ignored these requirements when it failed to consider reasonable alternatives and drafted a NEPA analysis that could only have one result. Worse yet, the final decisions had already been made before the NEPA analysis was complete. In short, there was no deliberation, no reasoned consideration among alternatives. The Service's blatant disregard for proper NEPA procedures undermines the quality of the decision meant to be based thereon – the critical habitat designation. Without the foundation of a proper environmental assessment and finding of no significant impact, the critical habitat designation must be vacated.

## III.  FWS Failed to Consider All Economic Impacts

Although Congress intended listing decisions to be made regardless of cost, designation of critical habitat is made only "after taking into consideration the economic impact." 16 U.S.C. §1533(b)(2); *see also* H.R. REP. 97-567 at 12 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2811-12 ("Desirous to restrict the Secretary's decision on species listing to biology alone, the committee nonetheless recognized that the critical habitat designation, with its attendant economic analysis, offers some counter-point to the listing of species without due consideration for the effects on land use and other development interests.") The Supreme Court has noted that consideration of economic

_____

the week before it was released and admitted she had "never done a NEPA document in my life, and I'm pretty confused right now." GUSG0189455-56; *see also* GUSG0195266 (staff member receiving comments on "fatal flaws" just two days before EA finalized).

impact in critical habitat designations is a "categorical *requirement*." *Bennett v. Spear*, 520 U.S. 154, 172 (1997) (emphasis in original). And the Tenth Circuit in particular requires a more robust economic analysis than some of its sister Circuits.

The Service has a history of trying to downplay the economic impact of its critical habitat designations. By using an "incremental baseline approach," the Service analyzes the economic impacts that result solely from the critical habitat designation and ignores any impacts that can be attributed to the initial listing decision. This approach was flatly rejected by the Tenth Circuit in *New Mexico Cattle Growers Ass'n v. U.S. FWS*, 248 F.3d 1277, 1285 (10th Cir. 2001). The court held that the incremental baseline approach inadequately considered economic impacts and ordered the Service to "conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." *Id*. Although other Circuits have decided differently, the Service is required here to follow the law set forth by the Tenth Circuit and must consider the economic impacts attributable to both the ESA listing and the critical habitat designation.

The Service initially admitted as much. In an instructional memorandum provided to the contractor hired to perform the economic analysis, the Service stated that, since the Gunnison sage-grouse is located in Colorado and Utah – within the jurisdiction of the Tenth Circuit – it would consider "the baseline economic impacts of listing the species and the additional incremental effects of designating critical habitat to perform a coextensive analysis of the economic impacts of the proposed critical habitat designation." GUSG0194648. But by the time the final critical habitat designation was

made, the Service had changed its tune. Relying on a 2013 regulation that unconvincingly claims to eliminate the need to follow *New Mexico Cattle Growers Ass'n*, the Service concludes "we are only required to consider incremental costs based on the revised regulation." 79 Fed. Reg. at 69347.

*New Mexico Cattle Growers Ass'n* is still the law in the Tenth Circuit and the Service cannot simply ignore it. Considering only those impacts that arise from the critical habitat designation fails to fulfill this Circuit's mandate for a "full analysis of **all** of the economic impacts." 248 F.3d at 1285 (emphasis added).

Despite its unequivocal conclusion that it need not follow *New Mexico Cattle Growers Ass'n*, the Service may try to assert that it did, nonetheless, consider economic impacts from the listing decision. Admittedly, the final economic analysis and critical habitat designation do disclose both baseline and incremental costs. But disclosure is not consideration. *Wyoming State Snowmobile Ass'n. v. U.S. FWS*, 741 F. Supp. 2d 1245, 1266 (D. Wyo. 2010) ("[T]he Court concludes that the Service **conducted** a full analysis of all of the economic impacts of the [critical habitat designation], regardless of whether those impacts were attributable co-extensively to other causes. This part of the economic analysis is consistent with Tenth Circuit precedent. However, it is unclear and indeed highly questionable that the Service **considered** the full analysis of all the economic impacts.") (emphasis in original).

To consider means to "investigate, analyze and ultimately to give careful thought to the relevant information in the context of deciding whether or not to proceed ..." *Id.* In the face of the Service's assertion that it need not consider economic costs from the

listing, it is hard to countenance any argument from the Service that it gave careful thought to costs it believes it can disregard.

The critical habitat designation shows again and again the short shrift the Service paid to economic impacts. In response to comments from Utah and Colorado, the Service reports only "forecasted incremental impacts from the critical habitat designation alone (not including baseline impacts due to listing of the species)" and provides no analysis beyond a recitation of the figures. 79 Fed. Reg. at 69318-319; *see also* GUSG0199528. In considering potential exclusions based on economic factors, the Service states that its analysis "did not identify any costs that are concentrated in any geographic area or sector" and thus no areas are being considered for exclusion. *Id.* at 69348. It does not explain why concentration is a necessary predicate for exclusion; economic impacts could be diffuse but still devastating. The economic analysis was not even completed until two weeks before the critical habitat designation, giving federal decision makers scant time to consider its information and have it inform their decision making. GUSG0194449. Analysis of economic impact, such as it is, is only even found in sections related to potential exclusions and the Regulatory Flexibility Act. *Id.* at 69347, 69531. The ESA, however, does not give consideration of economic impacts such a narrow ambit, but instead directs that consideration of such impacts is a necessary step before critical habitat is designated at all. 16 U.S.C. §1533(b)(2) ("The Secretary shall designate critical habitat … after taking into consideration the economic impact…."); *Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce*, 792 F.3d

1027, 1030 (9th Cir. 2015) ("Before designating any particular area as critical habitat, an agency must take into consideration the economic impact") (citation omitted).

The requirement in this Circuit is for the Service to conduct "a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." *New Mexico Cattle Growers Ass'n*, 248 F.3d at 1285. In blatant disregard for the law, the Service admittedly ignored a major component of economic impacts. And the partial economic analysis it did conduct was perfunctory and provides no evidence that the Service carefully weighed the economic impacts. Lacking an adequate consideration of economic impacts, the critical habitat designation is fatally flawed and should be invalidated.

**Conclusion**

At every step in the process, the Service's designation of critical habitat for the Gunnison sage-grouse was arbitrary, capricious, and unlawful. The State has identified numerous fatal flaws with regards to the excessive habitat chosen, the incomplete and rushed NEPA analyses, and the willfully ignorant economic analysis. Any one of these provides adequate grounds for invalidating the critical habitat designation. Together, they show the Service's callous disregard for proper procedure and substance. This Court should vacate the final critical habitat rule and the underlying environmental and economic analyses and grant such other relief as the Court deems appropriate.

Respectfully submitted,


    */s/ David Halverson*
David M. Halverson

David M. Halverson
Special Assistant Attorney General
Kathy A.F. Davis
Assistant Attorney General
5110 State Office Building
PO Box 142477
Salt Lake City, UT 84114-2477
801-537-9023
dhalverson@utah.gov
kathydavis@utah.gov

*Counsel for State of Utah and
San Juan County, Utah*


August 4, 2017

**CERTIFICATE OF SERVICE**

I certify that on August 4, 2017, the undersigned electronically transmitted the

OPENING BRIEF OF PETITIONER-INTERVENORS STATE OF UTAH AND SAN

JUAN COUNTY, UTAH to the Clerk's Office using the CM/ECF system, which will send

notification of this filing to all counsel of record.


*/s/ David Halverson*