# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**In re Gunnison Sage-Grouse**     Lead Case No. 1:15-cv-130-CMA-STV
**Endangered Species Act Litigation**     Consolidated With 1:15-cv-286
                                                   and 1:15-cv-131

This Case Relates to Case No. 1:15-cv-286

## BRIEF AMICUS CURIAE OF MARKLE INTERESTS, LLC, AND P&F LUMBER COMPANY 2000, LLC, IN SUPPORT OF STATE AND COUNTY PLAINTIFF-INTERVENORS

# CORPORATE DISCLOSURE STATEMENT

Markle Interests, LLC, and P&F Lumber Company 2000, LLC, have no parent corporations and no publicly held company owns 10% or more of their stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................................ 1

ARGUMENT ................................................................................................................. 2

    I.    UNDER THE ENDANGERED SPECIES ACT,
         CRITICAL HABITAT MUST BE HABITAT ............................................................. 2

    II.   THE DESIGNATION OF UNOCCUPIED CRITICAL
         HABITAT REQUIRES A MORE RIGOROUS STANDARD
         THAN THE DESIGNATION OF OCCUPIED CRITICAL HABITAT ........................ 4

    III.  THE GOVERNMENT'S DECISION TO NOT EXCLUDE
         UNOCCUPIED AND UNSUITABLE AREAS FROM
         CRITICAL HABITAT IS JUDICIALLY REVIEWABLE ........................................... 5

    IV.  THE LIMITLESS DESIGNATION OF NON-HABITAT AS
         CRITICAL HABITAT RAISES CONSTITUTIONAL CONFLICTS .......................... 7

CONCLUSION ............................................................................................................ 11

CERTIFICATE OF SERVICE ...................................................................................... 12

## TABLE OF AUTHORITIES

### Cases

*Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010) ..................... 4-5

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................ 6

Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. &
  Constr. Trades Council, 485 U.S. 568 (1988) ............................................................. 9

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004) ................................................................................ 3

*Markle Interests, L.L.C. v. U.S. Fish and Wildlife Service*,
  827 F.3d 452 (5th Cir. 2016) ................................................................................. 3-4, 7

*Markle Interests, L.L.C. v. U.S. Fish and Wildlife Service*,
  848 F.3d 635 (5th Cir. 2017) ............................................................................. 1, 4-5, 7

*MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994) ............................................. 4

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Auto Ins.*,
  463 U.S. 29 (1983) ............................................................................................................ 7

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 132 S. Ct. 2566 (2012) ................. 9

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*,
  531 U.S. 159 (2001) ..................................................................................................... 8-10

*United States v. Bass*, 404 U.S. 336 (1971) ..................................................................... 10

*United States v. Lopez*, 514 U.S. 549 (1995) ..................................................................... 9

*United States v. Morrison*, 529 U.S. 598 (2000) ............................................................... 9

### Statutes

16 U.S.C. § 1532(5)(A)(i)–(ii) ............................................................................................ 2-3

16 U.S.C. § 1533(a)(3)(A)(i) .................................................................................................. 3

**Other Authorities**

Habitat, Black's Law Dictionary (10th ed. 2014) ............................................................. 2

*Listing Endangered and Threatened Species and Designating
   Critical Habitat; Implementing Changes to the Regulations for
   Designating Critical Habitat*, 81 Fed. Reg. 7414 (Feb. 11, 2016) .............................. 7-8

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

This case raises an identical claim to that raised in *Markle Interests, L.L.C. v. U.S. Fish and Wildlife Service*, 848 F.3d 635 (5th Cir. 2017), now pending on petition for writ of certiorari in the U.S. Supreme Court (17-74). Amici filed their petition on July 12, 2017. The government response is due August 14, 2017. The High Court is asked to decide whether the Endangered Species Act authorizes the federal government to designate as critical habitat private land that is unsuitable as habitat and has no connection to a protected species. This Court must answer the same question. A resolution of this question at the Supreme Court may determine the outcome of this case. The arguments made to the Supreme Court in *Markle* apply equally here. A familiarity with those arguments will therefore aid the Court in deciding this case.

The designation of non-habitat as critical habitat is unprecedented in its potential to expand federal authority over local land and water use. It vests federal agencies with virtually limitless power to regulate any and all areas of the Nation based solely on the government's bald assertion that the regulated areas are "essential to the conservation of a protected species." This is so, even when the designated area is unsuitable and inaccessible as species habitat, like the vast unoccupied areas designated as critical habitat for the Gunnison sage-grouse.

This approach effectively rewrites the statutory text. With the exception of *Markle*, it conflicts with all relevant judicial decisions. It ignores controlling Supreme Court precedent. And, it raises irreconcilable constitutional conflicts.

1

Accordingly, the Supreme Court and this Court must address four predicate issues: First, whether private property that is unsuitable as habitat and does not contribute to the conservation of a listed species meets the definition of critical habitat under the Endangered Species Act. Second, whether the designation of unoccupied critical habitat requires a more rigorous standard than the designation of occupied critical habitat. Third, whether the government's decision to not exclude an area from critical habitat is reviewable for an abuse of discretion under the Administrative Procedure Act. And, fourth, whether the designation of unoccupied and unsuitable habitat raises a constitutional conflict that can be avoided by a more limited reading of the ESA.

## ARGUMENT

## I

### UNDER THE ENDANGERED SPECIES ACT, CRITICAL HABITAT MUST BE HABITAT

The term "critical habitat" is not a term of art divorced from its plain language. It is descriptive. The word "habitat" denotes a place where species live and grow. *See* Habitat, Black's Law Dictionary (10th ed. 2014) ('The place where a particular species of animal or plant is normally found."). The ESA defines critical habitat as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section

2

> 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A)(i)–(ii).

Subsection (i) describes occupied *habitat* while subsection (ii) describes unoccupied *habitat*. This is clear from another provision of the ESA that states:

> The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable—
>
>   i.  shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, *designate any habitat of such species which is then considered to be critical habitat . . . .*

*Id.* § 1533(a)(3)(A)(i) (emphasis added).

This language is clear and determinative. Under the statutory text, critical habitat is a subset of a species' larger habitat. "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (citations omitted).

In this case, it is the government's reading of the statutory text, contrary to its plain language, that is absurd. As Judge Owen stated in her dissent from the panel decision in *Markle Interests, L.L.C. v. U.S. Fish and Wildlife Service*, 827 F.3d 452 (5th Cir. 2016), the word "essential" vests the Service with significant discretion in determining which areas are necessary for the conservation of a species, "but there are limits to a word's meaning and hence the Service's discretion." *Id.* at 484. In this case, the Service's interpretation of essential "goes beyond the boundaries of what 'essential' can reasonably be interpreted to mean." *Id.* Therefore, as the Supreme Court explained, "an agency's

3

interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *Id.* (citing *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994)). This is such an interpretation.

II

**THE DESIGNATION OF UNOCCUPIED CRITICAL HABITAT REQUIRES A MORE RIGOROUS STANDARD THAN THE DESIGNATION OF OCCUPIED CRITICAL HABITAT**

According to the six-member dissent to the petition for rehearing en banc in *Markle,* "When Congress took up the critical habitat issue in 1978, members of both Houses expressed concerns about the Service's broad definition and its potential to expand federal regulation well beyond occupied habitat." *Markle*, 848 F.3d at 647. Therefore, Congress "took a narrower approach to unoccupied habitat, severing unoccupied from occupied critical habitat and placing the respective definitions in separate provisions." *Id*. Thus, "Congress intentionally curtailed unoccupied critical habitat designation[s]." *Id.* at 647-48.

Additionally, until *Markle*, every court to consider the matter held that the showing the government must make to designate unoccupied areas as critical habitat is *more* demanding than designating occupied areas that contain all of the physical and biological features essential for the species' survival:

> The statute thus differentiates between "occupied" and "unoccupied" areas, imposing a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species.

*Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010).

4

The district courts are in accord:

*See Ctr. for Biological Diversity v. Kelly*, 93 F. Supp. 3d 1193, 1202 (D. Idaho 2015) ("The standard for designating unoccupied habitat is more demanding than that of occupied habitat."); *All. for Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1138 (D. Mont. 2010) ("Compared to occupied areas, the ESA imposes 'a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species.'" (quoting *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1163)); *see also Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 44 (D.D.C. 2013) (referencing "the more demanding standard for unoccupied habitat"); *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 119 (D.D.C. 2004) ("Thus, both occupied and unoccupied areas may become critical habitat, but, with unoccupied areas, it is not enough that the area's features be essential to conservation, the area itself must be essential.").

*Markle*, 848 F.3d at 648.

Nevertheless, the Service lowered the bar in *Markle* and this case, and asserts it may designate any unoccupied area as critical habitat that has the potential, even if not the actual possibility, of becoming sustainable habitat through human intervention. This approach makes it *less* onerous to designate unoccupied areas as critical habitat contrary to the intent of Congress and the relevant case law.

III

**THE GOVERNMENT'S DECISION TO NOT EXCLUDE UNOCCUPIED AND UNSUITABLE AREAS FROM CRITICAL HABITAT IS JUDICIALLY REVIEWABLE**

Section 4 of the ESA authorizes the government to exclude any area from designation as critical habitat where the societal burdens outweigh the biological benefits to the species. In *Markle*, as in this case, the government failed to exclude such areas even though the impacts on resource users are severe and the designation of non-habitat provides no benefit to the protected species. Those benefits derive only from actual

5

sustainable habitat. The designation of non-habitat as critical habitat is therefore arbitrary and capricious. The government argued in *Markle*, and will probably argue in this case, that the government's decision to not exclude an area from critical habitat is left to the sole discretion of the government and is not reviewable in court.

But that argument conflicts with the Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154 (1997), wherein the Court expressly held the government's critical habitat designation is judicially reviewable for abuse of discretion under the Administrative Procedure Act:

> It is true that . . . except where extinction of the species is at issue, "[t]he Secretary *may* exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Ibid.* (emphasis added). However, the fact that *the Secretary's ultimate decision is reviewable only for abuse of discretion* [under the APA] [emphasis added] does not alter the categorical *requirement* that, in arriving at his decision, he "tak[e] into consideration the economic impact, and any other relevant impact," and use "the best scientific data available."

*Id.* at 172.

*Bennett v. Spear* is controlling and that case authorizes this Court to review the government's decision to not exclude unusable areas from the critical habitat designation where the impacts are high and the benefits are low. Or, in this case, nonexistent.

> The Service has a history of trying to downplay the economic impact of its critical habitat designations . . . . ¶ The critical habitat designation shows again and again the short shrift the Service paid to economic impacts. In response to comments from Utah and Colorado, the Service reports only "forecasted incremental impacts from the critical habitat designation alone (not including baseline impacts due to listing of the species)" and provides no analysis beyond a recitation of the figures. 79 Fed. Reg. at 69318-319; *see also* GUSG0199528. In considering potential exclusions based on economic factors, the Service states that its analysis "did not identify any costs that are concentrated in any geographic area or sector" and thus no

6

> areas are being considered for exclusion. *Id.* at 69348. It does not explain why concentration is a necessary predicate for exclusion; economic impacts could be diffuse but still devastating.

Petitioner-Intervenors' Opening Brief at 17-19.

With a potential for severe impacts on resource users, including the state and local governments and ranchers and farmers, on one side, and no articulated benefit to the species on the other side, the government's decision defies reason and is arbitrary and capricious. The designation of non-usable areas as critical habitat "runs counter to the evidence before the agency" and "is so implausible that it [cannot] be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Auto Ins.*, 463 U.S. 29, 43 (1983).

## IV

## THE LIMITLESS DESIGNATION OF NON-HABITAT AS CRITICAL HABITAT RAISES CONSTITUTIONAL CONFLICTS

The en banc dissent in *Markle* warned that the designation of non-habitat as critical habitat gives the government "virtually limitless" power to designate critical habitat. *Markle*, 848 F.3d at 651. In her panel dissent, Judge Owen argued that if this approach is allowed to stand it will lead to the designation of "vast portions" of the Nation subject to strict federal control. *Markle*, 827 F.3d at 481. The multi-state designation of critical habitat for the Gunnison sage-grouse is a case in point.

Moreover, the government recently codified this approach in a new rule relying on *Markle*, although the Supreme Court has yet to rule on the decision. *See Listing Endangered and Threatened Species and Designating Critical Habitat; Implementing Changes to the Regulations for Designating Critical Habitat*. 81 Fed. Reg. 7414, 7427

7

(Feb. 11, 2016). That rule prematurely establishes *Markle* as a nationwide precedent and was challenged by 18 states in the U.S. District Court for the Southern District of Alabama (16-cv-00593). The case is on hold allowing time for the new Administration to determine if it will defend the rule.

Authorizing the government to wield the sweeping and unprecedented power to designate "vast portions" of the Nation as critical habitat that cannot sustain the species without drastic modification, and which do not provide any supporting role in the conservation of the species, is troubling because it raises a constitutional conflict, in two ways. First, federal regulation of local land and water resources, that have no connection to a protected species, exceeds the commerce power on which the ESA is based. And, second, federal regulation of local land and water use unduly impinges on the power of the states in violation of the Tenth Amendment.

Enforcement of the ESA to protect species found on private, state, and local lands and waters creates a line-drawing problem that implicates the outer boundaries of constitutional power. The Supreme Court addressed a similar line-drawing problem under the Clean Water Act wherein the Court acknowledged such broad regulation raised constitutional concerns and held the challenged statutory provisions should be read to avoid a constitutional conflict.

In *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*), the Corps asserted jurisdiction over remote water bodies that had no connection to any navigable-in-fact waters subject to regulation under the Clean Water Act, as authorized by the Commerce Clause. The Supreme Court rejected the Corps'

interpretation of the Act, explaining that "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *Id.* at 172 (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).

The basis for that policy lies in the Court's desire "not to needlessly reach constitutional issues" and the Court's assumption "that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Id.* at 172-73. According to the Supreme Court, the Corps pushed the limits of congressional authority in *SWANCC* when it "claimed jurisdiction over petitioner's land because it contains water areas used as habitat" by migratory waterfowl. *Id.* at 173. The constitutional conflict arose because the Corps did not identify a basis for such regulation under the commerce power. This is significant, the Court stated, because it had twice affirmed "the proposition that the grant of authority to Congress under the Commerce Clause, though broad, is not unlimited." *Id.* See *United States v. Morrison*, 529 U.S. 598, 613 (2000) ("[T]hus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."); *and United States v. Lopez*, 514 U.S. 549, 559 (1995) (Congress may regulate intrastate economic activity where the activity substantially affects interstate commerce.). More recently, the Supreme Court explained: "[A]s expansive as this Court's cases construing the scope of the commerce power have been, they uniformly describe the power as reaching 'activity;'" specifically, "existing commercial activity." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 132 S. Ct. 2566, 2572-73 (2012).

9

The Court could have been talking about *Markle* or even this case, because the same conflict arises. With respect to those areas that are unsuitable as habitat and which provide no conservation benefit to the species, the government has failed to identify any Commerce Clause connection. To the contrary the government asserts it may designate non-habitat as critical habitat thereby cutting off any constitutional link. The Supreme Court has never upheld a Commerce Clause regulation where there is no connection to interstate commerce.

The Supreme Court's concern over needlessly reaching constitutional issues, unless Congress clearly intends to push the limits of constitutional power, "is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *SWANCC*, 531 U.S. at 173 (citing *United States v. Bass*, 404 U.S. 336, 349 (1971)). The traditional state power that concerned the Court in *SWANCC* was the power of the state to control local land and water use, much like this case. "Permitting respondents to claim federal jurisdiction over ponds and mudflats . . . would result in a significant impingement of the State's traditional and primary power over land and water use." *Id*. at 174. That impingement created a constitutional conflict. It is no wonder that 15 states filed an amicus brief in support of Markle's en banc review and that 18 states are now seeking to overturn the critical habitat rule that relies on the still-pending *Markle* decision. The designation of vast areas as critical habitat that do not provide any conservation benefit to a listed species is a quintessential impingement on the powers of the states in violation of constitutional norms.

**CONCLUSION**

The essentially boundless authority granted the federal government by allowing the designation of non-habitat as critical habitat, under the guise of species protection, conflicts with a plain reading of the Endangered Species Act and, with the exception of *Markle*, all the lower courts interpreting the Act. It also conflicts with the Supreme Court's decisions in *Bennett* and *SWANCC*, and long-held constitutional limitations on federal power. This Court should overturn the Final Rule designating critical habitat for the Gunnison sage-grouse or await further guidance from the Supreme Court in the *Markle* case.

DATED: August 11, 2017.

                                        Respectfully submitted,

                                        */s/ M. Reed Hopper*
                                        M. REED HOPPER
                                        Pacific Legal Foundation
                                        930 G Street
                                        Sacramento, California 95814
                                        Telephone: (916) 419-7111
                                        Facsimile: (916) 419-7747
                                        E-mail: mrh@pacificlegal.org

                                        Counsel for Amici Curiae Markle Interests, LLC, and P&F Lumber Company 2000, LLC

## CERTIFICATE OF SERVICE

I certify that on August 11, 2017, the undersigned electronically transmitted the BRIEF AMICUS CURIAE OF MARKLE INTERESTS, LLC, AND P&F LUMBER COMPANY 2000, LLC, IN SUPPORT OF STATE AND COUNTY PLAINTIFF-INTERVENORS to the Clerk's Office using the CM/ECF system, which will send notification of this filing to all counsel of record.

*/s/ M. Reed Hopper*
M. REED HOPPER
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
E-mail: mrh@pacificlegal.org

Counsel for Amici Curiae Markle Interests, LLC, and P&F Lumber Company 2000, LLC