**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**


IN RE GUNNISON SAGE-GROUSE            Civil Action No. 1:15-cv-130- AP
ENDANGERED SPECIES ACT LITIGATION,

---

### FEDERAL RESPONDENTS' AMENDED RESPONSE TO THE STATES' AND COUNTIES' OPENING BRIEFS IN CASE 1:15-cv-286

---

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 2

   I.   Statutory Background .................................................................................. 2

      a.  The Endangered Species Act.................................................................. 2

         i.  Listing Determinations ..................................................................... 2

         ii.  Designation of Critical Habitat ....................................................... 3

      b.  The National Environmental Policy Act ........................................... 5

   II.  Factual Background ................................................................................... 7

      a.  Gunnison sage-grouse ............................................................................. 7

         i.  Gunnison sage-grouse population size and trends........................ 7

         ii.  Gunnison sage-grouse habitat and range..................................... 8

      b.  Gunnison sage-grouse listing and critical habitat determinations.................................. 9

         i.  Gunnison sage-grouse listing.......................................................... 9

         ii.  Gunnison sage-grouse critical habitat designation ................... 10

            1.  The Final Critical Habitat Rule ...................................... 10

            2.  Procedural Background on the Final Critical Habitat Rule ............... 14

STANDARD OF REVIEW ..................................................................................... 15

ARGUMENT............................................................................................................ 16

   I.   The Service's Listing Decision Was Reasonable and Supported by the Record, and the Petitioners Have Failed to Show Otherwise ................................................................. 16

      a. Colorado's science-based claims have not demonstrated the Service's listing determination to be unreasonable ........................................................................ 18

i. The Service's interpretation of the best available science receives the highest deference ................................................................................................. 19

ii. The satellite populations are essential to the Gunnison sage-grouse's long-term survival ............................................................................................. 20

iii. The Gunnison sage-grouse is likely to become endangered within the foreseeable future ................................................................................................... 22

1. Habitat loss due to human disturbance is a threat (Factor A) ............................ 23

2. Climate change is an increasing future threat (Factor A) .................................. 24

3. Severe, prolonged drought is an increasing threat (Factor E) ............................ 25

4. West Nile virus is an increasing future threat (Factor C) .................................. 27

5. Current regulatory mechanisms are inadequate to address current and future threats faced by Gunnison sage-grouse across their range ................................. 28

6. 2006 Colorado Candidate Conservation Agreement with Assurances .............. 29

7. 2013 Gunnison Basin Candidate Conservation Agreement ................................ 31

8. Declining genetic health due to small population size and structure is a current and future threat (Factor E) ................................................................................. 33

a. The satellite populations are vital to the species' long-term survival ............... 33

b. The Service's threatened determination is not premised solely on the 2012 population viability analysis .......................................................................... 34

c. The Service's threatened determination analyzed specific current and future threats to the Gunnison sage-grouse ................................................................. 36

d. The satellite populations provide redundancy .................................................. 37

b. Gunnison does not demonstrate any procedural errors ..................................... 38

i. Gunnison was not prejudiced by the Service's consideration of the 2012 Davis PVA ....................................................................................................... 38

ii.    The Service's PECE analysis was adequate .............................................. 41

II.    The Service's Designation of Unoccupied Critical Habitat in Utah Was Reasonable and
       Supported by the Record .......................................................................... 44

   a.   Colorado and Gunnison have waived their challenges to the critical habitat
        designation .......................................................................................... 46

   b.   The Service made a reasonable determination that the unoccupied areas designated are
        essential for the conservation of the GUSG ................................................ 49

   c.   Unoccupied areas need not contain PCEs to be designated ........................... 56

III.    The Service Fully Considered the Economic Impacts of Designating Critical
        Habitat ................................................................................................ 64

   a.   The Service is not bound by Tenth Circuit case law that rejected an approach that was
        not even followed in this rulemaking ........................................................ 64

   b.   The Service's Discretionary 4(b)(2) Exclusion Analysis is Distinct From the Impact
        Analysis and has no bearing on whether the Service "considered" economic
        impacts ............................................................................................... 70

   c.   Utah's remaining arguments regarding the economic analysis should be rejected ........ 72

IV.    The Service Complied With NEPA ............................................................. 73

   a.   The Environmental Assessment Considered Appropriate Alternatives ..................... 73

   b.   The Service Did Not Predetermine a Plan of Action Prior to Conducting its NEPA
        Analysis .............................................................................................. 75

CONCLUSION ............................................................................................... 76

**INTRODUCTION**

Petitioner State of Colorado ("Colorado") and Petitioner-Intervenors, Gunnison County and Gunnison County Stockgrowers' Association ("Gunnison"), and the State of Utah ("Utah") (collectively, "Petitioners"), in case 1:15-cv-286, challenge decisions regarding the Gunnison sage-grouse ("GUSG") made by the U.S. Fish & Wildlife Service ("Service") pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*. Petitioners each bring varied claims under the ESA, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). More specifically, Colorado challenges the Service's scientific analyses and predictions in the Service's November 20, 2014 decision to list the GUSG as a threatened species and argues that listing the species was not warranted and, thus, the GUSG should not receive any protection under the ESA. Gunnison, for its part, claims the Service committed various procedural errors in issuing its final listing decision. And, finally, Utah challenges the designation of unoccupied critical habitat and claims the designation violates the ESA and NEPA.

In making their respective arguments, however, Petitioners ignore key Service analyses and rely heavily on inaccurate and exaggerated characterizations of cherry-picked statements from the record. Petitioners also ignore relevant case law that has rejected their arguments time and again. After a careful reading of the relevant case law and record documents, Petitioners' arguments amount to nothing more than a disagreement with the Service's listing and critical habitat determinations. But mere disagreement does not invalidate an otherwise reasonable decision. As explained further below, the Service, in applying its interpretation of the ESA's "endangered species" and "threatened species" definitions, carefully analyzed the severity and immediacy of the impacts from all threats facing the grouse. The Service, as the expert wildlife agency charged with implementing the ESA, reasonably determined the grouse to be a "threatened species" under the ESA and appropriately designated approximately 1,429,551 acres of critical

habitat throughout the species' range. These determinations were reasonable and supported by the record. For these reasons, the Court should deny Petitioners' petitions for review in case 1:15-cv-286.

## BACKGROUND

### I.  Statutory Background

#### a.  The Endangered Species Act

"The purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the survival of their existing numbers." *Alaska Oil & Gas Ass'n* ("AOGA") *v. Jewell*, 815 F.3d 544, 550-51 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 2091 (2017), 137 S. Ct. 2110 (2017). To accomplish this goal, Congress requires the Service to list a species that qualifies as an "endangered species" or "threatened species" and to designate areas considered to be the species' critical habitat. *See* 16 U.S.C. § 1533(a)(1), (3).

#### i.  Listing Determinations

The ESA directs the Service to determine, based on the best scientific and commercial data available, whether a particular species should be listed as a "threatened species" or "endangered species." 16 U.S.C. § 1533(b)(1)(A). An "endangered species" is "any species which is *in danger of extinction* throughout all or a significant portion of its range." 16 U.S.C. § 1532(6) (emphasis added). A "threatened species" is "any species which is *likely to become* an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20) (emphasis added). Despite the similarity of these statutory definitions, there is a crucial temporal distinction between them. An endangered species is in danger of extinction (or on the brink of extinction) in the present, whereas a threatened species is likely to become endangered at some point in the foreseeable future. *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig*., 794 F. Supp. 2d 65, 89-90, n.27 (D.D.C. 2011), *aff'd*, 709 F.3d 1 (D.C. Cir. 2013).

2

The ESA requires the Service to determine whether a species is endangered or threatened because of any or a combination of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). In deciding whether to list or delist a species, the Service must make its decision "solely on the basis of the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b); *see* 16 U.S.C. § 1533(b)(1)(A). The ESA also requires that the Service take into account State, local, and other conservation efforts in making its listing determinations. 16 U.S.C. § 1533(b)(1)(A).

## ii. Designation of Critical Habitat

The ESA also provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). Section 4 of the ESA directs that the Service "to the maximum extent prudent and determinable . . . (i) shall, concurrently with [listing a species as threatened or endangered], designate any habitat of such species which is then considered to be critical habitat; and (ii) may, from time-to-time thereafter as appropriate, revise such designation." 16 U.S.C. § 1533(a)(3)(A). The Service may designate as critical habitat both occupied and unoccupied areas. *Id.* § 1532(5)(A). Occupied critical habitat is defined as "the specific areas within the geographical area occupied by the species, at the time it is listed…on which are found those physical or biological features (I) essential to the conservation of the species and (II) which <u>may</u> require special management considerations or protection." *Id.* § 1532(5)(A)(i) (emphasis added); *contra* Utah Br. (ECF No. 148) at 3 (omitting "may"). Areas outside the

3

geographical area occupied by the species at the time it is listed may be designated as unoccupied habitat "upon a determination by the Secretary that such areas are essential for the conservation of the species." *Id.* § 1532(5)(A)(ii). "Conservation" is defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided [by the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

Unlike the assessment of a species' status for listing purposes, which is based solely on the best scientific and commercial data available, the Service must consider "the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). The Service has the discretion to exclude from a critical habitat designation any area if the Service concludes "the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat," but not if the exclusion would "result in the extinction of the species." *Id.*

Critical habitat receives protection under ESA Section 7, which requires <u>federal agencies</u> to consult with the expert agency, here the Service, on any actions "authorized, funded, or carried out by" the agency to ensure that their actions are not likely to destroy or adversely modify critical habitat.[1] *Id.* § 1536(a)(2). If the Service finds that an agency action, such as the issuance of a permit, is likely to result in adverse modification of critical habitat, the Service must suggest reasonable and prudent alternatives that would avoid adverse modification. 50 C.F.R. § 402.14(h)(3). "Reasonable and prudent alternatives" must be "economically and technologically feasible." *Id.* § 402.02. Unoccupied critical habitat is not *per se* regulated by the ESA. If private land is designated as unoccupied critical habitat and the private party's activities have no federal

---

[1] ESA Section 7(a)(2) also protects listed species by requiring Federal agencies to consult to ensure that their actions are not likely to jeopardize the continued existence of those species. However, that aspect of ESA Section 7(a)(2) is not relevant here and so will not be discussed further in this brief.

nexus, *i.e.*, it is not authorized, funded, or carried out by a federal agency, it is not affected by a critical habitat designation. *See Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 458 (5th Cir. 2016); *contra* Utah Br. at 1 (asserting that a designation of critical habitat in itself has "enormous implications on how…state, and private landowners can use their land"), *pets. For cert docketed* Nos. 17-71, 17-74.

The designation of critical habitat benefits the species in a number of other ways. Identifying critical habitat "facilitates implementation of section 7(a)(1) of the Act by identifying areas where Federal agencies can focus their conservation programs." 78 Fed. Reg. 53,058, 53,059 (Aug. 28, 2013). It also helps focus the efforts of other conservation partners, such as the State and local governments, nongovernmental organizations, and individuals. It can also educate the public about the need to conserve the species. Finally, it may also provide early conservation planning guidance to bridge the gap until the Service can complete more thorough recovery planning. *Id.*

### b. The National Environmental Policy Act

Through NEPA, Congress established "a national policy which will encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321; *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1236 (10th Cir. 2011). NEPA serves two general purposes. "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Forest Guardians v. U.S. Fish & Wildlife Serv.,* 611 F.3d 692, 711 (10th Cir. 2010). "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Id.* NEPA, however, is strictly a procedural statute. *Wyoming*, 661 F.3d at 1237. It does not mandate any particular results or impose substantive environmental obligations on federal agencies. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989); *Wyoming*, 661 F.3d at 1237.

NEPA requires an agency to take a "hard look" at the environmental impacts of proposed actions. *Sierra Club v. Bostick*, 787 F.3d 1043, 1047 (10th Cir. 2015). In taking this "hard look," the agency must take appropriate steps based on the nature of the proposed action. If the proposed action involves a "major Federal action" that would "significantly affect [ ] the quality of the human environment," the agency must prepare a detailed environmental impact statement ("EIS"). *Id.* (quoting 42 U .S.C. § 4332(2)(C)). But if the future effects of the proposal are unclear or not significant, the agency can prepare an environmental assessment ("EA") instead of a more detailed EIS. *Id.*

An EA is a concise public document that briefly describes the proposal, examines alternatives, considers environmental impacts, and provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9. If the EA shows that the impacts would be insignificant, the agency need not provide any further environmental report. *Bostick*, 787 F.3d at 1047. "The requirements of NEPA 'have been [implemented] by longstanding regulations issued by the Council on Environmental Quality.'" *Wyoming*, 661 F.3d at 1237-38 (citation omitted); *see* 40 C.F.R. pts. 1500–08. Those regulations prescribe different procedures for EISs than those for EAs. *Compare, e.g.,* 40 C.F.R. §§ 1502.2, 1502.9 *with* 40 C.F.R. § 1508.9; *see also* 43 C.F.R. §§ 46.300-46.325 (Department of Interior ("DOI") regulations regarding EAs); 43 C.F.R. §§ 46.400-46.450 (DOI regulations regarding EISs).

In reviewing an agency's NEPA compliance, the Tenth Circuit applies "a rule of reason standard (essentially an abuse of discretion standard) . . . ." *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004). "Deficiencies in an [environmental assessment] that are mere flyspecks and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal*." Hillsdale Envtl. Loss Prevention v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012) (citation omitted); *see also Nat'l Audubon Soc'y v. Dep't of Navy*, 422

F.3d 174, 186 (4th Cir. 2005) ("[a]llowing courts to seize upon any trivial inadequacy in an [EA] as reason to reject an agency decision would permit undue intrusion into an agency's decisionmaking authority).

## II.    Factual Background

### a.    Gunnison sage-grouse

Gunnison sage-grouse (*Centrocercus minimus*) are ground-dwelling birds known for their elaborate mating ritual where males congregate on leks (breeding grounds) and strut or "dance" to attract mates. During the breeding season, males have conspicuous neck feathers and yellow-green air sacs on the chest. Gunnison sage-grouse are most easily identified by their dark brown color, distinctive black bellies, long, pointed tails, and association with sagebrush habitats. Hens have drab, cryptic plumage that helps them hide from predators. GUSG0022594[2] (12-Month Finding, 75 Fed. Reg. 59,804, 59,805 (Sept. 28, 2010)). Gunnison sage-grouse and greater sage-grouse (a similar, closely related species) have similar life histories and habitat requirements but differ, among other things, in physical appearance and genetic makeup. GUSG0199401; *see also* GUSG0011309.

#### i.    Gunnison sage-grouse population size and trends

At the time of decision-making in 2014, the rangewide population was estimated at 4,705 birds across seven population areas. GUSG0199404-08. The primary population—the Gunnison Basin population—at that time was estimated to contain nearly 4,000 birds, representing more than 84% of the total number of birds across the range and 62% of the species' occupied habitat. *Id.*; GUSG0199404-06. The Gunnison Basin population was considered relatively stable, though population estimates for the particular population have ranged from approximately 2,400 to 5,200

---

[2] "GUSG######" refers to the bates-stamp number on the lower right corner of each page in the administrative record.

since 1996. GUSG0199404, GUSG0199406. The other six "satellite" populations were much smaller than the Gunnison Basin population at the time of decision-making, ranging from 206 to 10 birds in size, together representing 16% of the species' population, 37% of its occupied habitat, and 24% of the rangewide genetic diversity. GUSG0199406, GUSG0199425, GUSG0199497. All of the satellite populations were generally in decline until 2010, some were still in decline after that time, and all remained at population size estimates that raised concern for their viability. GUSG0199406-08.

### ii. Gunnison sage-grouse habitat and range

Gunnison sage-grouse are considered obligate users of sagebrush and require large, contiguous areas of sagebrush across the landscape. GUSG0022594; GUSG0199435-37. For this reason, the range of Gunnison sage-grouse closely aligns with the distribution of sagebrush habitats. Historically, the range of the grouse included parts of central and southwestern Colorado, southeastern Utah, northwestern New Mexico, and northeastern Arizona – approximately 13,680,590 acres. GUSG0199412. As of 2014, however, the grouse occupied approximately 8- to 10% of its historical range – approximately 940,000 acres in southwestern Colorado and southeastern Utah. GUSG0199435-37. Gunnison sage-grouse are currently found only in seven widely scattered and largely isolated populations – Gunnison Basin, Crawford, San Miguel, Piñon Mesa, Monticello-Dove Creek, Cerro Summit-Cimarron-Simms Mesa, and Poncha Pass. GUSG0199401 (Final Listing Rule, 79 Fed. Reg. 69,192 (Nov. 20, 2014)).



### b. Gunnison sage-grouse listing and critical habitat determinations

### i. Gunnison sage-grouse listing

On November 20, 2014, after four public comment periods, three public hearings, and evaluation by five peer reviewers, the Service determined the Gunnison sage-grouse to be "threatened" under the ESA. GUSG0199399. As explained in more detail below and in the Final Listing Rule, the Service based its decision on an analysis of the threats contributing to the grouse's rangewide decline. GUSG0199510-13. The principal threats to the species at the time of listing were habitat loss and fragmentation due to human disturbance and associated infrastructure, climate change, drought, disease, and declining genetic health due to a small population size, particularly with the six satellite populations. The fragmented nature of the remaining habitat, now reduced to 8- to 10% of its historical rangewide habitat, exacerbated the negative effects the primary threats were having on the current populations.[3] *Id.* While the Gunnison Basin population

---

[3] Other threats also found to be affecting the grouse to a lesser degree and at a local scale included overgrazing, fences, invasive plants, fire, mineral development, piñon-juniper encroachment,

appeared to be relatively stable in light of the current threats at the time, the smaller satellite populations in particular were highly vulnerable to extirpation, leaving the entire species vulnerable. *Id*. And the threats to the rangewide grouse populations were expected to increase in the future, including those affecting the Gunnison Basin population. *Id*. The Service also found that, while the grouse benefitted from various rangewide conservation measures and protective local, State, and Federal regulatory mechanisms (*e.g*., laws, regulations, zoning, and land management plans), the conservation measures and regulatory mechanisms were not yet cumulatively adequate to protect the species against the full scope of these current and future rangewide threats. For these reasons, the Service determined that, while the species was not *presently* endangered or on the brink of extinction, the best available science indicated that the current threats across the range were likely to increase and intensify over the next 40-60 years (the foreseeable future) to a level where the Gunnison sage-grouse would likely become in danger of extinction. Therefore, the Service listed the grouse as threatened under the ESA.[4]

### ii. Gunnison sage-grouse critical habitat designation

### 1. The Final Critical Habitat Rule

On November 20, 2014, at the same time it listed the species as threatened, the Service also designated approximately 1,429,551 acres of critical habitat for the grouse throughout the species' range. GUSG0199347 ("Final Critical Habitat Rule"). The area included six units in Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, and San Miguel Counties in Colorado, and in Grand and San Juan Counties in Utah. *Id*. Units 1 and 2 include designated areas

---

large-scale water development, predation (often facilitated by human development or disturbance), and recreation.

[4] Because Gunnison asserts several procedural claims in challenging the listing determination, the relevant procedural background is discussed in detail in the Argument section below.

in Utah. GUSG0199392-93. The Service initially proposed to designate 1,704,227 acres in seven units. *Id*. However, as described in more detail below, after carefully considering comments made by peer reviewers and the public, including the parties to this litigation, the Service modified the boundaries in certain areas and excluded other areas.

The Service designated 784,611 acres of occupied critical habitat, which is not challenged here, and 644,940 acres of unoccupied critical habitat. GUSG0199349. Approximately 1,280,789 of those acres are located in Colorado and the remaining 148,762 acres are located in Utah. As part of its assessment of occupied areas, the Service evaluated the primary constituent elements ("PCEs"), which define the primary physical or biological features essential to the conservation of the species and that provide for the GUSG's life-history processes, based on studies relevant to the GUSG's habitat, ecology, and life history. GUSG0199364. The PCEs may include, but are not limited to "[s]pace for individual and population growth and for normal behavior" and "[h]abitats that are protected from disturbance or are representative of the historical, geographical, and ecological distributions of a species." GUSG0199364 (emphasis added). For the GUSG, the relevant PCEs are:

> (1) Extensive sagebrush landscapes that include areas in which at least 25 percent of the land is dominated by sagebrush cover within a 1.5km radius of any given location and of sufficient size and configuration to encompass all seasonal habitats for a given GUSG population and facilitate movements within and among populations.

> (2) Breeding habitat, including lek, nesting, and early brood-rearing habitats; early brood-rearing habitat may include agricultural fields;

> (3) Summer-late fall habitat, including sagebrush communities having the reference habitat structure values, as well as agricultural fields and wet meadow or riparian habitat types;

> (4) Winter habitat including sagebrush areas that are available (i.e., not covered by snow) to the GUSG during average winters;

> (5) Alternative, mesic habitats used primarily in the summer-late fall season, such as riparian communities, springs, seeps, and mesic meadows.

GUSG0199389-90. The Service determined that PCE 1 should be at a "landscape scale" and "occur wholly within the potential historical range" of GUSG.[5] GUSG0199389. All areas designated by the Service as occupied habitat meet the landscape specific—PCE 1 and one or more of the seasonally specific PCEs (2-5). *Id.* This approach is reasonable because, as the Service explained, the GUSG "move seasonally among various habitat types driven by breeding activities, nest and brood-rearing site requirements, seasonal changes in the availability of food resources, and response to weather conditions." GUSG0199364. Additionally, "[h]abitat structure and quality vary spatially over the landscape; therefore, some areas may provide habitat for a single season, while other areas may provide habitat for one or more seasons." GUSG0199365.

The Service also designated 644,940 acres of unoccupied critical habitat that it determined to be essential for the conservation of the GUSG. As the Service explained in detail in the Final Critical Habitat Rule, the Service designated unoccupied areas for a number of reasons. First, current satellite populations are at levels too low to ensure long-term survival and they require additional unoccupied habitat to provide for necessary population expansion. GUSG199375. Second, because the Gunnison Basin population is "extremely important for the species' survival" and the extensive sagebrush landscapes in the basin are "rare across the species' range," providing

---

[5] Utah complains about the use of a "landscape scale," but does not go so far as to challenge the scale with reference to any scientific data from the administrative record. Utah at 9 n.5. Thus, the Federal Respondents limit their discussion of this point. The Final Rule demonstrates the reasonableness of looking at the "landscape scale" in this case, stating that

> for a wide-ranging, landscape species covering a large area of occupied and potential habitat across several States (such as the Gunnison sage-grouse), a relatively coarse-scale analysis is appropriate and sufficient to designate critical habitat as defined by the Act, while for a narrow endemic species, with specialized habitat requirements and relatively few discrete occurrences, it might be appropriate to engage in a relatively fine-scale analysis for the designation of critical habitat.

GUSG0199351.

"additional expanses of sagebrush landscapes [not occupied at the time of listing] is essential for the conservation of the species." *Id.* Additionally, the unoccupied areas near the Gunnison Basin provide potential connectivity to certain of the satellite populations. *Id.* Third, unoccupied areas in each of the designated critical habitat units "decrease the geographic isolation of the current geographic distribution of [GUSG] by increasing the connectivity between occupied habitats and populations." *Id.* Finally, the unoccupied areas are located within the historical range of the species and have good potential for serving as corridors, or movement areas, between currently occupied areas. *Id.* The designation of unoccupied critical habitat is further discussed in the Argument section below.

As a result of the peer review process, public comments, including from Petitioner Colorado and Intervenors Gunnison and Utah, and newly available information, the Service refined the designation thereby reducing the designated acreage. First, the Service used the "most recent occupied habitat spatial layers [produced] by" Colorado Parks and Wildlife ("CPW") and CPW's mapping to refine the boundaries of the designation. GUSG0199348 (in response to CPW's comments at GUSG0096303); 0199352 (response to comment 4). The Service also deleted one unoccupied polygon in the Cerro Summit areas based on the low likelihood of the area supporting birds. GUSG0199348. Based on newly available information, the Service also removed the critical habitat unit in Poncha Pass, an area that had been part of the bird's historical distribution, but had not successfully supported birds in almost a decade. *Id.* The Service determined that the "landscape [was not] capable of supporting a population of Gunnison sage-grouse and therefore does not meet PCE 1." *Id.*

The Service also considered peer review and public comments and determined that it was appropriate to exclude private lands enrolled in the GUSG Candidate Conservation Agreement with Assurances ("CCAA") as of the effective date of the Final Rule, private lands under

permanent conservation easement as of August 28, 2013, and private land owned by the Ute Mountain Ute Tribe under restricted fee status that is subject to a species conservation plan as of the effective date of the Final Rule. *Id.*; *see also* GUSG73481 (Gunnison County Stockgrowers Association requesting that the Service exclude "all lands covered by the CCAA"). The exclusions reduced the designation by 191,457 acres. *See* GUSG0199349 (comparing designated habitat without exclusions and with exclusions). The Service also modified the designation around the City of Gunnison to leave out areas of medium-to high-intensity development, airport runways, and golf courses. GUSG0199348. In all areas, lands covered by buildings, pavement, and other manmade structures, as of the effective date of the Final Rule, are not included in the designation even if they occur inside the boundaries of a critical habitat unit because those lands "lack physical and biological features essential to the conservation of the" GUSG. *Id.*

To meet its duty to "consider" the economic impacts of designation, the Service prepared a draft economic analysis, which it made available to the public for comment on September 19, 2013. 78 Fed. Reg. 57,604. The Service incorporated the comments received into the final economic analysis, which was finalized concurrently with the final designation. GUSG0199347. The economic analysis is discussed in more detail in the Argument section below.

### 2. Procedural Background on the Final Critical Habitat Rule

The Service published a proposed rule to designate critical habitat for the GUSG on January 11, 2013. GUSG0199347. The proposed critical habitat rule (as well as the proposed listing rule) was evaluated by five peer reviewers with scientific expertise on sage-grouse biology and conservation who were asked to review the Service's technical assumptions, analysis, and use of the best available science. *See id*; GUSG0072271 (Young); 0074415 (Messmer); 0076614 (Holloran); 0076770 (Phillips); 0078390 (Aldridge). Two peer reviewers affirmatively supported the designation. *See* GUSG0072271 (Young); 0078390 (Aldridge). A scientist from Western State

Colorado University concluded that "[t]hroughout the relevant sections, conclusions are logical, well supported, and conservative," and the determination included "careful analysis." GUSG0072272. A U.S. Geological Survey scientist concluded that, in both rules the Service "thoroughly considered the available scientific information to help inform those decisions." GUSG0078390. Two peer reviewers, including the reviewer from Petitioner Colorado agency CPW, were generally in opposition to both proposed rules. GUSG0199347; 0076770 (Phillips).

The Service also made both proposed rules available for public comment for 60 days and then extended the period by an additional 21 days. GUSG0199347-48. The public was then given yet another opportunity to provide comment or additional information in July 2013. GUSG0199348. When the draft economic analysis was made available, the Service reopened the comment period twice and held three public hearings. *Id.*; *see also* 78 Fed. Reg. 65,936 (Nov. 4, 2013). "All substantive information received during all public comment periods related to the critical habitat designation, economic analysis, and environmental assessment [were] incorporated directly into the final versions of those documents," or were addressed in the Final Critical Habitat Rule. GUSG0199348.

## STANDARD OF REVIEW

Judicial review of agency determinations under the ESA is governed by the "arbitrary or capricious" standard set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1186 (10th Cir. 1999). The Tenth Circuit has stated that such review is "highly deferential." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation omitted). This Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *Citizens' Comm.*, 513 F.3d at 1176. "[T]he ultimate standard of review is a narrow one. The court is not

empowered to substitute its judgment for that of the agency." *Overton* Park, 401 U.S. at 416; *see also Colo. Wild. v. U.S. Forest Serv.*, 435 F.3d 1204, 1213-14 (10th Cir. 2006) ("It is not [the court's] duty, however, to substitute [its] judgment for that of the agency's on matters within its expertise.") (citation omitted). Hence, an agency's decision under the ESA is presumed to be valid in the first instance and should be upheld even if the Court might have decided the issue differently. *Overton Park*, 401 U.S. at 415-16. An agency is not required to have furnished "detailed reasons for its decision," so long as the Court is not required to "speculate" as to its basis. *Lodi Truck Serv. v. United States*, 706 F.2d 898, 901 (9th Cir. 1983). This Court must uphold an agency's decision if its path may "reasonably be discerned." *Bowman Transp. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974) (citation omitted).

## ARGUMENT

### I. The Service's Listing Decision Was Reasonable and Supported by the Record, and the Petitioners Have Failed to Show Otherwise

Dissatisfied with the Service's determination, Colorado and Gunnison attempt to impugn the Service's robust and lengthy analysis. Colorado asserts numerous science-based claims, *see* ECF No. 143 (Colo. Br.), while Gunnison advances several procedural claims, *see* ECF No. 147 (Gunn. Br.). As explained below, none of the arguments have any merit.

In January 2013, the Service issued a proposed rule to list the species as endangered. GUSG0069985 (Proposed Listing Rule, 78 Fed. Reg. 2,486 (Jan. 11, 2013)). Based on its review of the species' status under the five ESA statutory factors, the Service determined that the species was currently at risk throughout its range due principally to habitat loss, degradation, and fragmentation caused by residential, exurban and commercial development, and associated infrastructure, such as roads and powerlines. GUSG0070034. The Service further found that the small size of the six satellite populations put them at risk of inbreeding depression and that all

seven populations might be losing their adaptive potential. *Id.* Other threats to the species identified by the Service included predation, improper grazing management, and a lack of adequate regulatory mechanisms to protect the species and its habitat. *Id.* Based on the information available to it at that time, the Service viewed these threats as imminent and high in severity. Due to the perceived immediacy and high severity of these threats, combined with the cumulative impacts from other current and increasing threats such as climate change, invasive plants, drought, and disease, the Service initially concluded that the Gunnison sage-grouse was in danger of extinction and therefore met the definition of an "endangered species" and submitted, for public comment, its proposed determination to list the species as endangered. *Id.*; GUSG0069985.

After considering public comment on the proposed rule – generated from four public comment periods that spanned over a hundred days, three public hearings, and five peer reviewers – the Service issued a final rule on November 14, 2014 listing the Gunnison sage-grouse as threatened, rather than endangered as it had proposed. GUSG0199399. The Service decided that the species was not *presently* endangered as a result of its reevaluation of the principal threat it had relied upon in the proposed rule, the impact of current residential development on the species and its habitat, especially in the critical Gunnison Basin population area. Based on this reevaluation, the Service concluded that current residential development was a lower-magnitude threat to the Gunnison Basin population than it had previously thought and that, as a result, this threat was not causing the rangewide population to be in danger of extinction. GUSG0199510-11. The Service further concluded that the other factors identified as threats in the proposed listing rule, while still current threats, did not support a finding that the species was *currently* in danger of extinction.

However, the Service determined that the species warranted listing as threatened because it was likely to become in danger of extinction in the foreseeable future throughout all of its range. GUSG0199511-13. In making this determination, the Service defined the foreseeable future as 40-

60 years, *see* GUSG0199511-12, and noted, as it had in the proposed rule, that current threats to the species are anticipated to increase over time throughout the species' range. GUSG0199512. These risks included the threat of habitat loss due to human disturbance and associated infrastructure and the likelihood that one or more of the satellite populations would be extirpated during this period, thus reducing the species' ability to survive catastrophic events in the other remaining populations. *Id.* Other threats that the Service found placed the species in danger of extinction in the foreseeable future included climate change and its future effects, such as increased drought and greater exposure of the species to disease. *Id.* The Service next considered in its determination ongoing conservation efforts and existing regulatory mechanisms and found that, while these efforts were a positive step towards conserving the species, they were not currently adequate to offset the full scope of current threats to the species or prevent the increase in threats that caused the Service to find that the species was likely to become in danger of extinction in the foreseeable future. GUSG0199512-13. The Service therefore determined that the species was threatened. *See* 16 U.S.C. § 1532(20) (a "threatened species" is "any species which is *likely to become* an endangered species within the foreseeable future throughout all or a significant portion of its range") (emphasis added). The Service's decision was reasonable, is supported by a record of more than 200,000 pages, and should be upheld.

### a. Colorado's science-based claims have not demonstrated the Service's listing determination to be unreasonable

Colorado's premise in attacking the Service's scientific analyses and its ultimate listing determination is that, while the current and future threats to the grouse are valid for the six satellite populations, those threats are not a concern for the Gunnison Basin population and that the Gunnison Basin population is large, stable, and sufficient, in itself, to secure the species for the foreseeable future. Colo. Br. at 12-14. But, as explained above and in more detail below, the

Service concluded that the science did not support such a determination. Although this particular population was larger and relatively stable at the time of decision-making, the best available science indicated that it (along with the six satellite populations) faced significant current and future threats that, individually and cumulatively, made it likely that the Gunnison sage-grouse would become an endangered species within the next 40-60 years. GUSG0199510-13. Because of these future cumulative threats facing all seven populations, the Gunnison Basin population alone was not sufficient for the species' long-term survival. The Service's science-based analyses and conclusions in the grouse listing determination are reasonable and entitled to the highest deference.

### i. The Service's interpretation of the best available science receives the highest deference

As the expert wildlife agency, the Service's scientific determinations are entitled to a high level of deference. The Supreme Court has stated that a "reviewing court must remember that [the agency] is making predictions, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). In *Citizens for Alternatives to Radioactive Dumping v. U.S. Department of Energy*, the Tenth Circuit described the deference owed an agency as "especially strong where the challenged decision [] involve[s] technical or scientific matters within the agency's area of expertise." 485 F.3d 1091, 1098 (10th Cir. 2007) (citation omitted); *see also Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001) ("We cannot displace the agencies' choice between two conflicting views, even if we would have made a different choice had the matter been before us de novo.") (citation omitted). The Ninth Circuit, in *San Luis & Delta-Mendota Water Authority v. Jewell*, similarly explained:

Although our inquiry must be thorough, the standard of review is highly deferential; the agency's decision is "entitled to a presumption of regularity," and we may not

substitute our judgment for that of the agency … Where the agency has relied on "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence"… Even "[i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings."

747 F.3d 581, 601 (9th Cir. 2014) (citations omitted). Here, the Service conducted thorough and reasonable analyses of the best available science and its conclusions therefore should be given the highest deference. Accordingly, Colorado's repeated demands that the Court substitute its judgment for that of the Service are improper and should be rejected.

### ii. The satellite populations are essential to the Gunnison sage-grouse's long-term survival

The premise of Colorado's lawsuit mistakenly discounts the importance of the six satellite populations in the grouse's long-term survival and conservation. Colo. Br. at 14-15 (insisting the Gunnison Basin population is sufficient to secure the species for the foreseeable future); Colo. Br. at 39 ("Maintaining and even increasing the size of the satellite populations . . . [is not] necessary for the long-term survival of the species."). Furthermore, as explained below, this position is far different from the non-litigating one previously taken by Colorado's biologists. In essence, Colorado's present litigating position is now the following: with a species already constricted within 8- to 10% of its historical range (presently 940,000 acres of approximately 13,680,590 historical acres), the additional loss of (1) the satellite habitats (approximately 37% of the species' remaining range or 358,894 acres), GUSG0199403, (2) the individual satellite grouse occupying those habitats (approximately 16% of the species' remaining population or approximately 727 birds), GUSG0199405, and (3) the genetic reservoir present in the satellite populations (approximately 24% of the remaining gene pool), GUSG0199497, is of no concern for long-term grouse survival. According to Colorado, the long-term survival of the species is accomplished by the Gunnison Basin population alone (approximately 4% of the historical range or 592,167 acres).

With the species' current rangewide status, however, not only is Colorado's premise flawed, but the best available science indicates that it is simply a reckless and ill-advised gamble.

As explained above and in the Final Listing Rule, because of the current and future threats facing *all* grouse populations, including the Gunnison Basin population, population redundancy (a species' ability to compensate for significant loss of population numbers across the species' range such that the loss of a single population has little or no lasting effect on the structure and functioning of the species as a whole) is vital to the long-term survival of the grouse; the satellite populations help provide that redundancy. GUSG0199497; GUSG0199503; *see also* GUSG0011590 (ranking most of the satellite populations as "high" conservation importance). The satellite populations increase species abundance rangewide, increase the range of environmental variability (more variability in topography, precipitation, elevation, and temperature), minimize the threat of catastrophic events (drought, fire, disease, etc.) affecting the species as a whole since the populations are widely distributed across a varied landscape and some populations are isolated from others, and provide additional genetic diversity not found in the Gunnison Basin increasing the species' ability to adapt to a changing environment. GUSG0199503. Even Colorado's biologists, prior to this litigation, acknowledged in the 2005 Rangewide Conservation Plan ("RCP") (a plan developed in party by Colorado Parks and Wildlife) that the six satellite populations are crucial for the species' long-term conservation:

> though the smaller GUSG [satellite] populations have a relatively high probability of extinction, they are vital to the long-term success of GUSG. Multiple populations across a broad geographic area provide insurance against a catastrophic event threatening the entire species. In addition, the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir.

GUSG0011466; *see also* GUSG0011447 (Colorado acknowledging in 2013 that all populations (except Poncha Pass) ranked "high or very high" in conservation importance); GUSG0011590.

To be clear, as repeated numerous times throughout the Final Listing Rule, the Service did not deny the Gunnison Basin population's relative stability at the time of decision-making. But, given the downward trend of the satellite population numbers and the best available science on the current and future threats facing *all* of the subpopulations of the grouse, it is simply not true, as Colorado suggests, that the potential loss of the habitat, birds, and genetic pools in the six satellite populations was not a concern for the species' long-term survival. *See, e.g.*, GUSG0199497 ("[C]ollectively it is reasonable to assume that 24 percent of the genetic diversity is important to the future rangewide survival and adaptability of the species. Some of the genetic makeup contained within the satellite populations . . . may be critical to maintaining adaptability in the face of issues such as climate change or other environmental change."). As even Colorado acknowledged prior to litigation, the satellite populations are vital to the long-term success of the grouse. The Service's scientific determination on this issue is thorough, reasonable, and supported by the record. The premise of Colorado's entire case therefore, is fatally flawed.

### iii. The Gunnison sage-grouse is likely to become endangered within the foreseeable future

The scope of Colorado's remaining arguments similarly focus solely on the Service's analysis with respect to the Gunnison Basin population. As explained above, Colorado's myopic scope is misplaced. Given the current and future threats facing *all* populations, the satellite populations are required to provide sufficient redundancy and, therefore, are crucial to the species' long-term survival and conservation. Any threats analysis specific to the Gunnison Basin population must be viewed in context with the overall rangewide threats facing all seven populations. Each of Colorado's 12 remaining arguments are addressed below in turn.

## 1. Habitat loss due to human disturbance is a threat (Factor A)

Colorado attacks the Service's conclusion that habitat loss due to human disturbance in the Gunnison Basin is an "increasing threat in the future." Colo. Br. at 15-17. More specifically, Colorado claims that this conclusion is arbitrary because most of the occupied habitat in the Gunnison Basin has substantial protections from further development (due to conservation easements, conservation agreements, and State/Federal ownership), most development is expected to occur outside of sage-grouse habitat, and only a small amount of Tier 1 habitat is located on developable land. Colorado's argument is without merit.

Data indicated that future human development in the Gunnison Basin was likely to occur in occupied grouse habitat. GUSG0199443-44. Approximately 23.3% of total occupied habitat in the Gunnison Basin (about 137,975 of 592,168 acres) were private lands not currently under a conservation easement and therefore, were at higher risk of development. GUSG0199445. And approximately half of the occupied habitat at risk was high-priority habitat (Tier 1). GUSG0199445. Furthermore, this threat only intensified when taking account of other threats of habitat loss on private and public lands due to drought and fire which conservation easements, conservation agreements, and State/Federal ownership cannot prevent. With a habitat-dependent species already reduced to 8- to 10% of its historical range, the future loss of an additional 137,975 acres of occupied habitat in the Gunnison Basin would be substantial, and even more so when combined with the likely loss of occupied habitat due to extirpation in one or more of the satellite populations and the loss of habitat across the range due to drought and fire. Contrary to Colorado's assertion, the Service's conclusion with respect to the future threat of habitat loss from human disturbance in the Gunnison Basin – especially when viewed within the context of the Service's rangewide threats analysis – was reasonable and supported by the record.

## 2. Climate change is an increasing future threat (Factor A)

As Colorado points out, Colo. Br. at 17, some data seem to suggest that warmer temperatures and increased drought may not significantly affect generic, low-elevation sagebrush habitat in the Gunnison Basin. GUSG0025250-51. But that is certainly not the case with critical late brood-rearing habitat. GUSG0199462. In late-summer into fall, Gunnison sage-grouse broods require mesic or moist habitats (known as late brood-rearing habitat) that provide the necessary vegetation (nutrient-rich flowering forbs) and insects required for brood development and survival. GUSG0199462-63. Typically, in the spring and early summer after the annual snowmelt, all generic sagebrush habitats are relatively moist and provide the necessary early brood-rearing habitat. After the long summer months, however, the necessary moist, late brood-rearing habitats are limited and typically confined to mesic meadows, springs, seeps, and other riparian areas. Drought reduces the availability of these vital moist, late brood-rearing habitats which, in turn, lowers grouse population numbers. In fact, drought conditions from 1999 through 2003 were closely associated with reductions in the sizes of all Gunnison sage-grouse populations, including the Gunnison Basin. GUSG0199462-63; 0199505-07. With more severe and prolonged drought projected in the foreseeable future, even a relatively stable population like the Gunnison Basin population is vulnerable to significant adverse impacts that could push it toward the brink of extinction.

Colorado does not dispute the fact that warming temperatures in western Colorado will bring droughts that are more frequent, severe and, prolonged, *see* GUSG0199462. Instead, Colorado claims that the loss of late brood-rearing habitat due to drought is not a concern in the Gunnison Basin because of irrigated hay meadows, conservation easements, and other protections, located on private lands. Colo. Br. at 18. As an initial matter, private-land irrigation can be limited or even eliminated with severe and prolonged drought; protections like conservation easements on

private lands do not prevent droughts. Nor do these particular easements contain any affirmative obligations with respect to any water management measures related to drought or other shortages of water. GUSG0199475; GUSG0068160. In any event, even if water is available for irrigation, Colorado overstates the benefits of irrigated hay meadows. First, even if the grouse find these irrigated hay meadows, the usable amount of this type of habitat is significantly limited as the best available data suggests that grouse only use the first 50 meters (approximately) from the edge of the sagebrush. GUSG0005202; *see also* GUSG0005211 (noting that grouse use the first 35-50 feet of irrigated meadows but occasionally up to 165 feet); GUSG0077200. Second, and most importantly, the fact that late brood-rearing habitat (both mesic sagebrush and irrigated hay meadows) was located on private land in the Gunnison Basin did not prevent the loss of that habitat or the subsequent decline of grouse population numbers during severe drought conditions from 1999 through 2003. Colorado's argument regarding late brood-rearing habitat fails.

In sum, all rangewide grouse habitat and populations, regardless of habitat location and a particular population's size and stability, are vulnerable to drought. The best available science regarding climate change at the time of decision-making indicated that more frequent and more severe droughts were likely in the foreseeable future. The Service's scientific prediction that habitat loss across the range, including the Gunnison Basin, was an increasing threat due to climate change and drought is reasonable, supported by record evidence, and should be upheld. *See Alaska Oil, & Gas Ass'n v. Pritzker*, 840 F.3d 671, 679-80 (9th Cir. 2016) (deferring to the National Marine Fisheries Service's scientific conclusions regarding a threatened species' future loss of habitat due to climate change), *pets. for cert docketed*, Nos. 17-118 (2017), 17-133 (2017).

### 3. Severe, prolonged drought is an increasing threat (Factor E)

Colorado next argues that "the record does not support the possibility of prolonged drought threatening the existence of the Gunnison Basin Population in the foreseeable future." Colo. Br. at

20. Colorado's argument ignores the Service's full analysis, cherry picks data, and is ultimately without merit. As an initial matter, Colorado's litigating position on this issue is different from past positions taken by Colorado's biologists. GUSG0011472 (explaining that it may be prudent to maintain captive flocks (in zoos, for example) with diverse genetic makeup to bring the Gunnison Basin population back to adequate numbers and genetic health in the event of a catastrophic drought). In any event, as explained previously, it is undisputed that severe drought reduces grouse populations. GUSG0199505-06. In fact, severe drought caused defoliation and sagebrush mortality, loss of grass and forb understories, and a reduction of grouse numbers across the range between 1999 and 2003, including a 30% reduction in the Gunnison Basin population. GUSG0199505; *see also* GUSG0011289 (identifying drought as one of the most significant threats to the species). Now, while it is true that the larger Gunnison Basin population eventually rebounded to pre-drought numbers, most of the smaller satellite populations have not – and are not even close. GUSG0199405. For these reasons, even with the minimal beneficial effects of severe drought, GUSG0199505, the Service reasonably concluded that drought was a current and future rangewide threat to the Gunnison sage-grouse.

But even for the sake of argument, assuming as Colorado claims that the Gunnison Basin population is the only population the Service should be looking at for listing purposes, the Service still reasonably concluded that drought is a legitimate threat in the foreseeable future. As already explained, a severe but relatively short-term drought caused a 30% decline in the Gunnison Basin population between 1999 and 2003. GUSG0199505. When looking to the future, the best available data predicts rising temperatures in the next 50 years (which Colorado does not dispute) that is likely to bring with it more frequent, more severe, and more prolonged droughts. GUSG0199505; *see also* GUSG0011289 (identifying drought in the RCP as one of the most significant threats to the species). Based on all the data, more frequent, severe, and long-term droughts are likely to

reduce Gunnison Basin population numbers beyond the 30% reduction seen in 2003 and will likely afford the species less time for a population rebound before the next severe and long-term drought. Colorado's insistence that drought is not a future threat to the Gunnison Basin population is simply not supported by the evidence.

#### 4.   West Nile virus is an increasing future threat (Factor C)

Colorado's criticism of the Service's West Nile virus analysis in the Gunnison Basin is without merit.[6] Colo. Br. at 21-22. Currently, West Nile virus is a low-level threat in the higher elevations of the range, like the Gunnison Basin and Piñon Mesa populations, due to the cooler temperatures making it inhospitable for mosquitos carrying the West Nile virus. GUSG0199480-81. As explained above and in the Final Listing Rule, climate change in the next 40-60 years is expected to bring warming temperature and more frequent severe and prolonged drought. GUSG0199462. Warming temperatures are likely to create more favorable conditions for mosquito vectors even at the higher elevations and the drought conditions will force the grouse toward the types of water sources where these mosquitoes thrive. GUSG0199480-81. Additionally, West Nile virus has already been documented across most of the Gunnison sage-grouse's range and, while no Gunnison sage-grouse deaths have been reported in the wild, the virus has proven deadly in greater sage-grouse in the wild, other gallinaceous game birds in the wild (*i.e.*, pheasant, turkey, etc.), and a few captive Gunnison sage-grouse individuals. GUSG0199480; GUSG0199429. For these reasons, the Service reasonably determined West Nile virus to be a future threat.

---

[6] West Nile virus was one part of the Service's overall and comprehensive analysis on the general threat of disease.

5.  **Current regulatory mechanisms are inadequate to address current and future threats faced by Gunnison sage-grouse across their range**

The Service's Factor D analysis – the adequacy of existing regulatory mechanisms to address current and future threats – focused on all local, State, and Federal laws, regulations, and land management plans and their combined effectiveness at addressing the numerous threats facing the Gunnison sage-grouse across its range. GUSG0199485-96. The Service found that some existing regulatory mechanisms were in place to conserve Gunnison sage-grouse, but individually or collectively the mechanisms did not fully address the substantial current and future threat of habitat loss and fragmentation due to human development and infrastructure across the range, did not compensate or offset for habitat loss, nor did any of the existing regulations sufficiently reduce or eliminate the increase in other threats to the species such as climate change, drought, fire, invasive species, and West Nile virus. GUSG0199495-96.

Contrary to Colorado's assertion, Colo. Br. at 25-27, the Service did not dismiss the effectiveness of Gunnison County's efforts to devise regulatory mechanisms to conserve the grouse and its habitat in the Basin. The Service commended Gunnison County (and other counties) on its efforts and acknowledged that the efforts would help reduce some of the negative effects of human development and infrastructure. GUSG0199486-87. But, as explained in the Final Listing Rule, the regulations did not prevent all human development in grouse habitat or the accompanying loss of habitat and fragmentation. Moreover, the regulations did not address or require offsetting or mitigation for the likely habitat loss and fragmentation that could not be avoided. GUSG0199486-87. Considering the current reduced range of occupied habitat, additional loss of habitat without offsetting or some other type of mitigation to compensate was a threat to the species' continued existence, regardless of the size and stability of the Gunnison Basin population. Further, Gunnison County's regulations did not address the other cumulative and synergistic

threats such as climate change, drought, fire, invasive species, and West Nile virus. GUSG0199487, 0199495-96. As a result, the Service reasonably concluded that the individual and collective regulations on local, State, and Federal lands, including those implemented by Gunnison County, did not sufficiently address the substantial current and future threats across the grouse's range. In other words, even with all of these measures in place, the Service still reasonably concluded that the grouse was likely to become in danger of extinction throughout all of its range in the foreseeable future.

### 6. 2006 Colorado Candidate Conservation Agreement with Assurances

Colorado next faults the Service for considering the 2006 Candidate Conservation Agreement with Assurances as a conservation measure under its Factor A analysis (analyzing the present or threatened destruction, modification, or curtailment of grouse habitat or range) instead of a regulatory mechanism under Factor D (analyzing whether regulatory mechanisms are adequate to address identified threats to grouse).[7] Colo. Br. at 22-24. Contrary to Colorado's argument, it does not matter where in the Final Listing Rule the Service analyzed the CCAA. The required analysis is whether the CCAA eliminated or reduced the threat of habitat loss to an extent that listing would not be warranted. The Service undertook this analysis and concluded that the CCAA, while clearly providing a conservation benefit, did not adequately address the current or increasing threat of habitat loss or fragmentation due to human disturbance – or any other threat for that matter (climate change, drought, fire, invasive species, etc.) to the point that listing would not be warranted. GUSG0199470-72. Thus, the Service completed the required analysis.

---

[7] The CCAA is not a regulatory mechanism like a conservation easement or local regulation that applies at all times regardless of a property sale, transfer, etc. Landowners enrolled in the CCAA can withdraw at any time, and for any reason. GUSG0013797-98.

The ultimate goal of the CCAA is to reduce threats to Gunnison sage-grouse and help provide for secure, self-sustaining local populations by enrolling, protecting, maintaining, and enhancing or restoring non-federally owned Colorado habitats of Gunnison sage-grouse. GUSG0199471; GUSG0014198. Private landowners sign up for the CCAA and specify the land enrolled and the habitat protection or enhancement measures the landowner will implement. More specifically, private land uses including livestock grazing and agricultural production are managed to be consistent with the needs of Gunnison sage-grouse and the species' conservation. Although enrollment of property in the CCAA is voluntary and not permanent or binding, *see* GUSG0013797-98, the program's regulatory assurances and take authority provide an incentive for participating landowners to continue enrollment and compliance with the terms of their permits. GUSG0199471. At the time of listing, 40 landowners had enrolled rangewide covering approximately 94,391 acres, 81,156 of which are located in suitable grouse habitat. GUSG0199471. In the Gunnison Basin, 32 landowners had enrolled covering approximately 54,580 acres of which 50,410 acres were located in suitable grouse habitat. GUSG0199471.

The Service determined that, because the CCAA was not a long-term agreement and continued enrollment was voluntary, it did not sufficiently address the future threat of habitat loss and fragmentation. GUSG0199472. First, the CCAA was only valid for 20 years with no certainty of renewal. GUSG0199471. Second, there would be instances in which the CCAA's assurances and incentives would no longer be desirable to the landowner. For instance, a landowner may choose to opt out of the CCAA to sell subject lands, whether for development or other purposes, meaning the benefits to Gunnison sage-grouse provided under the program would cease as well unless the new owner decided to continue the property's enrollment in the CCAA. Thus, although residential development was expected to be very limited on enrolled properties under the terms of the permits, the CCAA did not preclude the sale of those properties nor their subsequent

development. Development would likely result in further habitat loss and decline for Gunnison sage-grouse. GUSG0199472. Furthermore, the CCAA did nothing to address the threat of habitat loss due to other cumulative events like drought, fire, disease, etc. For these reasons, the Service determined that the CCAA did not sufficiently address the future threat of habitat loss or other threats.

Colorado next argues that the Service inappropriately applied too high of a standard – legal certainty – when assessing whether the CCAA was adequate to address the threat of habitat loss and fragmentation due to human disturbance. Colo. Br. at 22-24 (citing *Defs. of Wildlife, v. Zinke*, 849 F.3d 1077, 1084 (D.C. Cir. 2017)). Federal Respondents agree that, as determined by the *Zinke* court, legal certainty with a regulatory mechanism or conservation measure is not required. The Service could conceivably and reasonably find that either a regulatory mechanism or conservation measure could avoid a species' listing (or support its delisting) if sufficiently certain and effective to alleviate a threat. However, the facts did not support such a finding here. First, the CCAA was voluntary. An enrolled landowner could terminate participation at any time and for any reason. GUSG0013797-98. Second, the CCAA was for a limited 20-year duration. GUSG0013797. Finally, the CCAA did not adequately address all the other identified threats to the grouse or its habitat (climate change, drought, fire, disease, etc.). Again, due to the vital importance of habitat to the grouse's conservation and the increasing threats to both the species and its habitat, the Service's decision not to withdraw its listing proposal based on a limited and voluntary CCAA was reasonable and supported by the record.

### 7. 2013 Gunnison Basin Candidate Conservation Agreement

Colorado next takes aim at the Service's assessment of the 2013 Candidate Conservation Agreement (CCA). Colo. Br. at 24-25. The CCA, which includes the Bureau of Land Management, the U.S. Forest Service, the National Parks Service, and other members of the Gunnison Basin

Sage-Grouse Strategic Committee, serves as a project screen and requires implementation of conservation measures associated with the most common land use authorizations where grouse occurs on Federal lands in the Gunnison Basin. GUSG0199472; GUSG0077094. A key component of the CCA's site-specific conservation measures is a requirement for offsetting habitat loss or disturbance to ensure a net increase in priority habitats, and no net loss (maintenance) of secondary habitats for Gunnison sage-grouse. GUSG0199472.

Contrary to Colorado's assertion, Colo. Br. at 24-25, the Service appropriately considered the CCA and its efforts to address the primary threat of habitat loss and fragmentation on Federal lands due to human disturbance. The Service found that, despite incidental negative effects on individual birds and potential short-term, localized, and unavoidable effects, implementation of the CCA would provide a long-term, net benefit for Gunnison sage-grouse on a landscape scale. GUSG0199472. The Service also noted that conservation measures and a mitigation strategy were required for the signatory Federal agencies engaging in covered activities, and were based on the current applicable land management plans of the respective agencies. But the Service found that, while the CCA was likely to reduce several substantial threats known to affect the species on Federal lands in the Gunnison Basin (including habitat loss/fragmentation), approximately 22 percent of rangewide occupied habitat on Federal lands – all within the satellite population areas – are not covered by the CCA. GUSG0199473; GUSG0088474 (approximately 20,000 acres of Federal land not covered by the CCA). Furthermore, the CCA did not apply on private land where human development was likely. Regardless of where the CCA fits within the Service's overall listing analysis, because it did not adequately cover the satellite habitats outside the Gunnison Basin (among other things), the CCA was not effective at reducing the threats to the species rangewide such that listing would not be warranted. GUSG0199473. Colorado's argument fails.

### 8. Declining genetic health due to small population size and structure is a current and future threat (Factor E)

Again, the Service based its listing decision on an analysis of the threats contributing to the grouse's rangewide decline. GUSG0199510-13. One part of this analysis focused on the effects of the various rangewide threats (habitat loss, climate change, drought, fire, disease, genetic inbreeding/mutations, etc.) on a small population size, particularly with the six satellite populations. GUSG0199496-504. The Service noted that, due to small population size, population redundancy, in particular, was already limited and would be further limited in the near term, due to the probable extirpation of one or more satellite populations. With this data, the Service concluded that the current and future threats affecting a small population, combined with the probable loss of satellite populations, indicated the long-term survival of the species was at risk. GUSG0199504. As discussed below, Colorado's attempts to undercut the Service's conclusion are all to no avail.

### a. The satellite populations are vital to the species' long-term survival

The Service does not deny that the Gunnison Basin population appeared to be relatively stable at the time of decision-making. *See* Colo. Br. at 28 (emphasizing the stable size and genetic health of the Gunnison Basin population). But, as discussed above, given the best available scientific data on the current and future threats facing *all* of the subpopulations of the grouse, including the Gunnison Basin, it is simply not true that the potential loss of the six satellite populations (*i.e.*, the additional loss of 727 birds, 24% of the rangewide genetic pool, and 358,894 occupied acres) is not a concern for the species' long-term survival or that the Gunnison Basin population alone is sufficient to conserve the species. *See, e.g.*, GUSG0199497. Colorado's "put all our eggs in one basket and hope for the best" approach is contrary to the Service's expert

analysis of the best available science, contrary to the views of Colorado's own biologists, ill-advised, and unreasonable.

### b. The Service's threatened determination is not premised solely on the 2012 population viability analysis

Colorado's critique of the Service's review of three population viability analyses ("PVAs") – the 2012 Davis PVA, in particular – is misplaced, *see* Colo. Br. at 29-36, because, while the Davis PVA supports the threatened determination, the PVA was not essential or vital to the threatened determination. As explained in the Final Listing Rule, the Davis PVA – submitted to the Service by Colorado and Gunnison County during the first public comment period on the Proposed Listing Rule – was one of as many as eight reasons the Service concluded the species was likely to be at risk of extinction in the foreseeable future and therefore threatened. GUSG0199435; GUSG0199510-13. Although the Service included various findings reported in the Davis PVA, and identified it (and Davis 2014 (*in press*)) as "the most current and best available scientific information regarding the viability of the Gunnison sage-grouse," the record demonstrates the agency did not view Davis's work as essential or vital to its decision that the grouse should be listed as threatened. GUSG0199503. Rather, the Davis information was new material – compared to what was considered in the proposed listing rule where the Service had originally proposed an endangered listing – that only provided additional support for the Service's warranted-for-listing determination. *Compare* GUSG0070029-30, 33-34 *with* GUSG0199400-01, 409 (demonstrating that all of the non-Davis reasons identified by the Service in the "Determination" section of the Final Listing Rule were also identified and discussed in the Proposed Listing Rule).

In any event, the Service's consideration of the 2012 Davis PVA was appropriate because of its use of Gunnison sage-grouse-specific data. In trying to estimate the Gunnison sage-grouse's

rangewide viability in the face of the identified current and future rangewide threats, the Davis PVA was the only PVA that incorporated the two necessary elements for this specific analysis: (1) stochastic demographic data specific to Gunnison sage-grouse populations (variability in population growth rates due to survival and reproduction rates); and (2) environmental stochasticity specific to Gunnison sage-grouse populations (variability in population growth rates due to external factors such as weather, drought, fire, disease, etc.). GUSG0199500-03. Gunnison sage-grouse-specific data is preferable when available because, as here, it strengthened inferences in assessing the viability of Gunnison sage-grouse due to the species' unique behavioral, morphological, and genetic characteristics. GUSG0199498; *see also* GUSG0007247 (identifying Gunnison sage-grouse as its own species including distinct attributes such as morphological measurement differences, plumage differences, differences in courtship displays, and genetic differences). After combining six years of demographic data (2005 to 2010), environmental stochastic simulations in the Davis PVA produced a minimum extinction time of 31 years and a mean or expected extinction time of 58 years. GUSG0199500-03. The Service fully acknowledged the uncertainty of the Davis PVA due to data collection during a six-year period of time when the population experienced a decline. GUSG0199503. Even so, when compared to the shortcomings of the other two PVAs, see GUSG0199502-03, the Service reasonably determined the Davis PVA to be the most current and best available data regarding the viability of Gunnison sage-grouse but applied its findings cautiously in light of the acknowledged limitations.

To be clear, the Service's consideration of the Davis PVA, while reasonable and appropriate, was not vital or essential to the Service's listing determination. In both the Proposed and Final Rules, the Service's underlying warranted-for-listing determination was premised primarily on the probable extirpation of one or more of the satellite populations, as the basis for finding that the grouse's rangewide resiliency, redundancy, and representation were or would be

inadequate to ensure the species' long-term survival. The current and future threats to the Gunnison Basin population also contributed to this conclusion, but this consideration was based on the Service's identification of these current and future threats, not on the Davis PVA. The Davis analysis did not alter any justification for the Service finding the grouse warranted listing from what was outlined in the Proposed Listing Rule. This was appropriate and prudent given the uncertain nature of PVAs in general, including the Davis PVA. The Davis PVA merely provided additional information on these subjects and support for the conclusion that the species warranted some type of listing and ESA protection – though as threatened rather than endangered. Thus, contrary to Colorado's argument, the Service's threatened determination was reasonable and not dependent on the 2012 Davis PVA (or any PVA for that matter).

### c. The Service's threatened determination analyzed specific current and future threats to the Gunnison sage-grouse

Colorado's implication that the Service listed the grouse merely because of a desire for multiple redundant populations is misleading. *See* Colo. Br. at 36. The determination that multiple redundant grouse populations were necessary came after the Service's rangewide threats analysis. GUSG0199510-13. The principal threats to the species at the time of listing were habitat loss and fragmentation due to human disturbance, climate change, drought, disease, and a relatively small population size, particularly with the six satellite populations. GUSG0199512. The fragmented nature of the remaining habitat exacerbated the negative effects the primary threats were having on the current populations. The Service determined that, in light of all the threats facing this small and constricted rangewide population, long-term grouse survival and conservation would require multiple stable populations across a broad geographic area to provide sufficient population redundancy and resiliency necessary for the species' survival. The Service explained, however, that the species was not yet at that point. While the Gunnison Basin population currently appeared

to be stable, the smaller satellite populations in particular were still highly vulnerable to extirpation, leaving the entire species vulnerable, and that the threats to the rangewide grouse populations would likely increase in the future, including the Gunnison Basin population.

The listing decisions Colorado cites to attempt to support its argument are distinguishable on their facts. Colo. Br. at 37 (citing 81 Fed. Reg. 53,315 (Aug. 12, 2016) and 75 Fed. Reg. 19,592 (Apr. 15, 2010)). The Service based its delisting decision for the Channel Island fox, *see* 81 Fed. Reg. 53,315, on eliminating or greatly reducing the primary threats facing the species. Threat reduction or elimination is easier on islands with no people as compared to the grouse where human disturbances occur across the range on a frequent basis. Furthermore, the data in the fox finding suggested self-sustaining populations which is clearly not the case with the grouse. The Service made a "not warranted" listing decision with respect to the Wyoming pocket gopher, *see* 75 Fed. Reg. 19,592, due to lack of information regarding the threats facing the species. It is true, as Colorado states, that a small and limited population, in and of itself, in the absence of threats, does not support a listing decision. Here, however, that is not the case. As explained, the grouse faces current and increasing threats across its range that are likely to put its small and isolated population in danger of extinction in the next 40-60 years. GUSG0199512. On the record before the Court, the Service's decision was reasonable.

### d. The satellite populations provide redundancy

Finally, Colorado argues that the satellite populations cannot provide redundancy because any catastrophic event, like drought, "that could pose an existential threat to the Gunnison Basin would likely not spare the satellite populations." Colo. Br. at 38. Colorado's argument is wrong for two reasons. First, catastrophic events encompass more than just drought. It is entirely possible that a catastrophic event like fire and disease could affect a significant portion of the Gunnison Basin while not affecting one ore more of the other six satellite populations. Second, while drought

may affect all populations in their current state, conservation in the satellite populations could potentially change that situation in the future. For example, the Piñon Mesa population spans a large elevation band. GUSG0022895 (ranging from 4,600 to 9,800 feet in elevation); GUSG0125619; GUSG0011372. Conservation efforts in that population resulting in increased population numbers would allow the birds there to take advantage of a wide array of habitats at different elevations. Thus, in the future, it may not be the case that severe drought affects all grouse populations equally across the range. Colorado's argument should be rejected.

### b. Gunnison does not demonstrate any procedural errors

Gunnison advances several claims that the Service committed procedural error in issuing its final listing decision. As explained below, none of Gunnison's arguments have merit.

#### i. Gunnison was not prejudiced by the Service's consideration of the 2012 Davis PVA

Gunnison first appears to argue that the 2012 Davis Population Viability Analysis should have been identified in the proposed listing rule. Gunn. Br. at 9. The Service did not consider or rely on the Davis PVA in the proposed listing rule because the Service became aware of the study, thanks to an email from Colorado, only a few weeks before the proposed listing rule was circulated for final approval for publication. GUSG0058855. At that particular point, it was too late in the approval process for the Service to analyze new data and incorporate it into the draft proposed listing rule. Contrary to Gunnison's implication, the Service cannot be expected to halt the listing approval process – especially when the Service's Gunnison sage-grouse deadlines were court-ordered – every time a new study or additional piece of information is submitted, particularly when information is presented at the eleventh hour.

In any event, Gunnison does not identify any prejudice it (or any other public commenter) experienced from the omission of this study in the proposed rule. After the proposed listing rule

was published, a biologist from Colorado Parks and Wildlife, who served as a peer reviewer for the proposed listing rule, recommended that the Service consider the Davis PVA and another population viability analysis (Garton). *See* GUSG0068225, 0068231. Another peer reviewer, Utah State University's Terry Messmer, also recommended in his review that the Service consider the Davis PVA. GUSG0235073, 0235092. And, in fact, although Gunnison suggests that it did not know to comment on the Davis PVA, Gunnison (and Colorado) did in fact address the Davis PVA in their comments on the proposed listing rule. GUSG0091282 (comments submitted by Gunnison, including discussion on Davis (2012) and criticizing the Service for not considering the study in the proposed rule); GUSG0073464 (comments submitted by Gunnison Stockgrowers' Association, including a discussion on Davis' findings); GUSG0232240 (comments submitted by CPW, including a discussion on Davis (2012)). Gunnison provides no explanation as to how it was prejudiced by the Service's inclusion of and reliance on the Davis PVA—at its suggestion—in the final listing rule. Thus, even if the Service should have included the Davis PVA in its proposed listing rule, any such error did not prejudice Gunnison and was harmless.

Gunnison also argues that the public should have had an opportunity to comment on the Service's use of the Davis PVA because it was central to the Service's conclusion that the sage-grouse was threatened. Gunn. Br. at 9-11. As explained above, that is factually incorrect. First, Gunnison did in fact get to comment on the Davis PVA during the public notice and comment period. Second, the Final Listing Rule establishes that the Service's threatened determination was based on a number threats affecting the species, including habitat loss and fragmentation due to human disturbance, climate change, drought, fire, disease, small population size, etc. The Davis PVA was a minor factor in its determination. *See* GUSG0199400, 199510-513. The threats identified by the Service were discussed in the proposed listing rule, and Gunnison had an opportunity to comment on them. To the extent that the Davis PVA was cited in the Determination

section of the Final Listing Rule, the study merely expanded on the discussion related to these threats in a way that is consistent with the discussions of the information relied on by the Service in the Proposed Listing Rule – where the species was proposed as endangered.

To be clear, reliance on the Davis PVA in the Final Listing Rule did not alter any conclusions or justifications for the Service's finding that the sage-grouse is threatened. Moreover, the Service acknowledged that "[e]ach of these population viability models [including the RCP model that Colorado developed] has its own limitations and weaknesses." GUSG0199502-503. The Service then noted that a "PVA does not predict the real or absolute risk of extinction for a species or population, only their relative extinction risk under various scenarios, and thus should be interpreted and applied with caution." *Id*. The Service also acknowledged that the Davis PVA may overestimate the extinction risk because the study was "based on a 6-year period of time when the population was experiencing a slight decline." *Id*. Had the study "been conducted just a few years earlier or later, a different trend across time could have resulted." *Id*. Contrary to Gunnison's assertion, the Service fully acknowledged the Davis PVA's shortcomings. For that reason, the Service was cautious in its use of this particular PVA.

To the extent Gunnison argues that, if the Service considers any new studies or data in its listing decisions, the Service must reopen public comment, that argument should be rejected. "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary . . . [however,] the public is not entitled to review and comment on every piece of information utilized during rule making . . . . [A]n agency, without reopening the comment period, may use supplementary data . . . that expands on and confirms information contained in the proposed rulemaking . . . so long as no prejudice is shown." *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 992-93 (9th Cir. 2015) (quoting *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006); *see also In re FCC 11-161*, 753

F.3d 1015, 1140 (10th Cir. 2014) (explaining that agencies need not reopen notice and comment on "additional fact gathering [that] merely supplements information in the rulemaking record by checking or confirming prior assessments without changing methodology, by confirming or corroborating data in the rulemaking record, or by internally generating information using a methodology disclosed in the rulemaking record") (citation omitted).

In reply, if Gunnison relies on *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995), it does not support their assertion. In that case, the basis of the Service's decision "changed significantly" from the proposed rule to the final rule. *Id*. It appears from the court's decision that the reason that it determined that the public did not have an adequate opportunity to comment was not simply because two additional studies were cited in the final rule; rather, it is because those new studies resulted in the Service reaching a decision on a completely different basis than the one set out in the proposed rule. The facts here are entirely distinguishable and Gunnison has no viable argument.

### ii. The Service's PECE analysis was adequate

Gunnison argues mistakenly that the Service inappropriately conducted an "abbreviated" analysis of a 2013 multi-county "Conservation Agreement for Gunnison Sage-grouse" under its "Policy for Evaluation of Conservation Efforts When Making Listing Decisions" ("PECE Policy"). Gunn. Br. at 15. The PECE policy provides criteria for evaluating when "formalized conservation efforts" that are planned or newly implemented may be relied upon in species listing determinations. GUSG0009110-12. The PECE criteria permit reliance on such "conservation efforts" when consideration of the PECE criteria establishes that these efforts are "sufficiently certain" to be implemented and effective in the future. GUSG0009125. A "conservation effort," as defined by the PECE Policy, is a specific action, activity, or program intended to abate or reduce

threats to a species like "restoration, enhancement, maintenance, or protection of habitat; reduction of mortality or injury; or other beneficial actions." GUSG0009123.

Contrary to Gunnison's assertion, *see* Gunn. Br. at 15, the 2013 Conservation Agreement and the preceding Memorandum of Understanding did not meet the first implementation criterion to identify specific conservation efforts, funding sources, staffing needs, and other criteria required in the policy. GUSG0121822. Nowhere in the 2013 Conservation Agreement did any of the parties identify any specific on-the-ground effort to eliminate or abate the identified threats to the grouse like habitat loss due to human disturbance, climate change, drought, fire, and disease. GUSG0199234. Rather, the Conservation Agreement only stated general goals and desires to someday implement general resolutions, regulations, and guidelines to enhance the species' habitat or to someday expand on efforts already underway as part of other plans or agreements (*e.g.*, the 2005 RCP, the 2006 Candidate Conservation Agreement with Assurances, etc.) which were already considered and analyzed in the listing determination. These unspecified and general "someday" intentions are not finalized "conservation effort" as defined and required in the PECE Policy.[8] GUSG0121822; GUSG0199234-35; GUSG0199475. Furthermore, the 2013 Conservation Agreement did not identify funding sources, did not obligate any county or state to provide funding, nor did it discuss or identify any staffing requirements. GUSG0121822. Therefore, due to the absence of any specific and finalized conservation effort, the Service's final

---

[8] Gunnison also appears to imply that the Service's reference to the 2013 Conservation Agreement as an "MOU" (or "Memorandum of Understanding") demonstrates a cursory or inadequate PECE analysis. Gunn. Br. at 16. The Service's reference to the 2013 Conservation Agreement as an MOU was in fact a typo but does not indicate an inadequate review. Both documents were related and largely involved the same parties. The 2013 Conservation Agreement largely provided more specifics as to some of the stated goals and intentions outlined in the 2013 MOU. *See* GUSG0199233-35. Both documents, however, lacked a specific "conservation effort" to analyze under PECE; neither document identified a specific on-the-ground effort designed to eliminate or reduce identified threats or otherwise improve the status of the species.

PECE analysis of the 2013 Conservation Agreement was relatively short and appropriately determined that the agreement could not "contribute to a determination that listing is unnecessary or a determination to list the species as threatened rather than endangered." GUSG0199475.

Gunnison's next argument that the Service allegedly failed to conduct a PECE analysis on the conservation benefits of future rangewide enrollments of private land under the 2006 Candidate Conservation Agreement with Assurances (CCAA), Gunn. Br. at 17-18, fares no better. This type of analysis is not required. Again, the PECE Policy only requires the Service to analyze *specific and finalized* conservation efforts within a particular agreement that have not yet been implemented or have not yet had sufficient time to demonstrate whether they are effective at the time of listing. *See* GUSG0009110, 9123. Here, at the time of listing, not only did the Service not know (or have any way of knowing) the number of the remaining landowners across the range that would choose to enroll in the CCAA, but it also did not know what specific conservation efforts those particular landowners would choose to implement on their respective properties which is or can be different among the enrolled properties. GUSG0014195 (discussing how landowners can enroll for a suite of conservation activities). Gunnison never provided any of that information during the public comment period. The PECE Policy does not require the Service to look into a crystal ball and speculate on the benefits of unknown conservation efforts resulting from an unknown number of future CCAA enrollees.

Lastly, Gunnison appears to imply that the Service was required to release its PECE analysis to the public. Gunn. Br. at 18-19 (indicating that the Service never released its draft or final PECE analysis). Noticeably absent from Gunnison's argument is a citation to any such requirement because none in fact exists. As relevant to this issue, the Service's only requirement under the ESA before listing a species is that it "tak[e] into account" relevant conservation efforts. 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(f). Neither the statute nor the PECE Policy require

any particular process for that analysis much less require the agency to produce a separate PECE-analysis document that must be made available for public review. Gunnison acknowledges that the Service did apply PECE to determine whether certain conservation efforts could be considered—though the analysis of these efforts did change over time as reflected by the robust deliberative process in the administrative record. Thus, the Service fulfilled the ESA's requirement to give those efforts consideration. That the Service allegedly did not finalize a document memorializing its full PECE analysis—which is not legally required—until right before the final listing rule was completed does not invalidate the Service's decision. Moreover, Gunnison can point to no such requirement that the Service make that document available to the public before finalizing a listing determination. *See Lands Council v. McNair*, 537 F.3d 981, 991-92, 993 (9th Cir. 2008) (en banc) (holding that courts are not free to "impose 'procedural requirements [not] explicitly enumerated in the pertinent statutes'") (citation omitted); *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,* 435 U.S. 519, 549 (1978). Accordingly, Gunnison has failed to establish any error with regard to the consideration of any conservation efforts under PECE.

## II.     The Service's Designation of Unoccupied Critical Habitat in Utah Was Reasonable and Supported by the Record

After considering the best available science and the importance of protecting unique and vital extensive sagebrush landscapes, areas that support the necessary expansion of GUSG populations, and areas that increase connectivity between the populations, the Service reasonably determined that certain unoccupied areas are essential for the conservation of the GUSG.[9]

Underlying Utah's arguments is its position that it would prefer that the conservation of the species, including protection of critical habitat, take place outside of the ESA context. *See* Utah

---

[9] Because Utah limits its arguments to the designation of unoccupied critical habitat, the Federal Respondents do not address the reasonableness of the designation of occupied critical habitat here.

Br. at 4-5 & n.2. Although the Service understands this position, Congress has not directed the Service to merely "consider designating critical habitat." Utah Br. at 1. Instead, Congress <u>requires</u> the Service to designate "any habitat of such species which [at the time of listing] is then considered to be critical habitat," subject to certain exceptions that Utah does not argue are applicable here. 16 U.S.C. § 1533(a)(3); *see* 50 C.F.R. 424.12(a); *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1223 (10th Cir. 2002) (The ESA "requires the Secretary of the Interior to designate critical habitat."). Moreover, Congress has not limited the designation of critical habitat to only those areas "most in need of special protections," as Utah asserts. Utah Br. at 1. Instead, Congress directs the Service to designate (1) those areas occupied by the species at the time of listing, on which are found those physical and biological features <u>essential to the conservation of the species</u> and which "may require" special management considerations or protections and (2) those areas not occupied by the species that are "<u>essential for the conservation of the species</u>," whether they may require special protections or not. 16 U.S.C. § 1532(5) (emphasis added). Congress defined "conservation" as "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the <u>point at which the measures provided pursuant to this chapter are no longer necessary</u>." 16 U.S.C. § 1532(3) (emphasis added).

Utah suggests that, despite Congress' directive and the plain language of the ESA, the Service may only in fact designate "the *minimum* amount of habitat needed to avoid short-term jeopardy or habitat in need of immediate intervention." Utah Br. at 3-4 (citation omitted). The ESA contains no such limiting language. Instead, the language cited by Utah comes from a 1991 district court case from the Western District of Washington that has only been repeated once—in a case from the District of New Mexico. As an initial matter, the only issue raised on appeal in the New Mexico case related to the NEPA analysis and, thus, the Tenth Circuit has not adopted this interpretation of the ESA. Additionally, the court in the Western District of Washington appears

to have ignored two key parts of the ESA's definition of "critical habitat": (1) that when designating occupied habitat, the Service looks for areas that contain the features essential to the conservation and <u>may</u> require special management considerations or protection; and (2) the Service can designate unoccupied habitat that is essential for the conservation of the species without any consideration of management. *See* 16 U.S.C. § 1532(5)(A)(i), (ii). Moreover, key to the definition of "critical habitat" is the phrase "conservation of the species." *See* 16 U.S.C. § 1532(5). Congress has made clear that the Service shall designate the areas necessary to get the species to the point at which it can be delisted, not merely those areas needed to avoid jeopardy.[10] *See also Markle*, 827 F.3d at 460-61 ("In other words, 'the objective of the ESA is to enable [listed] species not merely to survive, but to recover from their endangered or threatened status.'" (citation omitted)).

### a. Colorado and Gunnison have waived their challenges to the critical habitat designation

As an initial matter, Colorado and Gunnison have waived their challenges to the designation of critical habitat for the GUSG by not raising a single argument regarding the critical habitat designation in their respective briefs. In fact, in the remedy portion of Colorado's brief, the State does not seek vacatur of the Final Critical Habitat Rule. *See* Colo. Br. at 40. To the extent that Colorado and Gunnison believe they have preserved their respective challenges to the Final Critical Habitat Rule by simply dropping a footnote and incorporating by reference Utah's brief, they are mistaken. These parties seem to have misinterpreted the Court's scheduling order as permitting them to divvy up not just the arguments related to their claims but also the claims themselves. The Court provided direction to the <u>Intervenors</u>, stating:

---

[10] "Jeopardy" refers to the point at which the species' continued existence is at risk. *See* 16 U.S.C. § 1536(a)(2) (requiring federal agencies to insure that activities authorized, funded, or carried out by the agency are not likely to "jeopardize the continued existence of" a listed species).

Thu Gunnison Intervenors shall file a joint brief. The State of Utah and San Juan County shall file a joint brief. Both briefs shall be limited in scope to <u>arguments not already raised in Petitioner State of Colorado's briefing</u>.

ECF 63 at 5 (emphasis added). Nothing in the Order authorizes Colorado to circumvent the page limits by dropping entire claims and then relying on the Intervenors to raise the claims for them. If Colorado wanted to challenge the critical habitat rule, it needed to do so in its own brief. Gunnison's brief suffers from the same problem. The Court directed Gunnison not to repeat arguments raised by Colorado. Colorado did not substantively address the critical habitat designation and, thus, Gunnison needed to do so in its own brief.

Colorado's and Gunnison's decisions not to argue all of their own claims and, instead, simply drop a footnote adopting Utah's claims, goes beyond misinterpreting the Court's order and trying to circumvent the page limits. *See* Gunn. Br. at 20 n. 5. It raises issues of standing and remedy and potentially prejudices the Federal Respondents. To establish Article III standing, a plaintiff must show it has suffered an "injury in fact," which is "concrete and particularized" and "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Although the Federal Respondents believe that Utah could establish standing to challenge the designation of critical habitat within the State of Utah, Utah has not actually submitted a standing declaration, let alone one that establishes that it is somehow injured by the designation of areas in another state. In its opening brief, Utah supports its arguments by citing information specific to Unit 1, which is located partially in the State of Utah. *See* Utah Br. at 5, 7, 9. Utah does not refer specifically to any units located in Colorado or make any attempt to allege an injury to Utah from the designation of habitat in Colorado. Colorado submitted a standing declaration that specifically mentions only the listing rule and alleged negative effects of listing the GUSG. ECF 143-1. Gunnison submitted one declaration, which solely goes to the issue of whether the past-President on the Board of the Gunnison County Stockgrowers' Association was personally aware of the Davis study. Thus,

Gunnison has not submitted a standing declaration, let alone one that addresses any alleged negative effects of the designation of critical habitat. Gunn. Br.[11] Because, at most, Utah has standing to raise arguments solely related to areas designated within the State and Utah is the only party to actually challenge the designation in its brief, any remedy related to the critical habitat rule that the Court may determine is appropriate must be limited to the 81,593 acres total of unoccupied habitat designated in Utah in Units 1 and 2. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221-22 (1974);[12] *Am. Humanist Ass'n v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017) ("Each plaintiff must have standing to seek each form of relief in each claim." (citation omitted)).

Moreover, should Colorado or Gunnison decide to raise arguments regarding the Final Critical Habitat Rule for the first time in their reply briefs, the Court should disregard those arguments because they have been waived. *See Grynberg v. Kinder Morgan Energy Partners, L.P.*, 805 F.3d 901, 908 n.5 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 1714 (2016); *Straub v. BNSF Ry. Co.*, No. 15-cv-1890, 2017 WL 131796, at *5 (D. Colo. Jan. 13, 2017). Setting aside the fact that this Court considers such claims waived if not raised in the opening brief, the Federal Respondents are limited to this one brief within which to respond to the Colorado Petitioners' claims and, thus,

---

[11] Even if Gunnison now were to submit a declaration attempting to establish an injury caused by the designation of critical habitat, this would be of little import because Gunnison's opening brief failed to argue the claim. Thus, the claim has been waived.

[12] Colorado requested that the listing rule be vacated only if the Court determines that Colorado's arguments have merit. Colorado Br. at 40. Colorado does not mention the Final Critical Habitat Rule. Gunnison, however, dropped a footnote also requesting that the critical habitat rule be vacated. If the Court were to determine that Gunnison dropping a footnote adopting Utah's arguments and another footnote to request vacatur of the critical habitat rule meet the requirements for raising a claim and requesting relief, then, at most, the Court should consider vacatur only of the unoccupied areas that fall within Gunnison County. Only Colorado would have potentially had standing to challenge the remaining areas designated in Colorado.

would be prejudiced if the Court were to consider any claims or arguments raised for the first time on reply.

### b. The Service made a reasonable determination that the unoccupied areas designated are essential for the conservation of the GUSG

Under the ESA, unoccupied areas may be designated as critical habitat if the Service determines that they are essential for the conservation of the species. 16 U.S.C. § 1532(5)(A)(ii). As Utah must concede, Congress did not define "essential" or set forth any specific requirements in the ESA for determining what areas are "essential." Rather, Congress delegated to the Secretary the authority to make that determination on a case-by-case basis. *Markle*, 827 F.3d at 464. Thus, any rational interpretation of "essential" is entitled to deference and must be upheld. *Chevron USA v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (Where Congress has not "directly spoken to the precise question at issue," the Service's reasonable interpretation of an ambiguous term is entitled to deference.); *Markle*, 827 F.3d at 464-65, 467-68; *Cape Hatteras Access Pres. All. V. U.S. Dep't of Interior*, 344 F. Supp. 2d 108. 119-120 (D.D.C. 2004) (concluding that, where the ESA does not define a term, the Service has "retained flexibility" and may "define the term differently depending on a given species's characteristics"). Moreover, the Service is not required to explicitly define "essential"; rather, it must explain its considerations for assessing what areas are essential. *See Markle*, 827 F.3d at 466 (upholding the Service's stated considerations for determining unoccupied areas were essential); *see also Cape Hatteras*, 244 F. Supp. 2d at 120 (rejecting plaintiffs' arguments that the Service was required to define "occupied"). The Service did so here and its reasoned explanation for its determination must be upheld.

Utah first argues that the Service should not have designated any unoccupied areas because the designated occupied habitat is sufficient to support viable populations. Utah Br. at 6. Utah cites the 2005 RCP, which extrapolated from data available at the time that a viable population of GUSG

would need 500 individuals and access to a minimum of 100,000 acres of habitat. As an initial matter, neither Utah nor San Juan County raised this argument during the notice and comment period despite having multiple opportunities to submit comments and having actually submitted comments on the proposed critical habitat designation. *See* GUSG0096053 (Utah's December 2, 2013 comment letter); 0075358 (Utah's April 2, 2013 comment letter); 0203419 (San Juan County April 1, 2013 comment letter); 0200793 (San Juan County October 18, 2013 comment letter); 0200984 (San Juan County December 9, 2013 comment letter). Nor did these parties raise this issue in their 60-day notices of intent to sue or their complaint. *See* ECF 34-2. Where a party had actual notice of the rulemaking but failed to submit comments, courts are hesitant to declare provisions invalid where a plaintiff waits until litigation to raise those concerns. *Wilson v. Hodel*, 758 F.2d 1369, 1372 (10th Cir. 1985) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but erred against objection made at the time appropriate under its practice." (citation omitted)). Accordingly, when parties have failed to raise claims with specificity relating to an agency action during the rulemaking process, the Supreme Court has deemed those claims waived. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-64 (2004) (holding that plaintiffs' challenges were forfeited because they "did not raise [their] particular objections to the EA" during the comment period, and thus denied the agency "the opportunity to examine any proposed alternatives to determine if they were reasonably available"). Because Utah had the opportunity but chose not to assert that the designation of critical habitat must be based on the viability assessment in the RCP during the rulemaking process, Utah has waived its ability to raise that issue during this litigation and the claim must be rejected.

Even if the Court considers Utah's argument, the claim must be rejected. Utah is conflating the RCP's estimate of the number of acres that would be necessary for a particular GUSG population to remain viable (100,000 acres) with the Service's assessment of the critical habitat necessary to conserve the species as a whole. GUSG0011473 (presenting question of "how much habitat is needed to sustain a given population size over time"); 0011565 (discussing the need for at least 100,000 acres of habitat for a viable 500-bird population in Monticello, Utah and Dove Creek, Colorado). The Service also noted that this "model did not take into account the inherent variance in habitat structure and quality over the landscape…and detailed habitat structure and quality data are lacking. Therefore, we consider the modeled minimum habitat area to be an approximation." GUSG0199371. In any event, none of the satellite populations have a sufficient number of individuals to be considered viable. *See* GUSG0199405 (population estimates for satellite populations). Even if those populations did increase to 500 birds each, three of the six populations, including Piñon Mesa, partially located in Utah, live in units that do not contain 100,000 acres of occupied habitat. *See* GUSG0199349.[13] One other population—Monticello-Dove Creek, partially located in Utah, barely meets the 100,000-acre minimum. *Id.*; GUSG0199351.

Utah also claims that the Service irrationally concluded that unoccupied critical habitat should be designated based on the Service's conclusion that occupied habitat must be insufficient because the satellite populations continue to decline. Utah Br. at 7. Although the Service did opine that the satellite populations may require additional habitat beyond the occupied habitat to be

---

[13] Utah chooses to ignore this information because, like Colorado, it argues that the GUSG does not need the satellite populations. Utah Br. at 6. As explained in Argument section I.a.ii, the Service reasonably concluded that, based on the best available science, the conservation of the GUSG depends in part on the viability of some of the satellite populations. *See* GUSG0199358 (response to comment 31). Thus, the Service rationally considered the conservation needs of those populations in its assessment of what areas are necessary for the conservation of the species.

conserved, Utah simply ignores the other justifications for designating unoccupied critical habitat.[14] As already discussed, the Service noted that the satellite populations need 500 birds each to be viable and designating only occupied habitat would be insufficient to support a viable population.[15] The Service also noted that unoccupied areas are needed for migration of birds from the Gunnison Basin to outlying areas and satellite populations and for potential range expansion. GUSG0199357; 0199360 ("With the designation of unoccupied habitat [in] the Cerro Summit-Cimarron-Sims Mesa Unit, we hope to facilitate some natural migration and interpopulation (between two or more populations) exchange of birds.")[16]; 0199368 ("[T]he extremely limited extent of sagebrush habitat throughout the current range of the species, particularly in the satellite populations, is a factor in our decision to include areas beyond currently occupied habitat."); 199369 (noting that the "limited extent of sagebrush habitats throughout the species' current range

---

[14] As the Service explained in the Final Rule, over time the GUSG's range has been reduced by approximately 88- to 93% of the historical range. GUSG0199367. This substantial reduction in range has coincided with evidence of "the loss of peripheral populations" and "a northward trend of extirpation." GUSG0199367-68. With that substantial loss in mind, the Service reasonably concluded that, in the case of the GUSG, "occupied habitat alone, or a subset of those lands (e.g., Federal land), are insufficient to ensure the species' persistence." GUSG0199368.

[15] On the one hand, Utah relies on the estimates from the RCP to argue that designation of occupied habitat is enough to sustain the GUSG populations. Utah Br. at 6. On the other hand, Utah seems to argue that it was irrational for the Service to rely on the estimates in the RCP because the Gunnison Basin population has more individuals than the RCP estimated it could contain. Utah Br. at 7 n.3. Utah does not go so far as to assert that the RCP does not represent the best available science, let alone establish through citation to the record that there is available science that is better than what the Service relied on. Thus, Utah's assertions should be dismissed. In any event, the Service explained that the Gunnison Basin habitat is unique in that it contains "extensive sagebrush landscapes capable of supporting a wide array of seasonal habitats and annual migratory patterns for Gunnison sage-grouse [which] are rare across the species' range." GUSG0199372. Thus, the best scientific data available does not support Utah's implied assertion that 500 birds outside of the Gunnison Basin would not actually need 100,000 acres to be viable.

[16] The Service further explained that the "Cerro Summit-Cimarron-Sims Mesa unit is particularly important as a linkage between the Gunnison Basin and the Crawford and San Miguel population" and the designated unoccupied habitat in the Gunnison Basin will facilitate the dispersal of birds from this larger population to those smaller satellite populations. GUSG0199372.

emphasizes the need for additional habitat for the species to be able to expand into, allowing for species' conservation"). Additionally, the Service determined that, "[w]ith the satellite populations declining, providing more stability for the Gunnison Basin population through additional expanses of sagebrush landscapes is essential for the conservation of the species." GUSG0199372.

Taking into consideration areas needed for expansion and for migration is consistent with the Service's critical habitat regulations, which are not challenged here. Under the Service's regulation addressing criteria for designating critical habitat, the Service, "[i]n determining what areas are critical habitat…shall consider those physical and biological features that are essential to the conservation of a given species" including, but not limited to, "[s]pace for individual and population growth, and for normal behavior" and "[h]abitats that are protection from disturbance or are representative of the historic geographical and ecological distributions of a species." 50 C.F.R. § 424.12(b). The determination to include such areas in the designation is also consistent with the purpose of the ESA and is entitled to deference. *See Balt. Gas*, 462 U.S. at 103 ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.").[17]

In determining what areas are "essential for the conservation of the species," the Service considered four criteria: (1) the overall distribution or range of the species; (2) potential occupancy of the species; (3) proximity and potential connectivity to occupied habitats; and (4) suitability of

---

[17] Additionally, Utah fails to mention that the RCP, of which the State was a plan representative, provided that, among the top five priority rangewide strategies listed in the RCP, is habitat improvements among "potential" habitats, noting that this would be a "slower, but perhaps surer, conservation strategy." GUSG0011490. The "5th" priority of the rangewide strategies is to protect from permanent loss historically used habitats that are not currently occupied by grouse. These are areas we've mapped as suitable, but not occupied, or as 'potentially suitable' habitat. These areas may, with proper restoration, serve as areas of expansion or as linkages connecting populations. These are obviously desirable outcomes…." GUSG0011490. "Potentially suitable" and "vacant/unknown" habitat is discussed in more detail below.

the habitat for the species based on scientific literature indicating that habitat suitability is dependent on large landscapes where 25% or greater of the area is dominated by sage-brush cover. GUSG0199353.[18] The Service only considered areas within the species' historical range that met these requirements <u>and</u> occur within approximately 18.5km of occupied habitat. GUSG0199352; 0199368. GUSG "make relatively large movements on an annual basis due to the need for a diverse range of seasonal habitat types." GUSG0199365. "[H]owever, information on how sage-grouse actually disperse and move through landscapes is lacking." GUSG0199370. The Service concluded that, outside of occupied habitat, areas within the 18.5km range, which "represents the rangewide maximum measured seasonal movement of Gunnison sage-grouse across all seasons, as presented in the RCP," "have the highest likelihood of Gunnison sage-grouse use and occupation." GUSG0199352; *see also id.* (citing other scientific sources supporting consideration of areas within 18.5km of occupied habitat).[19] Considering areas within this range would "allow for the expansion of the current geographic distribution of the species and potentially facilitate movements among populations." GUSG0199368; 0199370 (using this range to "account for proximity to and potential connectivity with occupied" GUSG habitat).

---

[18] The Service thoroughly discussed how it assessed habitat suitability for unoccupied areas. *See* GUSG0199371. However, the Federal Respondents do not address this analysis in detail because Utah has not specifically challenged the analysis in its opening brief. Thus, any argument relating to this analysis has been waived.

[19] The Service acknowledged that GUSG "movement behavior and distances likely vary widely by population and area, potentially as a function of population dynamics, limited or degraded habitats, and similar factors. Movements have been documented as being much greater (up to 56 km (35 mi)) or much less than 18.5 km in some cases….However, the best available information indicates 18.5 km is a reasonable estimate of the distance required between habitats and populations to ensure connectivity for [GUSG], or facilitate future expansion of the species' range." GUSG0199352.

The Service's "delineation of unoccupied critical habitat areas was based on these criteria, scientific data, and mapping methods on a landscape scale." GUSG0199353. The Service relied on maps and polygons delineated and defined by a group of biologists, including those from CPW, at the time Colorado Division of Wildlife, and San Juan County. GUSG0199354; 0199356. Specifically, the Service looked at the two types of unoccupied habitat adopted by CPW and the Utah Division of Wildlife Resources ("UDWR") for mapping purposes: "potentially suitable" and "vacant/unknown." GUSG0199370. The RCP defined "potential habitat" as "unoccupied <u>habitats</u> that could be suitable for occupation of sage-grouse if practical restoration were applied," and is most commonly former sagebrush areas overtaken by piñon-juniper woodlands. GUSG0199370 (emphasis added).[20] The RCP defines vacant or unknown habitat as "<u>suitable habitat</u> for sage-grouse that is separated (not contiguous) from occupied habitats that either has not been adequately inventoried, or has not had documentation of sage-grouse presence in the past 10 years." *Id.* (emphasis added). Using this information, the Service then further evaluated the areas based on their proximity to occupied areas and suitability, defined by large areas dominated by sufficient sagebrush cover at the landscape scale. *Id.* (also discussing how the Service eliminated certain areas that were part of the RCP mapped unoccupied habitat). Utah did not identify in its opening brief scientific data that is better than what Utah itself helped to prepare in the RCP. With regard to seasonal habitats, "[r]angewide, fine-scale habitat structure data on which to delineate seasonal habitats currently does not exist." GUSG0199365. The Service is only required to use the "best available science," not the best possible science. *See AOGA*, 815 F.3d at 555 (The ESA "requires use of the best available technology, not perfection.").

---

[20] In its complaint, Utah noted that the State became a signatory party to the GUSG RCP. ECF 34-2 at 15-16.

### c. Unoccupied areas need not contain PCEs to be designated

Utah incorrectly asserts that unoccupied habitat must contain PCE 1 to be designated. Utah equates the term "habitat"—which is not defined in the ESA[21]—with "extensive sagebrush landscape" or PCE 1, and asserts, without support, that the Service may not designate areas that do not contain PCE 1. Utah Br. at 9-10. Utah ignores the record, including the description of the remaining PCEs—which it does not challenge—which establish that GUSG use a number of different types of habitat during their life cycles. Moreover, Utah's argument is contrary to the plain language and purpose of the ESA and the relevant case law, which establishes that there is no requirement to show that PCEs are present to designate unoccupied areas as critical habitat. *See* 16 U.S.C. § 1532(5)(A)(i), (ii); *see also Markle*, 827 F.3d at 468; *Bear Valley*, 790 F.3d at 994; *Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1368 (N.D. Fla. 2009). Rather, as already discussed, the Service must make a different finding—that the area itself is essential for the conservation of the species. In other words, Congress has authorized the Service to designate areas that do not currently contain PCEs upon the determination that the area itself is essential for the conservation of the species.

The ESA defines "critical habitat" as:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

---

[21] By not defining the term, Congress left the interpretation of this term to the Service's discretion, taking into consideration the purpose of the statute—to conserve threatened and endangered species. 16 U.S.C. § 1531(b). Nothing in the statute supports Utah's restrictive view of "habitat." Moreover, the Service identified all of the unoccupied critical habitat using scientific data from the RCP, which described these areas as either "suitable habitat for sage-grouse" or "habitats that could be suitable for occupation of sage-grouse if practical restoration were applied." GUSG0011341 (emphasis added). The RCP noted specifically that these habitat definitions were used by Colorado Division of Wildlife and Utah Division of Wildlife Resources. *Id.*

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A). As the statutory language makes clear, there are two types of critical habitat, each with a separate standard and scope of analysis. Missing from the provision regarding unoccupied habitat is any mention of a finding of PCEs. 16 U.S.C. § 1532(5)(A)(ii).

The fact that Congress specifically included language requiring an assessment of physical and biological features in subsection (i) but excluded that language in subsection (ii) shows that Congress intentionally omitted the requirement of a showing of PCEs[22] for designating unoccupied areas. It is a well-established principle of statutory construction that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rusello v. United States*, 464 U.S. 16, 23 (1983) ("Had Congress intended to restrict [this subsection as Petitioner suggests] it presumably would have done so expressly as it did in the immediately following subsection…" (citations omitted)); *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 678 (10th Cir. 2016). As Congress must have recognized, depending on the specific needs of and threats to a listed species, areas that do not contain PCEs at the time of designation may still be essential to the conservation of the species. As a practical matter, this makes sense. The purpose of the ESA is to conserve listed species by, in part, protecting their habitat. 16 U.S.C. § 1531(b). It does not make sense to hamstring the Service's efforts to conserve a species by limiting the designation of habitat to only those areas that contain optimal conditions for the species.

---

[22] PCEs are those specific elements of physical and biological features that provide for a species' life-history processes and are essential to the conservation of the species. GUSG0199363.

Utah's argument that unoccupied critical habitat must be "predominantly populated by sagebrush" is essentially an argument that all designated areas must be habitable by the species. Utah Br. at 9. Utah has failed to provide any support for its interpretation. Even for occupied areas, the Service is not required to show that *all* PCEs are present in each occupied unit. *Home Builders Ass'n of N. Cal. V. U.S. Fish & Wildlife Serv.*, 616 F.3d 983, 988-89 (9th Cir. 2010) ("In general, there is simply no reason that two elements essential for the conservation of a species need be present in the same area."). Moreover, recent cases have repeatedly rejected this argument. *See, e.g., Markle*, 827 F.3d at 468 ("There is no habitability requirement in the text of the ESA or the implementing regulations. The statute requires the Service to designate 'essential' areas, without further defining 'essential' to mean 'habitable.'"); *Fisher*, 656 F. Supp. 2d at 1368 (for unoccupied critical habitat, the Service "was not required to identify PCEs" but instead find that unoccupied areas were "essential for the conservation of the species"). The Fifth Circuit found that the extra-textual limit placed on unoccupied land by requiring habitability "conflates the standard for designating *unoccupied* land with the standard for designating *occupied* land." *Markle*, 827 F.3d at 468. The Ninth Circuit similarly held that the Service need only find that an unoccupied area is essential and nothing more. *Bear Valley*, 790 F.3d at 994. In that case, the Ninth Circuit upheld the Service's designation of a unit of critical habitat that was not "suitable" habitat and never would be because the areas within the unit served as

> the primary sources of high quality coarse sediment for the downstream occupied portions of the Santa Ana River. The Final Rule determined that coarse sediment was essential to the sucker because [it] provided a spawning ground as well as a feeding ground from which the sucker obtained algae, insects, and detritus. The Final Rule also determined that Subunit 1A [the unoccupied unit] assisted in maintaining water quality and temperature in the occupied reaches of the river.

790 F.3d at 994.

As the Ninth Circuit aptly stated, there is "no support…in the text of the ESA or the implementing regulation" for the contention that "essential" means "habitable." *Id.* (upholding designation of "uninhabitable source areas" as essential for the conservation of the species). Had Congress wanted to narrowly define the term "essential" in that way, it could have done so. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (An ambiguous statutory term constitutes a "delegation[] of authority to the agency to fill the statutory gap in a reasonable fashion."). In addition, Utah attempts to argue that the unoccupied areas are not "habitat." Utah Br. at 8. However, as already noted, all of the unoccupied areas were selected from the areas mapped as "potentially suitable" or "vacant/unknown," as described in the RCP. Those areas by definition are "habitat." And these definitions were approved and applied by Utah itself. The ESA uses only the term "habitat," not "suitable habitat" or "habitat that can support the species." There is simply no support for Utah's arguments.

Moreover, the U.S. Supreme Court has stated that "[w]hen it enacted the ESA, Congress delegated *broad administrative and interpretive power* to the Secretary." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 708 (1995) (emphasis added). Deference is especially appropriate here because the determination of whether an area is essential for the conservation of the species is a scientific one that is "within the purview of the agency's unique expertise." *Ariz. Cattle Growers' Ass'n v. Salarar*, 606 F.3d 1160, 1165 (9th Cir. 2010); *see also, Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 442 (10th Cir. 2011) (deference to an agency's judgment is especially appropriate where the challenged decision implicates special agency expertise).

Utah also argues that the unoccupied areas should not have been designated because, according to Utah, the areas cannot benefit the species unless they are solely extensive sagebrush landscape. Utah Br. at 9-10. Similar arguments were recently rejected in *New Mexico Farm &*

*Livestock Bureau v. U.S. Dep't of the Interior*, No. 15-cv-428-KC-CG (D. N.M. Oct. 25, 2017).

There the court upheld a designation of unoccupied habitat that was not part of the jaguar's core habitat and was suitable only as "secondary habitat, which has little to no evidence of reproduction but can provide important dispersal habitat" for the species. ECF 76 at 10. The court concluded that the Service's determination that the areas were essential was rational because the Service showed that the areas contribute to the jaguar's persistence by supporting range expansion and genetic exchange. *Id.* at 11-12.

Utah's arguments are also similar to those rejected by the Ninth Circuit in a challenge to the polar bear critical habitat designation. *See AOGA*, 815 F.3d at 561 ("The district court erroneously focused on the areas existing polar bears have been shown to utilize rather than the features necessary for future species protection."). Although that case involved the designation of occupied habitat—approximately 187,157 square miles—the Ninth Circuit's assessment applies equally here. In that case, the plaintiffs challenged, among other things, the designation of Unit 2 for denning, arguing that the specific features needed for denning occurred in only 1% of the unit. *Id.* at 557. The Ninth Circuit rejected AOGA's arguments, finding that it was reasonable for the Service to take into consideration areas that allowed access to potential denning habitat. *Id.* The Court noted that, "[t]o the extent that Plaintiffs demand greater scientific specificity than available data could provide, Plaintiffs echo the district court's error in demanding too high a standard of scientific proof." *Id.* at 558. Here, Utah likewise ignores the limits in scientific technology and the practicalities of designating critical habitat for a species that uses large landscapes, such as the GUSG.[23] As the Final Rule explains, "the distribution of sage-grouse habitat across the landscape

---

[23] The Service's regulation addressing criteria for designating critical habitat also accounts for this issue by providing that "[w]hen several habitats, each satisfying the requirements for designation as critical habitat, are located in proximity to one another, the Secretary may designate an inclusive area as critical habitat." 50 C.F.R. § 424.12(d).

is naturally disconnected due to the presence of unsuitable habitat such as forests, deserts, and canyons across the landscape." GUSG0199367; *see also* GUSG0199389 (describing PCE 1, which Utah does not challenge, in part as areas in which at least 25% of the land is dominated by sagebrush, showing that the species' habitat across the landscape is fragmented but remains useable despite large areas of less than ideal habitat). Petitioner Colorado submitted comments noting that expansive areas of contiguous sagebrush habitat probably were not found in the GUSG's range even historically due to the "high elevation basins and naturally fragmented nature of the sagebrush communities in Colorado." GUSG0074717. Colorado further noted that, based on CPW research, adult GUSG "frequently moved between areas that are not contiguous habitat." *Id.* In other words, GUSG habitat is fragmented in such a way that it exists in patches throughout a large landscape. It would be virtually impossible to designate just those patches without sweeping up some locally unsuitable habitat.[24] And, in doing so, the Service would likely be omitting important, though less preferable, habitat, such as agricultural lands. Thus, the Service relied on the best available science and applied a set of criteria as discussed above to narrow down the areas that the Service could reasonably determine are essential for the conservation of the grouse. The Service also has accounted for the inclusion of such areas by emphasizing in the Final Rule that any Section 7 consultation would take into consideration the quality of the habitat when assessing whether a proposed Federal action will destroy or adversely modify critical habitat. GUSG0199351.

Utah also argues that the agency may not designate areas where the "sage-grouse does not live and is not found." Utah Br. at 9. Utah's assertion is contradicted by the plain language of the

---

[24] For example, "GUSG habitat [used by the Monticello, Utah subpopulation] is generally characterized by large grass pastures and agricultural fields interspersed with fragmented patches of Wyoming sagebrush and black sagebrush." GUSG0011368.

statute which expressly provides for the designation of <u>unoccupied</u> critical habitat. The only requirement for designating unoccupied habitat is that the area be "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). Congress chose not to include the occupancy requirement that Utah proposes. Moreover, not only does Utah fail to cite any case law to support its interpretation, it fails to mention that its arguments already have been rejected by other courts. *See, e.g., Markle*, 827 F.3d at 468; *N.M. Farm & Livestock Bureau*, No. 15-cv-428, ECF 76 at 9. Occupancy is not a prerequisite to the Service determining that an area is essential for the conservation of the species. Indeed, that would be conflating the standards for designating occupied and unoccupied critical habitat. *See* 16 U.S.C. § 1532(5)(A)(i), (ii).

Utah also asserts that the Service should not have designated agricultural lands in Unit 1 because "[f]armland does not provide the Gunnison sage-grouse necessary forage or cover for survival." Utah Br. at 9. As already discussed above, nothing in the statute requires the Service to show that every area of designated critical habitat be capable of supporting all life stages of the species. Moreover, to the extent that Utah implies that the GUSG derives no benefit from agricultural lands, that assertion is belied by the facts. As the Final Rule explains, although the GUSG is considered a sagebrush obligate, the grouse "may use a variety of habitats throughout [its] life cycle, such as…agricultural lands…." GUSG0199364; *see also* GUSG0199354 (noting that "unoccupied agricultural lands …can be important for various seasonal uses by grouse and can, because of scale, meet the landscape level habitat suitability criteria"); 0199367 ("In late summer and early fall, GUSG can be observed in atypical habitat such as agricultural fields."); 0199368 ("[O]ftentimes critical seasonal habitats have been converted to agricultural fields, and when sagebrush communities are drying out and forbs are waning on the landscape, resources can still be available in these agricultural areas."). Additionally, the Service determined, based on the best available science, that PCEs 2 and 3, which Utah does not challenge, may include agricultural

lands. GUSG0199389. Thus, it was reasonable to include other types of habitat that the GUSG has been known to use.

Finally, underlying many of Utah's claims is the complaint that private property makes up the majority of unoccupied habitat designated in the State. Utah Br. at 5 (noting that a "mere 33% of the critical habitat [in Utah] is currently occupied"). But there is no prohibition on designation of private property as critical habitat. Moreover, as the Fifth Circuit aptly explained, Utah's concerns about the impact of the designation on private property owners is unfounded:

> Misconceptions exist about how critical-habitat designations impact private property. Critical-habitat designations do not transform private land into wildlife refuges. A designation does not authorize the government or the public to access private lands. Following designation, the Fish and Wildlife Service cannot force private landowners to introduce [a listed] species onto their land or to make modifications to their land. In short, a critical-habitat designation alone does not require private landowners to participate in the conservation of [a listed] species.

827 F.3d at 458. In other words, absent a federal nexus to their activities, Utah landowners can do what they want with the unoccupied designated critical habitat. *See* GUSG0199363. Utah also seems to argue that the designation of unoccupied areas that are privately owned is impermissible because the Service cannot require the habitat modifications that would be needed to make the areas habitable for the GUSG. Utah Br. at 10. This argument was recently rejected by the Fifth Circuit which declined to "endorse—contrary to the express terms and scope of the statute—a private landowner exemption from unoccupied critical-habitat designations." *Markle*, 827 F.3d at 470. The Fifth Circuit noted that "[t]his, the Third Branch, is the wrong audience for addressing this matter of policy." *Id.* That court rejected the idea that "private landowners could trump the Service's scientific determination that unoccupied habitat is essential for the conservation of a species so long as they declare that they are not currently willing to modify habitat to make it habitable and that they will not be willing to make modifications in the foreseeable future." *Id.* This Court should likewise reject Utah's arguments. The Service is required by Congress to make

63

a determination of what areas are necessary to conserve the species. Where, as here, habitat destruction and degradation have been a contributing factor causing the decline of a species, it is not unusual for the Service to designate less than ideal habitat to conserve the species. The Service explained in great detail how it came to the determination that unoccupied areas were essential to the conservation of the species and what scientific data it relied on to identify those areas to be designated. Utah has fallen far short of meeting its burden of showing that the Service's determination was arbitrary and capricious and, thus, its arguments must be rejected.

III.    **The Service Fully Considered the Economic Impacts of Designating Critical Habitat**

Utah argues that the Service's economic impacts analysis is inadequate because the Service applied the incremental impacts approach to assessing economic impacts, which was adopted by regulation in 2013, and because the final economic analysis report was finalized just three weeks before the Final Critical Habitat Rule was published. The record demonstrates that the Service fulfilled its only obligation under the ESA to consider the probable economic impacts of designating critical habitat. Thus, Utah's arguments should be rejected.

a.    **The Service is not bound by Tenth Circuit case law that rejected an approach that was not even followed in this rulemaking**

Utah's primary complaint regarding the Service's economic impacts analysis is that the Service undertook an incremental impacts analysis rather than taking a co-extensive approach as required under Tenth Circuit case law. Utah Br. at 17. Utah fails to mention that the Service's incremental impacts analysis was based on a regulation that adopted a version of the incremental impacts analysis that differs from the one rejected by the Tenth Circuit. Utah Br. at 17-18. In any event, the Service is not bound by a court's prior interpretation of an ambiguous statutory directive for which the agency later provides a legally binding, reasonable interpretation. *See Brand X*, 545 U.S. at 982-83 (A court's prior judicial construction of a statute trumps an agency construction

"otherwise entitled to Chevron deference <u>only if</u> the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." (emphasis added)).

To determine the incremental impacts of designating critical habitat, the Service considers the probable impacts that would not exist "but for" the designation of critical habitat, *i.e.*, the costs above and beyond those attributable to the listing of the species. In contrast, the co-extensive approach preferred by Utah considers the "baseline" costs or the quantified impacts of conservation protections for the species that are already in place, such as ESA listing, and that would be incurred regardless of whether critical habitat is designated. Thus, the assessment of the impacts would differ only where the species exists—in occupied areas. As Utah noted in its brief, two-thirds of designated habitat in Utah is unoccupied and, thus, all potential economic impacts in those areas would be attributable to the critical habitat designation.

In the areas unoccupied by the GUSG, the Service reasonably relied on an incremental impacts analysis to identify and assess potential economic impacts. The ESA requires the agency to "tak[e] into consideration the economic impact" of designation, but it is silent as to the particular method of analysis. 16 U.S.C. § 1533(b)(2); *see also Fisher*, 656 F. Supp. 2d at 1368. Moreover, in the statute's legislative history, Congress explained that "[t]he Secretary is not required to give economics or any other 'relevant impact' predominant consideration in his specification of critical habitat." H.R. Rep. No. 95-1625, at 16-17, reprinted in 1978 USCCAN 9453, 9467 (1978). Instead, "[t]he consideration and weight given to any particular impact is completely within the Secretary's discretion." *Id.* Where the statute is silent as to the precise question at issue, Congress has delegated authority to the agency generally to make rules carrying the force of law, and if the agency's interpretation of the statute was issued pursuant to that authority, *Chevron* deference is generally appropriate. *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1221 (10th Cir. 2017). As already

noted, the U.S. Supreme Court has stated that "[w]hen it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary." *Babbitt*, 515 U.S. at 708. The Service was acting under that authority when it issued the formal regulation resulting from notice-and-comment rulemaking and, thus, the Court should defer to the agency's interpretation.

Congress requires the Service to designate critical habitat "after taking into consideration the economic impact…of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). In contrast, the Service is not permitted to consider the economic impacts before listing a species as endangered or threatened, a fact that Utah concedes. Utah Br. at 16. Because Congress has directed the Service only to consider the impacts of designating areas as critical habitat, the Service has rationally determined that the agency must consider the "hypothetical world with the designation to the hypothetical world without the designation." 78 Fed. Reg. at 53,062. As the Service explained in the final rule finalizing the revision of 50 C.F.R. § 424.19:

> The purpose of consideration of impacts is to inform decisions on possible exclusions from critical habitat; in turn, the purpose of exclusions is to avoid the probable negative impacts of designating particular areas as critical habitat. Fundamentally, it is not an 'impact' of a designation if an impact will happen with or without the designation—those impacts will not be avoided by exclusion. For example, the impacts due to the listing of a species will occur regardless of designation of critical habitat or exclusion of areas from critical habitat.

*Id.* at 53,067. The Service has provided a reasoned explanation for adopting the incremental impacts approach for consideration of probable economic impacts, and the Court should defer to that interpretation of the statute. *See Brand X*, 545 U.S. at 980 (*Chevron* requires the Court to "accept the agency's [reasonable] construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." (citation omitted)).

The Tenth Circuit has rejected a version of the incremental impacts approach, but not the one the Service relied on to assess the impacts of designating areas for the GUSG and has been employing for almost a decade. As the court in *Fisher v. Salazar* explained, for a period of time,

the Service ascribed to a theory that little actual benefit or impact flowed from designating critical habitat. 656 F. Supp. 2d at 1368. Instead, most, if not all, impacts stem from the listing decision. This theory, dubbed the "functional equivalence" theory, "had its root in the regulatory definitions functionally equating the [Section] 7 jeopardy standard (relevant to listing) with the destruction-or-adverse modification standard (relevant to critical habitat designation)…Under the regulations, a proposed agency action must affect both the survival and recovery of a species before a consultation is required under either the jeopardy standard or the destruction-or-adverse modification standard." *Id.* at 1369 (citing 50 C.F.R. § 402.02). "Relying on the regulatory definitions, the [Service] long asserted that, because actions likely to destroy or modify a species' critical habitat are also likely to jeopardize the species' existence, the designation of critical habitat would provide no additional benefits to a species beyond the protections available through a jeopardy consultation." *Id.* In taking the position that the designation of critical habitat would result in no benefits the Service would similarly come to the conclusion, based on the baseline approach, that there were no incremental economic impacts resulting from the designation. *Id.*

In *New Mexico Cattle Growers v. U.S. Fish & Wildlife Service*, the Tenth Circuit took issue with this "functional equivalence" theory, but the plaintiffs had not challenged the Section 7 implementing regulation, 50 C.F.R. § 402.02. *See* 248 F.3d 1277, 1283 (10th Cir. 2001) (noting that "[w]hile the regulatory definitions [of jeopardy and adverse modification were not before the Court], they have been the cause of much confusion in that they inform the FWS's interpretation of the ESA's economic impact language"). The Court noted that the Service had defined those distinct terms as "virtually identical, or, if not identical, one (adverse modification) is subsumed by the other (jeopardy)." *Id.* At the time, the Service was using the baseline approach in the context of this functional equivalence theory, *i.e.*, assuming that, like the benefits, all the impacts resulted from the listing decision, to come to the conclusion there were no economic impacts resulting from

designating areas as critical habitat. Thus, the Tenth Circuit was able to reject the functional equivalence theory by rejecting the Service's baseline approach. *Id.* at 1285 ("Because economic analysis done using the FWS's baseline model is rendered essentially without meaning <u>by 50 C.F.R. § 402.02</u>, we conclude Congress intended that the FWS conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." (emphasis added)). As one court described it: "Apparently hamstrung by its inability to consider the validity of 50 C.F.R. § 402.02, the Tenth Circuit found another way to require the Service to perform a more rigorous economic analysis. This is an instance of a hard case making bad law." *Cape Hatteras*, 344 F. Supp. 2d at 129-30. After the Tenth Circuit issued its decision in *New Mexico Cattle Growers*, the Ninth Circuit invalidated 50 C.F.R. § 402.02, in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, *amended on other grounds*, 387 F.3d 968 (9th Cir. 2004). The Tenth Circuit has not since revisited the issue.

Utah does not challenge the Service's implementing regulation that formally adopts the incremental impacts approach; rather, Utah simply argues that, regardless of the regulation, the Service is still bound by Tenth Circuit case law. Utah Br. at 17. The Supreme Court has stated,

> Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."

*Brand X*, 545 U.S. at 982-83. The Tenth Circuit held that the approach before it at the time—the use of the baseline approach in the context of the functional equivalence theory—is foreclosed by the ESA. Under that approach, the Service determined that there were no benefits or economic impacts resulting from designation and that all impacts followed solely from the listing decision. Consistent with the ESA, its implementing regulations, and the relevant case law, the Service no longer employs the functional equivalence theory and instead now contracts with Industrial

Economics, Inc., to do a thorough analysis of the economic impacts of any potential designations. *See* 78 Fed. Reg. at 53062-63. As Utah laments, the Service found that the designation could cost between $54.9 million and $73.8 million over a 20-year period. Utah Br. at 6.

Moreover, when the Tenth Circuit reviewed the Service's approach, the Court concluded that *Chevron* deference was not due "[b]ecause the statutory interpretation resulting in [that version of] the baseline approach ha[d] never undergone the formal rulemaking process, [and thus] remains an informal interpretation not entitled to deference." 248 F.3d at 1281 (citation omitted).[25] In contrast, the Service's interpretation set forth in 50 C.F.R. § 424.19, is the result of notice-and-comment rulemaking. *See* 78 Fed. Reg. at 53,063. Under 50 C.F.R. § 424.19, the Service has interpreted Section 4(b)(2) as reasonably requiring the evaluation of probable economic impacts through an incremental analysis, also known as the baseline approach. *See* 78 Fed. Reg. at 53,059. This interpretation has been approved by every court to review it outside the Tenth Circuit since the Ninth Circuit's rejection of 50 C.F.R. § 402.02 definitions of "jeopardy" and "destruction or adverse modification" in *Gifford Pinchot. See, e.g., Ariz. Cattle Growers*, 606 F.3d at 1173 (describing the incremental impacts approach as "more logical than the co-extensive approach"); *Markle*, 40 F. Supp. 3d 744, 765 (E.D. La. 2014) (concluding that the Service permissibly used the incremental impacts approach); *Fisher*, 656 F. Supp. 2d at 1371 ("To the extent the Tenth Circuit's co-extensive approach permits consideration of costs not attributable to the designation, it is inconsistent with the mandate of the ESA."); *Cape Hatteras*, 344 F. Supp. 2d at 130. Additionally, the incremental impacts approach is consistent with the guidance by the U.S. Office of Management and Budget to executive branch agencies as to how to conduct cost-benefit

---

[25] The Tenth Circuit did not state that the ESA unambiguously required a particular method of analyzing economic impacts. *See* 248 F.3d at 1285 ("The statutory language is plain in requiring some kind of consideration of economic impact" before designating critical habitat. (emphasis added)). Rather, it simply rejected the baseline approach in the functional equivalence context.

analyses. 78 Fed Reg. at 53,062; *see also* GUSG79125 (defining the baseline (or incremental impacts) approach as the "best assessment of the way the world would look absent the proposed action"). Consistent with *Chevron*, the Court must defer to the Service's interpretation of the ESA and reject Utah's arguments. *Chevron*, 467 U.S. at 844 (requiring courts to defer to agency's interpretation unless the interpretation is "manifestly contrary to the statute").

In any event, as Utah concedes, the Service did address both baseline impacts and estimated incremental impacts. Utah Br. at 18. The Draft Economic Analysis was prepared several months before the final rule formally adopting the incremental impacts approach was published. *Compare* GUSG79114 (DEA, May 31, 2013) with 78 Fed. Reg. at 53,076 (Final Rule amending 50 C.F.R. § 424.19, Aug. 28, 2013). Thus, acknowledging that the designation occurred within the jurisdiction of the Tenth Circuit, the Service pursued a co-extensive impacts approach out of an abundance of caution. GUSG79126; 79148 (baseline impacts to grazing); 79167 (baseline impacts to agriculture and water management); 79181 (baseline impacts to mineral and fossil fuel extraction). Consequently, Utah's argument lacks any basis and should be rejected.

### b. The Service's Discretionary 4(b)(2) Exclusion Analysis is Distinct From the Impact Analysis and has no bearing on whether the Service "considered" economic impacts

Utah does not otherwise substantively challenge the Service's analysis except to say that the Service could not have adequately considered economic impacts of the designation because the Service chose not to exclude areas based on economic factors. Utah Br. at 19. Section 4(b)(2) of the ESA provides for two separate analyses related to economic impacts. The first is the required "impact analysis" in which the Service must take "into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 78 Fed. Reg. at 53,060. Once the impact analysis is complete, the Service may, in its discretion, consider excluding an area from critical habitat after identifying and weighing the

benefits of inclusion and exclusion, provided that the failure to designate that area as critical habitat will not result in the extinction of the species concerned. *Id.*; *see also Bldg. Industry Ass'n of the Bay Area v. U.S. Dep't of Commerce*, 792 F.3d 1027, 1033 (9th Cir. 2015) ("[W]e read the statute to provide that, after the agency considers economic impact, the entire exclusionary process is discretionary and there is no particular methodology that the agency must follow."), *cert. denied*, 137 S. Ct. 328 (2016). This analysis is referred to as the "discretionary 4(b)(2) exclusion analysis." 78 Fed. Reg. at 53,060. Utah argues that, because the Service did not write out a fulsome explanation for why the agency decided not to exclude areas based on economic impacts, the Service must not have considered the economic impacts. Utah Br. at 19. Given that the Service is not even required to undertake this discretionary analysis, the fact that it chose not to exclude areas based on economic impacts cannot serve as evidence that the Service did not consider the economic impacts in the first place. *See* 16 U.S.C. § 1533(b)(2); 50 C.F.R. § 424.19(c).[26]

---

[26] Utah only mentions the exclusion analysis in a few lines in the context of arguing that the Service did not consider economic impacts. Utah Br. at 19. Thus, Utah has not challenged the exclusion analysis. In any event, courts have unanimously concluded that the analysis is unreviewable. *Markle*, 827 F.3d at 473-74; *Bear Valley*, 790 F.3d at 989-990; *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 29 (D.D.C. 2010). Because Utah has not challenged the exclusion analysis, the amicus curiae cannot do so. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1145 n.2 (10th Cir. 2000) ("To the extent that [the amicus curiae's] brief raises arguments that have never been advanced by the parties, we grant ARCO's motion [to strike those arguments]."); *United States v. Bd. of Cty. Comm'rs of the Cty. Of Otero City*, 184 F. Supp. 3d 1097, 1117 (D.N.M. 2015) ("[T]he named parties should always remain in control, with the *amicus* merely responding to the issues presented by the parties…'An amicus cannot initiate, create, extend, or enlarge issues.' Consistent with this limited role, an amicus may not introduce an issue into a case or seek relief that is not raised or requested by the parties." (citations omitted)). Moreover, none of the parties to this case raised constitutional issues in their opening briefs. Accordingly, the Federal Respondents request that the Court strike sections III and IV, pages 5-10. In any event, every argument raised by the amicus curiae in these sections has been rejected by numerous courts.

### c. Utah's remaining arguments regarding the economic analysis should be rejected

Utah also argues that the Final Economic Analysis report was not completed until November 7, 2014, about three weeks before the Final Rule was published and, thus, the economic impacts discussed in that report and referenced in the Final Rule, *see, e.g.,* GUSG0199353-54; 0199359; 0199382, could not have actually been considered. Utah Br. at 19. In fact, Industrial Economics provided the Final Economic Analysis to the Service on January 17, 2014, about ten months before the Final Critical Habitat Rule was finalized. GUSG0104606; *see also* GUSG0129485-88 (March 2014 draft of critical habitat rule discussing the FEA); 0127766 (March 2014 talking points regarding the FEA); 0153297 (September 2014 email explaining that the economic analysis would not need to be updated because the only change to the designation was the reduction in designated acres, which, if anything, would reduce the probable economic impact of the designation). Utah also ignores the fact that the Service's consideration of economic impacts is not represented solely by the finalization of the Final Economic Analysis report, but also in the preparation of a 77-page Draft Economic Analysis, which was made available to the public for comment a full year before the Final Rule was published, and the consideration of public comments on economic impacts and possible exclusions. *See* GUSG0079114 (DEA); *see also* GUSG0199359 (Final Rule's discussion of economic impacts on energy and mineral development in response to comment 38); *id.* (discussion of economic impacts on farming and ranching in response to comment 39); *id.* (discussion of impacts on regional economy in response to comment 40); *see also Markle*, 827 F.3d at 474 ("The Service fulfilled this requirement [to consider economic impacts] by commissioning an economic report by Industrial Economics, Inc."). Moreover, under the statute, Congress required only that an impact analysis occur; Congress did not specify when in the rulemaking process it must occur. 78 Fed. Reg. at 53,061. "The purpose of the impact analysis is

to inform the Secretaries' decision about whether to engage in the discretionary exclusion analysis under the second sentence of section 4(b)(2) of the Act." *Id.* at 53,060. As explained earlier, the Service commissioned the economic report by Industrial Economics, Inc., and even undertook the discretionary analysis of whether to exclude certain areas from the final designation, as Utah concedes. Utah Br. at 19. Thus, the Service fulfilled the requirement to take into consideration economic impacts.

## IV.    The Service Complied With NEPA

### a.    The Environmental Assessment Considered Appropriate Alternatives

An EA must include an analysis of alternatives, but the range of alternatives need not be as broad as that of an EIS. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("[T]he statutory and regulatory requirements that an agency must consider 'appropriate' and 'reasonable' alternatives does not dictate the minimum number of alternatives that an agency must consider."). Here, in addition to analyzing the Proposed Action and No Action alternatives, the Service considered three other alternatives within the EA, but did not fully evaluate them: (1) Designation of Critical Habitat Only on Habitat Currently Occupied, (2) Designation of Critical Habitat Only on Public Lands, and (3) Designation of Critical Habitat Only in Gunnison Basin. GUSG0198254-5.

In contrast to the detail required in an EIS, an EA need only contain "brief discussions" of the "alternatives to the proposed action." *See Town of Superior v. v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1118 (D. Colo. 2012) (comparing 40 C.F.R. § 1508.9(b) with 42 U.S.C. § 4332(2)(C)), *aff'd*, 784 F.3d 677 (10th Cir. 2015). "NEPA requires only that an EA 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* at 1119 (quoting 42 U.S.C. § 4332(2)(E)).  This is precisely what the Service did here.

73

First, the Service considered whether the critical habitat designation should be limited to habitat currently occupied by GUSG. GUSG0198254. However, the Service determined that the currently occupied habitat areas for the Piñon Mesa, Cerro Summit-Cimarron-Sims Mesa, and Crawford populations were smaller than the RCP model's predicated minimum required area for conservation of the species. *Id.* Likewise, the currently occupied habitat areas in the Monticello-Dove Creek and San Miguel Basin populations only slightly exceeded the model's predicted minimum required area. *Id.* The Service concluded that, based on this knowledge, this alternative would be insufficient for long-term population viability for three populations, and would only be minimally adequate for two populations. *Id.* Thus, the Service determined that this alternative would not meet the purpose and need for the critical habitat designation, *i.e.*, it would be insufficient to ensure conservation of the species, and it was to evaluate in further detail. *Id.*

Second, the Service considered whether critical habitat should be designated only on public lands. GUSG0198254. The Service determined that, although Federal agencies manage 55% of the currently occupied habitat, much of it is either unsuitable habitat such as forested areas, or is at a greater distance from existing habitat than is typically covered by sage-grouse movements. *Id.* Based on this information, the Service concluded that designating critical habitat only on public lands would be insufficient to ensure conservation of the species. Therefore, it would not meet the purpose and need for the critical habitat designation, and did not merit further detailed examination. *Id.*

Third, the Service considered whether critical habitat should only be designated within Gunnison Basin. GUSG0198255. The Service determined that, although the Gunnison Basin population encompasses 63% of all occupied habitat and 84% of the current total population, the other six populations provide the necessary redundancy in the instance of events such as an outbreak of West Nile virus or drought, which could result in severe impacts to the species. *Id.*

The loss of one or more of the populations outside of Gunnison Basin would reduce the distribution and total range of the GUSG, and increase the species' vulnerability to catastrophic natural events. *Id.* Thus, the Service determined that designating critical habitat only within the Gunnison Basin would not meet the purpose and need for the critical habitat designation to ensure conservation of the species, and the Service did not evaluate this alternative in further detail. *Id.*

The analyses discussed above show that Utah is simply incorrect that the Service only considered the Proposed Action and No Action alternatives. The Service considered three other proposals that were suggested by commenters but, as the Service explained in the EA, and as discussed above, each was rejected for not meeting the purpose and need for the critical habitat designation. NEPA's mandate only requires the agency to analyze "appropriate" alternatives. *See* 42 U.S.C. § 4332(2)(E); *See also Native Ecosystems*, 428 F.3d at 1246 (finding that consideration of a preferred alternative and a "no action" alternative in an EA was adequate). Only alternatives that meet the purpose and need of the agency are "appropriate" for purposes of NEPA. Therefore, once the Service determined that the alternatives suggested by commenters would not meet the purpose and need for the critical habitat designation, further analysis was unnecessary.

### b. The Service Did Not Predetermine a Plan of Action Prior to Conducting its NEPA Analysis

One of NEPA's basic principles is to require "informed" agency decision-making. When an agency makes a binding commitment to the outcome of its NEPA analysis before completing that analysis, this is known as "predetermination." Utah argues that, because the EA only considered the proposed action and the "no action" alternative – which as discussed above is incorrect, as the Service also considered three other alternatives – the Service had "predetermined" the proposed action. Utah Br. 14. Utah misconstrues the standard for predetermination.

"A petitioner must meet a high standard to prove predetermination." *Forest Guardians*, 611 F.3d at 714. "[P]redetermination occurs only when an agency irreversibly and irretrievably commits itself to a plan of action that is dependent upon the NEPA environmental analysis." *Id.* (finding that emails showing that an agency had a preferred outcome were not sufficient to show predetermination). It is not enough to show a mere bias or preference for a particular alternative, a petitioner must demonstrate that the agency had made an irreversible and irretrievable commitment to a course of action such as a binding contract firmly committing the agency to the outcome of the NEPA analysis. *See id.* at 718. Agencies are not required to be "subjectively impartial" in their decision making processes. *Id.* at 712.

Here, Utah fails to show that the Service made an "irreversible and irretrievable commitment" to choosing the proposed alternative prior to issuing the EA. Cases presented with this question typically have focused on the commitment of natural resources prior to the completion of NEPA. *See Pennaco Energy, v. U.S. Dep't of Interior*, 377 F.3d 1147, 1160 (10th Cir. 2004) (issuance of certain oil and gas leases constituted irreversible commitment by agency); *WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008) (holding that "the Forest Service's pre-marking of [hazard] trees did not irretrievably commit it to a particular course of action" notwithstanding that the Forest Service had expended over $200,000 to mark the trees). Here, the Service made no commitment of resources prior to the completion of the NEPA process, and accordingly predetermination did not occur.

## CONCLUSION

Petitioners fail to demonstrate any error in the Service's analyses in this case. The Service reasonably determined that the grouse was not on the brink of extinction and appropriately met the definition of "threatened" and appropriately designated critical habitat. While all the Petitioners obviously disagree with the Service's determinations, mere disagreement with otherwise

reasonable and lawful analyses is not sufficient reason to overturn the Service's determinations.

*See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1080 (9th Cir. 2010) ("The question is not whether this court agrees with the [Service's] decision, but whether it is reasonably supported by the Administrative Record."). For these reasons, the Court should deny the pending petitions for review.

DATED: November 7, 2017

JEFFREY R. WOOD,
Acting Assistant Attorney General
SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief
RICKEY D. TURNER, JR.,
JESSICA HELD, Trial Attorney

*/s/ Mary Hollingsworth*
MARY HOLLINGSWORTH
Trial Attorney (AZ Bar 027080)
United States Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Telephone: 303-844-1373
Email: rickey.turner@usdoj.gov

*Attorneys for Federal Respondents*

**CERTIFICATE OF SERVICE**

I hereby certify that today I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ Mary Hollingsworth.*
MARY HOLLINGSWORTH