**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:15-cv-130**

(Consolidated with Civil Action No. 1:15-cv-131 and Civil Action No. 1:15-cv-286)

This Document Relates to Civil Action No. 1:15-cv-286

IN RE GUNNISON SAGE GROUSE ENDANGERED SPECIES ACT LITIGATION

---

**COMBINED RESPONSE BRIEF OF DEFENDANT-INTERVENORS
WILDEARTH GUARDIANS, DR. CLAIT E. BRAUN, CENTER FOR BIOLOGICAL
DIVERSITY, AND WESTERN WATERSHEDS PROJECT TO STATES', COUNTIES',
AND STOCKGROWERS' OPENING BRIEFS**

---

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

BACKGROUND.................................................................................................. 2

ARGUMENT ...................................................................................................... 4

   I.   COLORADO, GUNNISON, AND UTAH FAILED TO DEMONSTRATE
      ARTICLE III AND PRUDENTIAL STANDING. ...................................... 4

      a.  Colorado, Gunnison, And Utah Failed To Establish
         Article III Standing. ...................................................................... 4

      b.  Colorado, Gunnison, And Utah Lack Prudential Standing
         To Bring Their NEPA Claims. ...................................................... 7

  II.  THE GUNNISON BASIN POPULATION ALONE CANNOT SUSTAIN
      THE SPECIES............................................................................... 8

      a.  The Gunnison Basin Population Is Not As Large, Stable, Or Resilient
         As Colorado Claims. ..................................................................... 9

          i.  *The Gunnison Basin Population Is Not As Large Or As Stable*
             *As Previously Thought.* .................................................... 9

          ii.  *The Gunnison Basin Population Is Not As Resilient*
             *As Colorado Suggests.* ................................................... 10

      b.  Small Population Size And Structure Is An Adequate Basis
         For Listing. ................................................................................. 10

          i.  *Gunnison Basin Sage-grouse Numbers Are Insufficient*
             *To Stave Off Genetic Risks.* .......................................... 11

          ii.  *The Service Properly Considered The Available PVAs.* ............... 12

 III.  THE SERVICE WAS NOT REQUIRED TO DESIGNATE ONLY OCCUPIED
      AREAS AS CRITICAL HABITAT. ...................................................... 15

      a.  Unoccupied Habitat Is Essential To the Species' Recovery.................... 15

    b.  The Service's Decision To Evaluate Two Alternatives Does Not
       Amount to Predetermination of NEPA Outcome. ................................. 17

IV.   THE COURT SHOULD NOT VACATE EITHER RULE. ..................................... 19

**CONCLUSION** ................................................................................................. 19

## **TABLE OF AUTHORITIES**

### **Cases**

*Aina Nui Corp. v. Jewell*, 52 F. Supp. 3d 1110 (D. Hawaii 2014) .................................... 17

*All. for the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126 (D. Mont. 2010) .............. 15, 18

*Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014) ............................................................ 4

*Ctr. for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223 (W.D. Wash. 2003),
*vacated as moot*, 511 F.3d 960 (9th Cir. 2007) ............................................................. 14

*Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236 (D. Colo. 2011) .............. 19

*Forest Guardians v. United States Fish & Wildlife Serv.*,
611 F.3d 692 (10th Cir. 2010) ........................................................................................ 19

*Grant v. United States Air Force*, 197 F.3d 539 (D.C. Cir. 1999) .................................... 5

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004) ........................................................................................ 15

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) ............................... 19

*In Re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation*,
794 F. Supp. 2d 65 (D.D.C. 2011) ............................................................................ 10, 14

*In Re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litigation*,
709 F.3d 1 (D.C. Cir. 2013) ............................................................................................ 12

*Jarita Mesa Livestock Grazing Ass'n v. United States Forest Serv.*,
140 F. Supp. 3d 1123 (D.N.M. 2015) ............................................................................... 8

*Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006) ................................... 12

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................ 4, 5, 7

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)............................................................ 7

*Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*,
827 F.3d 452 (5th Cir. 2016), *petitions for cert. filed*............................................. 6, 15, 16

*N.M. ex rel. Richardson v. BLM*, 565 F.3d 683 (10th Cir. 2009) .................................... 18

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) .............................. 8

*Rocky Mountain Wild v. Walsh*, 216 F. Supp. 3d 1234 (D. Colo. 2016)......................... 10

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002)......................................................... 7

*S. Utah Wilderness All. v. Palma*, 707 F.3d 1143 (10th Cir. 2013) .................................. 4

*Swanson Group Mfg. LLC v. Jewell*, 790 F.3d 235 (D.C. Cir. 2015)................................ 7

*Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58 (D.C. Cir. 2000)................. 12, 13

*Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087
(D. Colo. 2012), *aff'd sub nom. WildEarth Guardians v. U.S. Fish and Wildlife Serv.*,
784 F.3d 677 (10th Cir. 2015) ...................................................................................... 17

*Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929 (D. Or. 2007) ......................................... 14

*United States v. Murray*, 82 F.3d 361 (10th Cir. 1996) ..................................................... 5

*Utah Shared Access All. v. Carpenter*, 463 F.3d 1125 (10th Cir. 2006) .......................... 8

*Western Exploration, LLC v. United States Dep't of Interior*,
250 F. Supp. 3d 718 (D. Nev. 2017) .............................................................................. 5

*WildEarth Guardians v. United States BLM*, 870 F.3d 1222 (10th Cir. 2017) ................ 18

*Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209 (10th Cir. 2011)................................... 18

*Wyoming v. United States Dep't of Interior*, 674 F.3d 1220 (10th Cir. 2012) .............. 5, 6

## Statutes

16 U.S.C. § 1532(3) ....................................................................................................... 15

16 U.S.C. § 1532(5)(A)(ii) ............................................................................................. 15

16 U.S.C. § 1532(6) ................................................................................ 14

16 U.S.C. § 1532(20) .............................................................................. 14

16 U.S.C. § 1533(a)(1)(A)-(E) ................................................................ 10

16 U.S.C. § 1533(b)(1)(A) ...................................................................... 14

16 U.S.C. § 1535(c)(1) .............................................................................. 5

16 U.S.C. § 1535(d)(1) .............................................................................. 5

16 U.S.C. § 1536(a)(2) .............................................................................. 8

42 U.S.C. § 4332(E) ................................................................................ 17

## Regulations

50 C.F.R. § 424.11(c) ............................................................................. 10

## Federal Register Notices

Designation of Critical Habitat for Gunnison Sage-Grouse,
79 Fed. Reg. 69312 (Nov. 20, 2014) (CH Rule) .................................... 3, 4, 17

Designation of Critical Habitat for Gunnison Sage-Grouse; Proposed Rule,
78 Fed. Reg. 2540 (Jan. 11, 2013) (Proposed CH Rule) .................................... 3

Endangered Status for Gunnison Sage-Grouse; Proposed Rule,
78 Fed. Reg. 2486 (Jan. 11, 2013) (Proposed Endangered Rule) ................................. 2

Threatened Status for Gunnison Sage-Grouse; Final Rule,
79 Fed. Reg. 69192 (Nov. 20, 2014) (Threatened Rule) ....................................... *passim*

## INTRODUCTION

The opening briefs filed by WildEarth Guardians and Dr. Clait Braun (ECF No. 142) and by the Center for Biological Diversity and Western Watersheds Project (ECF No. 145) demonstrated that the U.S. Fish and Wildlife Service (the Service) properly followed the best available science and the statutory directives of the Endangered Species Act (ESA) when it proposed in 2013 to list the Gunnison sage-grouse as an "endangered" species and protect 1.7 million acres as its critical habitat. The record is equally clear that political interference by then-Interior Secretary Salazar – under heavy pressure from states, counties, and industries – caused the Service to abandon these proposals and instead list the species as "threatened" while excluding 300,000 acres from the critical habitat designation in its 2014 Threatened and Critical Habitat Rules.

Now the States of Colorado and Utah, along with Gunnison and San Juan Counties and Gunnison Stockgrowers Association, seek to have this Court undertake what political pressures failed to accomplish, by completely removing all ESA protection for the imperiled Gunnison sage-grouse. Their opening briefs (ECF Nos. 143, 147, 148) principally argue that no ESA listing is warranted because a single remnant population in the Gunnison Basin is supposedly sufficient to secure the species' persistence into the future, when the science and record conclusively show otherwise. Their other procedural and legal objections are equally unfounded. They also have failed to demonstrate any tangible harm to their interests from the Service's adoption of the Threatened and Critical Habitat Rules, and lack prudential standing to bring their National Environmental Policy Act (NEPA) claims. This Court therefore must deny their petitions for lack of Article III standing, and deny their NEPA claims for lack of prudential standing.

# BACKGROUND[1]

The Gunnison sage-grouse has been declining for decades due to the destruction and fragmentation of its native sagebrush habitat. Only 4,705 Gunnison sage-grouse persisted in the wild in 2014, in seven populations, constricted to as little as seven percent of the species' historic range. Threatened Rule, 79 Fed. Reg. 69192-310, 69228, 69193, 69196 (Nov. 20, 2014). A single population, in Colorado's Gunnison Basin, comprised 84 percent of all remaining Gunnison sage-grouse in 2014 (3,978); the six smaller populations (San Miguel, Monticello-Dove Creek, Pinon Mesa, Cerro Summit-Cimarron-Sims Mesa, Crawford, and Poncha Pass) numbered only 206, 98, 182, 74, 157, and 10 birds, respectively. *Id*. at 69197. As the Service conceded, there were fewer Gunnison sage-grouse remaining than the 5,000 birds needed to sustain the species. *Id*. at 69290.

In January 2013, the Service proposed to list the Gunnison sage-grouse as "endangered" under the ESA. Proposed Endangered Rule, 78 Fed. Reg. 2486-2538 (Jan. 11, 2013). Service scientists determined the species warranted endangered status because habitat loss and fragmentation were adversely impacting the Gunnison sage-grouse, as were livestock grazing, predation, genetic risks in the smaller populations, and the inadequacy of regulatory mechanisms to conserve the species. *Id*. at 2535. The Service emphasized that because each of the seven remaining populations contributes to the species' diversity and potential resilience to catastrophic events, "the loss of any one population would have a negative effect on the species as a whole." *Id*. at 2530.

---

[1] Our opening briefs provided a detailed discussion of the background facts, ESA listing history, and science underscoring the decline of Gunnison sage-grouse leading to the 2014 Threatened and Critical Habitat Rules, *see* ECF Nos. 142, 145, so the facts are only briefly summarized here.

The Service also proposed to designate 1.7 million acres of critical habitat for the bird. Proposed CH Rule, 78 Fed. Reg. 2540-70 (Jan. 11, 2013).

Shortly before the Service issued the Proposed Endangered Rule, Colorado asked the Service to consider a new study, Davis (2012).[2] GUSG58855. Davis (2012) is the only study that uses Gunnison sage-grouse demographic data to conduct a population viability analysis for the species, and the Service ultimately identified it, along with a 2014 study by Davis (then in press), as the best available science. Threatened Rule, 79 Fed. Reg. at 69294-95.

Meanwhile, as the record reveals, then-Interior Secretary Salazar responded to heavy pressures from Colorado, Utah, and others, and directed the Service to arrive at a "threatened" instead of "endangered" listing. *See* Guardians Op. Br. 7-9, ECF No. 142 & Attachment 1 (Nov. 14, 2012 Bell Memo). On November 20, 2014, the Service issued its final rules listing the Gunnison sage-grouse as a threatened species and designating 1.4 million acres of critical habitat (12 percent of its historic range) for the bird.[3] Threatened Rule, 79 Fed. Reg. at 69192-310; CH Rule, 79 Fed. Reg. 69312-63 (Nov.

_____

[2] In comments on the Proposed Rule, Michael Phillips, an expert reviewer and avian researcher with Colorado Parks and Wildlife, also directed the Service's attention to this study. GUSG68225, GUSG68231. The State of Colorado, Gunnison County Commissioners, and Gunnison County Stockgrowers discussed Davis (2012) in comments and urged the Service to consider it. GUSG232246, GUSG91317-18 GUSG73479. These facts fatally undermine Gunnison Intervenors' allegation that the Service erred in not citing Davis (2012) in the Proposed Rule. Gunnison Op. Br. 3-11, ECF No. 147.

[3] As the Service stated in its Response Brief, ECF No. 152, it identified occupied critical habitat using "primary constituent elements" (PCEs). However, the PCE 1 the Service identified in its brief is not the PCE 1 it used in the Final Critical Habitat Rule. The PCE 1 the Service used in its Final Critical Habitat Rule is "*[e]xtensive sagebrush landscapes capable of supporting a population of Gunnison sage-grouse*." CH Rule, 79 Fed. Reg. at 69333-34 (emphasis added). WildEarth Guardians and Dr. Clait Braun explained in their opening brief why the difference between PCE 1, as the Service now describes it, and the PCE used in the Threatened Rule is significant. Guardians Op. Br. 25-30, ECF No. 142.

11, 2014). The Service asserted that while the threats it had identified continued to impact the species, they did not support an endangered finding, especially because the threat from residential development in the Gunnison Basin was not as great as the Service originally thought. Threatened Rule, 79 Fed. Reg. at 69303. The Service also reduced its final critical habitat designation by about 300,000 acres. These reductions in ESA protection for the Gunnison sage-grouse contravened the best available science and ESA standards, as shown in Petitioners' opening briefs, such that the Court should direct the Service to upgrade the Gunnison sage-grouse to "endangered" listing status and designate the full 1.7 million acres of critical habitat, as the Service proposed in 2013. *See* Guardians & Center Op. Brs., ECF Nos. 142, 145.

## ARGUMENT

**I.      COLORADO, GUNNISON, AND UTAH FAILED TO DEMONSTRATE ARTICLE III AND PRUDENTIAL STANDING.**

### a.  Colorado, Gunnison, And Utah Failed to Establish Article III Standing.

Colorado, Gunnison, and Utah have failed to establish Article III standing for any of their claims. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [Article III standing]."); *see also Bishop v. Smith*, 760 F.3d 1070, 1088 (10th Cir. 2014) ("Each plaintiff must have standing to seek each form of relief in each claim."). Colorado and Gunnison provide only vague "general factual allegations" of injury, *Lujan*, 504 U.S. at 561, while Utah fails to offer any evidence of standing at all. These flaws are fatal, since standing is a "threshold jurisdictional question of whether a court may consider the merits of a dispute." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013). Lacking jurisdiction, this Court cannot rule in favor of Colorado, Gunnison, or Utah. Any attempt made on reply to cure these jurisdictional defects is waived and would prejudice

Defendants and Defendant-Intervenors, who will not have the opportunity to respond. *See Grant v. United States Air Force*, 197 F.3d 539, 543 n.6 (D.C. Cir. 1999) ("[A]n argument first made in the reply comes too late."); *see also United States v. Murray*, 82 F.3d 361, 363 n.3 (10th Cir. 1996) *(*"We decline to consider arguments raised for the first time in a reply brief.").

Colorado failed to offer specific evidence of a "concrete and particularized" injury that is "fairly …trace[able]," to the listing or critical habitat designation. *Lujan*, 504 U.S. at 560 (quotation marks and citations omitted). Rather, Colorado provided only vague, cursory allegations of unspecified injury to its management of wildlife in general and of the Gunnison sage-grouse in particular. Dec. of Bob Broscheid, ¶¶ 9–12, ECF No. 143-1. Colorado never explains what sorts of specific management activities are being affected – let alone injured – from listing the Gunnison sage-grouse or identifying critical habitat. Because Colorado has failed to identify any injury-in-fact, it cannot establish jurisdiction before this Court. *See Wyoming v. United States Dep't of Interior*, 674 F.3d 1220, 1235 (10th Cir. 2012) (noting that "speculative … evidence regarding economic loss … failed to demonstrate a concrete injury in fact"); *see also Western Exploration, LLC v. United States Dep't of Interior*, 250 F. Supp. 3d 718, 731–32 (D. Nev. 2017), *appeal filed* (finding that the state's alleged injury lacked "sufficiently specific facts … to demonstrate how particular binding standards … caused, or will imminently cause, a concrete and particularized injury to the State").[4]

---

[4] In all likelihood, Colorado and Utah cannot, in fact, produce evidence of a concrete, particularized injury that would be sufficient to invoke the Court's jurisdiction. If anything, protection of Gunnison sage-grouse under the Act should result in an influx of federal resources to assist Colorado and Utah agencies in conserving the species, as well as the expertise of the Fish and Wildlife Service to assist with such efforts. 16 U.S.C. § 1535(c)(1) (authorizing FWS "to enter into a cooperative agreement . . . with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species"); *id*. § 1535(d)(1) (authorizing FWS "to

Gunnison County and the Stockgrowers similarly rely on conclusory and speculative statements of harm to their economic interests, without evidence to establish any concrete and particularized injury. *See, e.g.*, Affidavit of Paula Swenson, ECF No. 23-2 (Swenson Aff.); Affidavit of Burt Guerrieri, ECF No. 23-4 (Guerrieri Aff.); Affidavit of Patrick I. Ydoumans, ECF No. 23-5 (Ydoumans Aff.). For example, Mr. Guerrieri states only that members of the Stockgrowers' Association will "potentially" be "harmed" and that their grazing operations "could be directly impacted" from the listing and designation of critical habitat. Guerrieri Aff. ¶¶ 5, 7; *see also* Youmans Aff. ¶ 4 (noting simply that grazing operations "stand to be affected" in some unspecified way by listing and critical habitat). Yet "potential" impacts that "could" affect grazing operations are simply too hypothetical and not enough to support standing. *Wyoming*, 674 F.3d at 1233-34 ("speculative economic data" is "insufficient … to meet [petitioners'] burden of showing an injury in fact").

In addition, like the Stockgrowers' unspecified and hypothetical claims of injury, Gunnison County's allegations of harm are conclusory and unspecific as well. *See* Swenson Aff. ¶ 8 (claiming that the Gunnison sage-grouse listing affects unspecified uses of unidentified lands along with generalized interests of Gunnison County). As with Colorado, such generalized and speculative allegations as these are lacking in the necessary evidence of a particularized, imminent injury and, therefore, cannot carry Gunnison's burden to provide "specific evidence" demonstrating injury-in-fact. *See, e.g.*, *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 463 (5th Cir. 2016), *petitions for cert. filed* (finding loss of unspecified future development projects due to the designation of critical habitat too speculative to support standing).

---

provide financial assistance to any State, through its respective State agency, which has entered into a cooperative agreement . . . to assist in development of programs for the conservation of endangered and threatened species").

Last, while Colorado and Gunnison submitted along with their opening briefs some evidence, although insufficient, of injury-in-fact, Utah submitted no evidence of any of the elements of standing at all, seeking to put the onus on Defendant-Intervenors to guess the "unknown in an attempt to prove the negative." *Sierra Club v. EPA*, 292 F.3d 895, 901 (D.C. Cir. 2002).[5] Utah has essentially requested that the Court "'presume' the missing facts' necessary to establish … standing[,]" something this Court cannot do. *Swanson Group Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Colorado, Gunnison, and Utah failed to carry an "indispensable part" of their claims, *Lujan*, 504 U.S. at 561, and have waived their ability to invoke this Court's jurisdiction. Their failure to submit sufficient evidence demonstrating Art. III standing with their opening briefs precludes Defendant-Intervenors from responding to their theories of injury-in-fact, causation, or redressability. Lacking jurisdiction over their claims, this Court must rule in favor of Defendants.

**b. Colorado, Gunnison, And Utah Lack Prudential Standing to Bring Their NEPA Claims.**

Even assuming that Colorado, Gunnison, and Utah have provided "specific facts" to support Article III standing, they nevertheless lack prudential standing to pursue their NEPA claims, because it is axiomatic that "a plaintiff may not pursue the NEPA's end[,]"

---

[5] Allowing Utah to introducing evidence with its reply brief would preclude Defendant-Intervenors' ability to respond. *See Sierra Club*, 292 F.3d at 901 (requiring petitioner to establish standing "at the outset," because "[t]he facts upon which a petitioner relies for its standing to sue are necessarily peculiar to it and are ordinarily within its possession; indeed … often … the relevant facts are known only to the petitioner, to the exclusion of both the respondent and the court"). To the extent that Utah seeks to introduce new evidence with its reply brief, or attempts to satisfy the requirements of standing by pointing to as-of-yet-to-be-identified portions of the record, this Court should allow Defendant-Intervenors to file a sur-reply "in order to ensure that the issue [of standing] is joined in a fair and thorough adversarial process…." *Id.*

which is to "protect[] the human environment," by "obstructing" the very means by which NEPA supports such environmental protection. *Jarita Mesa Livestock Grazing Ass'n v. United States Forest Serv.*, 140 F. Supp. 3d 1123, 1180 (D.N.M. 2015); *see also Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1137 (10th Cir. 2006) (noting that in addition to Art. III standing, "[t]he burden to establish prudential standing is on the plaintiff bringing the action").

To redress their (unspecified) injuries from the Service's alleged violations of NEPA, Colorado, Gunnison, and Utah ask the Court to vacate the Critical Habitat Rule, which is the rule identifying those areas that are "essential" or "necessary for the conservation of the species." GUSG198250. To vacate the rule would roll back, not strengthen, environmental protections for the Gunnison sage-grouse.[6] Additionally, vacatur would eliminate all protections for unoccupied critical habitat. Thus, petitioners do not request any relief – such as a remand for a sufficient environmental impact statement – that would be consistent with NEPA's purpose of ensuring that agencies "take a 'hard look' at environmental consequences" to promote fully informed decision-making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989) (citation omitted). Rather, Colorado, Gunnison, and Utah ask this Court to *eliminate* vital environmental protections by vacating the Critical Habitat Rule – in direct contravention of NEPA's purpose.[7] NEPA's purpose cannot be misapplied so as to undermine protections for an imperiled species. Therefore, Petitioners lack prudential standing.

---

[6] Such protections include section 7 of the ESA which protects critical habitat from federal actions that adversely affect it. *See* 16 U.S.C. § 1536(a)(2).

[7] To the extent that Colorado, Gunnison, and Utah claim that their own conservation efforts will provide equivalent protection to that currently provided by the critical habitat designation, the Federal Respondents have already found those efforts to be deficient. Resp't Resp. Br. 41-44, ECF No. 156.

II.     **THE GUNNISON BASIN POPULATION ALONE CANNOT SUSTAIN THE SPECIES.**

Turning to the merits, the Court must reject Colorado's argument that the Gunnison Basin population alone is sufficiently large and stable to warrant elimination of all ESA protections. The Record reflects that the Gunnison Basin population is not as large, stable, or resilient as Colorado claims. Small population size and structure could justify listing the species even in the absence of the other threats the Service identified, contrary to Colorado's cavalier assertions.

a.     **The Gunnison Basin Population Is Not As Large, Stable, Or Resilient As Colorado Claims.**

i.     *The Gunnison Basin Population Is Not As Large Or As Stable As Previously Thought.*

Colorado misconstrues the Service's conclusions in arguing that the Gunnison Basin population is sufficiently large and stable enough to halt the Gunnison sage-grouse's slide toward extinction. The Service stated that the Gunnison Basin population, "while showing variation over the period of record, including drought cycles and harsh winters, has been relatively stable[] based on lek count estimates[.]" Threatened Rule, 79 Fed. Reg. at 69198 (parenthetical omitted). Demographic data, which the Service acknowledged is more reliable than lek count estimates, show the Gunnison Basin population is neither as large nor as stable as lek count-based estimates suggest. *Id*. at 69209, 69288, 69293-94, 69296. Davis (2012) found that "lek count data resulted in extremely high values of population growth that were not realistic based on demographic data for the Gunnison Basin population." *Id*. at 69294. When integrating 16 years of demographic data and lek count data, Davis (2012) found the Gunnison Basin population may be "declining slightly" and "not as large as lek count-based estimates suggest." *Id*. at 69204-05; *see also id*. at 69294. Davis (2014) also found the

population showed "a slight decline since 1996." *Id*. at 69294. The best available science contradicts Colorado's characterization of the facts.

ii.   *The Gunnison Basin Population Is Not As Resilient As Colorado Suggests.*

Colorado touts that the Service described the Gunnison Basin population as resilient, but ignores that the Service qualified this description. In a workshop on June 11-12, 2013, the Service noted that wide fluctuations in Gunnison Basin population numbers had occurred over the last 12 years and that "while the population has bounced back several times following declines, potentially indicating resilience, such declines indicate risk, especially if concurrent with perturbations or stochastic events such as sustained drought." GUSG122124. The Service concluded that as threats increase in the future, the current level of resilience in the Gunnison Basin population may not be enough to offset population declines. Threatened Rule, 79 Fed. Reg. at 69295. In addition, the Service pointed out that Davis (2012) found the population was not as resilient (or stable) as previously thought. *Id*.

**b.  Small Population Size And Structure Is An Adequate Basis For Listing.**

Colorado errs next by arguing that small population size and structure is not a basis for listing the species in the absence of other threats. As a matter of law, this argument is incorrect, since it is well established that the Service may list a species on the basis of a single listing factor. *See In Re Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation*, 794 F. Supp. 2d 65, 72 (D.D.C. 2011) (citing 16 U.S.C. § 1533(a)(1)(A)-(E); 50 C.F.R. § 424.11(c)); *see also Rocky Mountain Wild v. Walsh*, 216 F. Supp. 3d 1234, 1247 (D. Colo. 2016) ("The ultimate question remains, 'Is the species 'threatened' or 'endangered' as those terms are defined in the ESA?'"). As the Service explained in the Threatened Rule, small population size and structure threaten the

species because the satellite populations are likely to be extirpated, which places the entire species in even greater peril. Threatened Rule, 79 Fed. Reg. at 69296.

Colorado attacks the Service's analysis by claiming that the Service should have concluded that small population size and structure is not a threat to the Gunnison Basin population for three main reasons: 1) the Gunnison Basin population is not susceptible to inbreeding depression; 2) the Service inaccurately projected extinction risk because it did not assign enough weight to two population viability assessments (PVAs) from 2005 and instead relied on Davis (2012); and 3) the Service misinterpreted Davis' findings by relying on the conclusions Davis herself drew. These points of disagreement with the Service's assessment of the scientific evidence do not amount to legal error.

        i.   *Gunnison Basin Sage-grouse Numbers Are Insufficient To Stave Off Genetic Risks.*

Colorado claims that because the Gunnison Basin population is not currently so small that inbreeding depression is an immediate risk, it does not warrant ESA listing based on the small population size and structure factor. This argument is deeply flawed: as then-Service Director Dan Ashe pointed out, with a landscape-scale species, "if we wait until we can measure genetic inbreeding, it will be way too late." GUSG141566.

Further, the Service's analysis also suggests that neither the Gunnison Basin population nor the species as a whole is large enough to avoid genetic risks. Rather, the maintenance of Gunnison sage-grouse genetic fitness requires an "effective population size" of 500, which translates to 5,000 individuals. Threatened Rule, 79 Fed. Reg. at 69290. Once a species' effective population size falls below 5,000 individuals, loss of genetic diversity increases, which causes inbreeding and loss of adaptive potential, making the population, and in turn the species, more vulnerable to extinction. *Id*. But the entire Gunnison sage-grouse population, let alone the Gunnison Basin population,

already falls below 5,000 birds. In 2014, the Gunnison Basin population was only 3,978 birds, and the entire species comprised 4,705 birds – both below the minimum number of 5,000 individuals. *Id*. at 69196. The loss of the satellite populations would sacrifice 24 percent of the species' remaining genetic diversity. *Id*. at 69296; *see id*. at 69289.

ii.   *The Service Properly Considered The Available PVAs.*

Colorado's claim that the Service misinterpreted the available PVAs also fails because the Record shows that the Service carefully considered each PVA, explained why it identified Davis' studies as the best available science, and relied on the conclusions that Davis drew herself. The ESA requires no more.

The ESA's "best available science" standard "prohibits [the Service] from disregarding available scientific evidence that is in some way better than the evidence it relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (citations and alterations omitted). Even if the available scientific and commercial data are "quite inconclusive" the Secretary "may—indeed must—still rely on it." *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000). "That a model is imperfect is not, in itself, a reason to remand agency decisions based upon it." *In Re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litigation*, 709 F.3d 1, 13 (D.C. Cir. 2013).

Here, the Record shows the Service reasonably determined that the older PVAs were less reliable than Davis' newer studies, and therefore was required to rely on the Davis studies. *See* Threatened Rule, 79 Fed. Reg. at 69294; *Sw. Ctr. for Biological Diversity*, 215 F.3d at 60 (noting that "the Secretary's decision must be made solely on the basis of the best scientific and commercial data available to him") (quotation marks omitted). The earliest population viability analysis for Colorado's Rangewide Conservation Plan, prepared in 2005, predicted a low risk of extinction over the next 50

years for those satellite populations with more than 500 birds; since 2005, however, two of the larger satellite populations have declined "to a point that their survival and long-term viability is at risk." Threatened Rule, 79 Fed. Reg. at 69294. In addition, the analysis combined both Gunnison and greater sage-grouse demographic data and did not account for environmental variation. *Id*. Garton (2005) had similar limitations, especially since that study relied on old lek-count data to predict robust satellite populations of Gunnison sage grouse while newer data shows that these populations are hurtling toward extirpation. *Id*. The Service explained that an additional nine years of lek count data have become available since Garton (2005), and his study relied exclusively on lek count-based population estimates and trends without considering demographic or environmental factors, or stochastity. *Id*. Contrary to Colorado's arguments, the Service also acknowledged the limitations of Davis (2012). *Contrast* Colo. Op. Br. 29, 32–35, ECF No. 143 (claiming Service ignored Davis study's limitations) *with* Threatened Rule, 79 Fed. Reg. at 69292-94 (discussing limitations). The Service nevertheless identified the study as the best available scientific information because it is "the longest and most current demographic study and population viability analysis for Gunnison sage-grouse." *Id*. at 69296.

The Service was not required to extrapolate from Davis' findings, as Colorado contends, a best-case scenario under which Gunnison sage-grouse might persist indefinitely. *See Sw. Ctr. for Biological Diversity*, 215 F.3d at 60 ("[T]he Secretary has no obligation to conduct independent studies."). Instead, it was entitled to rely on the study's findings: that the Gunnison Basin population, and species, faced a minimum extinction time of 31 years and a mean, or expected, extinction time of 58 years. GUSG41539, GUSG41588; *see also* Threatened Rule, 79 Fed. Reg. at 69293-95. Davis (2012) found that the second largest population, the San Miguel population, had a

significant probability of extinction within the next 30 years, and the Service concluded that the smaller satellite populations would likely be extirpated even sooner. *Id*. at 69295. Even adding a year of growth in the Gunnison Basin population, Davis' model still anticipated that population would be extirpated in a minimum of 41 years. GUSG41539. The Service was required to rely on these predictions, as they are the best available science. 16 U.S.C. § 1533(b)(1)(A).

Indeed, because Davis (2012) anticipated extinction within the 40 to 60-year foreseeable future the Service identified, the Gunnison sage-grouse falls squarely within the ESA's definition of an endangered species. A species is "endangered" if it "is in danger of *extinction* throughout all or a significant portion of its range"; a species is "threatened" if it is "likely to become an *endangered* species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20) (emphasis added). The "danger level for extinction" is highly fact-specific, and "necessarily depends on the applicable scientific viability assessments for the particular species." *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 948 (D. Or. 2007); *see also In re Polar Bear*, 794 F. Supp. 2d at 89-90. As little as a one to five percent chance of extinction in 100 years is enough to warrant threatened status. *See Ctr. for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223, 1232 (W.D. Wash. 2003), *vacated as moot*, 511 F.3d 960 (9th Cir. 2007).

Instead of listing the species as endangered based on these extinction projections, however, the Service reasoned that the species would only be in danger of extinction if one or more of the satellite populations were extirpated, as is expected within 30 years. Threatened Rule, 79 Fed. Reg. at 69303-05. This reluctant approach to listing follows Secretary Salazar's direction to avoid an endangered listing by adopting a threatened listing instead. Given the record showing that the species actually qualifies

for endangered listing, the Court may not jettison the less protective threatened listing that the Service ultimately adopted.

## III.   THE SERVICE WAS NOT REQUIRED TO DESIGNATE ONLY OCCUPIED AREAS AS CRITICAL HABITAT.

### a.  Unoccupied Habitat Is Essential To the Species' Recovery.

Intervenor the State of Utah and *amici* err in arguing that the Service lacks authority to designate currently unoccupied habitat as critical habitat. *See* UT Op. Br. 6-10, ECF No. 148; Markle Br. 2-10, ECF No. 151. Neither Utah nor *amici* cite to a single majority opinion supporting their argument—to the contrary, courts have soundly and consistently rejected their argument as inconsistent with the plain language and structure of the ESA.

The ESA plainly defines critical habitat to include "specific areas *outside* the geographical area occupied by the species at the time it is listed … upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii) (emphasis added). "Conservation" means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id*. § 1532(3). "Critical habitat is thus defined and designated in relation to areas necessary for the conservation of the species, not merely to ensure its survival." *All. for the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1138 (D. Mont. 2010) (internal quotation marks and citation omitted); *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) (the Service may not ignore the recovery goal of critical habitat).

In *Markle Interests L.L.C.*, Markle contended that the Service erred by designating ephemeral ponds on private land as unoccupied habitat when, Markle

claimed, the ponds were not habitable by the frog nor likely to support it within the foreseeable future. 827 F.3d at 467. The Fifth Circuit rejected that claim because requiring unoccupied habitat to be habitable would conflate the standard for designating unoccupied habitat with the one for designating occupied habitat. *Id.* at 468. In addition, the court noted, the Service had adequately supported inclusion of the ephemeral ponds as essential to the frog's conservation by using mapping and modeling to find areas within the frog's range that were adequately connected with other critical habitat areas, to allow for gene flow between breeding sites and expanding the species' meta-population structure. *Id.* at 466-67.

Utah and the *amici* parties attempt to make these same arguments here, even though the Fifth Circuit explicitly rejected them in *Markle Interests*. Utah claims that because the unoccupied areas are not currently habitable by the species, and will not be habitable without "extensive" manipulation, which private landowners may elect not to allow, the Service erred in finding them essential. But as the Fifth Circuit already explained, to require unoccupied critical habitat to be habitable would conflate the standard for designating unoccupied habitat with the one for designating occupied habitat. *Id.* at 468. Moreover, if unwillingness to be stewards in species conservation could preclude designation of private land as unoccupied critical habitat, then private landowners could trump the Service's scientific finding of essentiality simply by being unwilling to allow habitat to become habitable or to take part in conservation. *Id.* at 470. This would effectively amount to an exemption for private landowners from unoccupied critical habitat designations, but such an exemption contravenes the plain language and purpose of the ESA and would undermine the Service's finding that private lands are essential to a species' conservation. *Id.*

Here, as in *Markle*, the Record also shows that these lands can serve as habitat, and are essential to the species' recovery.[8] The Service analyzed habitat cover type and connectivity to occupied habitat to identify unoccupied critical habitat. CH Rule, 79 Fed. Reg. at 69336-37. Moreover, it is untenable to argue that the mere seven percent of the species' historic range that it still occupies is sufficient for its recovery, and the Service's own scientists expressed doubt as to whether the 12 percent of its historic range that the Service designated as critical habitat is enough. *See* GUSG121894; GUSG125820; GUSG194076. Where a species is restricted to such a tiny fraction of its historic range, a determination that additional habitat is essential to its recovery is wholly appropriate and mandated as the best available science. *See Aina Nui Corp. v. Jewell*, 52 F. Supp. 3d 1110, 1128-29 (D. Hawaii 2014) (upholding finding that current occupied areas were not sufficient for conservation of several plant species).

### b. The Service's Decision To Evaluate Two Alternatives Does Not Amount To Predetermination Of NEPA Outcome.

Utah next complains that the Service declined to adopt Utah's preferred alternatives for designating critical habitat. But, as noted by Federal Defendants, "NEPA requires only that an [environmental assessment] 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1119 (D. Colo. 2012), *aff'd sub nom. WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015) (quoting 42 U.S.C. § 4332(E)). Given the ESA's requirement that critical habitat must help to ensure the survival and recovery of the Gunnison sage-grouse, the range of alternatives considered in the Environmental Assessment (EA) was adequate.

---

[8] Colorado's own range-wide conservation plan identifies these very lands as potential habitat. CH Rule, 79 Fed. Reg. at 69319.

Additionally, the record belies the argument that the outcome of the EA and Finding of No Significant Impact was "predetermined," or the argument that Federal Defendants failed to take a sufficiently "hard look" at the environmental impacts associated with critical habitat designation.

Courts in the Tenth Circuit apply a "rule of reason" to determine whether the agency sufficiently analyzed a range of alternatives. *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 709 (10th Cir. 2009); *see also WildEarth Guardians v. United States BLM*, 870 F.3d 1222, 1233 (10th Cir. 2017). Which alternatives are "reasonable" is controlled by the agency's statement of purpose and need for the action at issue. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011) ("[O]nce an agency establishes the objective of the proposed action…the agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not reasonable[.]") (internal quotation marks and citations omitted).

The Service analyzed a reasonable range of alternatives to fulfill the ESA's mandate that critical habitat be designated for the conservation, *i.e.*, for the survival and recovery, of the Gunnison sage-grouse. GUSG198242-43, GUSG198254; *see also Lyder*, 728 F. Supp. 2d at 1137–38 (the Service must designate habitat not only for a species' survival, but also to "promote the conservation of the species"). Utah's preferred alternatives were not reasonable because they would not have achieved the Service's purpose and need and therefore the Service was not obliged to consider them.

Furthermore, the record contradicts Utah's assertion that the Service predetermined the outcome of its NEPA process. While the draft EA analyzed the designation of 1,704,227 acres of critical habitat, the final EA analyzed and proposed

designating only 1,429,551 acres as critical habitat. GUSG198256. Far from showing that the Service "irreversibly and irretrievably commit[ed] itself to a plan of action," *Forest Guardians v. United States Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010), the Service clearly altered course and reduced the size of the final designation.

## IV.     THE COURT SHOULD NOT VACATE EITHER RULE.

Finally, the Court must reject the states' and counties' requests that it vacate and set aside either the Threatened or Critical Habitat Rules. As explained in more detail in Guardians/Braun's opening brief, Guardians Op. Br. 37-39, ECF No. 142, even if the Court were to conclude the Service erred either procedurally or substantively, the proper remedy would be to remand for further agency proceedings while leaving the Threatened and Critical Habitat rules in place, given the imperiled status of the Gunnison sage-grouse and the policies and commands of the ESA. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (listing rule should remain in place during remand); *Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1240-43 (D. Colo. 2011) (considering purpose of ESA in fashioning equitable relief).

## CONCLUSION

For the foregoing reasons, and those explained in the Service's response brief (ECF No. 156), the Court should dismiss the States' and Counties' petitions and deny their requests to vacate the Threatened and/or Critical Habitat rules.

Respectfully submitted this 20th day of November, 2017.

Talasi Brooks<br>
Talasi Brooks<br>
Todd C. Tucci<br>
Laird J. Lucas

Advocates for the West
P.O. Box 1612
Boise ID 83701
(208) 342-7024
tbrooks@advocateswest.org
ttucci@advocateswest.org
llucas@advocateswest.org
tbrooks@advocateswest.org

Attorneys for Petitioners WildEarth
Guardians and Dr. Clait E. Braun

Amy Rae Atwood
Center for Biological Diversity-Portland
P.O. Box 11374
Portland, OR 97211
(503) 283-5474
Fax: (503) 283-5528
atwood@biologicaldiversity.org

Ryan Adair Shannon
Center for Biological Diversity-Portland
P.O. Box 11374
Portland, OR 97211
(503) 283-5474
Fax: (503) 283-5528
rshannon@biologicaldiversity.org

William Stewart Eubanks, II
Meyer Glitzenstein & Eubanks, LLP
3206 Norwood Court
Fort Collins, CO 80524
(970) 703-6060
Fax: (202) 588-5049
beubanks@meyerglitz.com

Kevin Lynch
University of Denver
Sturm College of Law
2255 East Evans Avenue
Suite 335
Denver, CO 80208-0632
(303) 871-7870
Fax: (303) 871-6847

klynch@law.du.edu

Attorneys for Petitioners Center for
Biological Diversity and Western
Watersheds Project

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

For Federal Defendants:

Joanna Kathryn Brinkman
Joanna.brinkman@usdoj.gov

Mary Elisabeth Hollingsworth
Mary.Hollingsworth@usdoj.gov

Rickey Doyle Turner
Rickey.turner@usdoj.gov

For the State of Utah:

Brittany Lynn Wilson
brittanywilson@utah.gov

David Halverson
dhalverson@utah.gov

Kathy A.F. Davis
kathydavis@utah.gov

For Gunnison County:

Bennett W. Raley
bwraley@mac.com

For Gunnison County Commissioners:

David Baumgarten
Dbaumgarten@gunnisoncounty.org

For Gunnison County Stockgrowers:

Deborah Lynn Freeman
dfreeman@troutlaw.com

Bennett W. Raley

bwraley@mac.com

For the State of Colorado:

Frederick Richard Yarger
Fred.yarger@coag.gov

Lisa Reynolds
Lisa.reynolds@coag.gov

/s/Talasi B. Brooks
Talasi B. Brooks
Advocates for the West
P.O. Box 1612
Boise ID 83701
Ph: (208)342-7024
Email: tbrooks@advocateswest.org

Attorney for Petitioners WildEarth
Guardians and Dr. Clait E. Braun